UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
ROCKLAND VENDING CORP.,
KEN GALLAGHER,

                         Plaintiffs,

      v.

ROXANNE CREEN, sued in her
individual capacity, MARSHA F. RILEY,
sued in her individual capacity,
STEWART KIDDER, sued in his
individual capacity,

                         Defendants.
------------------------------------------------------x

07 CIV 6268 (KMK)(MDF)

**Memorandum of Law
in Opposition to Defendants'
Motion for Summary
Judgment**

## INTRODUCTION

      Having been granted to leave to file a motion for summary judgment on the grounds of

qualified immunity, defendants claim that their egregious conduct violated neither plaintiff's

clearly established rights.  Simply stated, defendants did not merely "breach a contract"; they

confiscated plaintiff RV's property with no colorable warrant and detained one of its employees,

co-plaintiff, Gallagher, without any basis in law and in violation of the Fourth Amendment.  Nor

is the defendants' account of their actions remotely credible, requiring denial of this motion on

all grounds and the setting of a trial date.

## STATEMENT OF FACTS [1]

---

[1] The facts are fully set forth in plaintiffs' counter Rule 56.1 Statement.   These facts are incorporated by reference herein and the Statement of Facts is an abbreviated version of that presentation.  To the extent deserving of direct response, in this memorandum of law, defendants' contrary version of facts is dealt with through footnotes.

Plaintiff, Rockland Vending Corp., is a corporation organized to do business in the State of New York and conducting business within this judicial district. Plaintiff, Ken Gallagher, is an employee of Rockland Vending Company.[2] Defendant Roxanne Creen is Chief Steward of the Shawangunk Correctional Facility [hereinafter "CF"], County of Ulster, and, as relevant to this matter, has conducted business within this judicial district. Defendant Marsha Riley is Chief Steward of the Lincoln CF in New York City. Defendant Stewart Kidder is Chief of DOCS' Division of Support Operations, an employee of the New York State Department of Correctional Services [hereinafter "DOCS"]. His office is in Albany, and, by dint of his duties and state-wide responsibilities, he has connections sufficient with this district for it to assume jurisdiction over him for these purposes.

All defendants are sued for actions taken under color of state law and for actions which plaintiff contends are outside the scope of their assigned duties.

As plaintiff alleges that defendants violated certain rights provided him by the First and Fourteenth Amendments to the United States Constitution, this Honorable Court has jurisdiction pursuant to 28 U.S.C. sec. 1331, 1343 (3) & (4) and 42 U.S.C. secs. 1983 and 1988.

(a) **Background**

Plaintiff RV provides and services vending machines to customers. Amongst plaintiff's customers in March 2007 were ten correctional facilities operated by the New York State Department of Correctional Services.

Plaintiff was chosen to provide vending services through a process of competitive bidding. Plaintiff RV then signed contracts to provide the needed vending services with each

---

[2] Defendants identify Mr. Gallagher as "Michael".

correctional facility.

Contrary to defendant's Kidder claims, he and his assistant, Nan Ferri, were intimately involved in the decisions made here, encouraged and directed those decisions adverse to the plaintiffs. Defendant facility stewards did not act on their own, but, rather sought [and were provided] direction, guidance and advice from Kidder and Ferri. [3]

### (b) Shawangunk CF

Specifically, effective February 1, 2003, plaintiff entered a contract to provide vending services at the Shawangunk C.F. Under that three year contract, plaintiff received "the exclusive right to install, operate and service the automated vending machines dispensing of food, beverages, snacks, candy, etc. at designated locations" at the facility. The contract required the contractor/plaintiff to replenish the machines five times a week.

The contract also required the facility to take normal and expected precautions to safeguard the vending machines and equipment and passed the risk of any loss or theft to

---

[3] The most probative testimony in this regarded is provided by Glassanos. He reported that, several months before any punitive action was taken against the plaintiff RV, Ferri, contacted him and reported two different issues: first, RV was allegedly stocking vending machines with "illegal" bottles - this went nowhere - and second, that several facilities were reporting to her and Kidder that RV was late on commissions. He claims that he asked her to survey the facilities and get more concrete information on the nature of the problem. She then required the facility stewards to respond to five questions sent in memorandum form on March 7, 2007. Glassanos stated that Ferri then summarized this information about RV in an e-mail which she sent to him and that HE then suggested the self-help action with Ferri, Kidder and Creen. He claims this action was in the discussion stage for several months and denies that the first time it was discussed was May 8, as Kidder and Ferri and Creen all claimed. Other record evidence belies the notion that Support Operations was not critical to the decisions made here: one steward sought the written approval of Kidder/Ferri before advising plaintiff RV that it was terminating its contract. Creen, from Shawangunk, repeatedly copied Ferri with routine correspondence to RV about its late commission payments. The conduct of the stewards themselves calls into serious doubt Kidder and Ferri's claims that they had nothing to do with administration of the vending contracts.

plaintiff.   Under the agreement, plaintiff was required to pay the facility 15% of total gross sales and a monthly space rental fee by the 10th of the following month.

Apart from providing and serving vending machines covered by the contract, plaintiff was also responsible for paying "commissions" to each correctional facility based upon sales from each machine.

None of the contracts allowed the defendants to engage in self-help tactics of the sort alleged herein to settle disputes as to sums owed/not owed by plaintiff.

In February 2007, Creen extended plaintiff's contract for a final year.  At the time of this extension, Creen was complaining that RV was delinquent in commission payments every month.

The same month, through its President, Michael Freed, RV advised defendant Creen that substantial quantities of goods were being pilfered from two refrigerated vending machines at Shawangunk C.F. and requested assistance in stopping  practices which were responsible for losses estimated at between $250/400/week. [4]   Defendant Creen ignored Freed's request for assistance.

One week after notifying Creen of this issue, Freed again wrote her providing more exact figures, showing loss through theft of product of about $1,500 during the prior four weeks, or upwards of 200 food items out of the plaintiff's food machines every week. Again, Creen took no action and ignored plaintiff's concern.  **See,** Exhibit 23 to Sussman Affirmation for Freed Affidavit and attachments thereto.

On May 9, 2007, a Wednesday, RV dispatched co-plaintiff, Ken Gallagher, a driver

---

[4] This is much higher than the monthly commissions which RV owed Shawangunk.

within its employ, to re-fill seven vending machines in the visiting room at Shawangunk C.F.

As of this date, plaintiff remained behind in making monthly commission payments to

Shawangunk C.F.   As of this date, defendant Creen had not notified plaintiff that its services

were either suspended or terminated because of any delinquency in paying monthly commissions.

　　　Upon his arrival at the facility, defendant Creen escorted Gallagher to the visiting room.

Once Gallagher was in the otherwise empty visiting room, which is behind three sets of locked

gates deep within the correctional facility, defendant Creen and her staff detained him and

demanded that he open each vending machine and give them all the money in the machines. See,

Exhibit U to Schultze Affirmation.  Gallagher protested that he lacked any authority to give

defendant Creen and her staff any of these monies and explained that he was responsible for

collecting the funds and returning them to RV's headquarters.  Defendant Creen refused to allow

Gallagher to call RV's office or to speak with Freed and demanded that he provide her and her

attending staff, as he then did, all the collected funds.  Defendant Creen detained plaintiff's

employee for approximately two hours while she and her staff supervised his counting of all the

proceeds from the vending machines.

　　　Gallagher explained that he provided the funds because he was afraid that, if he did not,

he would remain detained.  He was never offered the option of leaving the facility.  He did not

ask to make a phone call because there were no available phones.

　　　This detention was entirely contrary to any advice Creen received from George

Glassanos, Deputy Counsel at DOCS, who claimed that he had advised Creen that, "upon his

arrival" at the facility, not after passing through three secured gates, RV's representative should

be given the option of accessing the facility to retrieve monies which would then be given over to

Creen or of simply not entering the facility.  Glassanos admitted at deposition that Creen did not follow this direction when she reported first advising Gallagher of her plan to take RV's funds after he passed three sets of security gates and entered into the visitor's room. [5]

On May 11, 2007, two days after engaging in the conduct described above and after learning that Freed had complained to the State Police about her behavior, defendant Creen terminated plaintiff's vending contract at Shawangunk C.F.  In a sworn affidavit filed in July 2007, Ferri claimed that the termination was for "non-payment" of commissions.  See, Exhibit I, para. 9, p. 3.  At deposition, Creen testified that this termination resulted from RV's failure, after May 9, 2007, to service her facility.  Freed has explained that that failure derived from the repeated threats of similar treatment should RV send another driver back to Shawangunk.  Mrs. Freed and Gallagher confirmed that Creen made these threats to both of them on May 9.

On or about May 11, defendant Creen demanded disputed commissions and announced that plaintiff's machines were deemed impounded until payment was received.  See, Exhibit T to Schultze Affirmation.

On May 28, 2007, counsel for plaintiffs wrote the Attorney General requesting an investigation of the self-help engaged in by defendants.  See, Exhibit 20 to Sussman Affirmation. On June 13, 2007, Creen claimed that plaintiffs had not responded to her May 11 letter and noticed her intent to treat the vending machines as abandoned property if plaintiff did not pay sums she claimed were owed.  See, Exhibit 21 to Sussman Affirmation.

The value of the vending machines being illegally held hostage at Shawangunk C.F. by

---

[5]  Glassanos claimed that he reviewed some of the contract between Shawangunk and RV before rendering legal advice.  The record shows that five days after the self-help was staged, Creen forwarded a copy of the contract to Glassanos.  See, Exhibit 22 to Sussman Affirmation.

defendant Creen was approximately $60,000.

© **Plaintiff's Protest of Defendant Creen's Conduct**

The day defendant Creen detained its employee, through its President, Michael Freed, RV protested her illegal conduct to the state police. That agency refused to intervene, telling Freed that this was a "civil," not a criminal, matter. DOCS learned of this complaint both through its general counsel's office and the arrival of an investigation at the Shawangunk facility.

In addition to complaining to the State Police, through counsel, plaintiff RV also sought redress from the Department of Correctional Services and the New York State Attorney General's Office. No redress was forthcoming from either office.

(d) **Subsequent Events at Other Correctional Facilities**

As a direct consequence of Freed's requests for assistance from the New York State police and its exercise of the right to petition the government to investigate its grievances, RV was advised that its contracts for vending services were being cancelled or non-renewed at Shawangunk [May 11], Eastern and Ulster [June 8] and Coxsackie CF [June 12]. RV was disallowed from retrieving his vending equipment from Lincoln CF in late May 2007 and needed an order from this Court to gain access to that facility.

(i) **Coxsackie CF**

At Coxsackie CF, upon the direction of defendant Kidder, plaintiff was [1] directed to remove his vending machines and then [2] disallowed from removing one machine because of a dispute concerning payment of commission. In effect, at defendant Kidder's direction, said machine was held as ransom pending resolution of a dispute concerning payment.

Such conduct is highly irregular and not contemplated by the contract between DOCS and

plaintiff. Kidder approved this conduct in retaliation for plaintiff's complaint about the treatment it received at Shawangunk earlier that same month.

### (ii) Eastern and Ulster CFs

At Eastern and Ulster CFs, the steward recommended to defendant Kidder that plaintiff's contract be extended. Indeed, during the week of June 4, 2007, the business officer responsible for these facilities advised plaintiff that she was pleased with its service and extending its contract one year. However, on or about June 11, 2007, Freed saw an announcement in the New York State Contract Reporter advertising for this contract.

Freed contacted the business officer who told her that she was forced by Albany to put the contract out for bid and accused by Albany of being part of Freed's family because of how hard she fought for the extension of RV's contract.

Plaintiff was not late in payment of commissions to either Eastern or Ulster C.F. And, plaintiff's service to both facilities was excellent and DOCS never sent a notice of termination or suspension of service with regard to service plaintiff provided at either facility.

### (iii) Lincoln CF

At the Lincoln Facility, before the incident of May 9, 2007 at Shawangunk, defendant Riley demanded that plaintiff remove its vending machines by May 30, 2007, claiming falsely that it owed commission from March 31 through the end of May 2007. Plaintiff sought to meet with Riley to correct her mis-information. But, after agreeing to meet, after the Shawangunk incident, she refused to see plaintiff's CEO and told him she had to time to meet with him. Then, after plaintiff made arrangements to remove its machines, on May 29, 2007, defendant Riley refused to permit plaintiff to remove its vending machines unless it paid via certified check or

money order the disputed sum she demanded.

On May 30, plaintiff dispatched a driver to the Lincoln CF, but he again was prevented from entering the facility to fill the vending machines, to take plaintiff's funds from the machine or to remove the machines from the facility.

The failure to allow plaintiff to recover its machines caused business loss and was arbitrary, capricious and retaliatory.

    (e)  **Defendants' Failure to Provide Notice of Deficiency**

At no time has plaintiff failed or refused to perform any of the "work" in accordance with the contracts awarded to it by the Department of Correctional Services.   Before engaging in the self-help described above, only the Lincoln Facility had sent plaintiff a Notice of Termination as contemplated by the Invitation for Bids.  None of the DOCS' facilities ordered RV to suspend performance of all or any part of the work for any period of time.

    (f)  **Impact of Challenged Conduct**

Termination of vending contracts at Shawangunk, Coxsackie,  Eastern & Ulster CF decreased plaintiff's annual gross sales by about $500,000 or 20% and cause plaintiff irreparable financial harm.  Such sudden business loss, absent judicial intervention, has now caused plaintiff to proceed into Chapter 11 status.  Finally, defendants' failure to allow plaintiff timely to retrieve his vending machines has, and shall continue, to impede his capacity to cover the substantial economic losses which stem from their wrongful conduct.

## <u>PLAINTIFFS' LEGAL CLAIMS</u>

Upon these facts, plaintiff RV claims that defendants [a] seized its property with premeditation and without any pre-deprivation proceeding in an intentional, not random, manner,

denying plaintiff's right to due process of law as protected by the Fourteenth Amendment and [2] then retaliated against it for the complaints made to the State Police and public officers concerning the illegal seizure of its employee and its assets and, in so doing, violated the First Amendment to the United States Constitution, as made actionable against them pursuant to 42 U.S.C. sec. 1983.  Gallagher alleges that he was unjustly seized and detained in violation of the Fourth Amendment to the Constitution.

Plaintiff sought, **inter alia**, to temporarily, preliminarily and permanently enjoin defendants and those acting in concert with them, their agents and successors from maintaining control and possession of plaintiff's vending machines and  from breaking contracts with plaintiff absent compliance with the terms of said contracts or from failing to renew said contracts in retaliation for plaintiff's reporting of illegal acts on the part of defendant Creen to the New York State Police or public offices charged with investigating such matters.

Upon said application, DOCS agreed to release all of plaintiff RV's machines, wherever held.

## LEGAL ARGUMENT

This is a motion premised on qualified immunity.  Defendants contend that accepting the facts taken most favorably to plaintiffs, they did not violate clearly established legal rights. However, upon the facts taken most favorably to plaintiffs, this Court should deny that motion as defendants violated plainly established legal norms.

### A. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.

<u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-50 (1986). A fact is material if, based upon it, a reasonable jury could find in favor of the non-moving party. <u>Anderson</u>, 477 U.S. at 248. The burden rests upon the movant to demonstrate the absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The district court is not to decide issues of material fact, but to discern whether any exist. <u>Gallo v. Prudential Servs., L.P.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

In deciding a motion for summary judgment, a district court resolves all ambiguities and draws all permissible inferences against the movant. <i>See</i>, <u>Anderson</u>, 477 U.S. at 255. Where, as here, a party's intent is a material issue, a district court may grant summary judgment, but must be cautious not to decide issues of credibility which bear on intent. <u>Gallo</u>, <u>supra.</u>

### B.  <u>GALLAGHER WAS HELD AGAINST HIS WILL</u>

Taking the facts most favorably to Gallagher, he was brought into the visiting room of the Shawangunk CF by defendant Creen and held against his will until he agreed to surrender RV's proceeds. He was behind three sets of locked and secure gates, given no choice, disallowed from making a phone call to anyone and given to believe by the totality of the circumstances that he would be held until he agreed to give up RV's funds.

Plainly, Gallagher meets all of the elements of false imprisonment: he was confined, as was defendant Creen's intent, he was quite conscious of his confinement, he did not consent to the confinement and it was not otherwise privileged. <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 118 (2d Cir. 1995).

Defendant Creen makes lame and fact-intensive arguments. Contrary to Glassanos' testimony, he had advised Creen "upon [Gallagher's] arrival at the facility to give him the choice

of entering and providing the funds to her or not entering the facility. Creen did not abide by that advice, but, knowingly brought Gallagher beyond three security stations and then demanded that he disgorge to her the funds in the vending machines.

In light of his actual circumstances, Mr. Gallagher had much more than "a vague feeling" that he was not free to leave if he did not comply. He argued for between 20–30 minutes with Creen before he even touched a vending machine and made clear he did not have the authority to give her the monies she demanded. At no time, as she had been advised to do, did Creen offer Gallagher any opportunity to leave. Had she followed the advice provided by Glassanos and, "upon arrival," presented options to Gallagher, no false imprisonment/arrest claim would lie. But, Creen willfully violated these suggestions and her report is quite clear [despite her later denials] that she brought Gallagher to the visitors' room and **then** advised him of her scheme.

The cases which defendants cite are all distinguishable: Cellemare v. Millbank, Tweed, Hadley & McCloy, LLP, 2003 U.S. Dist. LEXIS 22236 at *24-25 (S.D.N.Y. December 2, 2003) and Lee v. Bankers Trust Co., 1998 U.S. Dist. LEXIS 2784 at **13-15 (S.D.N.Y. March 11, 1998) both arose from lengthy employer/employee interviews. Plaintiffs' false imprisonment claims foundered on the established proposition that a lengthy interview of an employee by an employer , without more, does not support a claim for false imprisonment. Of course, Mr. Gallagher's employer did not summon him into a correctional facility and make demands of him once he was behind three locked gates. Even less apt is Bower v. Weisman, 639 F.Supp. 532, 40-41 (S.D.N.Y. 1986), where the district court found the facts set forth in the complaint in clear contradiction of this cause of action. The plaintiff left her home at will and unrestrained and could not credibly plead a false imprisonment claim. Gallagher was locked in a correctional

facility and it is plainly a fact issue as to whether he was or was not falsely imprisoned. The Court cannot reasonably dismiss this claim as a matter of law.

### C. <u>DEFENDANTS TRAMMELED PLAINTIFF RV'S DUE PROCESS RIGHTS</u>

A reasonable jury could conclude that defendants Creen, Riley and Kidder engaged in a planned and pre-meditated effort, without any due process, to take and appropriate plaintiff RV's property. While the contract which RV signed with each correctional facility provided for termination for convenience and for cause and also allowed the suspension of a vendor, defendants initiated no legal claims against RV.

As DOCS own counsel conceded, "set off" is an equitable principle which recognizes a party's right to gain credit in one transaction for monies owed arising from another. Set off has nothing to do with self help and self help is not authorized, in any form, in the contract signed by the parties.

Plaintiff RV is not alleging a mere breach of contract. It is alleging that, without due process, defendants simply confiscated its machines, product and funds with no notice, no opportunity to be heard and no process. Defendants offer no coherent response to this claim.

No provision of the contract remotely contemplated a blatant denial of fair play and attempting to hide behind some non-extant contract interpretation will not save defendants. As noted above, Glassanos had not even read or considered the contract RV entered with Shawangunk when rendering whatever advice he did. He received the contract five days after the botched "self-help" for which he takes credit. Yet, that self-help depended on the consent of the vendor and no such consent was attained for any of the self-help in which Kidder, her assistant

Ferri and Creen engaged.

        None of the cases which defendants cite remotely resemble this fact pattern: here, defendants confiscated plaintiff's money and property without any due process, though the planning for the self-help at Shawangunk and the refusal to allow plaintiff retrieve its property at Lincoln were long in planning.  In Costello v. Town of Fairfield, 811 F.2d 782 (2d Cir. 1987), the Court of Appeals held that where a party claims a contractually based-entitlement, which is disputed by the other party, and has a facially viable grievance procedure through the collective bargaining agreement to resolve the dispute, use of the latter procedure provides due process, mooting a Fourteenth Amendment claim.  This set of principles has no applicability here where the essential claim is not plaintiff's desire to obtain some entitlement, but, rather, defendants' intentional infringement on settled property interests, i.e., ownership of the vending machines, the contents thereof, including the proceeds of prior sales.  More relevant is Justice van Graafeiland's concurrence which explains the inadequacy of post-deprivation relief where, as here, "the property interest at stake" is not small by any measure and the deprivation was not the result of some "routine calculation of benefits," but rather of months of planning.  Id. at 786.

        In TM Park Avenue Associates v. Pataki, 214 F.3d 344 (2d Cir. 2000),  the Court of Appeals vacated a district court decision which held that the State of New York had violated the Contract Clause of the United States Constitution. Finding that the same parties were litigating a breach of contract claim arising from the same transaction, the Second Circuit panel employed the oft-stated principle that federal courts ought not pass on questions of constitutionality unless such adjudication is unavoidable.  Since the pending state-court litigation would likely resolve the dispute between the parties, the Court deemed it unnecessary to apply a contract clause

analysis which, it reasoned, depended on the unavailability of a remedy in damages. Again, this case has no applicability here where the State defendants are accused not of breaching a contract, but of depriving plaintiff RV of its property, i.e., use of vending machines and their contents, including funds, without due process of law. Such deprivations are not contemplated by any extant contract and represent action undertaken under color of state law but <u>dehors</u> the bounds of any contract. In such an instance, a "breach of contract" remedy is non-responsive to the due process violation.

Finally, defendants cite <u>Hellenic American Neighborhood Action Committee v. City of New York</u>, 101 F.3d 877 (2nd Cir. 1996)(hereinafter referred to as "HNAC") as closely related and apposite precedent. Again, this analysis fails. Inarguably, the Mayor had the authority to terminate plaintiff's extant contracts with thirty days notice. He did so. Likewise, in light of ongoing investigations of its conduct, another city agency found plaintiff non-responsible for a new contract. Plaintiff initiated an unsuccessful Article 78 proceeding challenging only the termination of its contracts before completion of a dispute resolution process which Supreme Court deemed inapplicable. Five days later, plaintiff initiated a federal lawsuit challenging the de facto debarment from any city contracts pending resolution of existing investigations and seeking redress for alleged deprivation of its liberty interest. After the district court held that the de facto disbarment and infringement on plaintiff's good name without due process was sufficient grounds for preliminary relief, the Court of Appeals reversed, holding that no pre-deprivation hearing was possible because of the nature of the challenged acts [characterized as random, unauthorized acts] and that Article 78 provided an adequate post-deprivation remedy.

Here, as noted above, according to Glassanos, discussion of "self-help" proceeded for

between four and six weeks before May 9, 2007.  Moreover, the complained of action was not random and unauthorized, but allegedly chosen by the named defendants with the advice of counsel.

Rather than initiating available remedies in light of alleged non-compliance by RV with its obligations and despite ample opportunity to provide pre-deprivation remedies, defendants simply trammeled settled property interests.  In this light, <u>HNAC</u> is inapposite and defendants can be held responsible for their failure to afford available due process before depriving plaintiff of its property rights.  While defendants in HNAC used contractual remedies against HNAC, here, defendants employed an unfathomable form of self help which finds no contractual support and was intended to teach the plaintiff a lesson, according to Creen.

> ### D.  A REASONABLE JURY COULD CONCLUDE THAT KIDDER AND RILEY VIOLATED PLAINTIFF RV'S FIRST AMENDMENT <u>RIGHTS</u>

Defendants do not disclaim that plaintiff RV and its president, Freed,  engaged in constitutionally protected speech.  Instead, they argue that [a] plaintiff's speech was not chilled; [b] the Lincoln contract was ended long before plaintiff engaged in any protected speech; [c] the Shawangunk contract was ended due to lack of performance, not any speech act; [d] Kidder was uninvolved in any wrongful decision and [e] the harm done to RV was de minimus.  In each regard, defendants either misconstrue plaintiff's contention or are legally erroneous.

### <u>PLAINTIFF HAS A VIABLE FIRST AMENDMENT CLAIM</u>

First, qualified immunity does not shield government officials from suits alleging due process or First Amendment violations. <u>Sadallah and Valley View Country Club v. City of Utica</u>, 383 F.3d 34, 38 (2d Cir. 2004)(noting that changes in objective status combined with defamatory

Page -16-

comments implicate liberty interest, satisfy stigma plus standard and may violate due process clause). Likewise, it has long been established that the First Amendment protects both First Amendment protected activity and disallows government actors from breaking contractual relationships in retaliation for such activity. See, Board of County Commissioners v. Umbehr, infra. Accordingly, no qualified immunity defense applies to the alleged conduct by these individual defendants. See, AFC Enterprises, Inc. v. N.Y.C. School Construction Authority, 2001 U.S. Dist. LEXIS 24447 at 48-58 ("the substance of the Court's opinion [in Umbehr] indicates that independent contractors, as well as public employees, ought to enjoy the same First Amendment protection as employees". Id. at *55).

Second, defendants submit that plaintiff cannot make out a First Amendment retaliation claim because the record does not show that Freed's expressive association was ever actually chilled. Defendants' citation to Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2000) suggests a confusion as to the claims advanced here.

However, unlike Curley, plaintiff RV does not allege that its First Amendment activities were "chilled." Rather, it argues that defendants punished RV because of the protected activity engaged in by Freed and the company's counsel. See, Board of County Commr's v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed2d 843 (1996). The three part test of Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999), which is consistent with Umbehr, controls: whether appellant's speech was constitutionally protected; whether he suffered an adverse action and whether a casual connection exists between his protected activity and the adverse action against him such that a reasonable jury could conclude that his protected expressive activity was a motivating factor of the adverse decision. Also see, Benedict v. Town of Newburgh, 124 F.Supp.2d 675,

678 (S.D.N.Y. 2001).

Here, RV's President engaged in protected speech, suffered an adverse action and alleges that those who adversely did so in retaliation for his protected expressions.

Defendant Riley was sued because after the plaintiff's response to the Shawangunk incident, she refused to meet with him [despite setting up a meeting] to continue discussion with respect to RV's disagreement with her claim that she was owed commissions. See, Exhibit A at 96. Instead, Riley impounded plaintiff's vending machines, a course she had never threatened or engaged in. As Freed's Affidavit makes clear, on May 29, 2007, after she had refused to meet with him to discuss her claim for delinquent proceeds, Riley refused to allow him to take his vending machines. Likewise, the following day, Riley refused to allow a driver to enter the facility to fill the vending machines, take RV's funds or remove the machines. This sequence of events compelled plaintiff to seek and obtain an injunction in this Court requiring Riley to release plaintiff's vending machines.

Next, Creen claims that she acted to terminate plaintiff's contract for a neutral reason, because RV would no longer service her facility, not because he complained about her illegal conduct to the state police. It is noteworthy, though, that the termination letter of May 11, 2007 does not set forth any specific basis for that action. In July 2007, Ferri swore that the action was motivated by plaintiff's failure to pay due commissions. But, in February 2007, Creen renewed plaintiff's contract for another year despite the very same delinquency. In March 2007, Creen noted the delinquency in response to Ferri's survey and indicated her intent to retain RV through its last contract year. So, a reasonable jury could easily find that RV's failure to pay timely commissions, especially in the amount of about $400/month, does not explain the letter dated

May 11, 2007 and that something else must. At her deposition, Creen abandoned the argument that non-payment of commissions informed this decision, claiming, instead, that plaintiff would not service her facility. However, this argument is entirely circular: plaintiff did not return to the facility on May 10 after Creen advised both Mrs. Freed and Gallagher that any driver sent would be detained and made to disgorge RV's proceeds to Creen and her staff. As this action was illegal and as Creen knew that plaintiff had protested the same conduct as against Gallagher, a reasonable jury could conclude that Creen wanted to be rid of RV in retaliation for the protest made by Freed against her illegal conduct and the future hoopla he would surely raise if she repeated, as she had promised, the same self-help.

Kidder's account of his limited involvement with the vending machine contracts is refuted by several facts: first, Glassanos testified that he had several conversations including Kidder as he assisted Ferri and Creen plan the self help at Shawangunk; second, all the documents from the facilities which manifest an intent to consider termination RV's contract are addressed, long before any such act, to Ferri, Kidder's deputy and a woman he acknowledged speaking with continually about work-related matters. Kidder's protestations of non-involvement are inconsistent with the thigh-deep involvement of his office in reviewing and terminating RV's contracts, both at Shawangunk and elsewhere.

A reasonable jury could disbelieve his claims of non-involvement and find him liable for orchestrating, with Ferri, the entire course of events which injured plaintiff.

Finally, the kind of retaliation which occurred here, both the extra-contractual conduct which defendants engaged in and their retaliatory abrogation of plaintiff's contracts, would deter similarly-situated people of ordinary firmness from the exercise of their constitutional rights.

<u>Dawes v. Walker,</u> 239 F.3d 489, 493 (2d Cir. 2001).

## **CONCLUSION**

For the reasons expressed herein, summary judgment should be denied and this matter set down for trial.

Respectfully submitted,

Michael H. Sussman [3497]

Counsel for Plaintiffs

SUSSMAN & WATKINS
PO Box 1005
Goshen, NY 10924
(845)-294-3991

Dated: May 15, 2008

Page -20-