UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ROCKLAND VENDING CORP.,
KEN GALLAGHER,

              Plaintiffs,                  07 CIV 6268 (KMK)

    v.                               **PLAINTIFFS' REPLY TO**
                                    **DEFENDANTS' RULE 56.1**
ROXANNE CREEN, sued in her        **STATEMENT**
individual capacity, MARSHA F. RILEY,
sued in her individual capacity,
STEWART KIDDER, sued in his
individual capacity,

              Defendants.
-------------------------------------------------------x

        Plaintiffs reply to the defendants' Rule 56.1 Statement as follows:

1.  Admitted as true at the time the Complaint was filed.

2.  Admitted as true at the time the Complaint was filed.

3.  Admitted as true at the time the Complaint was filed.

4.  Admitted.

5.  Denied as stated.  Support Operations actively set policy with respect to the

vending contracts at issue in this case and monitored the vending machine

contracts at issue in this case.  Kidder and Ferri also coordinated communication

between the stewards at its correctional facilities and between DOCS' counsel and

the facility stewards and instigated and coordinated the retaliation against plaintiff

RV as alleged in this matter.

6. Denied.

7. Denied.

8. Admitted, but Creen also directly reported to Kidder and Ferri as is

demonstrated by her testimony and the records provided by her and DOCS.

9. Admitted as to first sentence and denied as to second sentence as it omits the

controlling influence Kidder and Ferri had over administration of these vending

machine contracts.

10. Admitted.

11. Admitted, though these contracts lasted beyond "early 2007."

12. Admitted.

13. Admitted.

14. Admitted.

15. Admitted, but denied that this provision bears any relevance to this dispute or,

in any manner, justified the state defendants' violation of due process.

16. Denied as to first sentence. **See**, Ferri Deposition. Denied as to the

paraphrase of the content of the letter, which speaks for itself and to which the

Court is respectfully directed. Denied as to the content of Mr. Freed's response,

which defendants neither include nor cite to.

17. Admitted that Rockland was delinquent for a lengthy period of time in its payment of commissions in large measure because [a] of pilfering which deprived it of income from its vending machines and [b] of the agency's refusal to reasonably raise prices on vending products, despite significant increases in its costs.

18. Denied. The contract with Lincoln expired on 31 March 2007.

19. Denied as to paraphrase of document before the Court.

20. Admitted.

21. Denied as stated; Creen had no accounting which showed her the sum, if any, owed Shawangunk by RV as the date the self-help was implemented. None of the citations establish in a reliable manner how much money, if any, was then due the accounts at Shawangunk.

22. Denied, Exhibit O has never been authenticated and Ex E at 43 does not establish the proposition for which it is cited.

23. Denied as to timing; this seizure was planned long before the account provided by defendants.

24. Denied that Ferri and Kidder called Glassanos together or that this was his first involvement in the planning of this seizure.

25.  Denied as Glassanos' statements are variously reported.

26. Admitted that Glassanos so wrote.

27. Admitted.

28. Admitted.

29. Admitted.

30. Denied.  Plaintiff Gallagher was taken into the visitor's room, the gates locked and then he was confronted by Creen who advised that she was taking the money he collected from the machines.

31. Denied.  Creen stated that they were instructed by their lawyer they can confiscate my money bags...they were to take my money." [Exhibit B at 43-44].

32. Denied as distorted.  Gallagher said, "I'm not giving it up.  I said does Mike [Mr. Freed] know about this.  That's when they said they would contact him.  I said no.  I want to know — I want to hear from Mike that he knows about this, what is going on here.  She [Creen] said she would contact him....I said I am not giving up anything until that happens.  This went back and forth for a while because we don't normally give out cash."  When asked how long this back and forth went on, Gallagher answered ninety minutes.  **See**, Exhibit B at 45.  He then explained that he refused to comply with Creen's direction for between 20-30 minutes.  When asked whether he tried to leave, Gallagher replied, "I couldn't.

The gate was locked." **Id.** at 47.

33. Denied as stated. Explaining why he gave Creen and her assistant RV's monies, Gallagher stated, "Because I felt I had to give them the money **or they were not going to let me out." Id. at** 48. When asked why he concluded this, Gallagher stated, "Because they kept on insisting they wanted their money and were going to teach us a lesson and I felt that if I did not give it up, that I wasn't getting out that door." **Id.** at 48.

34. Denied. Creen was in and out of the room; she did not return once briefly after leaving, allegedly to call Freed. **Id.** at 50-51

35. Admitted.

36. Admitted.

37. Admitted.

38. Admitted.

39. Admitted for reasons set forth in response to para. 32 above.

40. Denied as stated. Mr. Gallagher could not contact Mr. Freed from inside the facility as he did not have a phone. **Id.** at 52.

41. Admitted.

42. Denied as stated. Kidder told Freed that he was aware of what had occurred and he "agreed with it." **See**, Exhibit A at 42-43. Kidder explained to Freed that

he knew in advance exactly what was going to occur - "they were going to hold my employee in that facility and take his money". **Id.** at 43.

43. Admitted.

44. Admitted.

45. Admitted.

46. Admitted.

47. Admitted. Freed so acted because of the statements made to him by Kidder that Shawangunk would hold his employees if any again entered the facility and he was afraid to dispatch his drivers in this light. **See, exhibit A at 62-63.**

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. Admitted.

53. Admitted.

54. Admitted.

55. Admitted.

56. Admitted.

57. Admitted.

# PLAINTIFFS' STATEMENT OF MATERIAL FACTS

## TESTIMONY OF MICHAEL FREED

1. As of January 1, 2007, RV serviced contracts with 10 state Correctional Facilities. See, Exhibit A at 13.

2. After receiving a November 7, 2006 letter from Kidder warning it to make all payments on time, RV could not do so and continued to be late in making payments. Id. at 117-18.

3. RV received no additional letters from Mr. Kidder regarding its delinquency in making timely commission payments. Id. at 117-18.

4. Plaintiff RV received no notice that any of the facilities intended to seize its funds or its machines. See, Exhibit R at 40.

5. The decision to seize RV's funds and hold its machines hostage was not spontaneous or random, but, rather the result of months of ratiocination and planning. See, Exhibit H [Glassanos' testimony].

6. Counsel for the state Department of Correctional Services could point to no provision of the contract between the plaintiffs and any state facility which permitted "self help" or the taking of property by the defendants. Id.

7. **Nothing** prevented the defendants from providing plaintiff RV with notice of its intent to initiate legal action to recover monies its facilities believed they were

owed.

8.  No such notice was provided on any occasion. <u>See</u>, Exhibit A at 37, ll. 12-16, 123.

9.  Pre-seizure due process was entirely feasible in this instance.

10.  In November 2006, while denying that he had control of the behavior of the correctional facility stewards, Kidder wrote RF, threatening to disqualify the company from further state contracts if it did not timely pay commissions. <u>See</u>, Exhibit I, Attachment A.

11.  Thereafter, Kidder made no contact with RV or its President to discuss the status of the contracts. <u>See</u>, Exhibit A at 23-24.

12.  During its final year at the facility [CY-07], RV was late paying commission checks at Shawangunk. <u>Id.</u> at 15.

13.  From time to time and, at times, RV was as many as three months late in making such payments. <u>Id.</u> at 14.

14.  This occurred because RV was "having trouble remaining profitable". <u>Id.</u> at 14.

15.  RV owed back commissions at the time its contract was renewed with many facilities, including Shawangunk [Creen].

16.  Despite this delinquency, at no time before the "self help" Creen NEVER

NOTIFIED RV of any intent to terminate its contract for vending services. Id. at 113-14.

17.  On May 9, 2007, Gallagher reported to Mrs. Freed that he had been locked in a room and forced to give up monies in RV's vending machines. See, Exhibit A at 36.

18.  Mrs. Freed reported this to her husband who called Mr. Gallagher. Id. at 37-38.

19.  Mr. Gallagher then told Mr. Freed that he was held at the facility, not allowed to leave or call RV's office. Id. at 39.

20.  Gallagher reported to Mr. Freed that Creen and two of her subordinates were the ones that held him at the facility. Id.

21.  During this call, Gallagher was shook up and upset. Id. at 40-41.

22.  After speaking with Gallagher, Mr. Freed called Kidder, explained that an RV employee had been held against his will at the facility and required to give Creen RV's monies. Id. at 42.

23.  Kidder "was aware of it," knew "it was going to occur and agreed with it." Id. at 42-43.

24.  Freed told Kidder that this was larceny and against the law. Id. at 44.

25.  Kidder told Freed that an attorney in Albany had advised Creen to take the

action. Id. at 44.

26.  After this conversation, Mr. Freed told Gallagher to go to the State Police

barracks and report what occurred. Id. at 51-52.

27.  Subsequently, the State Police advised Mr. Freed that an officer had gone to

Shawangunk and spoken with authorities there about the events. Id. at 55.

28.  After learning from Gallagher that Creen had threatened to take the same

action the following day, Freed decided not to send his staff to Shawangunk the

following day. Id. at 63-64.

29.  Freed was hoping for some dialogue with the state concerning its actions at

Shawangunk, but, after what occurred there and in light of Kidder's support of this

conduct, he concluded that he could not service this account. Id. at 72-73.

30.  After his issues at Shawangunk, the steward from Eastern Correctional

Facility advised Freed that she wanted to extend RV's contract after the third year

expired. Id. at 85.

31.  The steward sent Mr. Freed the extension document, which he signed before a

notary and returned. Id. at 85.

32.  Mr. Freed then found that this facility was being advertised for bid. Id.

33.  He then called the steward . She told him, "Mike, I did everything I could,

They accused me in Albany of being your relative.  That's how hard I worked for

you. They will not renew any of your contracts because of what is going on." Id.

34. The same steward told Mr. Freed that RV's service was "way over the top, way over what anybody else has done for them." Id. at 86.

35. At the time of this conversation, RV was behind in making commission payments to Eastern and Ulster CFs, the facilities for which Marti contracted vending services. Id. at 120.

36. RV was behind in making these payments because it could not get a price increase on vended products. Id. at 122.

37. Immediately upon replacing RV, DOCS allowed the replacement vendor to double the prices charged for the same product. Id.

38. On March 27, 2007, defendant Riley advised plaintiff that Lincoln Cf would not extend RV's contract at her facility. Id. at 94.

39. The letter so advising Freed indicated that RV was not current in commission payments. See, Exhibit L.

40. This letter was not correct as RV was current on commissions at that time. See, Exhibit A at 95.

41. Freed initiated conversation with Riley concerning this situation, but, after the incident at Shawangunk on May 9, 2007, defendant Riley refused any further communication with RV or its President. Id. at 89, 95-96.

42. After the Shawangunk incident,  Freed went to New York City to meet with Riley, who had set up a meeting for a Friday at 10:00 a.m., but then refused to meet with him and walked out of the building after Freed arrived. Id. at 89, 113-117.

43.  Riley locked RV's employees out of her building. Id.

44.  RV sought to submit a bid for the expiring Fishkill CF vending contract.  Id. at 93.

45.  To this end, Mr. Freed contacted the steward, Suzette Peterossi, and asked for a bid package. Id. at 93.

46.  The steward indicated she would have to check first to see if RV could be included. Id.

47.  RV was permitted to bid on the Fishkill contract.  See, See, Exhibit 1 to Sussman Affirmation.

48.  RV was the low bidder on the Fishkill contract.  Id.

49.   After the State disqualified RV from the Fishkill contract in February 2008, RV filed a notice of claim with respect to that wrongful act. Id.

50.  The  decision to terminate plaintiff's contract at Shawangunk was based not upon owed commissions, as Ferri swore to, a longstanding matter, but, rather followed RV's reporting of illegal practices by Kidder, Ferri and Creen and their

use of the right to petition. Id. 80, ll. 18-25- 81, ll. 1-21.

51.  Punishing a vendor by taking their contracts and disallowing them from

obtaining contracts though the low bidder would chill a reasonable vendor's

speech.

## TESTIMONY OF KEN GALLAGHER

52.  Gallagher was employed by RV as a driver. See, Exhibit A at 10.  As of May

2007, he was one of ten drivers RV employed. Id. at 10-11.

53.  On May 9, 2007, once at Shawangunk CF, Gallagher signed in, was stamped

in as a visitor, walked down a hallway until a locked gate, waited for the gate to

open, then walked through that set of gates and another set of locked gates before

approaching the visitors' room, where there is a third security gate, which opened

allowing him entry to that area.  See, Exhibit B at 24-25, 39, ll. 9-12..

54.  Before May 9, Gallagher had never met Creen, but dealt with one of her

subordinates. Id. at 27-28.

55.  After Gallagher signed in and while he was walking down the hallway, Creen

approached him, introduced herself and said, "your boss owes us commission.  We

want our commission." Id. at 32.

56.  Gallagher responded. "That's between you and him.  It has nothing to do with

me.  I'm not here for that.  I can't give you any money.  It has nothing to do with

me." Id.

57. Creen responded that she had tried to get a hold of Freed several times without success and "was going to teach us a lesson." Id. at 33-34.

58. At the point she said this to Gallagher, Creen and he were in the visiting room. Id. at 34.

59. It was only when he got to the visiting room that Creen told Gallagher that she intended to confiscate the money he took out of the machines. Id. at 35. As he explained, "in the hallway, I had no idea this was going on. We were walking and talking." Id. at 36-38.

60. There was no one in the visiting room except for Creen, her staff, himself and an unknown [to Gallagher] CO in the far back . Id. at 42-43.

61. After they entered the visiting room, Creen told Gallagher that "they were instructed by their lawyer they can confiscate my money bags." Id. at 43-44.

62. Gallagher resisted and stated, I'm not giving it up. I said does Mike know about this. That's when they said we will contact him. I said no, I want to know, i want to hear from Mike that he knows about this, what is doing on here. She [Creen] said she will contact him." Id. at 44.

63. This conversation went back and forth for between 20-30 minutes before Gallagher touched the vending machines. Id. at 47.

64. During this time, Gallagher could not leave as the gate was locked. <u>Id.</u> at 47.

65. After this lengthy discussion, Creen left the visiting area and stated she was going to call Freed. <u>Id.</u> at 50.

66. Creen returned and claimed that she had been unable to reach Freed. <u>Id.</u> at 52.

67. Gallagher told her "let me call them because I want him to know what was going on." <u>Id.</u>

68. Gallagher had to ask Creen for permission to call Freed because "there was no phones." <u>Id.</u>

69. Creen did not allow Gallagher to call Freed himself, but, instead, against left the visitors' room and stated she would again try to reach Freed. <u>Id.</u> at 52-53.

70. After Creen left the room, Gallagher repeated to her assistant, Margie, that he wanted Freed contacted and informed what was going on. <u>Id.</u> at 54.

71. The next time Gallagher saw Creen he was existing the visitors' room; he asked whether she had contacted Mr. Freed and she repeated that she could not get a hold of him. <u>Id.</u> at 54.

72. Gallagher again urged Creen to reach Freed. <u>Id.</u> at 55.

73. He then went into the employees lounge, collected proceeds from two machines·and, as in the visitors' room, handed those proceeds to Margie. <u>Id.</u>

74. Gallagher gave Creen the monies from the machines "[b]ecause I felt I had to

give them the money or they were not going to let me out." <u>Id.</u> at 48.

75.  While in the employee lounge area, Creen's assistant asked Gallagher when he was going to service the other machines in that area.  She told him, "I will see you for the rest of the money on Friday."<u>Id.</u> at 57.

76.  After leaving the facility, Gallagher called Mrs. Freed who had no idea what was gong on because none of them called.  <u>Id.</u> at 60.

77.  Gallagher explained, "I had to give them their money because I was locked into the visiting room." <u>Id.</u> at 61.

78.  A short whole later, Mr. Freed advised Gallagher to go to the state police barracks in New Paltz and file a report. <u>Id.</u>  at 63-64

79.  At the state police barracks, Gallagher was advised that "it was a civil matter, there's nothing be could do but he would go out and check it out." <u>Id.</u> at 70-71.

## CONTRACTUAL RELATIONS

80.  The contract between all the state correctional facilities and RV included Appendix B which provided remedies to the state facility in the case of non-performance.

81.  For instance, the state can suspend a contract for failure of the vendor to comply with its terms. <u>See</u>, Exhibit 2 to Sussman Affirmation, Appendix B, p. 11.

82.  In the case of such a suspension, the state is to provide "written notice

outlining the particulars of such suspension."

83. Likewise, the state may terminate a contract either for convenience or cause. In the former case, it must provide 60 days written notice; for the latter, a cause termination, the state is to provide 30 days notice of any "material breach." and, if that breach remains uncured, the state may terminate the contract upon written notice. "In such event, the Commissioner or authorized user may complete the contractual requirements in any manner it may deem, advisable and pursue available legal or equitable remedies for breach." Id.

84. Kidder is unaware of any training provided by the Support Operations unit to stewards regarding implementation of the contracts. See, Exhibit C at 27.

85. His office never advised stewards to read the contracts between their facilities and vendors and abide by them. Id. at 28.

## TESTIMONY OF STEWART KIDDER

86. Kidder has worked for DOCs since 1986. See, Exhibit C at 5.

87. As Director of Support Operations in May 2007, he reported to a Deputy Commissioner. Id. at 7.

88. Nanette Ferri is Assistant Director of Support services and reports directly to Kidder. Id. at 12. Her principal duty is to supervise all the purchasing in the Division. Id. at 12-13.

89. Kidder and Ferri have many contacts each day and speak frequently. <u>Id.</u> at 15.

90. Support Operations "is responsible for many things, whatever it takes to support an agency of our size." <u>Id.</u>

91. Support Operations does not maintain a list of approved vendors. <u>Id.</u> at 9-10.

92. Correctional facilities normally administer their own bids for vending machines <u>Id.</u> and the decision as to which vending machine company to use is made at the facility level. <u>Id.</u> at 11.

93. Kidder's office has "nothing to do with vending machine contracts". He then modified his response and noted his office might have involvement "if a facility *contacts us* for some advice." <u>Id.</u> at 12.

94. Support Operations does not engage in any monitoring of vending machine contracts, according to Kidder. <u>Id.</u> at 15.

95. When asked why, in this light, he wrote RV on November 7, 2007 concerning the status of its compliance with contracts with state correctional facilities, Kidder responded, "The letter was actually written by Nan Ferri. I did sign it because she just informed me that all these facilities were having problems with past due commissions." <u>Id.</u> at 30-31.

96. After writing this letter, Kidder 'did not get involved' with regard to RV's performance. <u>Id.</u> at 31. He recalled no discussion with Ferri with respect to

whether RV's contracts should, or should not, be renewed based upon its payment history. Id. at 46-47.

97.  After writing this letter and reading Freed's reply, Kidder recalled no contact with Freed and Ferri said nothing to him about RV's performance of vending machine contracts. Id. at 32, 47.  As Kidder explained, "I was never asked to send another letter." Id. at 48.

98.  Kidder did not recall directing Ferri to contact all the correctional facilities and find out the status of RV's performance on vending contracts. Id. at 22-23.

99.  Kidder recalled no report from Ferri concerning the status of RV contracts in 2007. Id. at 23.   He also could recall no contact with any of the facilities complaining about RV during that year.  Id. at 33.

100.  Facilities had no direction from his office as to how to investigate bidders. Id.

101..  Kidder recalled a couple of phone conversations with Freed; during one, Freed asked him to intervene and assist RV staff gain access to a facility in New York City.  Id. at 13.

102.  Kidder called the facility [he did not recall which but thought it was Fulton, not Lincoln] and asked them to work with this company. Id. at 14.

103.  Kidder recalled Ferri telling him that several facilities were having problems

with payments from RV. Id. at 16.

104. He told her "let the facility handle it." Id.

105. Kidder claimed that he and Ferri play no role in deciding whether or not to renew a vending machine contract at a correctional facility. Id. at 16-17.

106. His office would not generally even be notified of such a decision. Id. at 17.

107. Kidder claimed that he only learned of the "self-help" exercised at Shawangunk by Creen "right immediately after" it happened. Id. at 17.

108. He only learned beforehand of an inquiry from a facility as to whether they could retain "their percentage" when RV staff came to collect money from the machine. Id. at 18.

109. Kidder either told the facility or Ferri to contact counsel's office with that inquiry. Id.

110. At the time he first heard of this idea, Kidder claims that he was not advised RV's driver would be detained or, more generally, how Shawangunk intended to recover the claimed proceeds. Id. at 36.

111. Kidder had never heard of a like inquiry from any other facility. Id. at 19.

112. "After the fact," Kidder claims, he learned that "our counsel's office had advised the facility that they could keep money from the machine when it was collected up to the amount that was owed to them in past commissions and had not

been paid." Id. According to Kidder, no one from counsel's office spoke with him about this issue. Id. at 19, ll. 22-24, 21, ll. 9-12.

113.  When he received that information, Kidder did not know whether the facility had any accounting as to what it was "owed"; that information was not maintained by Support Operations. Id.

114.  Kidder did not know of any other example of such "self-help" in the period he served as Director of Support Operations. Id. at 34. He knew of no precedent for such conduct by his agency. Id.

115.  After the Shawangunk exercise in self-help, Kidder claimed that he did not give any direction that other facilities should do the same. Id. at 35.

116.  At around the same time as he learned of the "self-help," Kidder could recall having no conversation with Freed. Id. at 19-20, 38-39. Specifically, he could not remember telling Freed he had pre-knowledge of the self-help and had approved of it. Id. at 38.

117.  He also denied having any contact with any of the other correctional facilities concerning RV or the events at Shawangunk. Id. at 21.

**TESTIMONY OF NANNETTE FERRI**

118.  Ferri has served as Assistant Director of Support Operations, a non-competitive civil service position, since June 2002. See, Exhibit D at 5-6.

119. After she was placed in this position, Kidder assigned her new responsibilities dealing with vending machine contracts, specifically "working with the facilities" on invitations for bids and contracts. Id. at 8. Specifically, before facilities went out to bid, they were instructed to send copies of their bid documents to Support Operations for review and approval. Id. at 9-10

120. Stewards also called Ferri to answer questions about the bidding process. Id. at 10-11.

121. Ferri claimed to have no role regarding the implementation of a contract at the facility level. Id.

122. Ferri denied memory of a single phone call on May 8 or May 9 in which she, Kidder, Glassanos and Creen participated. Id. at 14.

123. Her memory was then refreshed by an e-mail sent from Creen to Glassanos confirming a phone call of May 8 at 2:47 p.m. which summarized "today's conversation with Stew Kidder and Nan Ferrie [sic]: tomorrow we will meet the vending machine filler and when the money is taken from the machines, it will be counted in from of the Rockland representative, receipted and signed by a facility staff member and the representative...We will advise how this method of "collection" works out." Id. at 15 & Exhibit 3 to Sussman Affirmation.

124. Ferri testified that after Creen called her on May 8 asking whether she could

take monies from the RV serviceman, she relayed this query to Kidder who then called Glassanos. <u>See,</u> Exhibit D at 18-20.

125.  In his e-mail response to Creen on May 8 at 4:21 p.m., Glassanos wrote, "Do not let the rep walk away with the State's money. If there is any resistance, show the rep the door, impound the machine and exercise the state's right to locate an alt source...You are within the state's right of self-help to retain possession of the machine until the vendor cures his default." <u>See,</u> Exhibit 16 to Sussman Affirmation.

126.  According to Ferri, this was not the advice Glassanos gave during the call with her and Kidder. <u>See,</u> Exhibit D at 53, ll. 12-23.  Nor during this call had Glassanos discuss retaining RV's vending  machines. <u>Id.</u> at 54.

127.  As of that date, May 8, 2007, Ferri had no prior experience with any such self-help. <u>Id.</u> at 19-20.

128.  In the training sessions she had attended concerning state contracts, self help has never been discussed. <u>Id.</u> at 55-56.

129.  As of this date, Ferri had no recollection of ever before speaking with Kidder about Rockland Vending. <u>Id.</u> at 24.

130.  Likewise, Ferri could not remember when she last spoke with Creen about RV. <u>Id.</u> at 25-26, 35-36.

131. Ferri does not know what Kidder then said to Glassanos. Id. at 21.

132. The one or two minutes conversation was "could she take the money". Id. at 21, 23.

133. Glassanos responded that Creen can take the money. Id. at 23.

134. Before rendering this advice, Glassanos asked no questions and asked for no documents . Id. at 23-24.

135. Ferri could not recall whether Glassanos was provided any background information along with this query. Id.

136. In her conversation with Ferri which prompted Kidder's call to Glassanos, Creen did not indicate she had previously been in touch with Glassanos. Id. at 22.

137. After the conversation between Kidder, Ferri and Glassanos, Ferri called Creen back, though she did not recall whether Kidder was party to that call. Id. at 24.

138  This conversation lasted 1-2 minutes. Id. at 35.

139. The day after Creen engaged in self-help, Ferri wrote Glassanos as follows:

> "Hi, George. I think it worked out at Shawangunk...by the way Freed did contact Stew.. "my employee was accosted..." Stew listened and told him the state had the right...and we conferred with counsel's office. [1]
>
> Anyway, I received an e-mail from Coxsackie, they want to tell him he

---

[1] Ferri testified that Kidder told her of this conversation. See, Exhibit D at 61

won't be allowed to take his machines on May 30 unless his commissions
are paid. I would like to tell them and all facilities he owes to do what
Shawangunk did. I do not think he is up to date with facility. Ok?"

140. Glassanos responded the same morning, "Nan: That is fine." See, Exhibit 17
to Sussman Affirmation.

141. Ferri could not recall whether she shared the direction proposed in her e-mail
to Glassanos, but could think of no reason she would not have. See, Exhibit D at
59-60.

142. Ferri was familiar with the contract between RV and Shawangunk. Id. at 29,
ll. 7-8.

143. When asked whether any provision of the contract allowed the State to take
monies from the vending machines, Ferri refereed to "set off right", "The State
shall have all of its common law, equitable and statutory rights of set off. These
rights shall include, but not be limited to, the State's option to withhold for the
purposes of set-off any monies due to the contractor under this contract up to any
amounts due and owing to the State in regards to this contract." Id. at 32
[emphasis added].

144. According to Ferri, during the phone call with her and Kidder on May 8,
2007, Glassanos referenced Appendix A of the contract, but did not specifically
refer to "set off" rights. Id. at 33.

145.  Ferri could not recall whether Glassanos ever specifically mentioned the phrase "set off" to her. Id.

146.  The conversation with Glassanos on May 8 was the only one Ferri had with Glassanos before Creen took RV's funds. Id. at 34.  [2]

147.  Before May 9, Ferri had probably spoken with Freed, but could not recall when or the subject of any such contact. Id. at 36-37.

148.  Ferri wrote the letter dated November 9, 2006 which Kidder signed. Id. at 71.

149.  When asked by what authority she wrote such a letter to RV demanding payment by them of commissions, Ferri responded, "I don't know." Id.  She then explained that "there is a vending machine directive that is the responsibility of Support Operations.  One of the stipulations in there, I believe, is when payment is to be made.  Knowing that payment was not made time timely on those contracts, just knowing that they were late, I felt doing nothing would not be the right choice to make.  So that was send out just keeping with the directive. Id. at 72.

150.  The documentary record shows that Creen copied Ferri with her correspondence with Freed starting at least in December 2006.

151.  On December 11, 2006, Creen advised Freed that RV's December payment

---

[2]  Obviously, this totally contradicts Glassanos' testimony, set forth below.

was one day late and that various issues needed to be addressed at Shawangunk. See, Exhibit 4 to Sussman Affirmation.

152. Ferri had no recall of conversation with Creen about this document and could not explain why Creen sent it to her. See, Exhibit D at 38-39.

153. Likewise, on December 18, 2006, Creen copied Ferri with an e-mail to Freed in which she complained that a check due December 10 had not yet been received. See, Exhibit 5 to Sussman Affirmation.

154. Ferri claimed that she took no action after receiving the document and never spoke with either Creen or Kidder about it. See, Exhibit D at 39-40.

155. Creen also sent Ferri a copy of an e-mail dated January 19, 2007, complaining that the December check was nine days late. See, Exhibit 6 to Sussman Affirmation.

156. Ferri did not speak with Kidder about this because there was nothing they could do about such routine matters. Id. at 40.

157. Likewise, Creen copied Ferri with a January 30 e-mail to Freed demanding payment of the commission check due January 10 by cob the following day. See, Exhibit 7 to Sussman Affirmation.

158. Ferri denied that she was monitoring Freed's compliance with his contract at Shawangunk at that time. See, Exhibit D at 41-42.

159. On February 6, 2007, Creen advised Ferri that Freed had paid the commission check due to the prior month. Ferri responded, "thanks for the info: so, for the next four days, is he up to date on commissions, space fees and bottle returns." See, Exhibit 8 to Sussman Affirmation.

160. In mid-February, Creen copied Ferri with her response to Freed's e-mail expressing concern that vending product was being stolen without payment at Shawangunk. See, Exhibit 9 to Sussman Affirmation.

161. Ferri denied speaking with Creen about this subject, but acknowledged awareness that Freed raised this concern. See, Exhibit D at 43.

162. She also received a copy of Freed's response which reported that one machine at Shawangunk was cheating him of between $300-400 every week until two weeks ago, See, Exhibit 10 to Sussman Affirmation, though she did not recall speaking with Creen about this. See, Exhibit D at 44.

163. After learning of the concern with the pilfering of food product, Ferri was advised that RV was late with January's commission check. See, Exhibit 11 to Sussman Affirmation. She took no action with regard to this situation. Ibid.

164. On March 7, 2007, Kidder sent Exhibit 12 to Sussman Affirmation to all institutional stewards, **requiring** their response to five inquiries within nine days.

165. Attempting to ward off responsibility for the actions of the institutional

stewards, Ferri had substantial trouble explaining the questions she and Kidder posed. <u>See</u>, Exhibit D at 46-48.

166.  When asked why she make inquiry concerning issues with payment of commission, Ferri responded she was just curious. <u>Id.</u> at 47.

167.  When asked why she was curious, she responded, "Probably in light of the fact that there were several contracts where payment was late, commissions were late". <u>Id.</u> at 47.

168.  In light of prior testimony that she and Kidder had nothing to do with implementing or monitoring these contracts, plaintiffs' counsel inquired, "What did that have to do with you or Mr. Kidder?," Ferri responded, "I just wanted to know."  When asked "What did knowing have to do with your job responsibilities, if anything?," Ferri responded, "Well, I just probably would have taken action regarding whatever the answers had come back, and no one had issues, other than the few at Rockland —with Rockland contracts."  When asked next, "You would have taken what action?," Ferri responded, "I don't know.  I just was curious if this was going statewide." When pressed as to what authority she had to take action, Ferri stated, "I didn't." <u>Id.</u> at 48.

169.  In reply to the questions posed by Kidder, on March 13, 2007, Creen wrote back a litany of concerns with RV, noting that the last extension of its vending

contract at Shawangunk was to expire on January 31, 2008 and closing with,
"Unfortunately, Rockland is not a shining star, but we are dealing with him."
See, Exhibit 13 to Sussman Affirmation.

170. Ferri probably took no action upon receipt of Creen's reply. See, Exhibit D
at 48. She did not converse with Creen about her concerns and made no
suggestions as to how Creen should proceed. Id. at 49.

171. As of March 13, 2007, Ferri was unaware of what accounts, if any, were
funded by the commission checks received from RV. Id.

172. On April 4, 2007, Creen copied Ferri with another e-mail complaining about
RV's late payment of the commission check. See, Exhibit 14 to Sussman
Affirmation.

173. Ferri claimed that terminating vendor contracts was a matter between facility
and vending company and that she did not get involved in such matters. Id. at 50-

174. However, Exhibit 15 to Sussman Affirmation shows that, on April 5, 2007,
at the steward at the Coxsackie Facility rote an e-mail asking whether it was ok for
her to send a notice of termination to RV. Ferri responded that the letter looked ok
and asked whether she had lined someone else up to take over vending.

## TESTIMONY OF DEFENDANT CREEN

175. An institutional steward since January 2004, Creen previously worked as a

purchasing agent and has been with DOCS since January 1986. See, Exhibit E at 6-8.

176.  Creen inherited vending machine contracts with RV; these had commenced in February 2003, lasted for three years and were subject to two one year renewals. Id. at 10.  Under this contract, RV was to provide 18 vending machines at Shawangunk. Id. at 31-32.

177.  The contract was last renewed in February 2007, a determination Creen made. Id. at 11.

178.  At the time she made that determination, Creen knew that "Rockland was consistently late with their payments" since she assumed her job in January 2004. Id. at 15, ll. 13-24.

179.  To Creen's knowledge, at the time of the last renewal in February 2004, RV was "consistently" three to four months later in payment of commissions. Id. at 16.

180.  The contract which bound RV and Shawangunk allowed the State to terminate the contract if the contractor fails to comply with the terms and conditions of the agreement. Id. at 34.

181.  Appendix B to the standard state contract provided for termination for convenience and cause.  Creen could not recall reading these provisions. Id. at 35.

182.  Before November 2006, Ferri made inquiries of Creen concerning RV's

payment history at Shawangunk. Id. at 29.

183.   By the time she renewed the contract in February 2007, Creen had never spoken with Freed directly as he was hard to get ahold of. Id. at 18.

184.   Nor had she directed her staff member, Margie Gardner, to do so. Id. at 19.

185.   Creen was apprised that Freed believed substantial product was being stolen at Shawangunk, $250-400/week for several months, but she never resolved that issue and could not utilize the video taping surveillance system he asked for because the cameras were not constantly running in the visitors' room. Id. at 56.

186.   Creen and Freed never resolved the issue of pilfered product before May 9, 2007. Id. at 57.

187.   The first time Creen spoke with Freed was on May 11, 2007, after the self-help. Id. at 20.

188.   Shortly after 9:00 a.m. on May 9, Creen had spoken with Mrs. Freed, advising her of the self-help and agreeing to fax her receipts of the monies taken from Gallagher. Id. at 21-22. $455 was taken from the machines. Id. at 42.

189.   Before engaging in this self-help, Creen spoke with Ferri who told her to clear this herself with Glassanos. Id. at 52, ll. 4-8.

190.   Ferri also told Creen that so proceeding "was a good idea if we were able to do it." Id. at ll. 9-11.

191.  Creen had cleared this self-help with Glassanos, with whom she had spoken a day or two before the action. Id. at 44.  In that conversation, she stated that RV was behind in their payments and "we wanted to know it would be able to do what we were planning — what happened on the 9th, if we would be able to collect the money from the vending machines as they were being taken out." Id. at 46.

192.  In response, Glassanos told her that what she intended to do was all right. Id. at 47-48.

193. Other than that conversation, Creen never had spoken with Glassanos. Id. at 45, ll. 10-16.

194.  That day, the contract between DOCS and RV to provide vending services at Shawangunk was still in full force and effect, Id. at 27, ll. 6-9.

195.  No suspension order was ever entered by DOCS as against RV. Id. at 27-28.

196.  DOCS never made any request to audit RV's records and accounts of services as provided at Shawangunk. Id. at 28-29.

197.  According to Ferri, the RV contract was terminated at Shawangunk due to non-payment of commission. **See**, Exhibit I, page 3, para. 9.  But, Creen disputed this, claiming the reason was because RV would not replenish product at the facility after the self-help on May 9. See, Exhibit E at 58-59.

198.  On May 11, 2007, Freed advised Creen that his drivers were afraid to come

back to her facility. Id. at 60.   She did not respond.   Id. at 60–61.

199.  Creen had no accounting of the sum due from RV when she engaged in self-help. Id. at 62.

200.  Creen intended to keep collecting monies from RV's machines in the same exact manner after May 9, 2007. Id. at 71-72.

201.  After RV was terminated, Creen hired Ellenville Vending to service Shawangunk; their prices "were higher". Id. at 74.

202.  In May 2007, Creen spoke with Kidder about  RV, but had absolutely no memory of that conversation. Id. at 75-76.

203.  Creen wrote Freed on May 11, 2007 impounding his 18 vending machines. See, Exhibit T.

204.  No provision of the contract permitted Creen to so take plaintiff RV's property without due process of law. See, Exhibit 1 to Sussman Affirmation.

## TESTIMONY OF GEORGE GLASSANOS

205.  Deputy Counsel of DOCS, Glassanos has worked for that agency since March 1981. See, Exhibit H at 6-7.

206.  In his 26 year employment with DOCS, before May 2007, he had never before given his client an opinion with regard to "self-help" by a facility. Id. at 7.

207.  When shown the contract between DOCS and RV, Glassanos stated that he

could not recall ever seeing it before. Id. at 8, 10.  He played no role in preparing the document. Id.

208.  Glassanos claimed at deposition that it was his idea to take RV's monies from the vending machines. Id. at 12.

209.  When asked whether he could recall Ferri and Kidder calling him to inquire whether Creen could take money from RV's vending machines, Glassanos responded, "I don't have a specific recollection of that." Id. at 12.

210.  When asked for the chronology of his own involvement with RV, Glassanos gave a story which entirely contradicted that provided by other witnesses:

a) he received a call from Ferri concerned that RV was :stocking products that did not confirm to the NY State Bottle law - this predated any discussion of RV's "omission to pay commissions when due." Id. at 17-18.

b) After Ferri's expression of concern, Glassanos interacted extensively with counsel for DEC which wanted to surveil the product which RV was loading into vending machines at DOCS' facilities. Id. at 19.  This was never arranged. Id.

c)  Thereafter, four to six weeks before discussion about self-help at Shawangunk, Nan Ferri mentioned to Glassanos "by the way, a lot of the facilities that RV has contracts with are reporting that they're not receiving the commissions that were promised them under the contract."  Ferri emphasized that

this was not sporadic, but widespread. Id. at 20-21.  During phone calls with him, Ferri asked Glassanos what could be done about this. Id.

 d) At least four weeks before she took the money from RV, Glassanos was in contact with Creen about RV. Id. at 25-26.  He had between 8-20 conversations with her regarding RV.  Id.

 e)  In the same time period, Glassanos had "many" conversations with Ferri about RV, "sometimes as many as four a day", "probably 20 to 30" regarding RV. Id. at 26.

 f) In the same 4-6 week period, Glassanos had one or two conversations with Kidder. Id.

 g) According to Glassanos, Ferri brought Kidder into a phone call he was having with her so that Kidder could understand "firsthand from the Legal Division what we were proposing to do, how we were trying to handle this." Id. at 27.

 h) Glassanos claims that he proposed to sit down with a RV representative, count out the money from the machine, give him a receipt for the monies taken and credit this to the commissions owed. Id. at 28.

 i) Glassanos could not recall whether he ever put his proposal in writing. Id.

211. Glassanos claimed that two notions, the common law notion of "self-help" and the contractual set off provision justified "his" proposal. Id. at 29.

212. Asked to define self-help, Glassanos stated, :it's kind of calm, low level assertion of your legal rights while maintaining the public peace." Id. at 29-30.

213. There was no history in DOCS of employing "self-help". Id. at 31.

214. When asked for other examples of "self-help," Glassanos pointed to entirely dis-analogous situations in which, according to his limited recall, the State provided notice of its intent to stop payments to vendors not properly discharging responsibilities. Id. at 31-33.

215. Glassanos denied advising Ferri to have other DOCS facilities follow the self help lead Shawangunk took. Id. at 39-40.

216. Glassanos did ask Ferri to solicit from the business offices of the facilities a status report so he could analyze how wide-spread the problem was, how long it had been going on and to try to get a fix on the money RV owed the state. Id. at 40, 42. [3]

217. After Ferri received a status report back from DOCS' facilities, she provided the same to Glassanos. He claimed that the total owed by RV was something in

---

[3] In explaining the March 7 survey Kidder sent to each facility, Ferri did not mention that Glassanow was behind this in any way. She sent it out of her own curiosity, she claimed.

the neighborhood of $22,000, and that he received detailed reports of delinquencies from 8 or 9 facilities. Id. at 41-42. No documents corroborating this have even been produced in discovery by the defendants. See, Sussman Affirmation. [4] Glassanos testified that he could not say whether he received this summarization before or after he proposed the notion of self help. Id. at 49-50.

218. Glassanos testified that he told Creen, Kidder and Ferri that 'upon the arrival' of the RV representative at the facility, Creen propose implementation of self-help. If he agreed, then it would be implemented. If not, "he would leave." Id. at 51.

219. In fact, according to her own description of events, Creen did not implement this suggestion; rather than advising Gallagher of her "proposal" when he first arrived so that he could assent or leave, she wrote the following, "I escorted him to his first area of fill - the Inmate's Visit Room. I explained to him that Rockland was behind in payment...." See, Exhibit 19 to Sussman Affirmation, See, Exhibit H at 52-53. By that time, Glassanos admitted, Gallagher was locked in the facility and could not "just leave." As he explained it, "The person was supposed to be

---

[4] At Glassanos' deposition, plaintiffs' counsel asked for the e-mail which, according to the witness, summarized the responses she received from DOCS' facilities to Kidder's March 7, 2007 letter. Defendants' counsel claimed that was "some confusion" and asked to "excuse the witness". The undersigned requested production of the document to which Mr. Glassanos referred, but the defendants' counsel never produced any such document. See, Sussman Affirmation and Exhibit H at 42-43.

advised that he or she could leave just be indicating that he or she wanted to leave." Id. at 55.  Glassanos admitted that the report from Creen did not indicate that this is what she implemented. Id.

220.  Between March 7 and May 8, 2007, Glassanos heard that RV claimed that its product was being pilfered at Shawangunk. Id. at 59.  Glassanos found that charge funny. Id. at 59-60.

221.  His May 8 conversation with Kidder and Ferri about RV could not have been Glassanos' first conversation with them about RV being behind on commission. Id. at 62.  As he explained, "This [date] is way, way into the transaction.  I'm pretty sure I had conversations with those people much earlier." Id.  at 63.

222.  After May 9, Glassanos received a call from a state police investigator investigating the self help.  Id. at 67.

### TESTIMONY OF CHERYL FREED

223.  She received a call from Creen mid-morning, between 10:00-11:00 am on May 9.  See, Exhibit R at 15-17.

224.  Creen stated, "I'm going to tell you something and you are not going to be happy about what i am going to tell you...You owe is commissions. Your driver was here.  We proceeded to hold him in our facility and we demanded that he take the money out of the machine."  When she asked Creen how she could do that,

Creen responded, "Well, we did it.  We are going to keep doing it until you pay us all the money." Id. at 16.  Creen mentioned no conferral with legal counsel in explaining the self-help undertaken that morning. Id. at 42-43.

225.  Mrs. Freed was unaware of any messages Creen claimed to have left on May 9. Id. at 23, 28.

226.  Commissions were paid late to Shawangunk because there were "shortages in the food." Id. at 38-39.  At the time Creen initiated self-help, this issue had not been resolved. Id.

227.  Before engaging in self-help, Creen sent no demand letter to RV. Id. at 40.

228.  On May 14, 2007, days after she engaged in self help, Creen sent a copy of the pertinent contract between RV and Shawangunk to Glassanos.  **See**, Exhibit 22 to Sussman Affirmation.

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

SUSSMAN & WATKINS
PO BOX 1005
GOSHEN, NY 10924

Dated: May 15, 2008