UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Index No. 07 CV 6268 (WP)(MDF)

- - - - - - - - - - - - - - - - - - - - - x

ROCKLAND VENDING CORP.,

                    Plaintiff,

        - against -

ROXANNE CREEN, sued in her individual

capacity; MARSHA F. RILEY, sued in her

individual capacity; STEWART KIDDER,

sued in his individual capacity,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - x

                        November 2, 2007

                        10:05 a.m.

    DEPOSITION of MICHAEL FREED, taken by

Defendants, Pursuant to Federal Rule 30(b)(6),

held at 10 East Post Road, White Plains, New York,

10601, before Michael Catania, a Notary Public of

the State of New York.

```
 1         A P P E A R A N C E S
 2
 3   SUSSMAN & WATKINS
     P.O. Box 1005
 4   Goshen, New York  10924
        Attorneys for Plaintiff
 5   BY: MICHAEL SUSSMAN, ESQ.
 6
     ANDREW M. CUOMO
 7   Attorney General of the State of New York
     120 Broadway - 24th Floor
 8   New York, New York  10271
        Attorney for Defendants
 9   BY: DANIEL SCHULZE, ESQ. (DS4198)
        Assistant Attorney General
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                  [Page 2]
```

```
 1                 Freed
 2   this may help.
 3            MR. SCHULZE:  You can show him that.
 4            Do you mind marking that?
 5            MR. SUSSMAN:  Yes.
 6            MR. SCHULZE:  He identified it now.
 7   Do you want me to show him this?
 8            MR. SUSSMAN:  It is the same
 9   document.
10            MR. SCHULZE:  Mark an e-mail from me
11   to Michael Sussman as Defendant Exhibit B, dated
12   10/31/07, including the text of the Rule
13   30(b)(6) Notice.
14            (Exhibit D-B, E-mail, marked for
15   identification.)
16       Q.  I show you what has been marked for
17   identification as Defendant Exhibit B.
18            Is that what you were referring to?
19       A.  As having seen before?
20       Q.  Yes.
21       A.  Yes.
22       Q.  The first thing in that e-mail is a
23   text of the Notice Pursuant to Rule 30(b)(6).
24            Do you see that?
25       A.  I don't know what Rule 30(b)(6) is.
                                  [Page 4]
```

```
 1                 Freed
 2   M I C H A E L   F R E E D, called as a witness,
 3        having been first duly sworn, was
 4        examined and testified as follows:
 5            MR. SCHULZE:  Mark the Notice of
 6   Deposition pursuant to Rule 30(b)(6) as
 7   Defendant Exhibit A.
 8            (Exhibit D-A, Notice, marked for
 9   identification.)
10   EXAMINATION BY
11   MR. SCHULZE:
12       Q.  Good morning, Mr. Freed.
13       A.  Good morning.
14       Q.  I am Dan Schulze.  I represent the
15   Defendants in this case.
16            Do you understand that?
17       A.  Yes.
18       Q.  I am showing you what has been marked
19   for identification as Defendant Exhibit A.  This
20   is the Notice of Deposition Pursuant to Rule
21   30(b)(6).
22            Have you seen that document before?
23       A.  I have not seen this particular
24   document.
25            MR. SUSSMAN:  If you show him this,
                                  [Page 3]
```

```
 1                 Freed
 2       Q.  Do you see the very first language in
 3   the e-mail says, "Please take notice that
 4   pursuant to Rule 30 of the Federal Rules"?  Do
 5   you see that?
 6       A.  Yes.
 7       Q.  And five topics are listed.
 8            Do you see that?
 9       A.  Yes.
10       Q.  Do I understand that you are here
11   testifying as to the knowledge of Rockland
12   Vending Corporation as to the five topics?
13       A.  As to the knowledge of Rockland
14   Vending Corporation?
15       Q.  Yes.
16       A.  Yes.
17       Q.  What did you do to prepare for this
18   deposition?
19       A.  What did I do?  Absolutely nothing.
20       Q.  Did you meet with your attorney?
21       A.  Yes.  I did meet with Michael Sussman
22   last evening.
23       Q.  How long?
24       A.  About 45 minutes.
25       Q.  Did you look at any documents?
                                  [Page 5]
```

[2]  (Pages 2 to 5)

Freed

1             Freed
2    A.  It was 8:30 last night. I am not
3 sure exactly what I was looking at.
4        Yes. I think I -- I think
5 basically -- yes, I did. I looked over what I
6 think was the complaint or basically the
7 complaint. That was it.
8    Q.  Did you look at your Affidavit filed
9 in this case?
10   A.  I think that is what it was, yes, an
11 Affidavit.
12   Q.  Anything else?
13   A.  No. Not that I can remember.
14   Q.  Did you review any of the financial
15 records of Rockland in preparation for this
16 deposition?
17   A.  No.
18   Q.  Did you review any of the
19 correspondence with documents in preparation for
20 this deposition?
21   A.  No.
22   Q.  What is your current position?
23   A.  President of Rockland Vending
24 Corporation.
25   Q.  How long have you been President of
                                      [Page 6]

Freed

1             Freed
2 Rockland?
3   A.  33 years.
4   Q.  What does Rockland Vending
5 Corporation do?
6   A.  Provide vending machine services to
7 clients.
8   Q.  Both private and government?
9   A.  Yes.
10   Q.  Who do you currently have contracts
11 with?
12   A.  Private accounts such as -- anything
13 from -- private accounts, as well as government
14 contracts.
15   Q.  Do you currently have government
16 contracts?
17   A.  We currently do have government
18 contracts, yes.
19   Q.  Who with?
20   A.  The Federal Government, the State of
21 New York. We continued to have one, two with
22 one so -- two contracts with the state.
23        And we also have -- we have held in
24 the past county contracts, federal, state and
25 local government contracts.
                                      [Page 7]

Freed

1             Freed
2   Q.  How many contracts do you have with
3 the Federal Government?
4   A.  One.
5   Q.  What is that for?
6   A.  The Federal Courthouse in White
7 Plains.
8   Q.  Did you have anything you wanted to
9 add?
10   A.  Yes -- no, I thought about another
11 contract that might have been federal, but it is
12 not. It is state.
13   Q.  What was that?
14   A.  It is a state police -- actually -- I
15 am sorry. It is part of the same contract.
16        The Federal Courthouse was packaged
17 in with another facility that I believe is a
18 state facility.
19   Q.  Do you have any contacts with the
20 Federal Judges in the White Plains courthouse?
21   A.  No.
22   Q.  Does anyone from your company deal
23 with the Federal Judges in connection with the
24 contracts?
25   A.  No.
                                      [Page 8]

Freed

1             Freed
2   Q.  What are your contracts with New York
3 State?
4   A.  New York State Correctional
5 Facilities. We had 11 New York State
6 Correctional Facilities, and I don't know -- I
7 can't recall whether we have any other state
8 contracts.
9        I don't believe we do right now. We
10 may have in the past. It has been 32 years.
11   Q.  Which of the contracts are still in
12 effect?
13   A.  Fishkill Correctional Facility, which
14 actually is bidding their vending with a
15 mandatory site visit today. Fishkill and Green
16 correctional facility.
17   Q.  Do you have any contracts with New
18 York City?
19   A.  We had -- we have had contracts with
20 New York City.
21   Q.  Do you have any currently?
22   A.  No.
23   Q.  How many employees does Rockland have
24 currently?
25   A.  Currently?
                                      [Page 9]

[3]  (Pages 6 to 9)

1          Freed
2     Q.  Yes.
3     A.  I don't know exactly, but I would say
4  probably -- the number I am thinking of is 13.
5     Q.  Do you employ drivers at Rockland?
6     A.  Yes.
7     Q.  The drivers are employees of Rockland
8  and are not with the contractors; is that
9  correct?
10    A.  Yes.  They are employees of Rockland
11  Vending.
12    Q.  Is Mr. Gallagher currently an
13  employee of Rockland?
14    A.  Yes.
15    Q.  How many drivers does Rockland
16  employ?
17    A.  Currently five.
18    Q.  Earlier this year, did Rockland
19  employ more than five drivers?
20    A.  Yes.
21    Q.  How many drivers did it employ in
22  January of this year?
23    A.  Okay.  Again, I believe it was ten.
24  It could have been 11, and it could have been
25  nine.  But I believe it was ten.
                                    [Page 10]

1          Freed
2          And the last one was actually four
3  years.  I believe it was nine years ago.  I
4  believe it was nine years ago.
5     Q.  You understand that you are here
6  testifying on behalf of Rockland?
7     A.  Yes.  Where I don't have the
8  knowledge, I am trying to express that, of what
9  I am not exactly sure.
10    Q.  What was the first contract for?
11    A.  Vending machine services.
12    Q.  At which facility?
13    A.  Fishkill Correctional Facility.
14    Q.  Any other?
15    A.  That was the first one.  They are bid
16  individually.
17    Q.  How long did that contract last?
18    A.  That was a four-year contract.
19    Q.  After that contract expired, did you
20  rebid?
21    A.  Yes.
22    Q.  What year was that?
23    A.  It was a two-year contract with two
24  options for one year.  It was four years
25  after -- if it was nine ears -- it was five
                                    [Page 12]

1          Freed
2     Q.  How about in May of this year?
3     A.  I believe in May it was also -- in
4  the beginning of May it was also ten.
5          There has been no change between
6  those times.
7     Q.  When did Rockland first enter into a
8  contract with the Department of Correctional
9  Services?
10    A.  I --
11    Q.  New York State Department of
12  Correctional Services?
13    A.  Right.  I believe eight years ago.
14         MR. SUSSMAN:  Do you want to call it
15  DOCS rather than New York State Department of
16  Correctional Services every time?
17         MR. SCHULZE:  Yes.
18    Q.  You will understand that?
19    A.  Yes.
20    Q.  Your first contract with DOCS was
21  eight years ago?
22    A.  Again, without reviewing my boards,
23  it is my best recollection that it was eight
24  years ago.  The way I am determining that is
25  that this was a five-year contract.
                                    [Page 11]

1          Freed
2  years ago.
3     Q.  Is that contract currently in effect?
4     A.  Yes.
5     Q.  When you bid for that contract, did
6  you bid for any other correctional facility
7  contract?
8          MR. SUSSMAN:  You mean the one five
9  years ago?
10         MR. SCHULZE:  Yes.
11    A.  At that time, no, it bid one at a
12  time.
13    Q.  At the beginning of 2007, how many
14  New York State correctional facilities did you
15  have contracts with?
16         MR. SUSSMAN:  You mean January 1, in
17  the beginning?  So that there is no ambiguity.
18         MR. SCHULZE:  Yes.  I am trying to
19  get a framework here.
20    A.  Okay.  Give me a second.  Ten.  I
21  believe it was ten.
22    Q.  Was one of the facilities that you
23  had a contract with the Shawangunk Correctional
24  Facility?
25    A.  Yes.
                                    [Page 13]

[4]  (Pages 10 to 13)

Freed

1
2  **Q.**  When did that contract start?
3  **A.**  I am not sure.
4  **Q.**  Was it in effect in 2006?
5  **A.**  Yes.
6  **Q.**  Did the contract require you to pay
7  commissions and a leasing fee for the space?
8  **A.**  Yes.
9  **Q.**  Were you ever late with payments for
10  those commissions and lease fees?
11  **A.**  Yes.
12  **Q.**  How often?
13      MR. SUSSMAN:  You are talking about
14  Shawangunk?
15      MR. SCHULZE:  Yes.
16  **A.**  At times we were late on commissions.
17  How often -- at times we were current. I am not
18  sure how to answer that question properly. We
19  were late from time to time.
20  **Q.**  Were there times where you were as
21  much as three months late in paying commissions?
22  **A.**  Yes.
23  **Q.**  Why was that?
24  **A.**  Financial -- we were just having --
25  we were having trouble remaining profitable.

[Page 14]

Freed

1
2  **A.**  We were contacted by the business
3  officer at the facility and we were also
4  contacted by Mr. Kidder.
5  **Q.**  Who is the business person at the
6  facility?
7  **A.**  Roxanne Creen.
8  **Q.**  Did she contact you personally?
9  **A.**  Yes.
10  **Q.**  How many times?
11  **A.**  Several.
12  **Q.**  By telephone?
13  **A.**  I believe I received e-mail
14  correspondence. And I might have also received
15  a letter.
16      And I don't recall any telephone
17  calls, but it could have happened.
18  **Q.**  When is the first time she contacted
19  you regarding late payments at Shawangunk?
20  **A.**  I'm sorry. I don't recall that.
21  **Q.**  Was it before 2006?
22  **A.**  That would have been 2005. No. I
23  don't believe so. I don't believe so because I
24  don't believe we were late prior to that.
25  **Q.**  At Shawangunk specifically?

[Page 16]

Freed

1
2  **Q.**  When were you having trouble
3  remaining profitable?
4  **A.**  At the facility I would say the
5  last -- within the last year.
6  **Q.**  From when to when?
7  **A.**  The last year we were involved in the
8  contract. And prior to that we were not late on
9  commissions.
10  **Q.**  Specifically what time period?
11  **A.**  I don't have that information.
12  **Q.**  When you say last year, do you mean
13  last year from today?
14  **A.**  No. I would say the final year we
15  were at the facility we were running late on
16  commissions.
17      So if we pulled out -- I think the
18  contract was over in May. So I would say the
19  last year, May to May, approximately.
20  **Q.**  May 2006, May 2007; correct?
21  **A.**  Approximately.
22  **Q.**  Were you contacted by anyone in
23  regards to the late payments?
24  **A.**  Yes.
25  **Q.**  Who?

[Page 15]

Freed

1
2  **A.**  That is correct.
3  **Q.**  How often were you contacted by Mr.
4  Kidder?
5  **A.**  Once.
6  **Q.**  Was that a letter in November 2006?
7  **A.**  That is correct.
8  **Q.**  What did that letter say?
9      MR. SUSSMAN:  Objection.
10      You can answer.
11  **A.**  The letter basically said that we
12  needed to catch up on all commissions at all
13  facilities.
14      MR. SCHULZE:  Mark as Defendant
15  Exhibit C a letter from Stewart Kidder to
16  Michael Freed dated November 9, 2006.
17      (Exhibit D-C, Letter, 11/9/06, marked
18  for identification.)
19  **Q.**  I hand you what has been marked for
20  identification as Defendant Exhibit C marked for
21  identification.
22      Is that the letter to which you are
23  referring?
24      MR. SUSSMAN:  Are you asking him if
25  he received this copy or --

[Page 17]

[5]  (Pages 14 to 17)

| | |
|---|---|
| 1 Freed | 1 Freed |
| 2 MR. SCHULZE: The question is, is | 2 **Q.** What did you understand that comment |
| 3 that the letter to which he is referring in his | 3 about Shawangunk to be referring to? |
| 4 testimony. | 4 A. That our contract at Lincoln was |
| 5 A. Yes. | 5 being cancelled. |
| 6 **Q.** Your counsel is pointing to | 6 **Q.** You were told that in 2006? |
| 7 something. Is there something you want to add? | 7 A. It was shortly after the letter was |
| 8 A. No. Actually, the bcc, I am not sure | 8 received. |
| 9 if those correctional facilities were missed on | 9 **Q.** Did this call take place with you |
| 10 my letter. | 10 personally? |
| 11 **Q.** When you received this letter, you | 11 A. Yes. |
| 12 did not know whether it had been copied to the | 12 **Q.** What did you say when you were told |
| 13 correctional facilities? | 13 that? |
| 14 A. When I got the letter, I did not know | 14 A. I don't recall. I was taken aback. |
| 15 if it was copied to the other correctional | 15 **Q.** Taken aback? |
| 16 facility. | 16 A. Yes, I was shocked. |
| 17 **Q.** You emphasize the words "got that | 17 **Q.** At that time did you believe |
| 18 letter." | 18 Shawangunk was cancelling their contract? |
| 19 Did you later become aware of the | 19 A. No. |
| 20 copies to other correctional facilities? | 20 **Q.** At that time did Lincoln in fact |
| 21 A. Yes. | 21 cancel their contract? |
| 22 **Q.** How did you become aware of that? | 22 A. No. |
| 23 A. One of the stewards at one of the | 23 MR. SCHULZE: Off the record. |
| 24 other facilities specifically called me and told | 24 (Discussion off the record.) |
| 25 me that we know what happened at -- at this | 25 **Q.** In Mr. Kidder's letter of November |
| [Page 18] | [Page 20] |
| | |
| 1 Freed | 1 Freed |
| 2 facility. | 2 9 -- |
| 3 **Q.** What facility? | 3 A. Excuse me. Can you give me a second? |
| 4 A. That was Lincoln Correctional | 4 MR. SCHULZE: Note the witness is |
| 5 Facility. | 5 conferring with his counsel. |
| 6 **Q.** This letter does not say anything | 6 A. I am sorry. |
| 7 that happened at Lincoln Correctional Facility? | 7 **Q.** In the letter of November 9, 2006, |
| 8 A. No. | 8 did Mr. Kidder remind you that commissions had |
| 9 **Q.** Who was the steward you spoke to? | 9 to be paid on time? |
| 10 A. Ms. Mason. | 10 MR. SUSSMAN: Objection. The letter |
| 11 **Q.** Did Miss Mason say that she had | 11 speaks for itself. |
| 12 received this letter that is marked for | 12 You can answer. |
| 13 identification as Defendant Exhibit C? | 13 A. Yes. |
| 14 A. No. | 14 **Q.** Is that what you understood? |
| 15 **Q.** What do you recall that you believe | 15 A. Yes. |
| 16 led you to believe she received this letter? | 16 **Q.** Did you understand that he was |
| 17 A. She told me -- I believe she | 17 telling you that if you did not pay the |
| 18 explained to me that we all know what happened | 18 commissions on time that you could be |
| 19 at Shawangunk and -- that she was taking action | 19 disqualified from the State contract? |
| 20 to make sure that the same thing happened at | 20 A. Yes. |
| 21 Lincoln. | 21 MR. SCHULZE: Mark as Defendant |
| 22 **Q.** What day was that? | 22 Exhibit D a one-page letter dated November 13, |
| 23 A. I don't recall. | 23 2006 from Michael Freed to Stewart Kidder. |
| 24 **Q.** What month was it? | 24 (Exhibit D-D, Letter, 11/13/06, |
| 25 A. It was shortly after this letter. | 25 marked for identification.) |
| [Page 19] | [Page 21] |

[6]  (Pages 18 to 21)

Freed

1        Freed
2    **Q.**  I hand you what has been marked for
3  identification as Defendant Exhibit D. Leaving
4  aside the fax line at the top and the stamp on
5  that, do you recognize this document?
6    A.  Yes.
7    **Q.**  Is that your signature at the bottom?
8    A.  Yes.
9    **Q.**  What is this document?
10   A.  It is a response to Mr. Kidder's
11 letter.
12   **Q.**  In this letter you state, "All
13 commission to all of your facilities are now
14 paid in full as of this date."
15     Was that true?
16   A.  I am sorry. Yes. I believe it was.
17 I believe that it was when I wrote this letter.
18 I am not absolutely sure.
19   **Q.**  Did you check that before you wrote
20 the letter?
21   A.  I would have -- I am not sure. I
22 would have thought that I would.
23   **Q.**  You don't remember doing so?
24   A.  No. Do I remember specifically going
25 in and talking to my bookkeeper at the time?

[Page 22]

---

1        Freed
2 No. I don't recall that.
3   **Q.**  Who is your bookkeeper?
4   A.  At that time?
5   **Q.**  Yes.
6   A.  Her name is Gail Goodson.
7   **Q.**  Is your wife employed by Rockland
8 Vending Corporation?
9   A.  Yes, she is.
10   **Q.**  What is her position?
11   A.  She is the Vice President.
12   **Q.**  After you wrote this letter to Mr.
13 Kidder, did you have any further contact with
14 him?
15     MR. SUSSMAN: What time period are
16 you speaking about; ever?
17     MR. SCHULZE: Ever.
18   A.  Yes.
19   **Q.**  When?
20   A.  On the day of the incident at
21 Shawangunk.
22   **Q.**  You are referring to May 9, 2007?
23   A.  Correct.
24   **Q.**  Between the date of this letter and
25 May 9, 2007 you did not have any contact with

[Page 23]

---

1        Freed
2 Mr. Kidder?
3   A.  I don't recall having any further
4 contact with Mr. Kidder.
5   **Q.**  Before you received his letter of
6 November 2006, did you have any contact with Mr.
7 Kidder?
8   A.  Before I received the letter, yes.
9   **Q.**  When did you have contact with him?
10     MR. SUSSMAN: The letter of November
11 9.
12     MR. SCHULZE: Yes. I just said
13 November. That's fine.
14   A.  Numerous occasions.
15   **Q.**  What about?
16   A.  Any specific issues we may have had
17 with any of the facilities that were not
18 addressed by the facility, at times I would
19 contact Mr. Kidder or his associate.
20   **Q.**  Prior to this November 2006 letter,
21 when was the last time you spoke to Mr. Kidder?
22   A.  I don't recall.
23   **Q.**  Is it fair to say that you worked out
24 most problems with the facilities directly under
25 these contracts?

[Page 24]

---

1        Freed
2   A.  Wherever possible.
3   **Q.**  Was the steward at each facility the
4 person you would normally contact?
5   A.  In each facility it was slightly
6 different. Some of the stewards were delegated
7 to someone below them.
8   **Q.**  Was Roxanne Creen your contact at
9 Shawangunk?
10   A.  No, not normally.
11   **Q.**  Who was your normal contact?
12   A.  A woman by the name of Margie, and
13 she worked in the business office.
14   **Q.**  After you wrote this letter in
15 November 2006, did you fall delinquent in
16 payment to Shawangunk again?
17   A.  Yes.
18   **Q.**  When was that?
19   A.  I don't recall.
20   **Q.**  When was the last time Rockland made
21 a commission payment on the Shawangunk contract?
22   A.  I don't recall.
23   **Q.**  Did you review the records in
24 preparation for this deposition?
25   A.  No.

[Page 25]

[7]  (Pages 22 to 25)

Freed

1    Q.  On the date of May 9, 2007, how
2  delinquent were you on the Shawangunk contract?
3    A.  I am sorry. I don't recall. I don't
4  have that.
5    Q.  Had you been contacted at that point
6  by Roxanne Creen about the delinquencies.
7       MR. SUSSMAN:  Between the November
8  and May period?
9       MR. SCHULZE:  Yes, that's fine. I
10  said before May 9.
11    A.  Yes. I believe so, yes.
12       MR. SUSSMAN:  Between November and
13  May, you believe you were contacted?
14       THE WITNESS:  Yes. I believe so.
15    Q.  How many times?
16    A.  I don't know.
17    Q.  What did she say to you when she
18  contacted you?
19    A.  As I recall, they were threatening in
20  nature, that we had better pay the commissions.
21       And when I -- just that we had better
22  pay the commissions.
23    Q.  When you say threatening in nature,
24  what do you mean?

[Page 26]

Freed

1    A.  They were very abrupt -- threatening
2  is the wrong word. They were very abrupt and
3  pay us our commission.
4    Q.  What does that mean?
5    A.  That's what she would say. Pay the
6  commissions now. Pay the commissions.
7    Q.  Were these written communications or
8  oral?
9    A.  I had received some e-mails from her.
10    Q.  Did you respond to any of those
11  e-mails?
12    A.  I did, I believe. I don't recall
13  specifically. But I think I would have
14  responded to e-mails.
15    Q.  What did you say?
16    A.  I am sorry. I don't recall.
17    Q.  Did you pay?
18    A.  We would have -- I don't recall. I
19  don't recall specifically an e-mail that I
20  responded to about paying a commission.
21       I know that we were behind. But we
22  did pay commissions to try to catch up. We were
23  trying to catch up.
24    Q.  You don't recall when the last time

[Page 27]

Freed

1  you paid a commission on that contract was;
2  correct?
3    A.  I do not.
4    Q.  You don't recall exactly how much
5  Rockland was behind in its payments on May 9,
6  2007; is that correct?
7    A.  Correct.
8    Q.  Is it fair to say Rockland was at
9  least several months behind at that point?
10    A.  It is possible.
11    Q.  Who would know?
12    A.  Going back to May, I would say either
13  my wife or the bookkeeper at the time.
14    Q.  Who was the bookkeeper at the time?
15    A.  Gail Goodson.
16    Q.  Did your wife keep the books?
17    A.  The bookkeeper would keep the books.
18  My wife is not a bookkeeper.
19    Q.  Did you review the complaint in this
20  action before it was filed?
21    A.  Yes.
22    Q.  In that complaint, does it state that
23  Rockland was delinquent in payment on May 9,
24  2007.

[Page 28]

Freed

1       MR. SUSSMAN:  Objection to form.
2       You can answer.
3    A.  I don't recall.
4    Q.  Is it fair to say that Rockland was
5  delinquent in its contract on May 9, 2007?
6       MR. SUSSMAN:  Objection.
7    A.  Yes. I believe so.
8    Q.  But you are not sure about how much?
9    A.  That is correct. How many months, I
10  don't know. It is paid monthly.
11    Q.  Did you go to Shawangunk Correctional
12  Facility on May 9, 2007?
13    A.  No. May 9 was the day that it
14  happened. I want to make sure that I have the
15  dates correct. No.
16    Q.  That's the date you allege in your
17  complaint, May 9, 2007?
18    A.  That is correct. It's not --
19    Q.  You don't have personal knowledge of
20  what happened at Shawangunk on that date; is
21  that correct?
22    A.  Yes, I do. I have my employee's
23  statement to me. That's by personal knowledge.
24    I am not sure what the definition of

[Page 29]

[8] (Pages 26 to 29)

```
 1            Freed
 2   personal knowledge is. My employee told me
 3   exactly what happened.
 4      Q.  You have personal knowledge of what
 5   your employee told you what happened, but you
 6   don't have personal knowledge if what he told
 7   you was true; is that correct?
 8      A.  Correct.
 9      Q.  What time does Rockland normally open
10   for business?
11      A.  Five o'clock in the morning. That's
12   what time my drivers report.
13      Q.  Who is present when your drivers
14   report?
15      A.  A route supervisor opens the building
16   so that the drivers can come in and then -- a
17   route supervisor.
18      Q.  Does Rockland have a switchboard?
19      A.  We have a receptionist, yes.
20      Q.  What time does the receptionist start
21   work?
22         MR. SUSSMAN:  You are talking about
23   in May?
24         MR. SCHULZE:  I am talking in
25   general. I will get to the specific date that
                                    [Page 30]
```

```
 1            Freed
 2      A.  I did not arrive at work that day.
 3      Q.  Did your wife go to work that day?
 4      A.  Yes.
 5      Q.  Do you know what time she arrived at
 6   work?
 7      A.  I do not.
 8      Q.  Was she with you at all that day?
 9      A.  No.
10      Q.  Where were you that day?
11      A.  I was in Maryland.
12      Q.  Who was the first person at Rockland
13   Vending who learned of what had happened to Mr.
14   Gallagher on May 9, 2007?
15         MR. SUSSMAN:  Objection.
16         You can answer if you know.
17      A.  I don't know.
18      Q.  Do you understand that you are here
19   testifying on behalf of Rockland Vending
20   Corporation?
21      A.  Oh, absolutely.
22      Q.  But you don't know who was contacted?
23      A.  Who was the first person to answer
24   the telephone when Mr. Gallagher called? I
25   don't know.
                                    [Page 32]
```

```
 1            Freed
 2   we are talking about, too.
 3         MR. SUSSMAN:  Okay.
 4      A.  Our receptionist reports, I believe,
 5   at 8:30 in the morning.
 6      Q.  Who is your receptionist?
 7      A.  Right now it is Diane. And I don't
 8   know her last name.
 9      Q.  Who was it in May 2007?
10      A.  I believe it was Diane. I believe it
11   was Diane.
12      Q.  Prior to Diane reporting to work,
13   what happens if someone calls Rockland?
14      A.  It goes to a voicemail system.
15      Q.  Who can access that voicemail system?
16      A.  Diane, my wife and -- if they leave
17   it in the general mailbox, it will go to Diane;
18   or my wife would check the voicemail in the
19   morning. Unless someone sends a message into a
20   specific voice mail.
21      Q.  Do you know what time Diane was at
22   work on May 9, 2007?
23      A.  I do not.
24      Q.  What time did you arrive at work on
25   May 9, 2007?
                                    [Page 31]
```

```
 1            Freed
 2      Q.  When did Mr. Gallagher call?
 3      A.  Sometime during the day. I don't
 4   recall the exact time.
 5      Q.  Is there any telephone record of
 6   this?
 7      A.  I guess if you are asking if we keep
 8   a log of telephone calls that come in, no, no.
 9      Q.  Besides a log of telephone calls, is
10   there any other type of record with respect to
11   calls?
12      A.  When it ultimately reached me, I
13   started making notes.
14      Q.  Who did Mr. Gallagher speak to?
15      A.  He spoke to my wife.
16      Q.  Do you know what time?
17      A.  I don't.
18      Q.  Is there any way that you can
19   estimate the time?
20      A.  No. I don't recall. It was sometime
21   during the work day.
22         I just don't recall what time it was.
23   You know what? I seem to believe it was right
24   about lunchtime. But I don't have any specific
25   way to anchor that.
                                    [Page 33]
```

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

1           Freed
2    **Q.** Why do you think it was possibly
3    around lunchtime?
4    A.   Because I was going for lunch. I
5    know exactly where I was. I was stopped in a
6    shopping center getting ready to go into Dunkin'
7    Donuts and grab a bagel.
8          I really -- actually, to answer your
9    question, I don't recall what time it was.
10   Guessing is not something that I should be doing
11   right here. And that was a guess.
12   **Q.** I don't want a guess. I would like
13   to have a fair estimate if you have one.
14   A.   I don't.
15   **Q.** What did Mr. Gallagher say to your
16   wife?
17   A.   He had told her that -- this is
18   secondhand. Whatever I tell you now would be --
19   if you are asking me specifically what he told
20   my wife, I don't know.
21   **Q.** Is your wife an employee of Rockland?
22   A.   Yes.
23   **Q.** What did he say to your wife?
24   A.   I don't know. I was not there.
25   **Q.** What did your wife say to him?
                                    [Page 34]

1           Freed
2    I didn't understand what she was trying to tell
3    me.
4          But she told me that he had been
5    locked in a room, and they took his money and
6    he -- he was locked in a room and they took his
7    money.
8    **Q.** When you say "he," did she say who he
9    was?
10   A.   Mr. Gallagher, Ken.
11   **Q.** When you say his money, what did that
12   refer to?
13   A.   The money in the vending machines.
14   **Q.** That he was there to pick up?
15   A.   Not just money that he was -- yes,
16   I'm sorry. Yes. Yes.
17   **Q.** How long did your call last with your
18   wife?
19   A.   I don't recall.
20   **Q.** Did your wife receive a call from
21   Roxanne Crren that day?
22   A.   I don't know.
23   **Q.** Did you ask her?
24   A.   I don't recall if she had --
25   throughout that whole day period you are saying?
                                    [Page 36]

1           Freed
2    A.   Again, I don't know.
3    **Q.** Did you speak to Mr. Gallagher that
4    day?
5    A.   Yes.
6    **Q.** When did you speak to him?
7    A.   After the telephone call that he made
8    to my wife, and my wife's telephone call to me,
9    I then contacted Mr. Gallagher on his cellular
10   telephone.
11   **Q.** Your wife contacted you after she
12   spoke to Mr. Gallagher; is that correct?
13   A.   That is correct.
14   **Q.** What did she say to you?
15   A.   She told me that one of our employees
16   had been in prison in a facility against his
17   will, and I was in --
18         MR. SUSSMAN: He asked you what she
19   said to you. That's what she said to you?
20         THE WITNESS: Yes.
21   A.   She said that he has been in prison
22   against his will. He had been held.
23   **Q.** Did she explain?
24   A.   Yes. That was basically -- I think I
25   asked her three times to repeat herself because
                                    [Page 35]

1           Freed
2    **Q.** Yes.
3    A.   I don't know.
4    **Q.** Did your wife receive a call from
5    Roxanne Creen before she talked to Mr.
6    Gallagher?
7    A.   No.
8          MR. SUSSMAN: When who talked to
9    Gallagher.
10         MR. SCHULZE: The wife.
11   A.   No.
12   **Q.** How do you know that?
13   A.   Because we had no indication at all
14   this was going to happen until it occurred. We
15   had no communications with Shawangunk that day
16   until this occurred.
17   **Q.** When you say until this occurred,
18   what are you referring to?
19   A.   Until we received a call from Ken
20   Gallagher saying he had just gotten out of the
21   facility.
22   **Q.** Did Anyone at Rockland receive a call
23   from Roxanne Creen shortly after the call from
24   Mr. Gallagher?
25   A.   I don't believe so.
                                    [Page 37]

[10]  (Pages 34 to 37)

Freed

1
2  Q.  Did you ask your wife if she received
3  a call from Roxanne Creen that day?
4  A.  I don't recall.
5  Q.  You don't recall whether you asked
6  her?
7  A.  I don't recall whether I asked her.
8  My recollection -- my best recollection is that
9  we did not.
10  Q.  After you spoke to your wife, you
11  called Mr. Gallagher; is that correct?
12  A.  Yes.
13  Q.  About what time was that?
14  A.  I don't recall.
15  Q.  Did you reach him?
16  A.  I believe I did.
17  Q.  Did he say where he was?
18  A.  I don't recall.
19  Q.  Did you ask him where he was?
20  A.  I believe at that point he had left
21  the facility and he was on the way back to our
22  office.
23  Q.  What did he --
24  A.  That's my recollection.
25  Q.  In the call, what did he say to you
                                          [Page 38]

Freed

1
2  and what did you say to him?
3  A.  I was -- I asked him to repeat what
4  had occurred, and he did.
5  Q.  What specifically did he say?
6  A.  That he was held at the facility.  He
7  was not allowed to leave.  He was not allowed to
8  call our office.
9  And then after approximately one
10  hour, he gave them all the money, and they gave
11  him a receipt and he left the facility.
12  Q.  Are those the specific words he used?
13  A.  No.
14  Q.  Tell me as much as you can about the
15  specific words he used.
16  A.  I don't recall specifically.  I
17  recall that he was shaken up.
18  Q.  Did he mention Roxanne Creen?
19  A.  Yes.
20  Q.  What did he say about her?
21  A.  He said that her and two -- he said
22  that she was involved -- that she and two of the
23  employees of Shawangunk were the ones that held
24  him in that room.
25  Q.  Room?
                                          [Page 39]

Freed

1
2  A.  It was the visiting room.
3  Q.  Did he describe how he was being
4  held?
5  MR. SUSSMAN:  Objection to form.  I
6  am not clear what you mean by the question how
7  he was being held.
8  Q.  You can answer.
9  A.  The door was locked and he was not
10  allowed to leave.
11  Q.  Did he ask to leave?
12  A.  Yes.
13  Q.  He told you that?
14  A.  Specifically, yes.
15  Q.  Did he replenish the machines while
16  he was there?
17  A.  I don't know.
18  Q.  Did he say whether he replenished the
19  machines in this call?
20  A.  I don't recall.
21  Q.  Did Mr. Gallagher ask you to do
22  anything in this call?
23  A.  No.  I don't recall.  I don't think
24  so.
25  Q.  What was his voice like?
                                          [Page 40]

Freed

1
2  A.  He was shook up.
3  Q.  How could you tell?
4  A.  Just the sound of his voice.
5  Q.  Describe it.
6  A.  I think when you worked with someone
7  for a time and talk to them on a regular basis,
8  and that person is upset, you can tell that from
9  his voice.
10  I don't know how to describe that.
11  He was not crying.  He was just upset.
12  Q.  But you cannot describe the tone of
13  his voice at all?
14  A.  I don't know how to.  No.
15  I remember that he sounded upset but.
16  Specifically how that -- how he sounded I don't
17  recall.  I don't know if I can describe it.  He
18  didn't sound normal.
19  Q.  What did you do after you made the
20  call to Mr. Gallagher?
21  A.  I called Mr. Kidder.
22  Q.  What time was that?
23  A.  Right after I spoke to Mr. Gallagher.
24  Q.  Did you reach him?
25  A.  Yes.
                                          [Page 41]

[11]  (Pages 38 to 41)

1             Freed
2    **Q.** What did you say?
3    A.  I was -- I told him what happened at
4 Shawangunk.
5    **Q.** Specifically what did you say?
6    A.  I said that one of our -- I told him
7 what happened, that one -- I am not going to
8 quote because it is eight months ago -- but I
9 told him that one of our employees was just held
10 against his will at Shawangunk Correctional
11 Facility for an hour, and was told that they had
12 to give the money, all of the money in the
13 machines and empty the machines and give them
14 the money.
15        MR. SUSSMAN: When he is asking you
16 to recall, give him the sum and substance. If
17 you don't remember the exact words, give him the
18 sum and substance of what you do remember.
19        Obviously, if you remember, then tell
20 him exactly. You can give him the sum and
21 substance if you don't remember.
22    **Q.** What did he say to you?
23    A.  He was aware of it.
24    **Q.** Meaning what?
25    A.  He knew about it. He knew that it
                                          [Page 42]

1             Freed
2 was going to occur and he agreed with it. I
3 remember this --
4    **Q.** What did he say?
5    A.  He said I know. I know that
6 happened. And I remember I said I was -- I said
7 you knew that occurred? I remember repeating
8 myself like twice. You knew that occurred? I
9 do remember that.
10        He was very specific that he did know
11 that was going to occur and --
12    **Q.** What did you understand that to refer
13 to?
14    A.  He knew they were going to hold my
15 employee in that facility and take his money.
16    **Q.** Take his money meaning what?
17    A.  Take the company's funds.
18    **Q.** Take the money out of the vending
19 machine?
20    A.  Correct.
21    **Q.** What did you say?
22        MR. SUSSMAN: Beyond what you already
23 told him. In the flow of the conversation, was
24 anything said next?
25    A.  I believe I told him it was against
                                          [Page 43]

1             Freed
2 the law to do that.
3    **Q.** Did you explain that?
4    A.  I believe I did tell him.
5    **Q.** Did you explain what you meant by
6 that?
7    A.  Yes.
8    **Q.** What did you say?
9    A.  I told him that it was grand larceny
10 and extortion. And the sum and substance of
11 what I said is that it was against the law. I
12 believe I did mention those words.
13    **Q.** What did he say in response to that?
14    A.  He told me that she was advised by an
15 attorney in Albany to take the action that she
16 did, and that he gave me the name of the
17 attorney in Albany if I wanted to contact him.
18    **Q.** What was the name?
19    A.  I don't recall. I do have -- I don't
20 recall.
21    **Q.** Does the name George Glassanos ring a
22 bell?
23    A.  It does not ring a bell.
24    **Q.** Did you contact that attorney?
25    A.  No.
                                          [Page 44]

1             Freed
2    **Q.** Why not?
3    A.  Because I didn't think whatever he
4 had to say was relevant.
5    **Q.** What do you mean?
6    A.  I had already spoken to a close
7 friend of mine who is an attorney, and he told
8 me --
9        MR. SUSSMAN: You don't have to go
10 into that.
11    A.  I had spoken to an attorney. And I
12 didn't agree with that assessment, and there was
13 no point in talking to Mr. Kidder.
14    **Q.** Who was the attorney?
15    A.  Howard Kave.
16        MR. SCHULZE: Are you asserting the
17 communications were privileged?
18        MR. SUSSMAN: Yes. This is an
19 attorney that he has used in consulting on a
20 number of prior occasions.
21        In that time he was acting in that
22 role as I understand. You can inquire about
23 that. But that's my understanding of the
24 relationship between Kave and Freed at that
25 time.
                                          [Page 45]

[12]  (Pages 42 to 45)

Freed

1  
2    Q.   Is Mr. Kave an attorney for Rockland  
3  Vending?  
4    A.   He is more of a friend.  
5    Q.   Does he act as your personal  
6  attorney?  
7    A.   No. I don't believe so.  
8    Q.   Did you --  
9    A.   I'm sorry.  
10   Q.   Go ahead.  
11   A.   He did on one occasion.  
12   Q.   What was that about?  
13   A.   A television set that we had at home  
14 that had a warranty on it. And the warranty  
15 company didn't cover it.  
16       And so Howard wrote a letter for me,  
17 and then they covered it.  
18   Q.   That's enough. That's fine.  
19       MR. SUSSMAN: It is your privilege to  
20 assert and not mine. If you wish to disclose  
21 the conversation that you had with Mr. Kave, you  
22 are allowed to do that.  
23       It is not Mr. Kave's decision, nor my  
24 decision. Counsel is free to inquire as he has,  
25 and you can tell him.  
[Page 46]

Freed

1  
2       If you believe that you were  
3  consulting with him for legal advice, then my  
4  opinion is that you can assert the privilege,  
5  and it will have to be decided by a judge if  
6  counsel want to argue that point.  
7    Q.   What did Mr. Kave say to you in with  
8  regard to whether the actions were legal or not?  
9    A.   He said they were illegal.  
10   Q.   Did he explain why?  
11   A.   Yes.  
12   Q.   What did he say?  
13   A.   Can I hold that?  
14   Q.   No, not now. Because you have waived  
15 the privilege.  
16   A.   Okay. I -- I called Mr. Kave as soon  
17 as I heard about this because I had no idea that  
18 someone could do that.  
19   Q.   When you say as soon as you heard  
20 about this, you mean after your call with Mr.  
21 Gallagher?  
22   A.   Correct.  
23   Q.   Then you spoke to Mr. Kave?  
24   A.   Yes, correct.  
25   Q.   This is before you called Mr. Kidder;  
[Page 47]

Freed

1  
2  correct?  
3    A.   Yes.  
4    Q.   What did you say to Mr. Kave, and  
5  what did he say to you?  
6    A.   I explained that a driver had gone  
7  into a facility to service and check the  
8  machines.  
9       He had been held at the facility and  
10 they had taken the collection -- all of the  
11 money out of the vending machines.  
12      I asked him if they can do that. Mr.  
13 Kave told me that is grand larceny, extortion.  
14      I think he mentioned false  
15 imprisonment, but I am not sure this he did or  
16 not.  
17      He advised me to have our driver go  
18 immediately to the State Police and report it.  
19   Q.   Did you speak to him as to whether  
20 the contract at issue allowed DOCS to collect  
21 those monies from the driver?  
22   A.   I did not.  
23   Q.   Why not?  
24   A.   I did not. I just didn't. I told  
25 him what had occurred on that specific day.  
[Page 48]

Freed

1  
2    Q.   Did you tell him that the monies DOCS  
3  took belonged to Rockland?  
4    A.   Yes.  
5    Q.   Based on this conversation with Mr.  
6  Kave, you decided that it would not serve any  
7  purpose to call the counsel at DOCS?  
8       MR. SUSSMAN: At DOCS or the  
9  counsel -- you have not established who the  
10 counsel is yet.  
11      I don't know if he was an AG at DOCS  
12 or whatever.  
13      MR. SCHULZE: Let me go back then.  
14   Q.   You testified that Mr. Kidder in his  
15 call with you said that counsel had told Ms.  
16 Creen to take the action she did; correct?  
17   A.   That is correct.  
18   Q.   Who did he say the counsel was?  
19   A.   I don't recall the name, but he did  
20 specify a name.  
21   Q.   Did he give you contact information  
22 for that person?  
23   A.   Yes.  
24   Q.   Do you remember the telephone number?  
25   A.   No, not offhand.  
[Page 49]

[13]  (Pages 46 to 49)

Freed

1
2   **Q.**  Do you have it written down?
3   A.   Yes.
4   **Q.**  Do you have the name written down?
5   A.   Yes, I do.
6   **Q.**  Is the counsel an attorney with DOCS?
7   A.   He did not specify that I can recall.
8   **Q.**  Who did you understand the counsel to
9   be?
10  A.   The department.
11  **Q.**  Who did you understand the counsel to
12  be representing?
13  A.   The Department of Corrections.
14  **Q.**  And you decided not to call this
15  counsel because of your conversation with Mr.
16  Kave; correct?
17  A.   That is correct.
18  **Q.**  What did you do next?
19  A.   After speaking to Mr. Kidder?
20  **Q.**  Yes.
21  A.   I believe I checked back to my office
22  to make sure that Mr. Gallagher was okay.
23  **Q.**  Was Mr. Gallagher at your office at
24  that time?
25  A.   I believe he was. I don't recall. I

[Page 50]

Freed

1
2   don't recall if they were checking on him or
3   what, but I believe he was.
4        Excuse me. No. I am sorry. We
5   direct Mr. Gallagher to go to the State Police.
6   I did contact Mr. Gallagher again, and I had
7   called and directed him to the State Police.
8        MR. SCHULZE: Let's take a short
9   break.
10       (Recess taken at this time.)
11  **Q.**  When you spoke to Mr. Gallagher, did
12  he say how long he had been detained?
13       MR. SUSSMAN: You are talking about
14  the first time? He already answered that, but
15  he can answer it again.
16       MR. SCHULZE: Yes.
17  A.   He said about one hour.
18  **Q.**  Other than what he told you, do you
19  have any knowledge?
20  A.   No.
21  **Q.**  When you told Mr. Gallagher to go to
22  the State Police, what did he say?
23  A.   He said he was fine. He said okay.
24  **Q.**  Did you order him to do that?
25  A.   I told him to go to the State Police.

[Page 51]

Freed

1
2        I don't know if you call it an order;
3   a supervisor, yes.
4   **Q.**  It was more than a suggestion; is
5   that fair?
6   A.   Yes. I told him to go.
7   **Q.**  Do you know whether he went to the
8   State Police?
9   A.   Yes, he did.
10  **Q.**  Were you present?
11  A.   No.
12  **Q.**  Do you know what he said to the State
13  Police?
14  A.   I believe he described what had
15  occurred.
16  **Q.**  Why do you believe that?
17  A.   Because that's what he went to the
18  State Police to do. I also -- that's why he
19  went to the State Police barracks.
20  **Q.**  What time did he go to the barracks?
21  A.   I believe it was in the afternoon.
22  **Q.**  Do you know who he spoke to?
23  A.   I don't know the name of the officer.
24  **Q.**  Did he tell you the name of the
25  officer?

[Page 52]

Freed

1
2   A.   Yes.
3   **Q.**  When did he tell you the name of the
4   officer?
5   A.   In a conversation after he left the
6   State Police barracks.
7   **Q.**  What were you doing while he was at
8   the State Police barracks?
9   A.   I was working in Maryland.
10  **Q.**  Did you talk to the State Police that
11  day?
12  A.   Yes.
13  **Q.**  Who did you speak to?
14  A.   The officer -- I don't recall his
15  name.
16  **Q.**  You were saying the officer who
17  did --
18  A.   The officer who did the
19  investigation, but I don't know his name.
20  **Q.**  Did you receive a call from that
21  officer?
22  A.   Yes.
23  **Q.**  Do you recall what time?
24  A.   Later on in the day.
25  **Q.**  What did the officer say to you, and

[Page 53]

[14]  (Pages 50 to 53)

Freed

1    what did you say to him?
2    A. The officer told me that he had
3    gotten a report from Ken, and was going to do an
4    investigation.
5    Q. Ken is Mr. Gallagher?
6    A. That is correct.
7    Q. Did he ask you any questions?
8    A. I don't recall having been asked any
9    questions, no. He might have asked me my
10   relationship to the company. I think that was
11   the only question.
12   Q. Do you know how he got your name?
13   A. The officer?
14   Q. Yes.
15   A. Yes. I called the State Police
16   barracks to see if Ken could go in and file a
17   report.
18   Q. Who did you talk to at the barracks?
19   A. I don't recall. It was a state
20   trooper.
21   Q. Did the trooper tell you to come in
22   and file a report?
23   A. Yes. He said have Ken go up there
24   and file the report. Not myself.

[Page 54]

Freed

1    A. To best of my recollection, it was
2    that he could not pursue it any further.
3    Q. Did he explain why?
4    A. No.
5    Q. What did you say?
6    A. I told him that I thought a crime had
7    been committed, and I was under the belief that
8    an action should be taken.
9    Q. Did the officer state he did not
10   believe that a crime had been committed?
11   A. No.
12   Q. And he didn't explain why he was not
13   pursuing the investigation further?
14   A. No.
15   Q. You said that you had reached the
16   conclusion that he had spoken to someone at
17   Shawangunk.
18        What did he say in that regard?
19   A. I don't recall. I recall that -- my
20   recollection is that he did speak to someone at
21   Shawangunk.
22        My recollection is that he actually
23   went to the facility and spoke to someone, but I
24   don't recall why I have that recollection.

[Page 56]

Freed

1    Q. Did he explain why?
2    A. No.
3    Q. Have you seen that police report?
4    A. No.
5    Q. After the State Police called you, do
6    you know what they did to investigate?
7    A. I don't know specifically what they
8    did. I don't know what action they took.
9    Q. Do you know generally?
10   A. I think they went up -- I think the
11   officer went up and spoke to someone at
12   Shawangunk. I do recall that.
13   Q. What is the basis for that?
14   A. My recollection?
15   Q. Yes.
16   A. Because I did receive a call from the
17   officer at the conclusion of the investigation.
18   Q. When was that?
19   A. Later that evening.
20   Q. So this investigation was finished on
21   the same day?
22   A. I believe so.
23   Q. What did the officer say when he
24   called you later that evening?

[Page 55]

Freed

1    Q. It would have been based on him
2    telling you that in the telephone call?
3    A. I would think so, yes.
4    Q. Would you have any other way of
5    knowing that?
6    A. No.
7    Q. Did you see Mr. Gallagher that day?
8    A. No.
9    Q. Did your wife see him?
10   A. Yes.
11   Q. Did you talk to your wife?
12   A. Yes.
13   Q. What did she say about Mr. Gallagher?
14   A. I remember knowing that he was upset.
15   Just that he was upset.
16   Q. What were his duties on this day?
17   A. He was to go out and service several
18   of our accounts, fill machines.
19   Q. What other account besides
20   Shawangunk?
21   A. On that specific date, I don't know,
22   because the route changes from day to day.
23   Q. Did he service other accounts that
24   day?

[Page 57]

[15]  (Pages 54 to 57)

Freed

1    A.    Yes. Prior to Shawangunk.
2    Q.    What other accounts did he service?
3    A.    Again, I don't know because his route
4    will change from day to day. Monday might be
5    different than a Tuesday. And Tuesday may be
6    different than a Wednesday. I don't know what
7    accounts he serviced that day.
8    Q.    Is there any written record of the
9    routed he had that day?
10    A.    Yes.
11    Q.    Who keeps that record?
12    A.    There was a record at that time. We
13    write it out. We have where he should be going.
14         When you say keep that record, I am
15    not sure that it is kept past that, once he
16    completes that day.
17    Q.    What is the corporate policy
18    regarding those?
19    A.    Once the day is done, you go on to
20    the next one --
21         MR. SUSSMAN: You are asking if there
22    is a regular policy keeping the drivers route
23    from the prior days?
24    Q.    A way you maintain those somewhere.
                                            [Page 58]

Freed

1    Is it on a computer, on paper, or in some other
2    form?
3         MR. SCHULZE: Right.
4    A.    Yes.
5         MR. SUSSMAN: From last May to now,
6    does somebody in your company keep them?
7    A.    I don't know. I don't know.
8    Q.    Did you ask?
9    A.    Did I ask where he had been before
10    that account?
11    Q.    No. Did you ask if those records are
12    kept?
13    A.    No. I never asked that.
14    Q.    Did he go and service any accounts
15    after what happened at Shawangunk?
16    A.    I don't know.
17    Q.    Did you ask him?
18    A.    No. Actually -- I am sorry. I did
19    not.
20    Q.    How do you know that?
21    A.    Because I sent him to the State
22    Police.
23    Q.    Did that take all day?
24    A.    I think so.
                                            [Page 59]

Freed

1    Q.    What happened to the other accounts
2    that he was supposed to service that day?
3    A.    They would have been serviced. I
4    would think they would be service the following
5    day.
6    Q.    Did Mr. Gallagher work the following
7    day?
8    A.    I don't know.
9    Q.    Who would know?
10    A.    My wife.
11    Q.    Other than the people you testified
12    about, did you speak to anybody else about the
13    events at Shawangunk?
14    A.    Yes. I believe I did.
15    Q.    Who?
16    A.    The Ulster County District Attorney.
17    And that might have been May 9 or the morning
18    after.
19         But my recollection is when I heard
20    from the State Police, I contacted the District
21    Attorney.
22    Q.    When you heard from the State Police
23    that they were done with the investigation?
24    A.    Correct.
                                            [Page 60]

Freed

1    Q.    Who did you speak to at the Ulster
2    County DA?
3    A.    Paul O'Neal. There is only one way I
4    would remember that name.
5    Q.    Are you a Yankees fan?
6    A.    Yes.
7    Q.    What did you say to Mr. O'Neal, and
8    he to you?
9    A.    He told me that it was a civil
10    matter.
11    Q.    Did he explain why?
12    A.    Yes, I -- I think he did. I think he
13    spent a bit of time explaining that it was
14    something that had to be taken up in civil court
15    because we owed them money, and they took the
16    money.
17         Yes. He indicated it should be in
18    civil court.
19    Q.    Do you recall anything more specific
20    than that?
21    A.    No. Just being dismissed.
22    Q.    How long did that conversation take?
23    A.    Probably not more than ten minutes.
24    Q.    Did you speak to anyone else at DOCS
                                            [Page 61]

[16]  (Pages 58 to 61)

Freed

1
2  on May 9?
3      A.  Not after I spoke to Mr. Kidder.
4      Q.  Did anyone at Rockland speak to
5  anyone else on May 9?
6      A.  I don't believe so.
7      Q.  On May 10, did anyone at Rockland
8  receive a call from Roxanne Creen?
9      A.  I don't know.
10     Q.  Who would know?
11     A.  The only other one who would have
12  talked to Ms. Creen would be my wife.
13     Q.  Did your wife talk to Roxanne Creen
14  that day?
15     A.  I don't know. I don't recall a
16  conversation. I don't recall anything about
17  that. Not to my knowledge.
18     Q.  On May 10, did you understand that
19  the contract with Shawangunk was still in
20  effect?
21     A.  Yes.
22     Q.  When was the next time that the
23  machines were to be serviced after May 9 at
24  Shawangunk?
25     A.  Either the next day or the day after.
                                          [Page 62]

Freed

1
2  I believe it was on an every other day schedule.
3      Q.  Did Rockland send anyone to
4  Shawangunk on May 10?
5      A.  No.
6      Q.  Why not?
7      A.  Because we were afraid to.
8      Q.  What do you mean?
9      A.  One of my employees had just been
10  incarcerated at that facility, and we were not
11  going back.
12     Q.  When you say we were not going back,
13  what do you mean?
14     A.  I was not sending anybody else to
15  that facility. Ms. Creen -- I considered Ms.
16  Creen to be a danger to my employees. Ms. Creen
17  also stated that she would do it again.
18     Q.  When did she state that?
19     A.  I believe she told that -- if I
20  remember correctly, she told that either to
21  myself or to Ken.
22     No. She couldn't have told it to me.
23  I don't think I talked to her after that. I
24  believe she told that to Ken.
25     Q.  Ken who?
                                          [Page 63]

Freed

1
2      A.  Mr. Gallagher.
3      Q.  Is this something that Ken said to
4  you?
5      A.  Yes. I believe so.
6      Q.  When did he say that to you?
7      A.  I don't recall.
8      Q.  Was it on May 9?
9      A.  I don't recall.
10     Q.  Did Rockland send anyone to
11  Shawangunk on May 11?
12     A.  No.
13     Q.  Did you speak to Roxanne Creen on May
14  11?
15     A.  No.
16     Q.  Did anyone at Rockland speak to
17  Roxanne Creen on May 11?
18     A.  I don't know.
19     Q.  Who would know?
20     A.  Whoever talked to her. I don't know
21  of any conversation that took place.
22     Q.  Did Rockland receive a call from
23  anyone at DOCS on May 10?
24     A.  I don't recall.
25     Q.  Did Rockland receive any written
                                          [Page 64]

Freed

1
2  communication from anyone at DOCS on May 10?
3      A.  Not to my recollection. I don't
4  recall.
5      Q.  Did Rockland speak to anyone from
6  DOCS on May 11?
7      A.  I don't recall. Not to my knowledge.
8      Q.  Did Rockland receive a written
9  communication from anyone at DOCS on May 11?
10     A.  I don't recall.
11     Q.  Did there come a time when Rockland
12  was notified that DOCS was terminating the
13  contract at Shawangunk?
14     A.  Yes.
15     Q.  When was that?
16     A.  I don't know. I don't recall.
17     Q.  How was Rockland notified?
18     A.  Again, I don't recall.
19     Q.  Who would be able to answer these
20  questions?
21     A.  I am not sure. I am not sure.
22     We were notified that the contract
23  was being terminated, but I don't know -- I
24  don't know who it was that received that
25  notification or how it came.
                                          [Page 65]

[17]  (Pages 62 to 65)

Freed

1    Q.   How did you personally learn of it?
2    A.   I believe it was -- it had to be a
3  written communication. At one point a letter
4  was put on my desk they were terminating our
5  contract.
6    Q.   But you don't remember when this was?
7    A.   No. I believe it was the beginning
8  of the next week. And the reason that I am
9  surmising that is because of the timing of how
10 things went down.
11         I believe it was the beginning of the
12 following week.
13   Q.   Did the written communication state
14 the reason for termination?
15   A.   I don't recall.
16   Q.   Did the written communication state
17 that monies were owed by Rockland?
18   A.   I don't know.
19   Q.   Did the written communication state
20 that the vending machines were going to be held
21 at Shawangunk?
22   A.   The vending machines were held by
23 Shawangunk. And whether the written
24 communication specifically stated that, I don't
[Page 66]

Freed

1    A.   Not specifically, no.
2    Q.   Do you know whether it goes into an
3  inmate account?
4    A.   I have been told that it does.
5    Q.   Do you know what that account is used
6  for?
7    A.   I have been told that it goes towards
8  amenities for the inmates; cable TV and things
9  like that.
10   Q.   Do you know if DOCS makes a profit on
11 the vending machine contracts?
12   A.   I have no knowledge.
13   Q.   Until they picked up the vending
14 machines, is it fair to say that after May 9,
15 2007, Rockland never sent another driver to
16 Shawangunk?
17   A.   Correct.
18   Q.   Do you know who made the decision to
19 cancel the contract at Shawangunk?
20   A.   Department of Corrections. I don't
21 know specifically who.
22   Q.   Do you know why they cancelled it?
23   A.   Based on the letters, I would assume
24 it was either because of late commissions or our
[Page 68]

Freed

1  recall because I don't recall the written
2  communication.
3    Q.   Over the term of your contract with
4  Shawangunk, how often did a typical vending
5  machine need to be replenished?
6    A.   Either daily, or every other day for
7  some of the machines.
8    Q.   What happens if they are not
9  replenished daily or every other day?
10   A.   They will empty out.
11   Q.   If they empty out, then there will
12 not be any of the vended products for the
13 inmates to obtain; is that correct?
14   A.   That is correct -- actually, that's
15 not correct. The families buy the product, but
16 the inmates cannot buy products from the
17 machine, but they can eat them.
18   Q.   In the visitors room?
19   A.   Yes.
20   Q.   Are there vending machines in the
21 officers lounge as well at Shawangunk?
22   A.   In the employee area, yes.
23   Q.   Do you know what is done with the
24 money that you pay in commissions to DOCS?
[Page 67]

Freed

1  refusal to re-enter the facility.
2    Q.   How many of your contracts with any
3  of DOCS correctional facilities were terminated
4  before their expiration date?
5    A.   I don't know offhand.
6    Q.   Who would know?
7    A.   I would, after looking at the record,
8  after reviewing.
9    Q.   When you say record, do you mean
10 Rockland's records?
11   A.   Yes, yes.
12   Q.   Do Rockland's contracts with the
13 correctional facilities have optional renewal
14 provisions?
15   A.   Yes.
16   Q.   And to exercise the renewal, both
17 sides need to agree?
18   A.   That is correct.
19   Q.   Either Rockland or DOCS were free to
20 walk away from the contract rather than renew
21 it; is that correct?
22   A.   Yes, that is correct.
23   Q.   Do you know how many of the DOCS
24 facilities chose not to exercise a renewal
[Page 69]

[18]  (Pages 66 to 69)

Freed

1  Freed
2  option?
3      A.  Several.
4      Q.  Which ones?
5      A.  Eastern, Ulster, Woodburn, Fulton. I
6  believe that those are the ones that did not
7  exercise their option.
8      Q.  Did Rockland have a contract with
9  Lincoln Correctional Facility?
10     A.  Yes, we did.
11     Q.  When did that expire?
12     A.  I believe it did not. It was
13 terminated prior. I believe it was terminated
14 prior to the expiration of the contract.
15     Q.  What do you base that belief on?
16     A.  The fact that they stopped letting us
17 into the facility, and a telephone call telling
18 us to take the machines out.
19     Q.  Would it refresh your recollection if
20 I told you that the contract expired in March
21 2007, and Rockland continued providing services
22 after the expiration date?
23     A.  That's not my recollection.
24     Q.  Okay.
25     A.  Without the specific contracts here

[Page 70]

1  Freed
2  in front of me, I can only go by what I recall.
3  That's not my recollection.
4      Q.  You understand that you are here
5  testifying on behalf of Rockland; is that
6  correct?
7      A.  Oh, absolutely.
8      Q.  Did Rockland ever claim it didn't owe
9  any commissions because there was no written
10 contract in effect with DOCS?
11         MR. SUSSMAN: With DOCS.
12     A.  I don't recall saying that.
13     Q.  Do you know whether --
14     A.  I don't recall that. I don't recall
15 that.
16     Q.  If one of the contracts reached its
17 expiration date and DOCS asked you to stay, and
18 you continued to provide vending services for
19 another month, would you owe DOCS commissions
20 for that month?
21     A.  I don't believe we would.
22     Q.  Why not?
23     A.  Because in my estimate if a contract
24 is expired and we continued to service that
25 account, I don't believe that we should be

[Page 71]

1  Freed
2  paying commissions.
3      Q.  Other than Fishkill, are there any
4  Rockland vending machines at any DOCS facilities
5  currently?
6      A.  Yes.
7      Q.  Where?
8      A.  Green Correctional Facility.
9      Q.  Is that contract still in effect?
10     A.  I believe it is.
11     Q.  What did you expect DOCS to do when
12 they were informed you that your drivers would
13 no longer enter Shawangunk Correctional
14 Facility?
15     A.  At that point my concern was for the
16 safety of my drivers, first and foremost. And I
17 was totally convinced that my drivers were not
18 safe.
19         I would not ask a driver to go some
20 place where he was not safe.
21     Q.  Okay. That's your motive. What did
22 you expect DOCS to do?
23     A.  After what occurred at Shawangunk, I
24 had no idea of what Shawangunk was capable of
25 doing, or DOCS.

[Page 72]

1  Freed
2         We had a situation that had occurred
3  and the person who was the utmost -- had the
4  utmost responsibility totally agreed with it.
5      Q.  If your driver did not enter the
6  Shawangunk facility, was there any way that
7  Rockland could continue to perform its contract?
8         MR. SUSSMAN: He did not testify that
9  the drivers would not enter the facility. He
10 directed them not to enter the facility.
11         You can answer.
12     A.  I was hoping that there would be some
13 dialogue. I guess, based on what occurred, we
14 couldn't service the account.
15     Q.  With respect to your counsel's
16 objection, I will make it clear.
17         You are the one who told the drivers
18 not to go to Shawangunk; is that correct?
19     A.  Yes.
20     Q.  Could you --
21     A.  Can I go back to correct?
22     Q.  Yes.
23     A.  Based on the last conversation, there
24 was some conversation from Shawangunk in the
25 days after that because the weekend was coming

[Page 73]

[19]  (Pages 70 to 73)

Freed

1    up.
2
3        And I recall them contacting us to
4    find out if we would be servicing them on that
5    specific weekend. There was some conversations.
6    I was not involved in it.
7        **Q.** What did Rockland tell Shawangunk in
8    that regard?
9        A. I don't know what they told them. I
10   can tell you, and it is not personal, but based
11   on what occurred, I would not allow my people to
12   go back in there.
13       **Q.** And you told your people that;
14   correct?
15       A. Absolutely.
16       **Q.** Did Rockland have a contract with
17   Coxsackie?
18       A. Yes.
19       **Q.** When did that expire?
20       A. I don't believe -- and again, without
21   the contracts in front of me -- that did expire.
22       **Q.** Do you think that the contract is
23   still in effect?
24       A. I think they cancelled prior to the
25   expiration of the contract.

[Page 74]

Freed

1
2    commissions; and some of them more. Some of
3    them four months.
4        When we -- but we had caught up, and
5    then we were terminated, didn't pick up the
6    option.
7        **Q.** When you say terminated, were you
8    including the case where the contract expired
9    and the option to renew was not used?
10       A. Some of them occurred that way, where
11   the option was not picked up. And some of them,
12   they terminated or they wouldn't allow our
13   driver's to come into the facility while our
14   contract was in effect.
15       MR. SUSSMAN: Can I have a minute
16   outside?
17       MR. SCHULZE: If it is an issue of
18   privilege, okay. Don't speak about his
19   testimony, though.
20       MR. SUSSMAN: I am not going to talk
21   to him about his testimony. There is no
22   requirement that I talk to him about his
23   testimony during the deposition, counsel.
24       (Witness and counsel leave, confer
25   and return to the deposition room.)

[Page 76]

Freed

1
2        I understand that I am under oath,
3    but that's my recollection. I could be wrong.
4        I'm looking at the contract and the
5    date that will verify. I am here without that
6    information. I believe that Coxsackie is one of
7    the accounts that terminated prior.
8        **Q.** How much were you in arrears to
9    Coxsackie?
10       A. I don't recall.
11       **Q.** How many months?
12       A. I don't recall.
13       **Q.** Is it fair to say that you were in
14   arrears?
15       A. I believe so.
16       **Q.** When --
17       A. At the day of the termination, we
18   would have been in arrears on some of these
19   facilities two to three months.
20       On some of the facilities on the day
21   we were terminated, we were paid in full.
22       **Q.** What do you mean by terminated?
23       A. In other words, on the day that they
24   concluded our service. We had been behind on
25   some of the facilities two to three months on

[Page 75]

Freed

1
2        **Q.** Having conferred with your counsel,
3    is there any testimony that you want to correct?
4        A. I just -- I don't think there is
5    anything specific. We have been late on
6    commissions for the last year. That's just the
7    way it is.
8        The reason we were terminated, and I
9    might have misunderstood your questions here, is
10   that we went to the State Police because my
11   employee was incarcerated. We were retaliated
12   against, and that's why the contracts were
13   cancelled.
14       They were not cancelled because we
15   were late on commissions, because we were always
16   late on commissions.
17       **Q.** Did your attorney tell you to say
18   that?
19       MR. SUSSMAN: Objection.
20       MR. SCHULZE: It is improper for you
21   to confer about his testimony.
22       MR. SUSSMAN: There is no question
23   pending. I am permitted to talk to him about
24   his testimony and about his case.
25       MR. SCHULZE: What you talk about

[Page 77]

[20]   (Pages 74 to 77)

1          Freed
2  after the witness is sworn is no longer
3  privileged.
4          MR. SUSSMAN: I disagree. All
5  communications between the client and the
6  attorney are privileged. I disagree.
7     Q.  What do you base that statement on?
8     A.  I base the statement on the fact
9  that, again, we have been late on commissions
10 for the last year or better, and during that
11 time they renewed our contract.
12          Now we have a situation where they go
13 in, and I think you refer to it legally as self
14 help, and helped themselves to our money and
15 incarcerated our employee. And within two
16 months they pull the contract.
17          I don't think it is a stretch to
18 assume that it was not a question of the
19 commission being late. I misunderstood the
20 questions.
21          I thought you were referring to
22 why -- what their stance was. I knew why the
23 contracts were cancelled.
24     Q.  Do you have anything other than the
25 temporal proximity that you base that statement
                                        [Page 78]

1          Freed
2  on?
3          MR. SUSSMAN: Objection to form.
4          THE WITNESS: I'm not sure what that
5  means.
6          MR. SCHULZE: You can say objection
7  to form.
8     A.  I don't know what that means.
9     Q.  You said you knew that the contracts
10 were not renewed in retaliation for your
11 complaint because it happened around the same
12 time.
13          MR. SUSSMAN: Objection. He did not
14 say that. You are mischaracterizing the
15 testimony. What he said is that the reason
16 given he was late --
17          MR. SCHULZE: He said --
18          MR. SUSSMAN: Excuse me. I will not
19 let you mischaracterize or shorten his
20 testimony. That's not going to happen.
21          He did not say that. He said there
22 was history of being late. And that during that
23 history, he said, was that his contracts were
24 extended.
25          MR. SCHULZE: Who is testifying here?
                                        [Page 79]

1          Freed
2          MR. SUSSMAN: Read back the
3  testimony. Don't play that game. He just said
4  that to you.
5          MR. SCHULZE: I am asking him
6  questions and not you. You cannot
7  mischaracterize the testimony, and then ask him
8  for the basis.
9          He told you the basis. He told you.
10    Q.  Are you ready to answer the question?
11    A.  If my attorney says I can, sure.
12          MR. SCHULZE: He can answer the
13 question.
14          MR. SUSSMAN: Do not mischaracterize
15 the testimony in your question.
16    Q.  I am not characterizing your
17 testimony at all.
18          Tell me why, or what is the basis for
19 your knowledge that you were terminated or not
20 renewed in retaliation for your complaint.
21    A.  We have had a history of being late
22 on commissions. For the last year or better,
23 our commissions have been late.
24          The letter I got from Kidder was back
25 in November. Since then, between November and
                                        [Page 80]

1          Freed
2  whenever this occurred at Shawangunk, they
3  renewed contracts. They renewed in spite of
4  that.
5          Now we have a situation where they
6  broke the law, and they imprisoned an employee.
7  We took the appropriate action. We went to the
8  State Police.
9          And I wanted help, and no one would
10 help me. Finally -- and basically, because I
11 took those actions, they cancelled all our
12 contracts specifically.
13          We have nothing left. As a matter of
14 fact --
15    Q.  Is your contract still in effect at
16 Fishkill?
17    A.  Yes, it is.
18    Q.  Is your contract still in effect at
19 Green?
20    A.  Yes, it is. That means they only
21 cancelled eight out of ten.
22    Q.  When you say cancelled, do you mean
23 non-renewed?
24    A.  Either that or non-renewed.
25 Cancelled in the middle of the contract, or
                                        [Page 81]

Freed

1  would not let our employees into the facility
2  even though we had a contract.
3  **Q.** You don't know why contracts were
4  cancelled in the middle; correct?
5  **A.** It is simple to figure out. I don't
6  have that information in front of me and I don't
7  have it memorized.
8  **Q.** And you don't know how many of them?
9  **A.** No, not specifically.
10  **Q.** Which facilities would not let your
11  employees in?
12  **A.** Lincoln Correctional, and there were
13  others. But Lincoln Correctional was the one
14  that stand outs in my mind.
15  **Q.** When?
16  **A.** Prior to them cancelling our contract
17  and telling us to get the machines out.
18  **Q.** What date?
19  **A.** I don't know offhand.
20  **Q.** What month?
21  **A.** I don't know. It was -- I don't
22  recall. It was after what occurred at
23  Shawangunk.
24  **Q.** How do you know that?

[Page 82]

Freed

1  contract in effect when she refused to let my
2  people come in and service the machines. You
3  know -- --
4  **Q.** Go ahead.
5  **A.** -- having a contract in effect and
6  not being allowed to go in and service the
7  machines with the machines still being there, to
8  me, that ended the contract.
9  **Q.** Do you have something that you want
10  to add?
11  **A.** No, that's fine.
12  **Q.** Did anyone at DOCS ever state to
13  Rockland they were terminating or not renewing a
14  contract because of your complaints?
15  **A.** Yes.
16  **Q.** Who?
17  **A.** Steward at Eastern Correctional
18  Facility.
19  **Q.** Who is that?
20  **A.** Her name is Marti. I don't know her
21  last name.
22  **Q.** When was this conversation?
23  **A.** Just prior to their not renewing our
24  extension.

[Page 84]

Freed

1  **A.** Because I remember her referring to
2  Shawangunk.
3  **Q.** Who?
4  **A.** Ms. Mason.
5  **Q.** You spoke to Miss Mason?
6  **A.** I tried to.
7  **Q.** You said that you remembered Ms.
8  Mason referring to it?
9  **A.** Yes.
10  **Q.** Who did she refer to it with?
11  **A.** To me.
12  **Q.** You spoke to Miss Mason?
13  **A.** Yes. I spoke to Ms. Mason. I tried
14  to. And I have an e-mail from her telling me to
15  stop e-mailing her and stop talking to me. Get
16  out.
17  And I tried to talk to her.
18  **Q.** Was there a contract in effect at
19  that time?
20  **A.** Yes, yes.
21  **Q.** You are referring to Lincoln
22  Correctional Facility; correct?
23  **A.** I am referring to Lincoln
24  Correctional Facility. I believe there was a

[Page 83]

Freed

1  **Q.** When was that?
2  **A.** During the summer.
3  **Q.** What month?
4  **A.** I don't know. August. That's a
5  guess.
6  **Q.** Who did she speak to?
7  **A.** Me.
8  **Q.** Tell me everything you know about
9  that conversation.
10  **A.** She had advised me that our third
11  year of the contract was over, and she was
12  sending me the extension to sign, and get
13  notarized and send back to her.
14  I did that.
15  Then I opened up the New York State
16  Contract Reporter the following month and found
17  that the facility was being advertised for bid.
18  I called her. She said: Mike, I did
19  everything I could. They accused me in Albany
20  of being your relative. That's how hard I
21  worked for you. They will not renew any of your
22  contracts because of what is going on.
23  She said: Do you know how much work
24  I have to do to put out another bid? I did

[Page 85]

[22]  (Pages 82 to 85)

Freed

1    Freed
2    everything I could, and they will not renew your
3    contract.
4          And she said our service was -- our
5    service has always been, to every one of these
6    facilities way over the top, way over what
7    anybody else has done for them. Way over the
8    top.
9        Q.  She said because of the situation?
10       A.  That's exactly correct.
11       Q.  What did she mean by Albany?
12       A.  She said specifically Albany. I
13   would imagine that she is talking about somebody
14   way over her pay grade.
15       Q.  Do contracts need to be approved by
16   the state controller?
17       A.  Yes. I believe so.
18       Q.  Do you know whether the state
19   controller expressed any concern about the
20   contract renewal at Eastern?
21       A.  I do not.
22       Q.  Do you know where the state
23   controller is located?
24       A.  I do not.
25       Q.  Did Marti mention Stewart Kidder in
                                    [Page 86]

1    Freed
2    Creen had made the decision to cancel the
3    contract at Shawangunk?
4        A.  No.
5        Q.  Had Rockland ever told you that
6    Stewart Kidder made the decision to cancel the
7    contract?
8        A.  I believe when -- I can only guess
9    based on the conversation I had with Marti that
10   when she was talking about Albany that Stewart
11   Kidder is the decisions maker in Albany.
12       Q.  So you are referring to that one
13   reference to Albany in that conversation; is
14   that correct?
15       A.  I am sorry. One more time.
16       Q.  When you say this, you are referring
17   to that one reference to Albany --
18       A.  In that specific answer to your
19   question, yes.
20       Q.  Was anything else done?
21       A.  In reference to?
22       Q.  Did anyone ever tell you that Stewart
23   Kidder directed that the contract with
24   Shawangunk was cancelled?
25       A.  I think Marti intimated that.
                                    [Page 88]

1    Freed
2    this call?
3        A.  She did not mention anyone by name.
4        Q.  Did anyone ever tell you that the
5    contracts were not being renewed because of
6    instructions from Stewart Kidder?
7        A.  No. I don't believe so.
8        Q.  Did Rockland bounce any checks to
9    DOCS in 2007?
10       A.  Yes.
11       Q.  How many?
12       A.  I don't know.
13       Q.  Were there some correctional
14   facilities where you did not make any commission
15   payments at all in 2007?
16       A.  I don't have that knowledge. I don't
17   know.
18       Q.  Would you be surprised to find out
19   that there were?
20       A.  Yes.
21       Q.  Do you know what happens to the
22   inmates' accounts when commissions are not paid
23   on time?
24       A.  No.
25       Q.  Was Rockland ever told that Roxanne
                                    [Page 87]

1    Freed
2        Q.  By her reference to Albany?
3        A.  Yes.
4        Q.  Anything else?
5        A.  I can't think of anything.
6        Q.  What did Marsha Riley do to retaliate
7    against Rockland?
8        A.  After this occurred at Shawangunk,
9    she refused any communication with myself or our
10   company. She insisted that we were behind on
11   our commissions, that we were not behind on.
12          After setting up a meeting that I
13   asked for to discuss our situation at Lincoln,
14   she refused to meet with me once we arrived, and
15   walked out of the building and walked out.
16       Q.  What day was that?
17          MR. SUSSMAN: Let him finish the
18   whole answer. Finish your whole answer, please.
19       A.  I don't recall the day.
20       Q.  Go ahead.
21       A.  And she -- and she locked our people
22   out of the building.
23       Q.  When you say she refused any
24   communication, what do you mean?
25       A.  I have e-mails from Miss Riley saying
                                    [Page 89]

[23]  (Pages 86 to 89)

Freed

1    don't ever e-mail her again.
2    Q. Did you e-mail her after that?
3    A. Yes.
4    Q. Did she respond?
5    A. I believe again with an e-mail saying
6    not to e-mail her again.
7    Q. When did this start?
8    A. After the situation at Shawangunk,
9    but specifically I cannot recall.
10   Q. Was Rockland barred from entering
11   into a contract with the New York City school
12   system?
13   A. New York City school system? Not
14   that I am aware of.
15   Q. Was there a New York City agency that
16   Rockland was barred from entering into contracts
17   with?
18   A. I am not aware of any stipulation
19   that we cannot bid on any contracts for any -- I
20   have not gotten anything to the effect in any
21   way that we are barred from entering into
22   contracts with anyone.
23        MR. SUSSMAN: Can I have the question
24   read back?
25                                    [Page 90]

Freed

1    bid. They were just -- I don't know what
2    happened to them.
3        It is kind of strange. The ones that
4    were, we did not participate in.
5    Q. That was a corporate decision?
6    A. No, no. Let me go back.
7        I think there were one or two that
8    went out for bid. The other ones were just
9    given to another company.
10       There was no bid. They were just
11   given out.
12   Q. What is the basis for that statement?
13   A. Because I follow the Contract
14   Reporter, and the bids going out and the
15   contracts going out. We get a letter to come
16   take the vending machines. And the next day
17   there is another company putting vending
18   machines in.
19       I have no idea how they got the
20   contract. Other than one or two of the smaller
21   facilities that might have gone out for bid,
22   seven or eight of them did not. They were just
23   given away.
24   Q. Did you bid on any of them?
25                                    [Page 92]

Freed

1        (Record read as requested.)
2        MR. SUSSMAN: To be clear, when you
3    say New York City agency, you are talking about
4    a city agency and not an agency located in the
5    city. You are talking about an agency of the
6    City of New York?
7        MR. SCHULZE: Yes, that's what I was
8    talking about.
9    Q. Are there any agencies in the City of
10   New York that you are barred from contracting
11   with?
12   A. I have not received any document or
13   written communication from anyone saying that we
14   are barred from bidding on a contract.
15   Q. After Rockland's contracts is expired
16   or were terminated at the correctional
17   facilities, were they rebid?
18   A. Some were and some were not.
19   Q. Do you know which were?
20   A. Specifically I don't.
21   Q. Did Rockland bid on any of those?
22   A. No.
23   Q. Why not?
24   A. Most of them were not put out for
25                                    [Page 91]

Freed

1    A. As of right now, as of today, we are
2    bidding on one because of a mandatory visit for
3    Fishkill is today. We will be participating in
4    that.
5        I don't know if we are welcome to.
6    My feeling is that we are not welcome to. I
7    have reason to believe that we are not welcome.
8    Q. Why?
9    A. Because when I called the steward at
10   that facility to ask for the bid package, which
11   is a normal everyday telephone call, I was told
12   that she would have to check first to see if we
13   could be included.
14   Q. Who was the steward?
15   A. Suzette Petterossi.
16       MR. SCHULZE: Let's take a short
17   luncheon recess.
18       (Luncheon recess taken at this time.)
19   CONTINUED EXAMINATION
20   BY MR. SCHULZE:
21   Q. When were you notified that the
22   contract at Lincoln would not be renewed? And
23   by you, I mean Rockland.
24   A. We participated in the bid on that,
25                                    [Page 93]

[24] (Pages 90 to 93)

1              Freed
2  so l don't know the time, but we were involved
3  in the rebid.
4      Q.  When was the rebid?
5      A.  I don't recall.
6          MR. SCHULZE:  Mark as Defendant
7  Exhibit E a letter of March 27, 2007 from Marsha
8  Riley to Michael Freed.
9          (Exhibit D-E, Letter, 3/27/07, marked
10 for identification.)
11     Q.  I show you what has been marked for
12 identification as Defendant Exhibit E.
13         Do you recognize that document?
14     A.  Yes.
15     Q.  What is it?
16     A.  It is a letter saying that they will
17 not extend our contract.
18     Q.  What is the date of this letter?
19     A.  It is March 27, 2007.
20     Q.  Does that refresh your recollection
21 as to when you were told that Lincoln would not
22 be extending your contract?
23     A.  Yes, it does.
24     Q.  This was before you ever made a
25 complaint to the State Police?

[Page 94]

1              Freed
2      A.  I am sorry?
3          MR. SCHULZE:  Read it back.
4          (Record read as requested.)
5      A.  This letter was before the complaint
6  to the State Police, yes.
7      Q.  And this letter notifies you that
8  Lincoln will not be renewing your contract;
9  correct?
10     A.  That is correct.  That's what the
11 letter does state.
12         Can I add something?
13         MR. SUSSMAN:  No.
14     Q.  Go ahead.
15         MR. SUSSMAN:  Just answer the
16 questions.
17     Q.  You want to add something?
18     A.  No.  That's fine.
19     Q.  What would you like to add?
20     A.  That the letter is -- that the letter
21 is incorrect.
22     Q.  In what way is the letter incorrect?
23     A.  We were current on commissions at
24 this time.  But we had some conversations with
25 Miss Riley after this letter that we weren't

[Page 95]

1              Freed
2  current on the commissions.
3          However, after the situation, the
4  conversations broke off.  After the situation at
5  Shawangunk, the conversations broke off, and
6  Miss Riley would not look at the evidence that
7  we had showing that we had received the
8  commissions, but that they had been commissions.
9          Yes.  We were late on her
10 commissions.  There is no question about it,
11 that we were late on the commissions.  She is
12 incorrect that we were that late on commissions.
13         Basically we were in the process of
14 explaining to her what was going on when this
15 incident happened at Shawangunk.
16         Thereafter, there was no more
17 conversations.
18     Q.  At the time you received this letter,
19 you had not yet made any complaints to the State
20 Police or to any other government officials
21 about the conduct of DOCS; correct?
22     A.  I'm sorry.
23         MR. SUSSMAN:  We can stipulate to
24 that if you want.  It is obvious, sequentially,
25 it is obvious.

[Page 96]

1              Freed
2          MR. SCHULZE:  Okay.  Will you
3  stipulate that the same is true at the time that
4  Mr. Kidder sent his letter November 2006?
5          MR. SUSSMAN:  Yes.  The protected
6  speech raised in this case is about Shawangunk.
7  That is clear.  We are not arguing about that.
8          MR. SCHULZE:  Okay.  That saves some
9  time.
10     Q.  Was Rockland ever placed on the New
11 York City School Construction Authority
12 disqualified list?  Was Rockland ever placed on
13 that list?
14     A.  Not that I am aware of.  I have no
15 documentation to that effect.
16     Q.  Did Rockland default on a contract
17 with the New York City Construction Authority?
18     A.  We completed the contract, but we
19 were behind on commissions at the conclusion of
20 the contract.
21     Q.  Did you ever make up those
22 commissions?
23     A.  We did not.
24     Q.  Why not?
25     A.  I just know that we didn't.  I think

[Page 97]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY  10119  Tel: 212-759-6014

Freed
1  we had experienced -- we were just -- the
2  contract was not as profitable as we thought it
3  would be. And we finished our contract and took
4  our machines out.
5
6        And we owed them commissions at the
7  end of the contract and they -- if they did in
8  fact do what you say, put us on the blacklist,
9  then they took the appropriate action for that.
10 They did not lock up my people.
11   **Q.** Did you have anything to add?
12   A.  No.
13   **Q.** As we sit here today, are you
14 delinquent, Rockland, on contracts that have
15 expired or that have been terminated with DOCS?
16   A.  Is Rockland Vending Corporation
17 delinquent as of right now?
18   **Q.** Yes. Rockland Vending is in Chapter
19 11.
20   A.  Since the filing -- post-filing we
21 are up to date. Pre-filing, yes.
22   **Q.** Meaning you are stating that these
23 debts have been extinguished in Chapter 11?
24   A.  They have been set aside by the
25 Bankruptcy Court.
[Page 98]

Freed
1
2    **Q.** We don't have to go into
3  technicalities of language.
4        The Bankruptcy Court has ruled that
5  you don't owe these debts any longer?
6    A.  That is not correct. The way the
7  Bankruptcy Court works that the debts are
8  negotiated. And hopefully, we will -- I am not
9  a lawyer.
10       I think that is a tough -- for me to
11 define what happens in bankruptcy is, you know,
12 is something that I can't do.
13   **Q.** Is the bankruptcy proceeding still
14 continuing?
15   A.  Yes.
16   **Q.** Has a plan been approved by the
17 Court?
18   A.  Yes. I believe so. I believe we are
19 in the process of doing that. We are in
20 approval. We are fine, yes.
21       MR. SUSSMAN: I don't know if he
22 understands your question.
23       MR. SCHULZE: I know.
24       MR. SUSSMAN: He is asking about a
25 specific plan that was submitted by the Trustee
[Page 99]

Freed
1
2  or by some other responsible party.
3        Was that, to your knowledge,
4  submitted and approved by the court to deal with
5  your debts --
6        MR. SCHULZE: Let me save time.
7    **Q.** For the purposes of this proceeding,
8  I don't care what happens in the Bankruptcy
9  Court.
10       At the time you filed for bankruptcy,
11 did you owe money to DOCS on the contract?
12   A.  Yes.
13   **Q.** Do you know how much?
14   A.  No.
15   **Q.** Do you know on which contracts?
16   A.  I assume on all of them because it is
17 a month-to-month payment. Even if we were up to
18 date, there is an amount of money that is owed.
19   **Q.** Do the contracts with DOCS require
20 Rockland to maintain any documents?
21   A.  To maintain any documents?
22   **Q.** Yes.
23   A.  I don't know.
24   **Q.** Are you -- go ahead.
25   A.  Yes. Commission statements given
[Page 100]

Freed
1
2  monthly along with gross sales.
3    **Q.** How long do you have to keep those?
4    A.  That I don't know.
5    **Q.** Does Rockland have a document
6  retention policy?
7    A.  No, not specifically.
8    **Q.** Do you have a general one?
9    A.  No.
10   **Q.** That is a lawyer's trick. Every time
11 you say not specifically, you will get that
12 question.
13   A.  Okay.
14   **Q.** Do you keep a file of correspondence
15 with DOCS?
16   A.  No.
17   **Q.** Does anybody at Rockland keep such a
18 file?
19   A.  No, no.
20   **Q.** Do you keep e-mails between Rockland
21 and DOCS?
22   A.  Some of them that I think are
23 relevant, but not as a rule. If he needs
24 follow-up, I will move it over.
25   **Q.** Since you instituted this lawsuit,
[Page 101]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

| | |
|---|---|
| 1         Freed | 1         Freed |

```
 1            Freed
 2  have you changed your policies in that regard?
 3     A.  No.
 4     Q.  Have you instructed your employees
 5  not to discard documents during the pendency of
 6  this lawsuit?
 7     A.  No. My employees don't really have
 8  documents, I wouldn't think. They are route
 9  drivers.
10     Q.  Do you have any documents relating to
11  the complaint to the State Police?
12     A.  I don't know. I don't know if there
13  was a police file that was given to us.
14     Q.  Do you have any document relating to
15  a complaint to the Attorney General's Office?
16     A.  No.
17     Q.  Do you have any documents regarding
18  any other complaints you made to state officials
19  about the events at Shawangunk?
20     A.  No.
21     Q.  Have you ever spoken to George
22  Glassanos?
23     A.  Who is that?
24        MR. SUSSMAN: He was the lawyer
25  mentioned earlier.
                                   [Page 102]
```

```
 1            Freed
 2     A.  I don't believe so.
 3     Q.  Was there anyone else from Rockland
 4  at the facility on that date?
 5     A.  Not that I know of, no. I don't
 6  believe so.
 7        The only other one would have been a
 8  service tech who would have been in there
 9  repairing a machine. And to the best of my
10  knowledge, there was no one else there.
11     Q.  Did other drivers service Shawangunk,
12  or was Gallagher the only one?
13     A.  We would have -- during the term of
14  the contract, there would have been other
15  drivers as drivers do change routes or leave the
16  company and come onto the company.
17     Q.  In 2007, would Gallagher have been
18  the only driver who went to Shawangunk?
19     A.  I believe there was another driver
20  who left the company and then Gallagher took
21  that route. Whether it was in 2007 or earlier,
22  I am not sure.
23     Q.  At any given time there would be one
24  driver assigned to that facility; is that
25  correct?
                                   [Page 104]
```

```
 1            Freed
 2     A.  I am sorry. The lawyer who advised
 3  them.
 4     Q.  I am not going to represent that.
 5     A.  No, never spoke to him.
 6     Q.  What are your wife's duties at
 7  Rockland?
 8     A.  Office Manager and Vice President.
 9     Q.  Would she often be the one to contact
10  the facilities directly?
11     A.  That would be both of us. We share
12  that responsibility.
13     Q.  Anyone else who would do that as a
14  regular part of their duties?
15     A.  On the DOCS facilities?
16     Q.  Yes.
17     A.  There is one more person who is an
18  operations manager. And he would be the one
19  when he was with us that would have the
20  conversation.
21     Q.  What was his name?
22     A.  His name was Mike Shay.
23     Q.  When Gallagher went to Shawangunk on
24  May 9, was there anyone else with him in the
25  truck?
                                   [Page 103]
```

```
 1            Freed
 2     A.  Yes. Can I confer with my attorney
 3  for a moment?
 4     Q.  On an issue of privilege?
 5     A.  Yes.
 6     Q.  On an issue of privilege, yes.
 7        (Witness and counsel leave, confer
 8  and return to the deposition room at this time.)
 9     Q.  Is what you are writing anything to
10  do with this case?
11        MR. SUSSMAN: Don't write anything
12  down right now about anything.
13     Q.  Does that have anything to do with
14  this case?
15        MR. SUSSMAN: So that you are clear,
16  Mr. Freed, and you didn't ask this directly, is
17  not sure the date on this letter, Defendant
18  Exhibit E is the date close to when he received
19  the document. You didn't really ask him when he
20  received it.
21        The date is on the document and it
22  speaks for itself. I told him to go back to his
23  documents and he can check the date. And if
24  there is some discrepancy, obviously, we will
25  let you know that there is an inconsistent date
                                   [Page 105]
```

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

Freed

1  with respect to the document.
2  with respect to the document.
3       It does not comport with his memory
4  as to the events and the sequence of the events.
5    **Q.** What is your memory of the date?
6    A. It doesn't meet the sequence that I
7  recall.
8    **Q.** What is the sequence you recall?
9    A. I would rather check it before I say
10 that.
11   **Q.** You just said that this doesn't meet
12 the sequence you recall.
13       MR. SUSSMAN: I said it.
14   **Q.** So it does meet your sequence?
15   A. No, it does not.
16   **Q.** What is your sequence that you can
17 recall?
18   A. My recollection is that this letter
19 was much closer or within the time period of the
20 situation at Shawangunk.
21   **Q.** What do you mean by much closer?
22   A. I would rather research it. I don't
23 have -- you my recollection is inconsistent with
24 the date on this letter. So I would like to go
25 back and make sure that the date on letter is

[Page 106]

Freed

1       Freed
2  correct.
3    **Q.** What are you going to do in order to
4  research it?
5    A. I am going to try to find notes that
6  I have in my calendar based on when I received
7  it, or try to go back and see if we have a copy
8  of the letter.
9    **Q.** Do you have a calendar covering the
10 days at issue?
11   A. I have an accountant's book, yes.
12   **Q.** You would make entries when you would
13 receive letters such as this?
14   A. If I received a letter and I was
15 going to respond to it, I would have Miss
16 Mason's name and telephone number where I would
17 call her back.
18       MR. SCHULZE: Do you have any
19 objection in providing that?
20       MR. SUSSMAN: No. There may be
21 irrelevant personal parts. I have not seen the
22 book.
23       Let me review it, and if the pages
24 are relevant, I will certainly share it.
25       MR. SCHULZE: I would like to have

[Page 107]

Freed

1       Freed
2  the entire calendar for 2006 and 2007 at least.
3  You can redact things like personal names and
4  birthdays if you prefer.
5       MR. SUSSMAN: Let me take a look at
6  it.
7  (REQUEST)
8    **Q.** Anything else?
9    A. That's it. I am going to respond to
10 that. You just said anything else.
11       Miss Riley specifically said to me
12 during this situation: We know what happened at
13 Shawangunk, quote, unquote. We know what
14 happened at Shawangunk. Those were her words.
15       I don't know how she could tell me
16 that if this letter arrived on March 27. I
17 remember that.
18   **Q.** You are talking about an oral
19 communication?
20   A. That is correct. She said that.
21   **Q.** Did you receive this letter before or
22 after this communication?
23   A. How could I have received the letter?
24 We would have been out of there -- no, I
25 received -- no. I remember that conversation

[Page 108]

Freed

1       Freed
2  and it was after Shawangunk. Because she said
3  we know what happened at Shawangunk, quote,
4  unquote.
5       This letter is inconsistent unless --
6       MR. SCHULZE: Mark as Defendant
7  Exhibit F a one-page letter dated May 4th, 2007
8  from Marsha Riley to Michael Freed.
9       (Exhibit D-F, Letter, 5/4/07, marked
10 for identification.)
11   **Q.** I hand you what has been marked for
12 identification as Defendant Exhibit F.
13       Do you recognize this letter?
14   A. I don't know that I received this
15 letter. I don't recall receiving this letter.
16   **Q.** Is it your testimony that you did
17 not?
18   A. No. My testimony is that I don't
19 recall it.
20   **Q.** Who would know whether Rockland
21 received that letter?
22   A. It was addressed to me, so it would
23 have gotten to me. But I don't recognize it.
24   **Q.** You don't recall being notified on or
25 about May 4th that your contract with Lincoln

[Page 109]

Freed

1    had been terminated?
2    **A.** I don't recall this specific letter.
3    I don't recall something like this where there
4    is a definition of termination. I just don't
5    remember it.
6    **Q.** If you had received this letter, what
7    would you have done with it?
8    **A.** If I had received this letter and
9    read it, it probably would have gone into a file
10   for Lincoln Correctional.
11   **Q.** Do you still have that file?
12   **A.** I still have the file, yes.
13   **Q.** If you went to that file, would you
14   be able to determine whether this letter had
15   been received?
16   **A.** I am hoping I can.
17   **Q.** I will ask you to do that, and to
18   give me a copy of the file.
19   (REQUEST)
20   MR. SUSSMAN: To the extent that
21   counsel has requests, please follow up in
22   writing with all of the requests so that we can
23   respond because I don't know when we will
24   receive the transcript.

[Page 110]

Freed

1    crime?
2    **A.** Never.
3    **Q.** Is this the first time that Rockland
4    has been in bankruptcy?
5    **A.** Yes.
6    **Q.** Do you currently expect to resume
7    operations?
8    **A.** Yes. We never stopped.
9    **Q.** But you expect to emerge from
10   bankruptcy?
11   **A.** Yes.
12   **Q.** Do you plan to bid on any DOCS
13   Correctional Facility contracts other than
14   Fishkill?
15   **A.** In the immediate future, no,
16   hopefully not.
17   **Q.** Why not?
18   **A.** Tremendously bad experience.
19   **Q.** Could you --
20   **A.** Tremendous drain on us financially.
21   **Q.** Were these losing contracts?
22   **A.** They wouldn't be, except for the
23   problems we experienced while we were there.
24   But they were.

[Page 112]

Freed

1    Please send whatever you want on a
2    list, and we will get the materials together. I
3    know you have a request for a calendar at this
4    point and a request for the Lincoln file.
5    I don't know if there are any other
6    documents that you asked for today.
7    MR. SCHULZE: What I am doing here is
8    not making a document request that goes beyond
9    the 30(b)(6) deposition relating to -- I just
10   wanted you to understand that.
11   **Q.** Since you don't recall Defendant
12   Exhibit F, you can put it aside. I will not ask
13   you any further questions about it right now.
14   Are you on any medication today?
15   **A.** Yes.
16   **Q.** What are you taking?
17   **A.** Lipitor.
18   **Q.** Does that affect your cognitive
19   ability in any way?
20   **A.** I don't think so. It affects my
21   cholesterol.
22   **Q.** That's a good thing?
23   **A.** Yes, exactly.
24   **Q.** Have you ever been convicted of a

[Page 111]

Freed

1    **Q.** Did you speak to anybody at Rockland
2    in preparation for this deposition?
3    **A.** No.
4    **Q.** Have you spoken --
5    **A.** My wife.
6    **Q.** What did you say to your wife?
7    **A.** I am going to have a tough day today.
8    **Q.** Anything else?
9    **A.** No. That's it.
10   **Q.** You did not go over the events?
11   **A.** No. Didn't have to.
12   **Q.** I think I might be done. Give me
13   about three minutes to figure that out.
14   MR. SUSSMAN: I have some questions.
15   MR. SCHULZE: You don't want to
16   proceed?
17   MR. SUSSMAN: I can wait or go ahead.
18   MR. SCHULZE: Go ahead.
19   EXAMINATION BY
20   MR. SUSSMAN:
21   **Q.** I show you what has been marked for
22   identification as Defendant Exhibit F. It has
23   Paragraph A entitled "Terminations."
24   Read that to yourself, please.

[Page 113]

Freed

1
2      A.   Sure.
3      Q.   To your knowledge, was that provision
4   common to all of the contracts with the
5   correctional facilities?
6      A.   All of the facilities?
7      Q.   Yes.
8      A.   I think it is a standard contract
9   language.
10     Q.   Before the incident involving Mr.
11  Gallagher, did you receive a letter like
12  Defendant Exhibit F from Shawangunk?
13     A.   No, not to my knowledge.
14     Q.   You started telling counsel about
15  some occasion when you were going to meet with
16  Miss Riley.
17          Do you recall that?
18     A.   Very, very well.
19     Q.   Where was the meeting to be held?
20     A.   At Lincoln Correctional.
21     Q.   Where is Lincoln Correctional?
22     A.   In the 120s. If faces Central Park
23  North in Manhattan.
24     Q.   Did you go there for the meeting?
25     A.   Yes.
                              [Page 114]

Freed

1
2   at Lincoln?
3      A.   No.
4      Q.   What month was that?
5      A.   I don't recall.
6      Q.   When was it in relation to the
7   Shawangunk incident?
8      A.   I believe it was after.
9      Q.   What was the purpose of the meeting,
10  your understanding?
11     A.   The commissions that were paid and
12  the checks that were cancelled that is referred
13  to in the letters.
14          We had cancelled checks on
15  commissions that she was still cancelling our
16  contract on.
17     Q.   Who set this meeting up?
18     A.   Mr. Ed Jones, who is Miss Riley's
19  assistant.
20     Q.   Was he at the meeting?
21     A.   No.
22     Q.   Do you --
23     A.   I did call on the morning of the
24  meeting to confirm the meeting. We drove
25  down --
                              [Page 116]

Freed

1
2      Q.   Were you with anyone else from your
3   company?
4      A.   Yes.
5      Q.   Who?
6      A.   A representative.
7      Q.   Did you have a meeting?
8      A.   We had a meeting scheduled.
9      Q.   Did you have a meeting, was the
10  question.
11     A.   Very short-lived.
12     Q.   How long did it last?
13     A.   A minute and a half, two minutes.
14     Q.   Where was the meeting as it was
15  conducted -- it -- as it was conducted, where
16  was it conducted?
17     A.   In Miss Riley's office.
18     Q.   Did you enter her office for the
19  meeting?
20     A.   Yes.
21     Q.   What transpired at the meeting?
22     A.   Ms. Riley says she didn't have time
23  for it. She didn't have time for it. And with
24  that, she got up and left.
25     Q.   Did anyone else continue the meeting
                              [Page 115]

Freed

1
2      Q.   Who did you call?
3      A.   I called and spoke to Ms. Riley.
4      Q.   What did she say?
5      A.   Come on down. I am waiting for you.
6          We parked over on Second Avenue and
7   took a cab over. It was expensive.
8          We waited about a half hour for her
9   to meet with us. We went into her office, and
10  she said that she spends enough time all week
11  long and will not spend any more time.
12          She took her pocketbook and left.
13     Q.   What day of the week was the meeting?
14     A.   Friday, at ten o'clock in the
15  morning.
16     Q.   What time were you prepared to meet?
17     A.   It was a 9:00, 9:30 meeting.
18     Q.   Counsel asked you some questions
19  about the contact that you had with Mr. Kidder.
20          Let me go back to the exhibits which
21  were previously marked for identification here
22  today.
23          And there were two of them, one dated
24  November 9, 2006, which is Defendant Exhibit C.
25     MR. SCHULZE:  You should refer him to
                              [Page 117]

Freed

1 the exhibit copy.
2 the exhibit copy.
3 **Q.** Exhibit C?
4 **A.** Yes.
5 **Q.** And you responded Exhibit D?
6 **A.** I'm sorry?
7 **Q.** You responded Exhibit D?
8 **A.** Yes.
9 **Q.** After you responded in D, did your
10 company make timely commission payments to all
11 of the facilities or not?
12 **A.** No. We did not.
13 **Q.** Did you receive -- Mr. Kidder's
14 letter says in the last sentence in the second
15 paragraph, "All future checks must be paid on
16 time."
17     Do you see that?
18 **A.** Yes.
19 **Q.** You are telling us that you did not
20 comply with that?
21 **A.** No. We did not.
22 **Q.** What contact after November 9, 2006,
23 and before you called Mr. Kidder in or around
24 May 9 or 10 did you have with Mr. Kidder?
25 **A.** I don't believe I spoke to Mr. Kidder

[Page 118]

Freed

1 Riley between November 23 and March 27, to your
2 knowledge?
3 **A.** I don't recall.
4 **Q.** Do you recall getting it?
5 **A.** I don't recall getting a letter.
6     MR. SCHULZE: Objection.
7 **Q.** You gave testimony here today about
8 another individual you identified only by the
9 first name of Marti.
10     Do you recall that?
11 **A.** Yes.
12 **Q.** At what facility did she have
13 responsibility for as a steward?
14 **A.** Eastern Correctional as a steward.
15 But her contract was for both Eastern and
16 Ulster.
17 **Q.** When you say her contract, the
18 vending contract she administered was for
19 Eastern and Ulster?
20 **A.** Yes, for both.
21 **Q.** At the time, and if you know the
22 answer to that question, that you were having
23 conversations you earlier related with Marti
24 regarding the renewal and her reference to

[Page 120]

Freed

1 again.
2 **Q.** Did you receive any additional
3 letters from Mr. Kidder?
4 **A.** No. I did not.
5 **Q.** In Exhibit E, you will notice and
6 read the first paragraph to yourself, please, in
7 Exhibit E.
8 **A.** Okay.
9 **Q.** The third sentence says, "I have
10 spoken with you concerning this matter with
11 respect to failure to pay timely commissions on
12 March 13, 2007. When I responded to the letter
13 received from Mr. Kidder, Director of Support
14 Operations regarding vending machines."
15     Do you have any idea what that is in
16 reference to?
17 **A.** No, I don't.
18 **Q.** This letter dated March 27, 2007 also
19 says in the same paragraph, "At the present time
20 your corporation is behind four months," which
21 is underscored in bold.
22     Do you see that?
23 **A.** Yes.
24 **Q.** Had you received any letter from Miss

[Page 119]

Freed

1 getting the renewal.
2     And do you recall all of that
3 testimony?
4 **A.** Yes.
5 **Q.** Do you know whether your company was
6 current or behind at Eastern and Ulster?
7 **A.** I believe we were behind.
8 **Q.** One other inquiry I want to make
9 because it was not clear to me on the record.
10     Counsel asked you some questions
11 about what happened, and if you rebid or tried
12 to bid again on the facilities where you had
13 been and then were no longer.
14     You said that for larger facility,
15 seven or eight of them, that one got the bid.
16     MR. SCHULZE: Objection.
17 **Q.** What company are we speaking about?
18 **A.** Ellenville Vending, I believe.
19 Ellenville Vending.
20 **Q.** What is the process by which the
21 Department of Corrections traditionally notifies
22 the vending community that there is a contract
23 for bid?
24 **A.** It advertises in the New York State

[Page 121]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

1          Freed
2   Contract Reporter.
3      **Q.** How frequently does that come out?
4      A.   Every Monday.
5      **Q.** Do you check that routinely?
6      A.   Yes.
7      **Q.** Do you have any personal knowledge
8   from conversations with anyone about how
9   Ellenville came to these various facilities
10  after your departure?
11         MR. SCHULZE: Objection.
12     A.   They just handed it to them.
13     **Q.** Who just handed it to them?
14         MR. SCHULZE: Objection.
15     A.   The Department of Corrections.
16     **Q.** How do you know that?
17         MR. SCHULZE: Objection?
18     A.   It did not go for bid. It was not
19  bid. And the bid at Corrections is based on the
20  lowest pricing gets the bid.
21         When we left Eastern and Ulster, we
22  could not get a price increase, which was the
23  reason for the financial problems.
24         And we were charging about 1.75 or
25  1.80 for a sandwich. And Ellenville came in
                                    [Page 122]

1          Freed
2      A.   In my calendar.
3          MR. SCHULZE: I will send you a
4   letter about that.
5          MR. SUSSMAN: No problem.
6      A.   You probably won't understand the
7   chicken scratch, to let you know.
8      **Q.** If we can't understand what is in
9   there, we may have to ask you some more
10  questions.
11     A.   I will be happy to. There is nothing
12  in there that I won't answer.
13         MR. SCHULZE: I have nothing further.
14         MR. SUSSMAN: Thank you.
15         MR. SCHULZE: Thank you.
16         (Time noted 1:35 p.m.)
17
18
19
20
21
22
23
24
25
                                    [Page 124]

1          Freed
2   charging 1.40 or 1.50 for a sandwich because
3   when we -- people went in to get the vending
4   machines, the machines were already set up, and
5   the corrections officers were having a tantrum
6   over it.
7          That's the same situation at Eastern,
8   Ulster, Shawangunk.
9      **Q.** Okay. Did you have any advance
10  notice from Miss Creen of any plan to take the
11  money directly from your machine and keep those
12  monies?
13     A.   Absolutely not.
14     **Q.** Had that ever happened before, to
15  your knowledge?
16     A.   Never.
17         MR. SUSSMAN: Thank you very much.
18  EXAMINATION BY
19  MR. SCHULZE:
20     **Q.** Regarding that meeting at Lincoln
21  that you just testified about, is it fair to say
22  that you don't recall the date?
23     A.   I can get that information very
24  easily.
25     **Q.** Where is that information?
                                    [Page 123]

1              J U R A T
2
3          I, MICHAEL FREED, have read the
4   foregoing record of my testimony taken at the time
5   and place noted in the heading hereof, and I do
6   hereby acknowledge it to be a true and correct
7   transcript of same.
8
9
10
11
12  _____
        MICHAEL FREED
13
14
15
16
17  Sworn and subscribed before me
    on the ____ day of ____, 2007
18
19
20  _____
        Notary Public
21
22
23
24
25
                                    [Page 125]