COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
ROCKLAND VENDING CORP.,

            Plaintiff,

    -against-        07 CIV 6268 (WP)(MPF)

ROXANNE CREEN,
    sued in her individual capacity,
MARSHA F. RILEY,
    sued in her individual capacity,
STEWART KIDDER,
    sued in his individual capacity,

            Defendants.
------------------------------------------------X

          Date:  November 15, 2007
          Time:  11:52 a.m.
          Place: 235 Main Street
                 Poughkeepsie, New York

       DEPOSITION OF STEWART KIDDER,
a Defendant in the above-captioned matter, held pursuant to Agreement, at the above time and place, before Gail M. Sherry, CRR, RPR, RMR, a Notary Public of the State of New York.

------------------------------------------------

        COURT REPORTING ASSOCIATES, INC.
          1699 Route 6; P.O. Box 113
            Carmel, New York 10512
               (845) 225-0024

---

Page 2

A P P E A R A N C E S

    SUSSMAN & WATKINS
    Attorneys for Plaintiff
        40 Park Place
        P.O. Box 1005
        Goshen, New York 10924
    BY:  MICHAEL H. SUSSMAN, ESQ.

    STATE OF NEW YORK
    OFFICE OF ATTORNEY GENERAL
    Attorney for Defendants
        235 Main Street
        Poughkeepsie, New York 12601
    BY:  DANIEL SCHULZE, ESQ.

A L S O  P R E S E N T:

    Michael Freed

---

Page 3

       S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that the sealing and filing of the within deposition be waived.

    IT IS FURTHER STIPULATED AND AGREED that this deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the officer before whom said deposition is taken.

    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

---

Page 4

        STEWART KIDDER,
  having been first duly sworn by Stacie Gero, a
  Notary Public of the State of New York, was
  examined and testified as follows:
        * * * * * *
EXAMINATION BY MR. SUSSMAN:
    Q.  Please state your name and address for the record.
    A.  Stewart Kidder, S-T-E-W-A-R-T, K-I-D-D-E-R.
        MR. SCHULZE:  He can be served through our offices.
    Q.  Mr. Kidder, you're here today for a deposition, which means, in essence, I'm going to be asking you a single question at a time.
    A.  Okay.
    Q.  Assuming that you hear and understand that question, please answer that question. If for some reason -- and there's a fan here that vacillates and sometimes is louder than others -- if you don't hear or for any other reason don't understand the question, indicate that and don't answer the question. It's important that you only answer questions you do understand.
    A.  Okay.

                                                5
                    STEWART KIDDER
 1
 2    Q.   You'll have an opportunity after the
 3   transcription is completed to read the testimony.
 4   Again, you'll have a chance then to make any corrections
 5   that are necessary, if any corrections are necessary.
 6    A.   Okay.
 7    Q.   You have to answer, as you're doing, verbally.
 8   Don't gesticulate or otherwise nod, et cetera.
 9    A.   Yep.
10    Q.   If you need a break, you'll be able to take a
11   break.  And if there's any reason for you to confer with
12   counsel, you can do that, as long as there's no question
13   pending.  Please answer any question that's pending.
14   Okay?
15    A.   All right.
16    Q.   Do you work for DOCS?
17    A.   I do.
18    Q.   How long have you done that?
19    A.   Twenty-one years.  Since 1986.
20    Q.   What's your educational background?
21    A.   I have an associate's degree in forestry.
22    Q.   When did you earn that?
23    A.   I graduated in 1964.
24    Q.   From what institution did you get the degree?
25    A.   Paul Smith's College, Paul Smiths, New York.

                 COURT REPORTING ASSOCIATES, INC.

                                                6
                    STEWART KIDDER
 1
 2    Q.   What county is that in?
 3    A.   That is in -- it's not in Essex.  I think it's
 4   Franklin County.  It's pretty close to the line there.
 5    Q.   Is that the area of the state that you're
 6   from?
 7    A.   No.  My home is -- my original home is in
 8   Maine.
 9    Q.   Okay.  In 1986 when you first started working
10   for DOCS, what did you do?
11    A.   I was a Budget Analyst.  I started as a -- I'm
12   trying to remember now.  I think I started as a Facility
13   Planner 1, but that was only for several months.
14    Q.   Okay.
15    A.   And then I became a Supervising -- no.  Then I
16   became an Associate Budget Analyst.  I have to remember
17   all the titles here.
18    Q.   Associate Budget Analyst for DOCS dealing with
19   the construction of DOCS' budget or --
20    A.   Yes, capital construction budget.
21    Q.   How long were you involved in that sort of
22   work?
23    A.   Approximately 13 years.
24    Q.   What position did you hold after those 13
25   years?

                 COURT REPORTING ASSOCIATES, INC.

                                                7
                    STEWART KIDDER
 1
 2    A.   Director of Support Operations, my current
 3   position.
 4    Q.   Who do you report to in that position?
 5    A.   In that position, right now -- we've had
 6   changes -- I report to Assistant Commissioner David
 7   Williams.
 8    Q.   Have you always reported to an assistant
 9   commissioner level?
10    A.   No, I reported to a Deputy Commissioner prior
11   to this new administration.
12    Q.   So let's just say May when some of these
13   events occurred, May of '07, who are you reporting to
14   then?
15    A.   I was reporting to the Deputy Commissioner.
16    Q.   What was that person's name?
17    A.   Gayle, G-A-Y-L-E, Haponik, H-A-P-O-N-I-K.
18    Q.   Was your office in Albany?
19    A.   Yes.
20    Q.   As Director of Support Operations, what did
21   you do every day?
22    A.   What do I do every day?  Well, first off, my
23   division is responsible for many things, whatever it
24   takes to support an agency of our size.  Our main
25   functions are purchasing for Central Office.  We also do

                 COURT REPORTING ASSOCIATES, INC.

                                                8
                    STEWART KIDDER
 1
 2   a lot of large purchases for facilities around the
 3   state, items that may be common to all facilities;
 4   security equipment, that type of thing.
 5         Fleet vehicle management.  We manage all the
 6   fleet vehicles in the agency.
 7         Quartermaster operations.  That's all the
 8   uniforms and supplies for over 22,000 correction
 9   officers.  We maintain a warehouse, central
10   quartermaster.
11         Inmate clothing.  That's a state shop -- which
12   there is a state shop in every facility in the state.
13         Commissaries, which are at most of our
14   facilities state-wide.
15         Housekeeping and environmental.  That
16   consists, from my office, primarily of audits.  Every
17   facility is audited once a year by our housekeeping
18   supervisor.  Those are sanitation audits.  Housekeeping
19   sanitation audits.
20         Let's see what else.  Those are really the
21   major functions.  We do have some other responsibilities
22   that don't fall under anyone else, so they end up at
23   Support Operations.
24         Just as an instance, inmate catalogue vendors.
25   That is handled directly by each of the facilities.  We

                 COURT REPORTING ASSOCIATES, INC.

9

STEWART KIDDER

just maintain a disapproved list. If vendors are disapproved for some reason, we disseminate that state-wide so all the facilities are aware of the problem.

I think those are the major things.

Q. How is your division organized? Do you have units? Departments?

A. We do have units. They're not -- operationally they function that way. There isn't any really hard-and-fast structure, okay, but we do have -- we have a Purchasing Unit. We have a Vehicle Management Unit. We have Quartermaster.

Q. And you've run this since '99?

A. '99, yes.

Q. Do you have a list of approved vendors?

A. I'm not sure what you mean by "approved vendors." What kind of approved vendors?

Q. A company that wants to do business with DOCS -- and from what you've described there seems to be a fair number of places where a company might do business with DOCS -- is there a process by which they're vetted to determine whether they can or can't do business with DOCS?

A. The only way would be if they are on a -- I

COURT REPORTING ASSOCIATES, INC.

10

STEWART KIDDER

guess you would call it a disapproved vendors list maintained by the Office of the State Comptroller. We do not have any approved vendors list. We don't maintain anything like that.

Q. So when DOCS, through your office and through the facilities, engages in some form of bidding process for a supply -- take vending machines, if you want; take any supply -- and you get a bid from a company, whose responsibility is it in this structure to determine whether to accept or not accept that bid?

A. That would be our Senior Purchasing Agent.

Q. So the Senior Purchasing Agent is in Albany?

A. Yes.

Q. So the decision whether to accept a low bid at a facility is not the facility's decision; is that accurate?

MR. SCHULZE: Objection.

A. No, that is not accurate. The facilities do administer their own bids. Okay. They do their own bidding. The only thing we do are Central Office. We also do some large items for the facilities where they use -- say, for instance, photocopiers. We do the photocopiers annually.

Q. So you do photocopy bids, and the photocopies

COURT REPORTING ASSOCIATES, INC.

11

STEWART KIDDER

that are thereby procured may be distributed to facilities around the State?

A. That's correct. Same thing with vehicles.

Q. But vending machines are bid at the facility level?

A. At the facility, yes.

Q. And is the decision about which vending machine company to use then made at the local level?

A. Yes, it is.

Q. Is there any approval process at your level --

A. No.

Q. -- for that?

A. No. None.

MR. SCHULZE: Be careful to let him finish his question before you answer. Sometimes he's not going where you think he is.

THE WITNESS: Okay.

BY MR. SUSSMAN:

Q. Now, once a contract is bid -- and let's, again, stay with the detail here of a vending machine contract -- and it's bid to a particular facility, what role, if any, does your office in Albany have with regard to that contract? If any.

A. None. The only -- I'll clarify that. The

COURT REPORTING ASSOCIATES, INC.

12

STEWART KIDDER

only involvement we have with any vending machine contracts is that if a facility contacts us for some advice; but other than that, we really don't have anything to do with vending machine contracts.

Q. Again, to the extent you know the answer to this -- and if you don't know, you can say you don't know -- is the facility under some DOCS rule to vet or investigate in a certain way those who have filed a bid, or is that up to the facility and its purchasing unit?

A. No, that's up to the facility.

Q. In May of 2007, what did Nanette Ferri do for you?

A. She is the Assistant Director of Support Operations.

Q. Was she a direct report to you --

A. Yes.

Q. -- at that time?

Did she have responsibility for particular parts of the duties you explained earlier, or was she assistant for everything?

A. She's assistant for everything, but her -- I guess her main expertise -- well, she has a lot of expertise. I shouldn't say that. But she -- one of her direct duties is to oversee all the purchasing in our

COURT REPORTING ASSOCIATES, INC.

13

STEWART KIDDER

division.

Q. All right. Do you know Mr. Freed?

A. Not -- he -- as we were coming in the door, he said that we had met at our training academy at some point. I really don't recall it.

Q. Okay.

A. We may have.

Q. Did you ever have any phone contact with Mr. Freed?

A. Yes.

Q. Do you know when that first started?

A. Honestly, I don't. I remember having, you know, at least a couple telephone conversations with him.

Q. Okay. Before this particular controversy developed in May, do you have any memory of Rockland Vending and any business dealings that you had with them?

A. Not really. I mean, like I say, I remember speaking to a Mr. Freed a couple of times on the phone. At one point I think he was asking me to intervene. He was looking for some assistance in his people accessing one of our facilities in New York City, and I explained to him, I mean, that's facility operation. It isn't my

COURT REPORTING ASSOCIATES, INC.

14

STEWART KIDDER

place to intervene. They're responsible for their own security and their own facility operations. I did, I believe, make a phone call to the facility and ask them, you know, please try to work with this company, you know, but that was all.

Q. Was this Lincoln?

A. I'm going to say --

Q. If you don't remember, that's fine.

A. I think it was Fulton, but I'm not positive. No, I don't think it was Lincoln. I believe it was Fulton.

Q. Do you remember what the issue was?

A. I think the issue was timing on Rockland's deliveries to the facility.

Q. Before this situation arose in May of '07, do you have any other memories of dealing with Freed directly other than around what you assume to be Fulton?

A. Not really. Like I say, I know that we had at least a couple of telephone conversations. I really don't remember the details.

Q. All right. Does your Support Operations unit oversee vending machine contracts in any form or fashion that you know of?

A. The only way would be if -- like I said

COURT REPORTING ASSOCIATES, INC.

15

STEWART KIDDER

earlier, if a facility calls us for advice like they would on any contract. I mean, they do it on commissary contracts. They may do it on vending machine contracts.

Q. But there's no process of monitoring the contracts that your office generally engages in?

A. Not with vending machines, no.

Q. If you're called, someone in your office will perhaps offer advice.

A. That's all, yes.

Q. With regard to Ms. Ferri and you, did Ms. Ferri have a process or a practice of reporting to you on a regular basis, or did you not speak frequently about work? How does that work?

A. No, well, we speak frequently. I mean, we have -- as you can imagine with all of our responsibilities, we have a very busy office, and we talk about various things during -- you know, every day during the day.

Q. Are there other assistants, or is she the only assistant?

A. I have a Deputy Director.

Q. So the Deputy is between you and Ms. Ferri?

A. Between myself and Nan Ferri.

Q. What's that person's name as of May?

COURT REPORTING ASSOCIATES, INC.

16

STEWART KIDDER

A. His name is Mark Shepard, S-H-E-P-A-R-D.

Q. Do you have any recollection of Ms. Ferri bringing to your attention any issues involving Rockland Vending?

A. The only thing I recall that she did say -- and I couldn't tell you when it was -- there were some problems with payments from Rockland. She was getting calls from several facilities that they had a lot of overdue commissions.

Q. Is that the kind of report that you would get from her periodically in general, or is that an unusual report?

A. No, that would be in general.

Q. What did you do concerning that, if you remember, if anything?

A. Nothing. I mean, but I would have told her, you know, let the facility handle it.

Q. There's a standard contract regarding vending machines of three years subject to renewals, which would extend out to five years, two renewals. Do you have any awareness of that?

A. I know that that exists, yes.

Q. If you know, does Ms. Ferri play a role in deciding whether to renew or not renew in those

COURT REPORTING ASSOCIATES, INC.

17

STEWART KIDDER

2  situations?
3    A.   No.
4    Q.   Does your office play any such role?
5    A.   No.
6    Q.   So from your point of view, that would be a
7  decision made at the local level, facility level?
8    A.   Yes.
9    Q.   Does your office get notified one way or the
10 other as to whether there's a renewal or not, if you
11 know?
12   A.   In a normal course of business, I would say
13 no. I mean, we may or may not if someone made a phone
14 call, but not as a normal --
15   Q.   But in the normal course of business.
16   A.   No.
17   Q.   This dispute arose on or around May 11th --
18 when I say "this dispute," I mean what brings us here --
19 arose on or around May 9th when at the facility, a
20 workman from Rockland Vending came and sought to deliver
21 product. Do you have any knowledge of this dispute from
22 then on? Have you heard anything about it?
23   A.   Right immediately after that I was made aware
24 that, you know, this did happen.
25   Q.   Let me ask you this question. Before the

COURT REPORTING ASSOCIATES, INC.

18

STEWART KIDDER

2  events of May 9th -- we'll get to those events in a
3  little while -- were you made aware that the facility
4  intended to take the monies out of the machine?
5    A.   The only thing that I recall -- and I'm not
6  sure if I received a phone call or if Nan Ferri received
7  the phone call from Shawangunk, asking if they could
8  retain -- when Rockland Vending came to collect the
9  money from the machines, could they retain their
10 percentage at that time. And I either told the facility
11 or I told Nan Ferri that that had to be referred to
12 counsel's office. I could not answer that question. I
13 didn't know if they had a right to do that or not.
14   Q.   So the question that you heard was whether
15 they could retain their percentage?
16   A.   Yes.
17   Q.   And did you hear that either directly from
18 someone at the facility or from Nan Ferri; is that what
19 you're saying?
20   A.   Yes. I can't remember if it was a phone call
21 from the facility or if she had told me.
22   Q.   When you use the word "could they retain their
23 percentage at that time," was that what was told to you?
24        MR. SCHULZE:  Objection.
25   Q.   Or was something else -- I'm trying to make

COURT REPORTING ASSOCIATES, INC.

19

STEWART KIDDER

2  sure I understand what language you heard, if you know.
3    A.   I don't really recall specific language.
4    Q.   Had you ever had a request like that before?
5    A.   Not that I ever recall, no.
6    Q.   And did you learn as to what guidance was
7  given by counsel, if any?
8    A.   I did after the fact.
9    Q.   What guidance was given?
10   A.   Well, all I know is what I was told.
11   Q.   Who told you something?
12   A.   I can't remember who told me, if it was -- and
13 it could have been Nan Ferri at the time that said, yes,
14 our counsel's office had advised the facility that they
15 could keep money from the machine when it was collected
16 up to the amount that was owed to them in past
17 commissions and had not been paid.
18   Q.   Do you know whether there was any accounting
19 as to what was owed to them at that point?
20   A.   I don't know. Only the facility would have
21 that information. I don't know.
22   Q.   Did the counsel's office speak with you about
23 this matter?
24   A.   Not that I recall, no.
25   Q.   In or around the same time you're having the

COURT REPORTING ASSOCIATES, INC.

20

STEWART KIDDER

2  conversations you just recounted, did you speak to
3  Mr. Freed?
4    A.   I don't recall that I did, no.
5    Q.   You don't recall any call from him inquiring
6  about your state of knowledge about this and whether you
7  had approved it?
8    A.   No. I don't recall that.
9    Q.   Do you remember speaking with anyone from
10 Rockland Vending about this in or around that time?
11   A.   No, I really don't.
12   Q.   Just so I'm clear, your memory at this point
13 is you didn't speak with anyone from the legal counsel
14 about this matter, one way or the other?
15   A.   I don't believe so. It was just left that the
16 facility was going to contact our counsel's office for
17 advice.
18   Q.   The day this happened, there was a report made
19 to the New York State Police regarding this matter. Did
20 you get information concerning that?
21   A.   After the fact, I was told that by someone;
22 and, again, probably it was Nan Ferri. Probably the
23 facility had told her that. But that was all the
24 information I had.
25   Q.   Did anyone from the State Police make contact

COURT REPORTING ASSOCIATES, INC.

21

STEWART KIDDER

with you?
A. No. Not at all.
Q. And did you have any contact on your initiative with anyone from the State Police?
A. None. Nope.
Q. Not down in the New Paltz area or in Albany?
A. No.
Q. And Ms. Ferri indicated this to you around the time it was going on, as far as you know?
A. As far as I know, yes. It was after -- after the fact.
Q. So after May 9, May 10, May 11, that time period, did you have conversations with any of the other facilities about what had occurred?
A. I did not, no.
Q. Do you know whether Ms. Ferri did?
A. I don't know.
Q. Did any of the facilities make contact with you with regard to what had occurred?
A. No.
Q. What about with regard to Rockland Vending? Did you give any directions with regard to Rockland Vending to any of the other facilities?
A. No.

COURT REPORTING ASSOCIATES, INC.

22

STEWART KIDDER

Q. So after this incident occurred and you received these reports which you've explained about the different events, did you have any contact with Rockland Vending whatsoever?
A. None.
Q. And what about with regard to Rockland Vending, did you have any contact with any of the facilities at all?
A. No, I did not.
Q. Did you give any directions with regard to Rockland Vending to Ms. Ferri?
A. Not that I recall, no.
Q. Do you have any knowledge of the Office of State Comptroller's review of contracts at Eastern Correctional Facility in the vending area?
A. I don't believe so, no. Not that I recall.
Q. Did you direct Ms. Ferri at some point in May to make contact with all the correctional facilities for the purpose of finding out the status of Rockland Vending?
MR. SCHULZE: May of what year?
MR. SUSSMAN: 2007.
A. I don't recall that I did, no. I mean, she may have done that.

COURT REPORTING ASSOCIATES, INC.

23

STEWART KIDDER

Q. Did you direct her to? That was the only question.
A. No.
Q. Did she give you any kind of report on what she found?
MR. SCHULZE: Objection.
A. (No response).
Q. You say she may have done that, so I'm asking you, do you have any recollection of getting a report from Ms. Ferri about the status of Rockland Vending at various facilities in May?
A. She may have told me verbally, but, no, no report that I recall.
Q. With regard to the Otisville facility -- you know there's a correctional facility in Otisville?
A. Yes, I do.
Q. Did you play any role in discussions with folks at Otisville about the Rockland Vending contract?
A. Not that I recall. I don't believe so.
Q. What about Lincoln Correctional Facility?
A. No, I don't believe I did.
Q. Did Ms. Ferri bring you any information about Otisville that you can remember?
A. Not that I recall.

COURT REPORTING ASSOCIATES, INC.

24

STEWART KIDDER

Q. What about Lincoln?
MR. SCHULZE: We're talking about vending contracts?
MR. SUSSMAN: Yes, vending contracts in the period of the spring of '07. I'm asking the gentleman whether Ms. Ferri conveyed to him anything about the status of those.
A. I remember something came up about Lincoln. I don't really remember the details. Again, I think it was problems with overdue commissions, but I really don't remember the details.
Q. We marked earlier a document. I would like to show you that.
A. Okay.
Q. We'll just walk you through a few of the items in here. The first section is Invitation for Bids for Vending Machine Services.
A. Uh-huh.
Q. Do you know whether this is a document specific to Shawangunk or in general use in New York State in 2002, 2003, 2004, and on?
MR. SCHULZE: Objection.
A. I don't know that this is a standard document used by all facilities. It may or may not be. I really

COURT REPORTING ASSOCIATES, INC.

25

STEWART KIDDER

1  don't know.
2  Q. Are you familiar with this document, this
3  Invitation for Bids?
4  A. Not the specific document, but it looks like,
5  you know, most invitations for bids that State agencies
6  prepare.
7  Q. And does a document in use at Shawangunk have
8  to be reviewed and approved by your office?
9  A. No.
10 Q. Attached to the exhibit is -- you can look at
11 the back -- is something called Appendix B.
12 A. Yes.
13 Q. Which has a table of contents.
14 A. Yes.
15 Q. Are you familiar with what this document is?
16 A. I'm familiar that the document exists. I
17 don't know all of these terms and conditions. I have
18 seen these before.
19 Q. Does this go with each State contract?
20 A. Yes, it does. All State contracts. To the
21 best of my knowledge.
22 Q. As far as you know, does this Appendix B
23 provision govern State contracts?
24 A. Yes. As far as I'm aware.

COURT REPORTING ASSOCIATES, INC.

26

STEWART KIDDER

1  Q. Does your office provide any training for
2  Institutional Stewards with regard to their relationship
3  with vendors?
4  A. Not specifically with vendors, no. We do --
5  the only training we do at stewards' conferences, which
6  are held at various times, we usually have some
7  Purchasing staff in attendance, a Vehicle person in
8  attendance to answer any questions that they may have.
9  It isn't -- nothing that would be considered detailed
10 training. They're there to assist the facilities.
11 Q. Do you know whether this Appendix B document
12 which I had asked you to look at a moment ago which is
13 at the end of Exhibit 1, do you know whether that
14 document is provided to the Stewards by your offices for
15 inclusion in each contract?
16 A. Not by our office.
17 Q. Do you know how they would get that document?
18 A. Probably from the State Comptroller's office,
19 I would imagine. Or I'm sure it's on-line these days.
20 I'm sure they can print them off.
21 Q. Does your office give the Stewards a direction
22 to include this document with various contracts?
23 A. No. That -- that is from the State
24 Comptroller's office.

COURT REPORTING ASSOCIATES, INC.

27

STEWART KIDDER

1  Q. And you're aware the State Comptroller's
2  office gives that direction?
3  A. Yes.
4  Q. How do you know that?
5  A. Well, because of my involvement over the years
6  with capital construction as part of their purchasing
7  guidelines. It also would be in the New York State
8  Procurement Council Guidelines, which are the governing
9  regulations for all procurements by State agencies.
10 Q. If you look at page 11 of that appendix.
11 A. Okay.
12 Q. There are provisions governing both suspension
13 of work and termination. Do you see that?
14 A. Yes.
15 Q. On the right column.
16 A. Yes.
17 Q. To your knowledge, are your Stewards given any
18 training that advises them with regard to the following
19 of these provisions?
20 A. Not that I'm aware of. I don't know.
21 Q. Do you have any awareness of whether the
22 Stewards are directed to read these provisions and abide
23 by them?
24 MR. SCHULZE: Objection.

COURT REPORTING ASSOCIATES, INC.

28

STEWART KIDDER

1  A. I don't know. Not for my office.
2  Q. Are the Stewards in your chain of command, or
3  are they facility employees?
4  A. No, facility employees.
5  Q. So whatever training the Stewards get is
6  really determined at that level, not your level?
7  A. That's correct. Yes.
8  Q. As far as you know, if you know, does your
9  office have the authority to direct the Stewards as to
10 how to behave with regard to contracts?
11 A. We do not.
12 Q. So the Stewards are responsive and responsible
13 to those at their own facility.
14 A. That's correct.
15 Q. Did you have any conversation with anyone
16 superior to Ms. Creen, the Institutional Steward at
17 Shawangunk, regarding the idea of taking funds directly
18 from the driver? Did you talk to anybody at that
19 facility about that?
20 A. Not that I recall.
21 Q. Do you know who the warden of that facility
22 was in May of '07?
23 MR. SCHULZE: Superintendent?
24 Q. Superintendent, warden.

COURT REPORTING ASSOCIATES, INC.

29

STEWART KIDDER

A. They've changed so much.
Q. You don't know who it was?
A. Not right off the top of my head. I'm sure I knew him.
Q. Did anyone from the facility other than Ms. Creen, the Institutional Steward, if you know, contact your offices regarding this idea of taking the money directly?
A. I'm not sure if the Deputy Superintendent for Administration did or not. I really don't know.
Q. That's Knott?
A. Knott. Kay Knott.
Q. Did you speak to Kay Knott about this?
A. I really -- I don't recall if I did or not. I don't remember if she called me about that or not.
Q. The most you can say is she might have.
A. She may have. I'm not sure.
Q. The attorney who was contacted at the general counsel's office, do you know who that attorney was?
A. I believe it was George Glassanos.
Q. How many attorneys are in that office; do you know?
A. I have no idea. There are many.
Q. Who told you that he had been involved with

COURT REPORTING ASSOCIATES, INC.

30

STEWART KIDDER

this matter; do you know?
A. I believe that was Nan Ferri.
Q. When a company like Rockland does business at a number of facilities simultaneously -- they have contracts with eight or ten or twelve facilities -- does that change your office's responsibility for monitoring them?
A. None. No.
Q. You still view it as a contract with each facility, however many they may have?
A. Yes.
Q. I show you what's been previously marked as -- I believe it's Exhibit B. This was at Mr. Freed's deposition.
  MR. SCHULZE: Defendants' Exhibit B.
  MR. SUSSMAN: Defendants' Exhibit B.
A. Yes. Okay.
Q. Have you seen this document before today?
A. Yes.
Q. Can you tell me why, in light of your relationship to each of these contracts, you wrote this letter?
A. The letter actually was written by Nan Ferri. I did sign it because she just informed me that all

COURT REPORTING ASSOCIATES, INC.

31

STEWART KIDDER

these facilities were having problems with past due commissions. Commissions were not being paid in a timely manner.
Q. So that's why you wrote it?
A. Yes.
Q. Or signed it. Excuse me.
A. Yes.
Q. Had you ever signed a like letter, to your knowledge or memory?
  MR. SCHULZE: Objection.
A. Not that I recall. I'm not sure. I signed a lot of letters.
Q. You don't remember any such letter?
A. No.
Q. After November 9, 2006, assuming that to be the date you signed the document, did you follow up with regard to this, to your memory?
A. Not that I recall, no. I might have -- I mean, Nan Ferri might have told me that commissions were overdue. I'm not sure.
Q. Without guessing.
A. No. I didn't get involved.
  MR. SCHULZE: Just in case we had the exhibit wrong, I just want to note this is the November

COURT REPORTING ASSOCIATES, INC.

32

STEWART KIDDER

9, 2006, letter from Stewart Kidder to Michael Freed that we've been referring to as Defendants' Exhibit B.
  MR. SUSSMAN: Okay.
BY MR. SUSSMAN:
Q. Before you wrote this letter, had you any contact directly with Mr. Freed about the facts involved in this?
A. I don't recall. I don't believe so, but I really don't recall that I did or not.
Q. And just using this letter as an anchor in time, so we're in November of 2006, after that, do you remember whether you had any contact with Mr. Freed about the subject matter of this letter? You directly.
A. I don't recall that I did, no.
Q. Did Ms. Ferri say anything to you in asking you to sign this letter beyond what you've already remembered and can remember now?
A. No.
Q. The Superintendent at Shawangunk in May was a guy named Smith?
A. Joe Smith.
Q. Does that refresh your recollection whether you had any contact with him about this matter in May?
A. No. As far as I recall, I didn't have any

COURT REPORTING ASSOCIATES, INC.

33

STEWART KIDDER

contact with him about this.

Q. Did any other Steward -- I understand you think you had contact with either the Steward or the Dep for Administration from Shawangunk either directly or through Ms. Ferri in May around the time of these events. I understand that from your prior answers. Did any other facility Stewards call you in May or June concerning Rockland Vending?

A. I don't believe so. Not that I recall, no.

Q. Did any other Stewards, to your knowledge, contact Ms. Ferri and indicate they too wanted to take money directly from the driver?

A. Not that I'm aware of, but I don't know.

Q. Mr. Glassanos is in the Legal Department, as I understand it; is that accurate, to your knowledge?

A. That's correct.

Q. Who in the period of time May of '07 was in charge of that department?

A. Anthony Anucci.

Q. Did you and Mr. Anucci have any conversation regarding this self-help?

A. Not that I recall, no. No. There wouldn't have been any reason to.

Q. As far as you were advised, the advice came

COURT REPORTING ASSOCIATES, INC.

34

STEWART KIDDER

from the staff attorney, Mr. Glassanos?

A. That's as far as I know, yes.

Q. You know nothing about any efforts beyond his level in the Legal Department to check --

A. Not that I'm aware of, no.

Q. In the period from 1999 to May of 2007, had this issue of self-help come up with regard to any other contract that you know of?

MR. SCHULZE: Objection.

A. Not that I ever recall, no.

Q. Were you aware -- what I'm asking you -- factually of any precedence for a departmental facility to say that somebody owed them money and that they would take the money without going through a court proceeding? Do you know of any other instances like that?

A. I don't know of any.

MR. SCHULZE: Objection.

Q. In the period since May of 2007 when this incident occurred, have you learned of any such incidents?

MR. SCHULZE: Objection.

A. Not that I'm aware of, no.

Q. Have you provided any guidance since May and this incident to your facilities indicating they should

COURT REPORTING ASSOCIATES, INC.

35

STEWART KIDDER

not do this?

A. No.

MR. SCHULZE: Objection.

Q. Have you had a Stewards' meeting -- you mentioned the periodic Stewards' meeting, so have you had any Stewards' meeting since early May of 2007?

A. No, I have not attended any. There was one in the middle of the state that some of my Purchasing staff attended, but that's all.

Q. Who actually sponsors those? DOCS?

A. DOCS, yes.

Q. And you have representatives of your unit at the meetings?

A. Yes.

Q. Do you know whether this was discussed at that time?

A. I don't know.

MR. SCHULZE: Objection.

Q. Your answer is you don't know whether the matter of what happened at Shawangunk with the self-help was discussed?

A. I don't know. It was in a different part of the state, but, no, I don't know.

MR. SUSSMAN: All right. I'm just going

COURT REPORTING ASSOCIATES, INC.

36

STEWART KIDDER

to take a five-minute recess and confer and we'll finish up.

(Brief recess taken.)

BY MR. SUSSMAN:

Q. Mr. Kidder, I want to direct your attention back to that period in May when you first heard about this situation. If I understand your testimony correctly, before anything actually happened at Shawangunk, either Ferri or somebody from the facility contacted you and ran this idea by you; is that accurate?

A. Yes, that's what I recall.

Q. And when they ran the idea by you, as you recall what you were told, were you advised that the driver would be detained?

A. No, I wasn't advised of any details.

Q. Were you advised as to how it was proposed that this would be done?

A. No.

Q. As you recall it, do you recall asking any questions of whoever was advising you about whatever was being proposed?

A. No. No. I would just -- I advised them to contact counsel's office. It was not my decision to

COURT REPORTING ASSOCIATES, INC.

37

```
 1                     STEWART KIDDER
 2   make.
 3       Q.   As you understood it, at that point in time
 4   before you referred anybody to counsel's office, did you
 5   have the authority to say, "Don't do it"?
 6            MR. SCHULZE:  Objection.
 7       A.   Not really, no.
 8       Q.   Why don't you think you had that authority?
 9       A.   Because this is a facility operation and the
10   facility staff do not report -- I do not have any
11   authority over the facility staff.  They work for the
12   executives at their facility.
13       Q.   Do you have any understanding of why your
14   office was being apprised of this beforehand, given what
15   you just said?
16       A.   Probably they didn't know who else to call so
17   they called our office.
18       Q.   Mr. Freed has given deposition testimony in
19   this case, and I want to ask you some questions that
20   derive from things he said.
21       A.   Okay.
22       Q.   He told counsel that basically as soon as he
23   learned of this, the first person he called was you and
24   he had a conversation with you on the 9th about this.
25   Does that refresh your recollection in any way as to any
```

38

```
 1                     STEWART KIDDER
 2   conversation you and he had?
 3       A.   It doesn't really.  I mean, I'm not saying it
 4   didn't happen, but I really don't recall it.
 5       Q.   And he indicated that he asked you, "Are you
 6   aware of what's gone down at Shawangunk?" and you told
 7   him that you were.  Do you have any memory of that?
 8       A.   Not of the discussion with him, no.
 9       Q.   And he says he asked you, "Do you agree with
10   it?" and you said, "I do."  Do you remember that?
11       A.   No.  No.
12       Q.   And he says you then told him there was a
13   lawyer involved and gave him the name of the gentleman
14   who you have identified today, Mr. Glassanos.  Do you
15   remember doing that?
16       A.   No.  I don't remember that discussion.
17       Q.   So as you sit here today, you remember nothing
18   about the call at all with Freed?
19       A.   Not from Mr. Freed, no, I don't.
20       Q.   Including whether it even happened?
21       A.   No, I really don't recall it.
22       Q.   Okay.  With regard to the Fulton Correctional
23   Facility, you gave some testimony about that earlier.  I
24   just want to follow that up a little bit.  Mr. Freed
25   indicates that his vending machine trucks and the people
```

39

```
 1                     STEWART KIDDER
 2   coming on the trucks were not being allowed into a
 3   courtyard which would easily access and service that
 4   facility and they were being delayed, if you will.  Do
 5   you have a recollection of him telling you about that?
 6       A.   I do recall that problem, yes.
 7       Q.   And he indicates that he contacted you to help
 8   resolve that.  Do you remember that?
 9       A.   Yes.  I do remember speaking with him about
10   that.
11       Q.   And he indicates that you informed him, at
12   least, that you had called the facility and, in fact,
13   this problem was resolved fairly quickly.  Do you
14   remember that?
15       A.   Well, I remember telling Mr. Freed I would
16   call the facility.  Again, these contracts are with the
17   facilities, not with our office.  But I told him that I
18   would, as a courtesy, contact the facility and ask them
19   to please try to work with this company.  Because I
20   never know the whole story there.
21       Q.   Who did you speak with at that facility; do
22   you remember?
23       A.   I don't recall now.
24       Q.   But you do remember making the call?
25       A.   Yes.  That's one I do remember.
```

40

```
 1                     STEWART KIDDER
 2       Q.   And he also indicates there was an occasion
 3   where he called you because there was a boycott of his
 4   machines going on and that people were putting up signs
 5   at Fulton not to use his machines.  Do you have a memory
 6   of that?
 7            MR. SCHULZE:  Objection.
 8       A.   I really don't.
 9       Q.   So you don't have any recollection of a
10   contact that he initiated to you directly regarding a
11   boycott of machine use at Fulton?
12       A.   I really don't recall that.
13       Q.   In 2004 or 2005, did DOCS operate a training
14   facility near Albany?
15       A.   We have a training academy.
16       Q.   Is that south of Albany?
17       A.   Yes.
18       Q.   And is there also a museum there where, for
19   instance, electric chairs are maintained?
20       A.   Yes, there is.
21       Q.   Where is that?
22       A.   It's on New Scotland Avenue in Albany.
23       Q.   Do you have a recollection of meeting
24   Mr. Freed in 2004 or 2005 at that training facility?
25       A.   I didn't, but as I think back, that could have
```

41

STEWART KIDDER

been -- could have been at a Stewards' conference that he was there, but I really don't remember much about it.

Q. Do you have any recollection that the Dep at Coxsackie had invited Mr. Freed to make a presentation at that conference and that you were, in fact, there?

A. I don't recall that he did that, but, again, I'm not saying that he didn't. I just --

Q. But as far as you currently sitting here today remember, you don't remember conversations with Mr. Freed at that occasion. You don't remember speaking with him?

A. I really don't recall that, no.

Q. In your contact with Mr. Freed around Fulton, the one that you do remember, do you have any recollection of saying to Mr. Freed in any way that what happened at the facilities was not something that you had any real control over?

A. I'm sure I did because that's the case.

Q. You're sure you did tell him that?

A. Yes.

Q. Does Ms. Ferri still work for you?

A. Yes, she does.

Q. And is she in the same position?

A. Yes.

COURT REPORTING ASSOCIATES, INC.

42

STEWART KIDDER

Q. Once a facility signs off on a contract, whether it be vending or anything else, do you know whether in the ordinary course that goes to the State Comptroller for review?

A. They always go to the State Comptroller for review and approval. It's not a binding contract until the State Comptroller approves it.

Q. Has your office had any issues with the State Comptroller reviewing contracts agreed upon by the facilities, to your knowledge?

MR. SCHULZE: Objection.

Q. Has the State Comptroller interposed any objection to any of the contracts which your facilities forwarded, to your knowledge?

MR. SCHULZE: Objection.

A. I don't know. Not to my knowledge, I don't believe.

Q. Do you have any information that with regard to any vending contracts, whether Mr. Freed's or anybody else's, the State Comptroller's office has raised any issue?

A. They may or may not have. I wouldn't necessarily know. I mean, that's between the facility and the State Comptroller.

COURT REPORTING ASSOCIATES, INC.

43

STEWART KIDDER

Q. Well, has any --

A. I wouldn't know.

Q. Has any such issue come to your office, that's what I'm asking you, that you do know about?

A. I don't believe so, no.

Q. Do you have any memory of any contracts that your office, apart from the facilities, has tried to engage in or enter into that the State Comptroller's office has raised questions with?

A. Oh, yes. Many times.

Q. And that comes to your attention?

A. No, that goes to our Purchasing -- Senior Purchasing Agent's attention.

Q. And does the Senior Purchasing Agent come to you and discuss it?

A. Rarely. Usually they handle that themselves. They're usually, you know, technical questions that can be answered. No, I normally would not see those.

Q. Does the Comptroller's office, to the extent you know -- and if you don't know, you can tell me -- when they get these contracts for either initial execution or renewal, do you know what kind of inquiry they make with regard to it?

A. No, I don't.

COURT REPORTING ASSOCIATES, INC.

44

STEWART KIDDER

Q. Do you have any knowledge as to whether they make any inquiry concerning performance issues of contractors, or is that something the agency does?

MR. SCHULZE: Objection.

A. I don't know. I mean, the Comptroller may.

Q. You're not sure?

A. I'm not sure.

Q. With regard to the commissions that are obtained from the vending machine companies, do all the contracts in New York State have such provisions that some share of the profits or proceeds are to be paid back to the facility in commissions; do you know?

A. For vending machines?

Q. Yes.

A. Yes.

Q. Is that the only such contract which has that, or do you not know?

A. I believe it is. I can't think of anything else that would be applied there.

Q. Does your office determine how those commissions, that is, the amount that comes back from those contracts, how those commissions are to be used?

A. No. That is not our office.

Q. Where is that decision made?

COURT REPORTING ASSOCIATES, INC.

45

STEWART KIDDER

A. By our executive staff.
Q. Executive staff of DOCS?
A. Of DOCS.
Q. Just so we're clear, because I want to make sure I understand this, are the commissions from the vending machine contracts used the same way, to your knowledge, in each facility?
A. As far as I know, yes.
Q. How are they used?
A. For specific machines, the commissions are paid to the Inmate Benefit Fund, and some particular machines, depending on their location, are paid to the Employee Benefit Fund.
Q. Do you know what the Inmate Benefit Fund is?
A. I don't know all of the details, but it's basically money that's available to the inmate population. They have an established committee that guides these. They're used for inmate activities. Might be a family day or cookout I know they have on occasion in the summer. It may be to purchase, I don't know, possibly some recreational equipment that they may want, but it has to be decided by a committee representing the entire inmate population.
Q. Do you know if there's a dedicated account,

COURT REPORTING ASSOCIATES, INC.

46

STEWART KIDDER

bank account, which represents the inmate activity fund?
A. Yes, there is.
Q. And that exists in each facility, as far as you know?
A. As far as I know.
Q. So as far as you know, there should be records of what balances are in such account at a given time and all?
A. Yes.
Q. And those are maintained by the Stewards?
A. Yes. Or at least by the business office in the facility.
Q. Does your office have anything to do with the monitoring of those accounts?
A. None. Nothing.
Q. And the Stewards don't report to you regarding the status of those accounts?
A. No. Not at all.
Q. Do you have any recollection of conversations with Ms. Ferri regarding whether Rockland's vending contracts should or should not be renewed in light of any payment problems that you dealt with in your letter which I've given you?
A. No. No.

COURT REPORTING ASSOCIATES, INC.

47

STEWART KIDDER

Q. You don't recall any conversations about that?
A. No, I don't recall any conversations whether Rockland's contract should be extended or not.
Q. Did you receive from Mr. Freed --
   MR. SUSSMAN: I believe you marked this as Exhibit C at his deposition, but in any event, it's a November 16, 2006, letter.
Q. Did you receive that letter from Mr. Freed on or about November 16th of 2006?
A. Yes.
Q. Do you have a recollection of that letter ever actually reaching you?
A. Yes, I'm sure it did.
Q. And you're familiar with it?
A. Yes.
Q. The last line of the letter indicates that, in essence, if there are continuing issues or problems, to contact him. Do you see that?
A. Uh-huh.
Q. Do you recall if, after that letter, you ever sent him another letter concerning any issue similar to your first letter, the November 9th letter?
A. I don't recall that I did, no. No.
Q. Do you have any recollection of after this

COURT REPORTING ASSOCIATES, INC.

48

STEWART KIDDER

November time period Ms. Ferri raising with you any issues and asking you to send another letter?
A. No. I was never asked to send another letter.
Q. Do you remember if Ms. Ferri in the period after this period came to you with complaints about Rockland before this issue in May that we've talked about?
A. She may have mentioned it. I don't recall any specifics.
Q. You don't recall her mentioning it at this point?
A. Not really, no.
Q. Where a facility is terminating a contract with a vending machine company, does the facility in the normal course advise your office of that?
A. They may or may not.
Q. There's no protocol?
A. There's no protocol, no.
Q. Do you know Marsha Riley, M-A-R-S-H-A, R-I-L-E-Y?
A. Not personally. I know she's at Lincoln. I never met the woman.
Q. Did Ms. Ferri provide you any information about the situation at Lincoln as between Ms. Riley and

COURT REPORTING ASSOCIATES, INC.

49

STEWART KIDDER

2   her facility and Rockland?
3   A.  I remember that she did at the time.  Again, I
4   don't remember the details, but I remember there was a
5   problem at Lincoln.
6   Q.  And you remember being briefed on that by
7   Ms. Ferri?
8   A.  Yes.
9   Q.  Do you have any knowledge of whether that was
10  before or after the situation at Shawangunk, that you
11  were briefed about Lincoln?
12  A.  I believe it was before, but I'm not positive.
13  Q.  Do you have any recollection of learning
14  anything about Lincoln and vending machines after the
15  situation at Shawangunk?
16  A.  I may have, but I don't recall.
17  Q.  Did you review any documents in preparing for
18  today's deposition?
19  A.  No.
20  Q.  Do you have files at your office with regard
21  to the vending contracts at each of the facilities?
22  A.  We would not have it for each of the
23  facilities, no.
24  Q.  You would have just all the contracts
25  together?

COURT REPORTING ASSOCIATES, INC.

---

50

STEWART KIDDER

2   A.  We wouldn't even have all the facility
3   contracts.  My guess is we don't have any of them.  I'm
4   sure we have a vending machine file for general
5   information.
6   Q.  You have not read that in preparing for today?
7   A.  No.
8         MR. SUSSMAN:  Okay.  Thank you very much
9   for coming and answering questions.  Counsel's allowed
10  to ask you whatever he would like at this point.
11        MR. SCHULZE:  I have no questions.
12        MR. SUSSMAN:  Okay.  Thank you very much.
13        (At 1:03 p.m., the examination of this
14        witness was concluded.)
15              * * * * *

COURT REPORTING ASSOCIATES, INC.

---

51

2               J U R A T
3
4   STATE OF            )
5   COUNTY OF           )
6   I, _____, have read the foregoing
7   record of my testimony taken at the time and place noted in
8   the heading hereof and do hereby acknowledge:  (Check one)
9
10      (  )  That it is a true and correct transcript
11            of same
12
13      (  )  With the exceptions noted in the attached
14            errata sheet, it is a true and correct
15            transcript of same
16
17            _____
                  STEWART KIDDER
18  Subscribed and sworn to before me
19  this _____ day of _____, 200__.
20  _____
21            Notary Public
22  My commission expires: _____.

COURT REPORTING ASSOCIATES, INC.

---

52

2          E R R A T A   S H E E T
3   Please note any errors or corrections on this sheet.
4   Indicate a reason for any change or correction.
5   PAGE \ LINE \ CHANGE \ REASON
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24
25        _____
              STEWART KIDDER

COURT REPORTING ASSOCIATES, INC.

53

C E R T I F I C A T E

I, GAIL M. SHERRY, a Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is hereinbefore set forth was duly sworn by me and that the within transcript is a true and accurate record to the best of my knowledge and ability.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand.

*Gail M. Sherry*
Gail M. Sherry, CRR, RMR

COURT REPORTING ASSOCIATES, INC.

---

46

1  Cheryl Fre[ed]
2  A.  From talki[ng to] ... e and
3  Mr. Sussman.
4       MS. SCHULZE: Okay. I don't
5  know if you want to waive privilege
6  here, do you?
7       MR. SUSSMAN: No, of course not.
8  It's not relevant when she
9  found out that fact.
10      (To witness): You don't have to
11 speak. Please don't discuss your
12 conversations you had with me.
13      MR. SCHULZE: I don't want to
14 get into this. Here's all I am
15 getting at; okay?
16 Q.  When Roxanne talked to you on
17 May 9th, do you know whether or not she had
18 conferred with legal counsel before that?
19 A.  I don't know.
20      MR. SCHULZE: Okay. I'm all done.
21
22          CHERYL CREEN
23 Sworn and subscribed to before me
   this ___ day of _____, 2008.
24
25 _____
   Notary Public
                                   [Page 46]

47

INDEX

WITNESS:                          PAGE

CHERYL FREED                        4

EXHIBITS

None.

INFORMATION
REQUESTED

Copies of Faxes: pg. 18

                                   [Page 47]

48

CERTIFICATION

STATE OF NEW YORK  )
                   ) ss.
COUNTY OF WESTCHESTER )

I, KATHRYN MACDONALD, a Stenographic Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose deposition is herein set forth was duly sworn by me; that the within transcript is an accurate record of the testimony given by such witness, to the best of my knowledge and ability.

That I am not related to any of the parties involved in this matter, and that I have no personal interest whatsoever in the outcome thereof.

_____
Kathryn MacDonald
                                   [Page 48]

49

ERRATA PAGE

Pg. Ln. CORRECT:       TO:

 4  _____  _____
 5  _____  _____
 6  _____  _____
 7  _____  _____
 8  _____  _____
 9  _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18  _____  _____
19  _____  _____
20  _____  _____
21  _____  _____
22  _____  _____
23  _____  _____
24  _____  _____
25  _____  _____
                                   [Page 49]

[13] (Pages 46 to 49)

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014