**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
ROCKLAND VENDING CORP.,

      Plaintiff,

  -against-        07-CIV-6268
                (WP) (MPF)

ROXANNE CREEN,
    sued in her individual capacity,
MARSHA F. RILEY,
    sued in her individual capacity,
STEWART KIDDER,
    sued in his individual capacity,

      Defendants.

-------------------------------------------------------

      STENOGRAPHIC MINUTES OF EXAMINATION BEFORE

   TRIAL conducted of NANNETTE FERRI on the 23rd day

   of January, 2008, at the offices of the New York

   State Attorney General, State Capitol, Albany,

   New York, commencing at 10:36 a.m.; before

   SADIE L. HERBERT, a Shorthand Reporter and Notary

   Public within and for the State of New York.

**ORIGINAL**

**Page 2**

APPEARANCES:

    ON BEHALF OF PLAINTIFF:

      SUSSMAN & WATKINS

      PO Box 1005

      Goshen, New York 10924

      BY: MICHAEL SUSSMAN, ESQ.

    ON BEHALF OF DEFENDANTS:

      OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

      120 Broadway

      New York, New York 10271

      BY: DANIEL SCHULZE, ESQ.
         Assistant Attorney General

ALSO PRESENT:

    MICHAEL FREED, Plaintiff

**Page 3**

      S T I P U L A T I O N S

      It is hereby stipulated and agreed by and

between the attorneys for the respective parties

hereto that the signing and filing of the

Notary's Oath be waived; that the examination be

conducted before Sadie L. Herbert, a Shorthand

Reporter and Notary Public in and for the State

of New York; that the filing of the transcript of

testimony in the Office of the Clerk of the Court

be waived; that the examining party will furnish

the examined party one copy of the transcript of

testimony as taken without cost or charge; that

all objections to questions, except as to the

form thereof, are specifically reserved to the

time of trial; and that the transcript of

testimony may be signed before any Notary Public

or other officer authorized to administer oaths.

**Page 4**

            Nannette Ferri

         NANNETTE FERRI,

    (first duly sworn by the Notary Public, was

    examined and testified as follows:)

         EXAMINATION

BY MR. SUSSMAN:

Q.   Good morning, Ms. Ferri. I am Michael Sussman, as you

    heard. I represent Mr. Freed in this lawsuit. I'm

    here for a deposition, which means I'll be asking you

    some questions today. Assuming you understand the

    question, please answer the question. If you don't

    understand the question, it's equally important that

    you indicate that, I'll rephrase the question. If the

    correct answer to a question is I don't know, please

    indicate that. Likewise, if the correct answer is I

    don't recall, indicate that. You are not here to

    guess, nor do I want you to guess with respect to

    answers to questions. As you are indicating, you know

    please answer verbally rather than by just

    gesticulating, nod or through other nonverbal means of

    communication. This is a formal proceeding as if we

    were in court.

A.   Okay.

Q.   You are under oath, so please answer the questions

    truthfully without regard to who you believe your

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | | testimony will help or hurt. If you need a break, you |
| 2 | | are permitted to take one. Please ask me, and I'll |
| 3 | | indicate on the record that we're taking a break. |
| 4 | A. | Okay. |
| 5 | Q. | The only other rule is let me finish a question even |
| 6 | | if you believe you know where the question is going, |
| 7 | | and likewise, I'll let you answer the question fully |
| 8 | | before I ask the next question. |
| 9 | A. | Okay. |
| 10 | Q. | How long have you held your current job? |
| 11 | A. | Since June of '02. |
| 12 | Q. | What is your current job? |
| 13 | A. | I'm the Assistant Director of Support Operations. |
| 14 | Q. | For what agency? |
| 15 | A. | Department of Correctional Services. |
| 16 | Q. | Did you work for that same department before 2002? |
| 17 | A. | Yes, I did. |
| 18 | Q. | In what capacity? |
| 19 | A. | Prior to this, I was Senior Purchasing Agent. |
| 20 | Q. | How long did you hold that job? |
| 21 | A. | I believe since '97. |
| 22 | Q. | And the current position you hold, is that a |
| 23 | | competitive position? |
| 24 | A. | No. |

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | Q. | Who appointed you to the position? |
| 2 | A. | I believe the director. |
| 3 | Q. | And who was the director who appointed you to the |
| 4 | | position? |
| 5 | A. | Stew Kidder, Stewart Kidder. |
| 6 | Q. | How long have you known Mr. Kidder for? |
| 7 | A. | Probably since 1990. |
| 8 | Q. | How did you meet him in 1990? |
| 9 | A. | I dealt with him through my work. |
| 10 | Q. | What was your work in 1990? |
| 11 | A. | We were purchasing equipment. My job specifically was |
| 12 | | to purchase equipment for new jails that were opening |
| 13 | | up. |
| 14 | Q. | And was that job within DOCS? |
| 15 | A. | Yes. |
| 16 | Q. | What was Mr. Kidder's role in 1990? |
| 17 | A. | He worked in facilities planning, and this was capital |
| 18 | | funding, so I dealt with him on some funding issues. |
| 19 | Q. | So in 2002 when this deputy position came open, did |
| 20 | | you apply for it or did he seek you out? |
| 21 | A. | Actually, my direct supervisor is Mark Shephard, and |
| 22 | | he's the one that talked to me about this. |
| 23 | Q. | So at that point you didn't speak with Mr. Kidder? |
| 24 | A. | No. |

7

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | Q. | Did Mr. Kidder interview you before your appointment |
| 2 | | to the position? |
| 3 | A. | No, not Mr. Kidder. |
| 4 | Q. | Did Mr. Kidder explain to you your duties and |
| 5 | | responsibilities when you took the position? |
| 6 | A. | Mark Shephard and Stew did. |
| 7 | Q. | So the answer is yes, he did, with Mr. Shephard? |
| 8 | A. | Yes. |
| 9 | Q. | When was this in 2002? |
| 10 | A. | June, May. |
| 11 | Q. | And in the conversation in May, June of 2002 was there |
| 12 | | any conversation about vending machines or vending |
| 13 | | contract orders in New York State? |
| 14 | A. | Not at that time. |
| 15 | Q. | Had you had any dealings before May or June of 2002 |
| 16 | | with vending contracts? |
| 17 | A. | No. |
| 18 | Q. | When did you first have conversations with Mr. Kidder |
| 19 | | about any responsibility you had with respect to |
| 20 | | vending machines? |
| 21 | A. | I don't recall exactly when. |
| 22 | Q. | Was it before 2006? |
| 23 | A. | Yes. |
| 24 | Q. | And what did you learn from that conversation, if |

8

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | | anything, about your responsibility with regard to |
| 2 | | vending machine contracts? |
| 3 | | MR. SCHULZE: Objection. |
| 4 | Q. | You can answer. |
| 5 | | MR. SCHULZE: Go ahead. |
| 6 | A. | That was to be added to my job description. |
| 7 | Q. | What was to be added? |
| 8 | A. | Vending machine -- taking -- we have a boilerplate |
| 9 | | that -- working on the boilerplate, working with |
| 10 | | facilities, providing the boilerplate, reviewing |
| 11 | | the -- reviewing was the main -- was the main |
| 12 | | responsibility, reviewing boiler -- IFBs, invitation |
| 13 | | for bids. |
| 14 | Q. | Reviewing invitations for bids which facilities would |
| 15 | | put out? |
| 16 | A. | Yes. |
| 17 | Q. | And when you say reviewing them, do you mean reviewing |
| 18 | | what facilities were going to be disseminating to the |
| 19 | | vending community? |
| 20 | A. | Yes. |
| 21 | Q. | And what would you be reviewing the IFPs(SIC) for? |
| 22 | A. | There was a standardized boilerplate that was already |
| 23 | | put in place. |
| 24 | Q. | Okay. |

*Nannette Ferri*

1   A.  And when facilities would prepare their IFB, they were

2       instructed to send copies to Support Operations for

3       review.

4   Q.  I may not have been clear with my question.  What were

5       you reviewing them for?  You were reviewing them, you

6       said that was your responsibility; what did you review

7       them for, to see what?

8   A.  To make sure they agreed with the IFB that was already

9       prepared.

10  Q.  To make sure they agreed with the boilerplate?

11  A.  The boilerplate, yup.

12  Q.  And once a facility sent out an IFP --

13  A.  B.

14  Q.  -- B --

15  A.  Sorry.  Yes.

16  Q.  -- did it then send you a copy or did it send you a

17      copy before it disseminated the IFBS?

18  A.  I don't understand.

19  Q.  Did you review the IFBs before the facility sent them

20      out or after?

21  A.  Before they -- you mean sent them to the vendors?

22  Q.  Yes.

23  A.  Yes, before.

24  Q.  And you approved them?

---

*Nannette Ferri*

1   A.  Yes.

2   Q.  And once you did that, what other roles, if any, did

3      you have with respect to vending machines?

4   A.  That was basically it, unless they had further

5      questions.

6   Q.  Further questions about what?

7   A.  For example, there's a site visit that's included in

8      the bid, if someone called and had a question on a

9      site visit and they did not know what the answer was,

10     they may call me.

11  Q.  And the someone you are referring to are the stewards?

12  A.  The stewards.  Generally the stewards, yes.

13  Q.  You say if someone had a question about a site visit,

14     which was included in the bid, do you mean that the

15     vending companies were permitted to make site visits

16     to the facilities in furtherance of their bid?

17  A.  That's one of the clauses in the IFB was the site

18     visit.

19  Q.  So did some stewards have questions of you as to the

20     site visits which they called you with?

21  A.  Mm-hmm.

22  Q.  That happened?

23  A.  Yes.

24  Q.  What kind of questions did any of these stewards have

---

11

*Nannette Ferri*

1      regarding site visits?

2   A.  Do they all have to come at the same time would be one

3      question.

4   Q.  What's the answer to that question?

5   A.  No, they don't.

6   Q.  Any other questions you can remember?

7          MR. SCHULZE:  Objection.

8   Q.  You can answer.

9   A.  Not that I recall.

10  Q.  What was your role, ma'am, once a contract was signed

11     between a vending machine company and a particular

12     facility with regard to the implementation of the

13     contract?

14  A.  That was the facility's --

15  Q.  You are nodding your head yes, but that --

16  A.  That was the facility's responsibility.

17  Q.  So you had no role?

18  A.  No.

19  Q.  Is that true?

20  A.  True.

21  Q.  And did that remain constant through today?

22  A.  Yes.

23  Q.  Never changed?

24  A.  No.

---

12

*Nannette Ferri*

1   Q.  And Mr. Kidder as far as you know also had no role; is

2      that true?

3   A.  Can I -- when I say no role, if down the line -- I

4      mean, other than a site visit question, there may have

5      been other questions.  But as far as if a contract --

6      once I reviewed the bid, if there were no questions or

7      issues, that was the end of it.

8   Q.  I asked you a different question.  I asked you once

9      the bid was determined and a contract was signed with

10     the vending machine company, did you play any role in

11     the monitoring and implementation of that contract?

12         MR. SCHULZE:  Objection.

13         MR. SUSSMAN:  Your objection is noted.

14  Q.  Please answer.

15  A.  I did not play a role in the implementation of the

16     contract.

17  Q.  And were the contracts implemented solely at the

18     facility level?

19  A.  Yes.

20  Q.  And were the facilities given any guidance by you as

21     to when, if ever, you were to be involved once a

22     contract was signed with the particular vending

23     machine company?

24         MR. SCHULZE:  Objection.

---

**Page 13**

*Nannette Ferri*

```
 1  Q.  You can answer.
 2  A.  I -- I'm not sure.  I --
 3          MR. SUSSMAN:  Read back the question because
 4      I want to make sure you hear the question.
 5          (The previous question was read back by the
 6      Court Reporter.)
 7          MR. SCHULZE:  Objection, asked and answered.
 8  BY MR. SUSSMAN:
 9  Q.  Do you have anything additional to add to your answer?
10          THE WITNESS:  Can you read that again.
11          (The previous question was read back by the
12      Court Reporter.)
13          MR. SCHULZE:  The question is:  Do you have
14      anything to add to your answer?
15  A.  And my answer was no?
16  Q.  Yes.
17  A.  I don't know how to answer that.
18  Q.  On May 8th, 2007 were you involved in a phone call
19      with a person named Stewart Kidder, another person
20      named Roxann Creen and a fourth person named George
21      Glassanos?
22  A.  May 8th?
23  Q.  May 8th.
24  A.  I'm not positive that was the date.  It could have
```

---

**Page 14**

*Nannette Ferri*

```
 1      been.
 2  Q.  What about May 9th; are you positive whether there was
 3      a phone call that date?
 4          MR. SCHULZE:  Objection.
 5  A.  I'm not sure either date.
 6  Q.  Who initiated the phone call you recall?
 7  A.  I recall getting a phone call from Roxann.
 8  Q.  Do you recall a phone conversation between you,
 9      Mr. Kidder, Mr. Glassanos and Ms. Creen on any
10      occasion?
11  A.  One phone call, like a conference call with all four?
12  Q.  One phone call in which you were all participating?
13  A.  No.
14  Q.  "No", meaning you don't recall it?
15  A.  I don't recall a phone call where all four
16      participated like a conference call, no.
17  Q.  I'll show you to refresh your recollection a document
18      which has been marked today as Exhibit 1 to your
19      deposition, 0049, Defendant.
20          (Plaintiff's Exhibit 1 was marked for
21      identification.)
22  Q.  Does looking at the document refresh your recollection
23      of the phone call I just referenced?
24          MR. SCHULZE:  Take a moment to look at it.
```

---

**Page 15**

*Nannette Ferri*

```
 1  A.  (Pause.)
 2      Okay.
 3  Q.  Not okay.  Does it refresh your recollection or not?
 4  A.  Yes.
 5  Q.  That's the question.
 6          MR. SCHULZE:  Objection.
 7  Q.  It does refresh your recollection?
 8          MR. SCHULZE:  Objection, harassing the
 9      witness.
10          MR. SUSSMAN:  No one is harassing the
11      witness.
12          MR. SCHULZE:  You are.
13  Q.  The question was:  Does it refresh your recollection?
14      It's a very simple question.
15          MR. SCHULZE:  Objection, harassing the
16      witness.  Go ahead.
17  A.  It refreshes my memory to conversations, but it was
18      not one four-way conference call.
19  Q.  So where the document says, "This is to follow-up
20      today's conversation" -- singular -- "with Stew Kidder
21      and Nan Ferri regarding Rockland Vending", from
22      Ms. Creen to Ms. Glassanos, the four of you were not
23      part of one call?
24  A.  Not one -- no, not one phone call.
```

---

**Page 16**

*Nannette Ferri*

```
 1  Q.  How many phone calls were there that you participated
 2      in on May 9th concerning Rockland Vending?
 3  A.  I don't know that it was May 9th.
 4  Q.  Well, I've asked you about May 9th, how many did you
 5      participate in that day?
 6  A.  I don't remember.
 7  Q.  Did you participate in any that day?
 8  A.  I'm sure I did, but I don't remem- -- I don't recall
 9      exactly.
10  Q.  What about Mr. Kidder, did he participate in any phone
11      calls that day regarding Rockland Vending, to your
12      knowledge?
13  A.  I'm not sure.
14  Q.  Did he participate in any phone calls that day with
15      you?
16  A.  On May 9th?
17  Q.  May 9th?
18  A.  I don't recall if it was May 8th or May 9th when
19      Roxann did call.
20  Q.  Was Mr. Kidder a participant in the call when Roxann
21      did call?
22  A.  I believe she called me initially, and I told her I
23      would get back to her.
24          MR. SUSSMAN:  Move to strike, nonresponsive.
```

Nannette Ferri

```
 1              MR. SCHULZE:  I object to that.
 2   Q.   Did Mr. Kidder participate --
 3              MR. SUSSMAN:  You can object to whatever you
 4        want, Counsel.  Put it on the record.  Your
 5        objection is noted.
 6              MR. SCHULZE:  I did.  You don't have to say
 7        my objection is noted every time.
 8              MR. SUSSMAN:  Your objection is noted.
 9              MR. SCHULZE:  You don't have to say my
10        objection is noted every time I --
11              MR. SUSSMAN:  I don't have to, but that's my
12        practice, Counsel.
13              MR. SCHULZE:  Well, I --
14              MR. SUSSMAN:  I don't have to, but I do,
15        so -- as a courtesy to you.
16   BY MR. SUSSMAN:
17   Q.   Now, is your testimony sitting here today that you
18        recall no conversation in which you and Mr. Kidder
19        participated together with Ms. Creen?
20              MR. SCHULZE:  Objection.
21   A.   Yes, I do recall a conversation.
22   Q.   The what?
23   A.   A conversation.
24   Q.   Do you recall a conversation between you, Mr. Kidder
```

19

Nannette Ferri

```
 1        her back, and I went to Stew.
 2   Q.   Did you tell Mr. Kidder that?  That was the question.
 3   A.   I told him what Roxann had asked, yes.
 4   Q.   And what did he say?
 5   A.   We called George.
 6   Q.   What did he say?
 7   A.   George?
 8   Q.   "He", meaning Mr. Kidder?
 9   A.   I think he just -- I don't really recall exactly what
10        he said.
11   Q.   Did he say anything to your recollection?  I
12        understand you don't recall the content; do you
13        remember that he said something?
14   A.   Well, I think it was decided that we should call
15        George.
16   Q.   Did you know George at that point?
17   A.   Yes.
18   Q.   Had you ever asked George the same question before
19        with regard to another facility?
20   A.   No.
21   Q.   Did you have any knowledge at that time of any
22        experience that DOCS had with taking money directly
23        from a vending machine?
24   A.   No.
```

Nannette Ferri

```
 1        and Ms. Creen?
 2   A.   Yes.
 3   Q.   And when was that conversation?
 4   A.   May 8th or 9th.
 5   Q.   What time of the day?
 6   A.   I don't remember.
 7   Q.   Where were you when you took the call?
 8   A.   I was in my office when Roxann called me, and then I
 9        went to Stew's office.
10   Q.   And what did you and Stew discuss when you went to
11        Stew's office?
12   A.   Well, I told him what Roxann asked and --
13   Q.   What did you tell him?
14   A.   That Roxann -- she asked if it would be possible if --
15        I don't recall the day the serviceman was due to come
16        in, but she asked if it was possible, if she could
17        take the cash from the machines in lieu of money that
18        was due them.
19   Q.   That's what she asked when she first called you that
20        day?
21   A.   Yes.
22   Q.   And you told Mr. Kidder that?
23   A.   Yeah -- well, at first I told Roxann that I couldn't
24        give her answer, I had to check and that I'd call
```

20

Nannette Ferri

```
 1   Q.   Did you have any previous knowledge of any self-help
 2        DOCS engaged in with regard to any contract?
 3   A.   No.
 4   Q.   So did you and Mr. Kidder then call George from
 5        Mr. Kidder's office?
 6   A.   Yes, we did.
 7   Q.   Was Roxann on the phone?
 8   A.   No.
 9   Q.   Did you get Roxann on the phone?
10   A.   No.  You mean to make this a four-way conversation?
11   Q.   That's correct.
12   A.   No.
13   Q.   So it was a three-way conversation between you,
14        Mr. Kidder and Mr. Glassanos?
15   A.   It was speakerphone.
16   Q.   With the three of you on the phone?
17   A.   Yes.  Stew called George, and I was there.  Stew put
18        George on speakerphone.
19   Q.   And who initiated this conversation, George or Stew?
20              MR. SCHULZE:  Objection.
21   A.   Stew called George.
22   Q.   What did he say to George when he got him on the
23        phone?
24   A.   I don't recall exactly, but he conveyed what Roxann
```

Nannette Ferri

1    had asked.

2  Q.  Well, to your best recollection, what did he say?

3  A.  I don't -- perhaps Stew and I talked to George.  It

4    was on speakerphone.  I don't -- maybe I said it.  I

5    don't really recall who asked George.  It was a

6    speakerphone conversation.  I may have said something.

7    I don't --

8  Q.  As I asked you earlier, please don't speculate.  If

9    you don't know, you can say you don't know.

10       The question was:  What did Stew say to George

11    when he got George on the phone?

12  A.  I don't know.

13  Q.  And apart from not knowing the exact words, do you

14    know the sum and substance of what he said?

15  A.  The conversation to George was, could she take the

16    money, and I don't recall who actually said those

17    words.

18  Q.  Was anything explained to George about the situation

19    by either you or Mr. Kidder during the conversation?

20    Rather than just saying, can she take the money, was

21    there any background given to the attorney at that

22    point, to your knowledge?

23       MR. SCHULZE:  Objection.

24  A.  I don't recall.

Nannette Ferri

1  Q.  By the time of this conversation, had you e-mailed

2    Mr. Glassanos concerning this situation?

3  A.  I don't remember.

4  Q.  What was the length of time that passed from when you

5    got the call from Roxann Creen to when you went to see

6    Mr. Kidder?

7  A.  I went immediately.

8  Q.  Did Ms. Roxann Creen indicate to you during the call

9    you had with her whether she had been in touch with

10    Mr. Glassanos by then?

11  A.  I don't believe she indicated it at that phone call,

12    and I don't know if she had been or not.  I'm not

13    sure.

14  Q.  And did you indicate to Ms. Creen during your phone

15    call with her that you needed to confer with others

16    before responding?

17  A.  Yes.

18  Q.  Did you specifically mention in that phone call

19    Mr. Glassanos and your desire to confer with him?

20  A.  I'm not sure.

21  Q.  Do you recall forming a desire to confer with

22    Mr. Glassanos as you spoke with Ms. Creen?

23  A.  I don't recall.

24  Q.  Well, before you went to see Mr. Kidder, as you recall

Nannette Ferri

1    the situation, had you decided in your own mind to

2    recommend that Mr. Kidder place a call to

3    Mr. Glassanos?

4  A.  No, I --

5  Q.  Okay.  So as far as you recall, what occurred was that

6    calling Mr. Glassanos came out of your contact with

7    Mr. Kidder; is that fair?

8  A.  Say that again.

9  Q.  The decision to call Mr. Glassanos came out of your

10    conversation with Mr. Kidder; it's not something you

11    came into the room suggesting?

12  A.  It may have been.

13  Q.  Don't remember.  How long were you on the phone with

14    Mr. Glassanos from Mr. Kidder's office on the

15    speakerphone?

16  A.  Maybe a minute or two.  I don't think it was very

17    long.

18  Q.  And what, if anything, did Mr. Glassanos say during

19    this minute or two?

20  A.  He said yes, she can take the money.

21  Q.  Did he ask any questions that you recall?

22  A.  Not that I recall.

23  Q.  Do you recall Mr. Glassanos asking you for any

24    documents during the one or two minute conversation

Nannette Ferri

1    you referenced?

2  A.  No.

3  Q.  Having received that advice from Mr. Glassanos, did

4    you call back Ms. Creen?

5  A.  Yes.

6  Q.  Was Mr. Kidder part of that conversation?

7  A.  I don't recall if we made that phone call from his

8    office or I went back to my office and called Roxann.

9  Q.  Do you recall any conversation between you and

10    Mr. Kidder after you completed your conversation with

11    Mr. Glassanos concerning this matter, right at that

12    point in time?

13  A.  No.

14  Q.  How long had you spoken, to your recollection, with

15    Mr. Kidder before the two of you decided to call

16    Mr. Glassanos?

17  A.  Just -- not long at all.

18  Q.  Half an hour?

19  A.  No.  Maybe a couple minutes.

20  Q.  And before those couple of minutes, had you and

21    Mr. Kidder spoken at all about the Rockland Vending

22    Corporation, to your recollection?

23  A.  Not that I recall.

24  Q.  Was this the first time that you and Mr. Kidder were

Nannette Ferri

```
1    speaking about Rockland Vending?
2  A.  No.
3  Q.  When had you last spoken with Mr. Kidder about
4      Rockland Vending before that conversation on May 8th
5      or May 9th?
6  A.  I don't recall.
7  Q.  Was it that month?
8  A.  Probably, yes.
9  Q.  What was the conversation that you probably had with
10     him earlier that month about Rockland Vending?
11 A.  (Pause.)
12 Q.  If you remember without speculating.
13 A.  Yeah, I'm not positive.
14 Q.  Had Mr. Kidder given you any directions with regard to
15     Rockland Vending that month before this conversation
16     in his office triggered by Ms. Creen's call?
17 A.  Say that again.
18 Q.  Had Mr. Kidder given you any directions with respect
19     to Rockland Vending earlier that month?
20 A.  No.
21 Q.  Before the call you reference from Ms. Creen, whether
22     it be the 8th or the 9th of May, when had you last
23     spoken with Ms. Creen about Rockland Vending?
24 A.  I don't recall.
```

Nannette Ferri

```
1  Q.  Was it within a week of that call?
2  A.  I don't recall.
3  Q.  So you recall Ms. Creen calling you on either May 8th
4      or May 9th and indicating that she had a question and
5      the question was whether she could take the money from
6      the vending machines --
7  A.  Mm-hmm.
8  Q.  -- or some of the vending machines?
9  A.  Mm-hmm.
10 Q.  Is that right?
11 A.  She didn't specify.
12 Q.  She didn't specify whether it would be all of them or
13     some of them?
14 A.  Correct.
15 Q.  Just whether she could take money from vending
16     machines?
17 A.  Well, that he was coming in and could they take the
18     money.
19 Q.  Did she indicate to you in that phone call that he was
20     coming in that day or the next day?
21 A.  I don't recall.
22 Q.  And did she say anything else to you that you can
23     recall during that phone conversation?
24 A.  Well, when she called me she initially said that the
```

27

Nannette Ferri

```
1      inmate account was either out of money or very little
2      money, and I believe she said there was a function
3      coming up and she was going -- I don't know if she
4      said she was going to have to fund it out of another
5      account or -- but they were very concerned with that,
6      and that is why they wanted to take the money.  That's
7      what she told me.
8  Q.  And you told Mr. Kidder that?
9  A.  I believe so.
10 Q.  And you told Mr. Glassanos that?
11 A.  I believe so.
12 Q.  And did she tell you anything else that you recounted
13     to Mr. Kidder that you can now remember?
14 A.  No.
15 Q.  What about anything else you recounted to
16     Mr. Glassanos that you can now remember?
17 A.  (No verbal response.)
18 Q.  You are nodding your head or shaking your head?
19 A.  No.
20 Q.  No?
21 A.  No.  I'm sorry.
22 Q.  I'm showing you Exhibit 1 again.  Did you receive
23     Exhibit 1?
24 A.  I believe I got a copy of this.
```

28

Nannette Ferri

```
1  Q.  And did you read it when you got a copy of that?
2  A.  Mm-hmm.
3  Q.  Did Ms. Creen prepare that, to your knowledge?
4      Did she prepare this?
5  Q.  Yes, that e-mail?
6  A.  It says she's the original author.
7  Q.  Is there any reference in there to the inmate account,
8      to your knowledge?
9          MR. SCHULZE: Objection.
10 A.  Just that she will deposit the funds into the
11     respective accounts.
12 Q.  Thank you.
13         The e-mail at the bottom from Mr. Glassanos,
14     quote, "I guess the owner is surprised you do not lay
15     like a rug.  I'm surprised he is.  Nice going.  I
16     would say you just introduced a change-up and a sinker
17     into the ball game.  George."  Did you receive a copy
18     of that e-mail, to your knowledge?
19 A.  I believe I did.
20 Q.  As of May 9th of 2007, were you fully familiar with
21     the contract that had been signed between Rockland
22     Vending and DOCS?
23         MR. SCHULZE: Objection.
24 A.  Was I fully aware of the contract?
```

29

*Nannette Ferri*

```
 1   Q.   Yes.
 2   A.   I don't know -- I don't recall if I had seen the
 3        contract after it had been signed.
 4   Q.   Well, did you ever read the contract before it was
 5        signed or after it was signed?
 6   A.   The contract is part of the IFB, so she should have
 7        used that contract.  So the contract that's with the
 8        IFB, yes, I have seen it and read it.
 9   Q.   And what is your educational attainment?  Do you have
10        a college degree, high school degree?
11   A.   Some college.
12   Q.   How much college do you have?
13   A.   Two years.
14   Q.   Do you have an Associate's Degree?
15   A.   No, I do not.
16   Q.   Take a look at Creen 1, it's called, "Invitation for
17        Bids for Vending Machine Services", and tell me
18        whether you are familiar with Creen 1.  You can take
19        your time and look through it.
20   A.   Yes, this looks like the IFB.
21             MR. SCHULZE:  You should probably go through
22        more than just the first three pages.  Note,
23        there are approximately 80 pages in this exhibit.
24             THE WITNESS:  Mm-hmm.
```

30

*Nannette Ferri*

```
 1             MR. SUSSMAN:  That's why I said, take your
 2        time, go through it, until you've satisfied
 3        yourself what it is.
 4             THE WITNESS:  (Witness complies.)
 5   BY MR. SUSSMAN:
 6   Q.   You have had a chance now and gone through each page
 7        of Exhibit Creen 1?
 8   A.   Mm-hmm.
 9   Q.   As counsel mentioned, it's a lengthy document, it's
10        approximately 80 pages?
11   A.   Mm-hmm.
12   Q.   Can you identify what that is?
13   A.   This is the IFB and the contract.
14   Q.   And --
15   A.   And I don't know if I've ever seen this exact -- I
16        don't know if I reviewed this in the beginning.
17   Q.   Is this -- do you know whether this is the boilerplate
18        that you referenced earlier in your testimony, at
19        least in part?
20   A.   Yes.
21   Q.   And the boilerplate that you referenced earlier in the
22        deposition, is that something which you have actually
23        read and reviewed?
24   A.   Yes.
```

31

*Nannette Ferri*

```
 1   Q.   And have you done that more than once or just once?
 2   A.   No, more than once.
 3   Q.   Has the boilerplate changed at all since 2002 when you
 4        commenced your job?
 5   A.   Yes.
 6   Q.   How has it changed, do you know?
 7   A.   Well, there's new laws that had to be incorporated;
 8        the lobbying law, the tax law, there's a vendor
 9        responsibility clause and a couple related termination
10        clauses that had to be added, and I have changed or
11        added to the actual specs.
12   Q.   And is there any provision in the contract that you
13        are aware of that allows a facility to take money from
14        a vending machine?
15             MR. SCHULZE:  Objection.
16   A.   Well, the appendix --
17   Q.   Can you tell us --
18   A.   Well, Appendix A.
19   Q.   Appendix A, what does Appendix A say that is relevant
20        to the question?
21             MR. SCHULZE:  Objection.
22   Q.   Appendix A says, "Standard Clauses for all New York
23        State Contracts" at the top?
24   A.   Mm-hmm.  I believe it falls under the Set-Off Rights
```

32

*Nannette Ferri*

```
 1        in Number 9.
 2   Q.   Set-off rights, "The State shall have all of its
 3        common law, equitable and statutory rights of set-off.
 4        These rights include, but not be limited to, the
 5        State's option to withhold for the purposes of set-off
 6        any monies due to the contractor under this contract
 7        up to any amounts due and owing to the State in regard
 8        to this contract.  Any other contract with any State
 9        department or agency, including any contract for a
10        term commencing prior to the term of this contract
11        plus any amounts due and owing to the State for any
12        other reason, including, without limitation, tax
13        delinquencies, fees delinquencies or monetary
14        penalties relative thereto.  The State shall exercise
15        its set-off rights in accordance with normal State
16        practices, including common in cases of set-off
17        pursuant to an audit, finalization of such audit by
18        the State agencies, its representatives or the State
19        Comptroller."  That's the provision that you believe
20        this is relevant to?
21   A.   I believe so, yes.
22   Q.   Did anyone tell you that?
23             MR. SCHULZE:  Objection.
24   A.   George Glassanos.
```

*Nannette Ferri*

| | |
|---|---|
| 1 | Q. When did he tell you that? |
| 2 | A. When we had that conversation -- |
| 3 | Q. So this is something -- |
| 4 | A. -- on May 8th or 9th. |
| 5 | Q. So this is something further he told you in the |
| 6 | conversation you referenced earlier when you were on |
| 7 | speakerphone with Mr. Kidder? |
| 8 | A. I believe it was during that conversation. |
| 9 | Q. Any other -- |
| 10 | A. It may have been a subsequent, but I believe it was |
| 11 | that one. I'm not positive. |
| 12 | Q. And did Mr. Glassanos specifically reference the term |
| 13 | "set-off" or did he reference this provision of |
| 14 | Appendix A? |
| 15 | A. I believe he just said it's in Appendix A. |
| 16 | Q. So he didn't reference the set-off paragraph |
| 17 | specifically? |
| 18 | A. No. |
| 19 | MR. SCHULZE: Objection. |
| 20 | A. No. |
| 21 | Q. Did Mr. Glassanos ever specifically to you mention the |
| 22 | word "set-off"? |
| 23 | A. I don't recall. |
| 24 | Q. Did Mr. Glassanos to you ever specifically reference |

*Nannette Ferri*

| | |
|---|---|
| 1 | any particular provision of Appendix A which he told |
| 2 | you he felt controlled? |
| 3 | MR. SCHULZE: Objection. |
| 4 | Q. Yes. |
| 5 | A. I don't recall. |
| 6 | Q. Apart from the provision you have just pointed us to, |
| 7 | is there any provision that you thought permitted |
| 8 | self-help, from your knowledge of the contract? |
| 9 | MR. SCHULZE: Objection. |
| 10 | A. Not to my knowledge. |
| 11 | Q. Apart from the conversation you told us you had with |
| 12 | Mr. Glassanos on either the 8th or 9th before you |
| 13 | indicated to Ms. Creen, called her back and indicated |
| 14 | what he had told you, did you have any other |
| 15 | conversation with him before Ms. Creen took the money? |
| 16 | A. Not that I recall, no. |
| 17 | Q. And between the time that you advised Ms. Creen after |
| 18 | your conversation with Mr. Glassanos and the time she |
| 19 | took the money, did you have any other conversations |
| 20 | with Ms. Creen that you can now recall? |
| 21 | A. From the time when? |
| 22 | Q. From the time you called her back -- |
| 23 | A. Yup. |
| 24 | Q. -- after she had first called you to the time that you |

35

*Nannette Ferri*

| | |
|---|---|
| 1 | understood she took the money, did you have any other |
| 2 | conversations with Ms. Creen? |
| 3 | MR. SCHULZE: Objection. |
| 4 | A. I don't recall. |
| 5 | Q. You don't recall any? |
| 6 | A. No. |
| 7 | Q. And in the conversation which you initiated with |
| 8 | Ms. Creen following the conversation you had with |
| 9 | Mr. Glassanos and Mr. Kidder, could you estimate how |
| 10 | long that conversation lasted. |
| 11 | A. The conversation when? |
| 12 | Q. After you spoke with Glassanos and Kidder, you said |
| 13 | you called back or you and Kidder may have called |
| 14 | back -- |
| 15 | A. Right, I'm not sure which. |
| 16 | Q. You are not sure which. And that conversation when |
| 17 | you called back or together called back Ms. Creen, how |
| 18 | long did that conversation last? |
| 19 | A. A minute or two. |
| 20 | Q. When did Ms. Creen first draw your attention to any |
| 21 | problems she claimed she was having with Rockland |
| 22 | Vending? |
| 23 | MR. SCHULZE: Objection. |
| 24 | A. I do not recall. |

36

*Nannette Ferri*

| | |
|---|---|
| 1 | Q. Do you recall the year? |
| 2 | A. No. |
| 3 | Q. And do you recall any conversations you had personally |
| 4 | with her about those problems before May 8th of 2007? |
| 5 | A. I don't recall. |
| 6 | Q. You don't recall any conversations with Ms. Creen |
| 7 | before May 8th or 9th? |
| 8 | A. There probably were, but I don't recall exactly when. |
| 9 | Q. What was their content? |
| 10 | A. I don't recall. |
| 11 | Q. Did you speak with anyone else at her facility, that |
| 12 | is Shawangunk, concerning Rockland Vending before |
| 13 | May 9th of two thousand -- |
| 14 | A. I don't believe so. |
| 15 | Q. Do you know who the warden of that facility was? |
| 16 | A. No. |
| 17 | Q. Did you ever speak with Mr. Freed before May 9th of |
| 18 | 2007? |
| 19 | A. Probably. |
| 20 | Q. You say probably, are you guessing or do you remember |
| 21 | doing so? |
| 22 | A. I probably did, I don't recall exactly. |
| 23 | Q. Do you recall when you probably did? |
| 24 | A. No. |

38

*Nannette Ferri*

1  Q.  Do you recall the content of your conversation with

2      Mr. Freed?

3  A.  No.

4  Q.  Did you speak with Mr. Freed's wife Cheryl before

5      May 9th of 2007?

6  A.  No.

7  Q.  Did you speak with anyone else associated with their

8      business before that?

9  A.  No.

10        MR. SUSSMAN:  I'm going to have marked

11      Defendant 0068 produced last week by Counsel and

12      make that Exhibit 2 to this deposition.

13        (Plaintiff's Exhibit 2 was marked for

14      identification.)

15  Q.  Take a look at that, please.

16  A.  (Witness complies.)

17  Q.  Did you receive a copy of that e-mail in December of

18      2006?

19  A.  I believe I did.

20  Q.  You can keep it in front of you, thank you.

21      And had you asked Ms. Creen to send you that

22      e-mail?

23  A.  She cc'd me.  No, I didn't ask her.  I don't believe I

24      asked her to send me that.

*Nannette Ferri*

1  Q.  Do you know why she sent it to you?

2  A.  No.

3  Q.  Did you ever ask her why she sent it to you?

4  A.  No.

5  Q.  Did you have a conversation with her around that time

6      concerning Rockland Vending?

7  A.  I may have.

8  Q.  Apart from what you may have, do you remember if you

9      did or didn't?

10  A.  I probably did.

11  Q.  Did you keep any file regarding that, document,

12      memoranda regarding that conversation?

13  A.  I don't know if I kept a copy of that or not.

14  Q.  Did you make any notes about your conversation with

15      her?

16  A.  Regarding this (indicating)?

17  Q.  Yes.

18  A.  I don't recall.

19  Q.  Did you tell Mr. Kidder about it?

20  A.  I don't recall.

21  Q.  Did you have a practice in December of 2006 of

22      reporting matters like this as referenced in that

23      e-mail to Mr. Kidder?

24  A.  No.

39

*Nannette Ferri*

1        (Plaintiff's Exhibit 3 was marked for

2      identification.)

3  Q.  This is 0067, Defendant's 0067, Exhibit 3.

4      Did you receive that from Ms. Creen?

5  A.  I must have.

6  Q.  Did you show that to Mr. Kidder?

7  A.  I don't believe so.

8  Q.  Did you send it to Mr. Kidder?

9  A.  I don't believe so.

10  Q.  Did you take any action upon receiving it?

11  A.  I don't believe so.

12  Q.  Did you take any action upon receiving Exhibit 2, the

13      prior document marked?

14  A.  I don't believe so.

15  Q.  And do you recall speaking with Ms. Creen upon

16      receiving Exhibit 3?

17  A.  No.

18        (Plaintiff's Exhibit 4 was marked for

19      identification.)

20  Q.  I'm showing you Exhibit 4, which is Defendant 0142,

21      dated 1/19/07.

22      Did you receive a copy of an e-mail dated 1/19/07

23      at 1:30 p.m.?

24  A.  I probably did, yes.

40

*Nannette Ferri*

1  Q.  What did you do with it once you received it?

2  A.  Probably nothing.

3  Q.  Did you share it with Mr. Kidder?

4  A.  Probably not.

5  Q.  Do you recall speaking with Mr. Kidder in December or

6      January having received these three e-mails about

7      Rockland Vending?

8  A.  No, I don't.

9  Q.  Why not?

10        MR. SCHULZE:  Objection.

11  Q.  Why didn't you speak with him?

12        MR. SCHULZE:  Objection.

13  Q.  You can answer.

14  A.  I don't know.  It was just a routine -- you know, at

15      this point he was behind in payments and there was

16      really nothing at that point that I needed to speak to

17      him about, there was nothing we could do about that.

18      She -- I believe she was just informing me.

19  Q.  Did all of the facilities inform you about their

20      relationships with their different vendors through

21      e-mail?

22        MR. SCHULZE:  Objection.

23  A.  No, not routinely, no.

24        (Plaintiff's Exhibit 5 was marked for

*Nannette Ferri*

```
 1              identification.)
 2   Q.  Exhibit 5 is dated 1/30/07 from Ms. Creen to
 3        Mr. Freed, copy Ms. Ferri.
 4              Did you receive this document?
 5   A.  Probably did.
 6   Q.  Do you recall whether it prompted you to speak to
 7        Mr. Kidder?
 8   A.  No, I don't recall.
 9   Q.  Did you speak to Mr. Kidder?
10   A.  I probably did not.
11   Q.  Do have a recollection of speaking in either December
12        or January, by January 30th of 2007 with Ms. Creen
13        about this matter?
14   A.  I could have, but I don't recall exactly.
15   Q.  When you say you could have, do you have any
16        recollection of doing so?
17   A.  No, not specifically.
18   Q.  And you were not monitoring Mr. Freed's compliance
19        with his contract at that time, were you?
20              MR. SCHULZE:  "At that time", meaning?
21              MR. SUSSMAN:  December, January of 2006 and
22              7.
23   A.  No.
24   Q.  That wasn't part of your responsibility; right?
```

*Nannette Ferri*

```
 1              MR. SCHULZE:  Objection.
 2   A.  No.
 3   Q.  Mark as Exhibit 6 Defendant 139.
 4              (Plaintiff's Exhibit 6 was marked for
 5              identification.)
 6   Q.  This is a series of four e-mails, and it appears that
 7        Ms. Creen wrote you on 2/7 -- sorry -- "Just so you
 8        know, we received the check from Rockland Vending for
 9        December on February 6th, 2007."  Do you see that?
10   A.  Mm-hmm.
11   Q.  And then you wrote back on 2/8 at 7:08 a.m.; is that
12        correct?
13   A.  Mm-hmm.
14   Q.  Is that yes?
15   A.  Yes.
16   Q.  "Hi, Roxann, thanks for the info.  So for the next
17        four days is he up to date on commissions, space fees
18        and bottle returns if he returns your bottles?
19        Thanks.  Nan."  Is that right?
20   A.  Yes.
21   Q.  And why did you write that?
22   A.  I don't recall.
23   Q.  Did you become aware in February of 2007 that
24        Mr. Freed had raised some concern about product being
```

43

*Nannette Ferri*

```
 1        pilfered from his machines at Shawangunk?
 2   A.  When?  I did hear about it --
 3   Q.  February of 2007?
 4   A.  I don't recall if it was February or not.
 5   Q.  Did you take any action with regard to that?
 6   A.  I don't believe I did.  I don't think so, no.
 7   Q.  Did the facility take any action with regard to that?
 8   A.  I don't know.
 9              MR. SUSSMAN:  Mark D 60 as Exhibit 7.
10              (Plaintiff's Exhibit 7 was marked for
11              identification.)
12   Q.  I'm going to show you what's been marked as 7.
13              And were you copied with a e-mail from Ms. Creen
14        to Mr. Freed in the middle of February regarding
15        vending losses at Shawangunk?
16   A.  Mm-hmm.
17   Q.  You have to say yes, no, something else?
18   A.  Yes.  I'm sorry.  Yes.
19   Q.  Did you speak with Ms. Creen about this?
20   A.  I don't believe so.
21   Q.  And both -- did Mr. Freed contact you with regard to
22        this?
23   A.  I don't recall.
24              MR. SUSSMAN:  Let's mark D 62 and D 63
```

44

*Nannette Ferri*

```
 1              Exhibit 8.
 2              (Plaintiff's Exhibit 8 was marked for
 3              identification.)
 4   Q.  The top e-mail is an e-mail from Mr. Freed to
 5        Ms. Creen and you.  Do you recall receiving it?
 6              MR. SCHULZE:  Referring to the top e-mail
 7              (indicating).
 8              THE WITNESS:  Mm-hmm.
 9   Q.  Do you recall receiving that e-mail?
10   A.  I'm not sure if I recall it.  I'm sure I did.
11   Q.  Did you talk to Ms. Creen about the contents of that
12        e-mail after you received it?
13   A.  I don't believe so.
14   Q.  Did she speak with you about the problem with regard
15        to alleged pilfering of sandwiches and other product?
16   A.  I don't recall.
17              MR. SUSSMAN:  Mark Exhibit 9, 2/22/07 e-mail
18              from Creen to Freed, copy Ms. Ferri.
19              (Plaintiff's Exhibit 9 was marked for
20              identification.)
21   Q.  Did you speak with Ms. Creen about the content of
22        Exhibit 9?
23   A.  I don't believe so, no.
24   Q.  Were you made aware by Ms. Creen that she was going to
```

45

*Nannette Ferri*

```
1        be putting out a new IFB during 2007 for her facility
2        for vending machines?
3    A.  I believe so because I believe she asked me for a copy
4        of the current IFB, that's how I would have found out.
5    Q.  She asked you that in a conversation?
6    A.  She must have.  I really don't recall the
7        conversation.
8    Q.  Do you know when the Rockland Vending contract was
9        over at Shawangunk or due to be over?
10   A.  No.
11   Q.  Did you ever find that out?
12   A.  I'm sure I ran across that, but I don't recall when I
13       found out, and I don't recall what the end date was.
14   Q.  Well, as of May 8th, May 9th, in that time period, did
15       you know when the contract was due to expire?
16   A.  I don't know if I knew or not.
17            MR. SUSSMAN:  Mark Exhibit 10 D 0059, a
18       3/2/07 e-mail.
19            (Plaintiff's Exhibit 10 was marked for
20       identification.)
21   Q.  Did you receive this from Ms. Creen on or about
22       3/2/07?
23   A.  I don't recall.  I'm sure I received it.
24   Q.  Did you take any action having received it?
```

46

*Nannette Ferri*

```
1    A.  Probably not.
2            MR. SUSSMAN:  Mark 0006, Defendant's, 3/7/07
3        as Exhibit 11.
4            (Plaintiff's Exhibit 11 was marked for
5        identification.)
6    Q.  I'm handing you what's marked today's Exhibit 11.  Do
7        you recognize the initials next to Stewart R. Kidder's
8        name?
9    A.  (Witness nods.)
10   Q.  Whose are they?
11   A.  They're Stew's.
12   Q.  Who prepared the document?
13   A.  I did.
14   Q.  Why?
15   A.  Well, I believe the -- I wanted to just get a current
16       inventory of who had contracts, when their expiration
17       dates -- I believe what I was looking for was to make
18       sure that everyone had a contract in place, and if
19       they were getting close, I was going to send out a new
20       IFB.
21   Q.  How does that explain Question 4?
22   A.  That I didn't know.
23   Q.  How does that explain Question 4 on Exhibit 11?
24   A.  Oh.  Oh, right.
```

47

*Nannette Ferri*

```
1    Q.  "Oh, right", what?
2    A.  I was curious whether anyone was late on commissions,
3        and I was looking to see if there were any can deposit
4        issues with any vendors.
5    Q.  Why were you curious if anyone was late on
6        commissions?
7            MR. SCHULZE:  Hold onto the exhibit until he
8        asks for it back.
9            Can you read the question back.
10   Q.  I'll repeat the question.
11           Why were you curious about whether anyone was
12       late with their commissions?
13   A.  Probably in light of the fact that there were several
14       contracts where payment was late, commissions were
15       late.
16   Q.  What did that have to do with you?
17           MR. SCHULZE:  Objection.
18   Q.  Or Mr. Kidder?
19           MR. SCHULZE:  Objection.
20   A.  I just wanted to know.
21   Q.  You said you just wanted to know, I asked you:  What
22       did knowing have to do with your job responsibilities,
23       if anything?
24           MR. SCHULZE:  Objection.
```

48

*Nannette Ferri*

```
1    A.  Well, I just probably would have taken action
2        regarding whatever the answers had come back, and no
3        one had issues, other than the few at Rockland -- with
4        Rockland contracts.
5    Q.  You would have taken what action?
6    A.  I don't know.  I just was curious if this was going on
7        statewide.
8    Q.  What authority did you have to take action?
9    A.  I didn't.
10           MR. SCHULZE:  Objection.
11   Q.  Okay, thank you very much.
12           MR. SUSSMAN:  March 13th, 2007, 0137
13       Defendant, Creen to Kidder.
14           (Plaintiff's Exhibit 12 was marked for
15       identification.)
16   Q.  Did you receive this document on or about March 15th,
17       2007?
18   A.  I believe I did.
19   Q.  Did you read it?
20   A.  I believe I did.
21   Q.  What action did you take having read it, if any?
22   A.  Probably nothing.
23   Q.  When you say "probably", do you believe you may have
24       done something?
```

50

Nannette Ferri

1   A.   I don't believe so.
2   Q.   Did you converse with Ms. Creen having received it?
3   A.   I don't believe so.
4   Q.   Did you make any suggestions to Ms. Creen as to what
5        she should do?
6   A.   No.
7   Q.   The end of the document, the following appears, "For
8        at least the last six months I put all requests in
9        writing via e-mail".
10  A.   Mm-hmm.
11  Q.   "Unfortunately, Rockland isn't the shining star, but
12       we are dealing with them.  Let me know if you need any
13       additional information."  Did you request any
14       additional information?
15  A.   No.
16  Q.   As of March 13th, 2007, if you know, were any accounts
17       being funded at Shawangunk by monies coming in from
18       the vending machine contract?
19  A.   Were any accounts being funded?
20  Q.   Inmate account, employee accounts, any accounts, if
21       you know?
22  A.   I don't know.
23  Q.   Thank you.
24            MR. SUSSMAN:  Mark Exhibit 13, dated 4/4/07.

Nannette Ferri

1            (Plaintiff's Exhibit 13 was marked for
2         identification.)
3   Q.   Have you seen that document before today?
4   A.   Probably.
5   Q.   Did you take any action upon receiving it?
6   A.   Probably not.
7   Q.   With regard to the cessation of contracts and
8        contractual relationships between the vending
9        companies and the particular facilities, does your
10       office play any role?
11            MR. SCHULZE:  Objection.
12  Q.   Or is that between the facilities and the vending
13       companies?
14  A.   It's between the facilities and the vending companies.
15  Q.   And do any of the facilities inquire as to whether
16       they may terminate their contracts with you?
17  A.   I have received those types of phone calls.
18  Q.   And did you have any authority over that?
19  A.   No.
20  Q.   Is that what you advised them, that it's their
21       decision?
22  A.   Yes.
23  Q.   You don't get involved?
24            MR. SCHULZE:  Objection.

51

Nannette Ferri

1   A.   I try not to, no.
2            MR. SUSSMAN:  Mark this Exhibit, please,
3         0004.
4            (Plaintiff's Exhibit 14 was marked for
5         identification.)
6            MR. SUSSMAN:  0004 is Exhibit 14, it's an
7         e-mail from Deborah Dayton from the period
8         April 5th, 2007.
9            While she's looking, we can mark Exhibit 15,
10        a letter dated April 5th, 2007, unsigned, Mark
11        Matthews to Mr. Freed.
12            (Plaintiff's Exhibit 15 was marked for
13        identification.)
14  Q.   I'm also showing you Exhibit 15, here's Exhibit 15, a
15       document that was attached by Ms. Dayton for your
16       review.
17            Is Exhibit 15 the document which was attached for
18       your review to Exhibit 14?
19  A.   Is it?
20  Q.   Yes.
21  A.   I'm not sure.  It probably was.
22  Q.   And is your response to that document at the top of
23       Exhibit 14, "Hi, Deb, looks okay.  Do you have someone
24       else lined up?"

52

Nannette Ferri

1   A.   Mm-hmm.
2   Q.   Is that your response?
3   A.   Yes.
4            MR. SCHULZE:  Objection.
5            (Plaintiff's Exhibit 16 was marked for
6         identification.)
7   Q.   Tell me if you have seen Exhibit 16, which is
8        Defendant 0096 with the writing on it or not before
9        today.
10  A.   No, I don't believe I saw the writing.
11  Q.   So did you receive that e-mail without the writing on
12       or about April 19th?
13  A.   I believe I did.
14  Q.   And did you take any action upon receipt of that?
15  A.   Probably not.
16            MR. SUSSMAN:  Mark Exhibit 17, that would be
17        0031, Defendant.
18            (Plaintiff's Exhibit 17 was marked for
19        identification.)
20  Q.   And marked earlier Exhibit 1, that's part of Exhibit 1
21       (proffering), but it stands by itself, 5/8/07,
22       4:25 p.m.  Did you receive a copy of this document?
23  A.   I believe I did.
24  Q.   And did you receive a copy of Mr. Glassanos' response?

53

*Nannette Ferri*

1  A.  I believe I did.
2  Q.  Now, just, if you can, Ms. Creen's document, if you
3      look down to the first quarter of the page, it says,
4      original author, Roxann Creen, 5/8/07, 2:47 p.m., and
5      it says, then, "Mr. Glassanos this is to follow-up
6      today's conversation with Stew Kidder and Nan Ferri
7      regarding Rockland Vending." Had you asked Ms. Creen
8      to write an e-mail to Mr. Glassanos of this sort?
9  A.  Not that I recall.
10 Q.  Had you given her Mr. Glassanos' e-mail address?
11 A.  No.
12 Q.  The response from Mr. Glassanos, which says, "Good, do
13     not let the rep walk away with the State's money. If
14     there is any resistence, sho" -- S-H-O -- "the rep the
15     door, impound the machine and exercise the State's
16     right to locate an alternative source." Do you see
17     that?
18 A.  Mm-hmm.
19 Q.  Was that advice given to you by Mr. Glassanos over the
20     phone during the phone call with Mr. Kidder and
21     Ms. Glassanos?
22         MR. SCHULZE: Objection.
23 A.  No, I don't recall that, no.
24 Q.  The next sentence says, "You are within the State's

54

*Nannette Ferri*

1      right of self-help to retain possession of the machine
2      until the vendor cures his default." When you spoke
3      with Mr. Glassanos and Mr. Kidder in that conversation
4      you referenced earlier in this deposition, did you,
5      Mr. Kidder and Mr. Glassanos discuss retaining the
6      vending machines?
7  A.  Not that I recall.
8  Q.  Do you have any knowledge from your experience at the
9      State Department of Correctional Services as to what
10     the word "default" means?
11         MR. SCHULZE: Objection.
12 Q.  You can answer.
13 A.  Yes.
14 Q.  What is a default?
15         MR. SCHULZE: Objection.
16 A.  To not hold up your end of the bargain, to default on
17     a contract, to...
18 Q.  Okay. Do you want to add anything, or is this
19     sufficient?
20 A.  I think that's sufficient.
21 Q.  And from your knowledge of the contracts that are
22     within the IFB, are you aware of any provisions that
23     deal with how the agency, the facility is supposed to
24     act in the case of an alleged default?

55

*Nannette Ferri*

1         MR. SCHULZE: Objection.
2  Q.  You can answer.
3  A.  I'm not sure.
4  Q.  In your job responsibilities, you deal with purchasing
5      and you deal with ongoing State contracts with vendors
6      beyond vending machines?
7  A.  Mm-hmm.
8  Q.  Is that yes?
9  A.  Yes.
10 Q.  And have you ever been in the years at the State
11     involved in a situation where a State agency, namely
12     DOCS, claimed that a vendor was in default on
13     something?
14         MR. SCHULZE: Objection.
15 A.  No, I have never been involved in anything.
16 Q.  Did you have any training for your job?
17 A.  Well, the Office of the State Comptroller provides
18     training, which I go to every year. OGS has training.
19 Q.  Does any of that training deal with the boilerplate
20     contracts?
21 A.  Some of it does, yes.
22 Q.  Does any of it deal with termination of contracts?
23 A.  It probably was discussed in one of the training
24     classes that I took.

56

*Nannette Ferri*

1  Q.  Has self-help ever been discussed in any of those
2      training classes?
3  A.  Not that I recall those words being used, no.
4  Q.  What about going into the vending machines and taking
5      the money if there's a dispute as to how much money is
6      owed?
7  A.  Not that I recall.
8  Q.  Did Roxann Creen talk with you about what happened
9      when Mr. Gallagher came, the gentleman came from
10     Rockland Vending on the 9th, did she explain to you
11     what had happened?
12 A.  Yes.
13 Q.  Not the e-mail, she actually called you and told you?
14 A.  Yes.
15 Q.  What did she tell you?
16 A.  To the best that I recall, she told me that the
17     serviceman, when he arrived, she explained to him what
18     her intent was, he -- I believe she said he expressed
19     an interest in calling Mr. Freed and letting him know
20     what they were going to do, which I believe she did,
21     she told me. I don't recall any other details.
22 Q.  Did she --
23 A.  Oh, she did say that --
24 Q.  I'm sorry.

58

*Nannette Ferri*

1  A.  -- he only counted the money -- she -- I believe she

2      said to him, only go to the machines you were going to

3      service today, not the whole facility.  I didn't

4      realize they only did a few at a time, so that's what

5      she told him, just whatever you were going to do

6      today, that's the money that they were going to take

7      out of those machine.

8  Q.  Did she tell you why she was only doing those

9      machines?

10 A.  I think -- I don't recall how she worded it, but

11     that's the impression I got that she told him it's

12     just the ones that you would routinely service today.

13     I don't know what their service days were.

14 Q.  I understand that, but did she explain to you why she

15     was only seeking the money from the machines they

16     routinely serviced that day?

17 A.  I don't recall.

18 Q.  Was that issue discussed as to why she was doing that?

19 A.  I don't recall.

20         MR. SUSSMAN:  Mark Exhibit 18, it says D149

21     at the bottom.

22         (Plaintiff's Exhibit 18 was marked for

23     identification.)

24 Q.  Are you familiar with those e-mails?

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

---

*Nannette Ferri*

1  A.  Mm-hmm.

2  Q.  You have to say yes, no, something else.

3  A.  Yes.

4  Q.  Did you write any of those e-mails?

5  A.  Yes.

6  Q.  Which one?

7  A.  I wrote the one, 5/10.

8  Q.  Any of the others?

9  A.  No.

10 Q.  It appears that in order these e-mails go from bottom

11     to top?

12 A.  Yes.

13 Q.  The first one is from Mr. Glassanos, "Nan, I am going

14     to defer even further my letter to Rockland while we

15     are satisfying what's owed out of the change boxes

16     while DEC is inspecting containers."  What is the

17     reference to DEC inspecting containers, if you know?

18 A.  There was an issue with soda cans, soda cans being put

19     in the machines that did not have the New York State

20     return label on them.

21 Q.  And when did you first learn about that issue?

22 A.  I don't recall.

23 Q.  When did you talk with Mr. Glassanos first about that

24     issue?

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

---

59

*Nannette Ferri*

1  A.  I don't recall.

2  Q.  Was that part of your conversation with him when you

3      and Mr. Kidder spoke with him on the speakerphone?

4  A.  No, I don't believe so at all, no.

5  Q.  And did you have a conversation with Mr. Glassanos

6      after that conversation?

7  A.  After the phone call with Stew?

8  Q.  Yes.

9  A.  Regarding soda?

10 Q.  Regarding Rockland Vending?

11 A.  Anything?

12 Q.  Yes.

13         MR. SCHULZE:  You can answer yes or no.

14 A.  Yes.

15 Q.  Yes?

16 A.  Yes.

17 Q.  How many?

18 A.  I don't recall.

19 Q.  Next sentence, "One other item, if two or more

20     facilities deal with Rockland and Rockland is current

21     with some and in breach with others, the ones who are

22     paid in full may still deduct what is owed to the

23     other or others as was done this morning at Roxann's

24     facility.  Keeping good records is the key.  George."

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

---

60

*Nannette Ferri*

1          Did you share that advice with any other

2      facilities?

3  A.  I don't -- I don't recall.

4  Q.  You may have but may not have, is that what you are

5      saying?

6  A.  I don't recall.

7  Q.  Was there any reason you would not have shared that

8      advice?

9          MR. SCHULZE:  Objection.

10 A.  No.

11 Q.  Had you asked Mr. Glassanos for that advice?

12 A.  No.

13 Q.  Now, there seems to be a middle e-mail here from you

14     to Mr. Glassanos, "Hi, George, I think that worked out

15     at Shawangunk.  By the way, Freed did contact Stew" --

16     quote -- "my employee was accosted" -- close quote --

17     "Stew listened to him and told him" -- quote -- "the

18     State had the right and we conferred with counsel's

19     office", close quote.  Did Mr. Kidder tell you about

20     that conversation or are you a party to the

21     conversation?

22 A.  No, I believe --

23         MR. SCHULZE:  Objection.  I'll just note for

24     the record that Counsel is reading off a document

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | | that neither the witness nor I can see.  Go |
| 2 | | ahead. |
| 3 | | MR. SUSSMAN:  That's very true.  I am |
| 4 | | reading from it. |
| 5 | Q. | Were you present for the conversation? |
| 6 | A. | I don't believe so. |
| 7 | Q. | Mr. Kidder told you about that conversation? |
| 8 | A. | I believe he told me about that. |
| 9 | Q. | Quoting, "Anyway, I received an e-mail from Coxsackie, |
| 10 | | they want to tell him he won't be allowed to take his |
| 11 | | machines on May 30th unless his commissions are paid |
| 12 | | up.  I would like to tell them and all facilities he |
| 13 | | owes to do what Shawangunk did.  I do not think he's |
| 14 | | up-to-date with any facility."  Do you recall asking |
| 15 | | that question -- |
| 16 | A. | Yes. |
| 17 | Q. | -- of Mr. Glassanos? |
| 18 | A. | Yes. |
| 19 | Q. | And did he advise you that was fine? |
| 20 | A. | Yes. |
| 21 | Q. | And did you then do that? |
| 22 | A. | No. |
| 23 | Q. | Why not? |
| 24 | A. | Either the next day or that same day Roxann, to the |

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | | best of my recollection, received a phone call from |
| 2 | | Rockland and was told that they would not be servicing |
| 3 | | anymore machines, so I felt if I passed that |
| 4 | | information along that George said was okay to do, |
| 5 | | that they would lose their service.  So I did not tell |
| 6 | | anyone to do that. |
| 7 | | MR. SUSSMAN:  Take about a five minute |
| 8 | | break. |
| 9 | | (A break was taken in the proceedings.) |
| 10 | | (Plaintiff's Exhibit 19 was marked for |
| 11 | | identification.) |
| 12 | BY MR. SUSSMAN: | |
| 13 | Q. | I'm showing you a document, a letter from Rockland |
| 14 | | Vending that has some marginal notes on its two pages. |
| 15 | | Are you able to identify the writing on those notes, |
| 16 | | whose writing that is?  It's a June 15th, 2007 letter |
| 17 | | directed to Ms. Creen. |
| 18 | A. | No, I don't recognize the writing. |
| 19 | Q. | Have you seen the letter before? |
| 20 | A. | I don't recall. |
| 21 | Q. | Show you what we'll mark as 20; 104, 105, 106, |
| 22 | | Defendant. |
| 23 | | (Plaintiff's Exhibit 20 was marked for |
| 24 | | identification.) |

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | Q. | It's a three page document including the same letter |
| 2 | | and the third page in order is a fax.  The letter does |
| 3 | | not contain any marginal notes.  Do you know whether |
| 4 | | the fax shows the faxing of that very letter to you? |
| 5 | | MR. SCHULZE:  Objection. |
| 6 | A. | I don't know if -- |
| 7 | Q. | You don't know? |
| 8 | A. | -- that had that letter on it. |
| 9 | Q. | And whose writing, if you know, is on the Post-it slip |
| 10 | | which is on the third page of Exhibit 20? |
| 11 | A. | I'm not positive.  It's not my writing, no. |
| 12 | Q. | Did you see the Post-it slip before? |
| 13 | A. | No, I don't recall seeing that. |
| 14 | Q. | Who is the fax transmission to and from? |
| 15 | A. | It's to -- |
| 16 | | MR. SCHULZE:  Objection. |
| 17 | A. | To me from Roxann, but the sticker is covering the |
| 18 | | number of pages, so I don't know if that was -- note |
| 19 | | was attached or not. |
| 20 | Q. | Are you familiar with a process by which DOCS does |
| 21 | | audits of the performance of various vendors including |
| 22 | | vending machine vendors? |
| 23 | A. | Could you say that again. |
| 24 | Q. | Are you aware of audits done on vending machine |

*Nannette Ferri*

| | | |
|---|---|---|
| 1 | | vendors by DOCS or some independent agency for DOCS? |
| 2 | A. | No, I'm not aware of any. |
| 3 | Q. | Have you ever seen any audits done of the vending |
| 4 | | machine vendors by DOCS or an independent agency? |
| 5 | A. | No, I have not, not that I recall. |
| 6 | Q. | And are you aware of any process internal to DOCS |
| 7 | | which involves auditing vending machine contract or |
| 8 | | performance? |
| 9 | A. | No, I'm not aware of any. |
| 10 | Q. | Are you aware of a sanitation audit? |
| 11 | A. | There is a -- I believe there is a sanitation audit |
| 12 | | done.  I don't know if it's internal. |
| 13 | Q. | What does it study, if you know? |
| 14 | A. | No, I don't know. |
| 15 | Q. | Have you ever seen the results? |
| 16 | A. | There is a gentleman in our office who does a -- he |
| 17 | | inspects the facilities once a year. |
| 18 | Q. | What's his name? |
| 19 | A. | Charles Hunt.  And I believe his report is called |
| 20 | | sanitation and hygiene, I'm not positive.  But I have |
| 21 | | not really -- I have -- to my knowledge, I don't |
| 22 | | recall reading any of those reports. |
| 23 | Q. | And you don't know whether they deal with vending |
| 24 | | machines? |

66

Nannette Ferri

1  A.  No.

2  Q.  What did you do to prepare for today's deposition?

3  A.  I read over my original deposition that I had given.

4  Q.  You are talking about an affidavit that you swore to?

5  A.  Affidavit, I'm sorry.  Yes, I did look that over.

6  Q.  Did you do anything else?

7  A.  No.

8  Q.  Did you speak with any of the individuals who were

9      involved in these actions with you; Mr. Kidder,

10     Mr. Glassanos, Ms. Creen?

11 A.  No.

12         MR. SCHULZE:  To prepare?

13         MR. SUSSMAN:  Yes.

14 A.  No.

15 Q.  Did you speak with Mr. Kidder following his deposition

16     about the contents of his deposition?

17 A.  No.

18 Q.  You mentioned an affidavit which you filed, or was

19     filed after you signed and had it notarized on the

20     23rd of July, 2007.  We'll mark that Exhibit 21.

21         (Plaintiff's Exhibit 21 was marked for

22         identification.)

23 Q.  I'm showing you a faxed copy of a five page affidavit

24     with certain supporting exhibits, and tell me if you

---

Nannette Ferri

1      can recognize that as the document you referred to

2      several answers ago.

3  A.  (Pause.)

4  Q.  The question is:  You have had an opportunity to look

5      at the five pages?

6          MR. SCHULZE:  I --

7          MR. SUSSMAN:  Hold on please, Counsel.

8          MR. SCHULZE:  Well, I have an objection to

9      the exhibit.

10         MR. SUSSMAN:  I'm not asking you right now.

11 Q.  I'm asking you:  Do you know whether that is a copy of

12     your affidavit with the exhibits which you attached or

13     someone attached to it at that time?

14         MR. SCHULZE:  I'm noting for the record that

15     one of the exhibits attached has a sticker on it

16     saying Plaintiff's Exhibit Creen Number 2, dated

17     11/15/07.

18         MR. SUSSMAN:  Fine.

19 Q.  Are all those exhibits exhibits that were attached to

20     your affidavit?

21 A.  I don't recall.  This is my affidavit.

22 Q.  Okay.

23 A.  But I don't --

24 Q.  We'll get to that in a minute, the exhibits.

---

67

Nannette Ferri

1  A.  Okay.

2  Q.  The affidavit, did you prepare that affidavit

3      yourself?

4  A.  Yeah, basically.

5  Q.  You did?  Did you write it up on a computer?

6  A.  No.

7  Q.  How did you prepare it?

8  A.  I initially spoke with Mr. Schulze --

9          MR. SCHULZE:  I'll instruct you not to

10     reveal any communications we had.

11         THE WITNESS:  Okay.

12 Q.  All I asked you is how you prepared it, so if you say

13     you initially spoke --

14         MR. SCHULZE:  You can say you spoke, but

15     don't tell him what we said.

16 Q.  You initially spoke with Mr. Schulze, did you write

17     anything yourself constituting your affidavit?

18 A.  Not this one.

19 Q.  You wrote another --

20 A.  This was a final version, I believe, from what I

21     recall.

22 Q.  So you wrote a draft?

23         MR. SCHULZE:  Objection.

24 A.  I don't know initially if I wrote the draft, but I did

---

68

Nannette Ferri

1      have input and I --

2  Q.  You made changes on a draft?

3  A.  Changes, yes.

4  Q.  Okay.  Thank you.

5          You wrote on the second page, paragraph two,

6      quoting, "The final contracts must be approved by the

7      State Comptroller's Office"?

8  A.  Mm-hmm.

9  Q.  Are you aware of that yourself?

10 A.  Yes.

11 Q.  And how long does that process normally take?

12 A.  It depends on how busy they are.  It's got to -- they

13     have to go to the Attorney General first, and then

14     Audit and Control, so from the time they leave the

15     business office, it could take anywhere from three to

16     eight weeks.

17 Q.  The following sentence states, quote, "The facility

18     steward then deals with the day-to-day operations

19     under the contract and may call support operations if

20     there are questions or problems."  Is that accurate?

21 A.  Yes.

22 Q.  Do the stewards report to your office?

23 A.  No.

24 Q.  Who do they report to?

69

70

*Nannette Ferri*

| | |
|---|---|
| 1 | A. They report to the deputy superintendent for |
| 2 | administration or the equivalent at the facility. |
| 3 | Q. Is it accurate that at each facility the money from |
| 4 | the vending machine commissions is placed in inmate |
| 5 | benefit funds and employee benefit funds? |
| 6 | A. Start that sentence again. |
| 7 | Q. Is it accurate that the money from the vending machine |
| 8 | contracts is placed in inmate benefit funds and |
| 9 | employee benefit funds? |
| 10 | A. That's where it's supposed to be placed. |
| 11 | Q. Do you know if it is placed there? |
| 12 | A. No. |
| 13 | Q. In your affidavit, which I'll show you again in a |
| 14 | moment, in paragraph five, you relate a conversation |
| 15 | you had with Mr. Freed on November 8th, 2006. And |
| 16 | when you signed this document on July 23rd of 2007, |
| 17 | how were you able to identify November 8th, 2006 as |
| 18 | the date you had that conversation? |
| 19 | A. I don't recall. |
| 20 | Q. Do you have any notes of that conversation? |
| 21 | A. There must have been something, but I don't recall |
| 22 | what it was. |
| 23 | Q. You say "there must have been something", what are you |
| 24 | referring to? |

*Nannette Ferri*

| | |
|---|---|
| 1 | MR. SCHULZE: Objection. |
| 2 | A. I don't recall. |
| 3 | Q. I'll call for the production of any document in your |
| 4 | possession that substantiates you had a conversation |
| 5 | with Mr. Freed on November 8th, 2006 as sworn to on |
| 6 | July 23rd, 2007. |
| 7 | MR. SCHULZE: Objection. |
| 8 | Q. Do you remember this phone call? |
| 9 | A. No, I don't. |
| 10 | Q. Now, you indicate that following up on that phone call |
| 11 | your supervisor, Mr. Kidder, wrote a letter dated |
| 12 | November 9th, 2006, Exhibit A. Did you prepare that |
| 13 | document? |
| 14 | A. Yes. |
| 15 | Q. So it was your responsibility to collect commissions |
| 16 | at the various facilities; is that right? |
| 17 | MR. SCHULZE: Objection. |
| 18 | A. No, we don't collect commissions. |
| 19 | Q. Is it your responsibility to ensure that the payments |
| 20 | are made to the various facilities? |
| 21 | MR. SCHULZE: Objection. |
| 22 | A. No. |
| 23 | Q. So when this document by Mr. Kidder reads, quoting, "I |
| 24 | understand you spoke to Nan Ferri on November 8th and |

71

*Nannette Ferri*

| | |
|---|---|
| 1 | informed her that all commissions due would be paid, I |
| 2 | am advising you that all" -- underlined -- |
| 3 | "commissions currently due must" -- underlined -- "be |
| 4 | paid to each facility within five business days." You |
| 5 | say you wrote that? |
| 6 | A. I composed the letter. Stew may have made changes. I |
| 7 | don't recall. |
| 8 | Q. So you don't know if you wrote that? |
| 9 | MR. SCHULZE: Objection. |
| 10 | A. I wrote the draft. He may have made changes. |
| 11 | Q. I asked you if you wrote that. |
| 12 | MR. SCHULZE: Objection. |
| 13 | A. I don't recall. |
| 14 | Q. By what authority would you have written that? |
| 15 | MR. SCHULZE: Objection. |
| 16 | A. I don't know. |
| 17 | Q. Further, the letter states, November 9th, 2006, "I |
| 18 | remind you that each contract is very specific as to |
| 19 | when the commission check is to be paid." To your |
| 20 | understanding, were these contracts between the |
| 21 | facilities and the vendor or between your offices and |
| 22 | the vendor? |
| 23 | A. The facilities and the vendor. |
| 24 | Q. "All future commission checks must be paid on time", |

72

*Nannette Ferri*

| | |
|---|---|
| 1 | according to this letter, and the letter went to every |
| 2 | facility; is that right? |
| 3 | A. It went -- |
| 4 | MR. SCHULZE: Objection. |
| 5 | Q. Every facility where Rockland Vending had a contract? |
| 6 | A. Yes, yes. |
| 7 | Q. And was that your decision or Mr. Kidder's? |
| 8 | A. I don't recall. |
| 9 | Q. Was it your decision or Mr. Kidder's? |
| 10 | A. Well, I believe at the time that was written, he was |
| 11 | late on all of his commissions. |
| 12 | Q. So what did that have to do with your office? |
| 13 | MR. SCHULZE: Objection. |
| 14 | A. (Pause.) |
| 15 | Q. Can you answer that, please. |
| 16 | A. Well, the IFB and the directive -- there is a vending |
| 17 | machine directive that is the responsibility of |
| 18 | Support Operations. One of the stipulations in there, |
| 19 | I believe, is when payment is to be made. Knowing |
| 20 | that payment was not made timely on these contracts, |
| 21 | just knowing that they were late, I felt doing nothing |
| 22 | would not be the right choice to make. So that was |
| 23 | sent out just in keeping with the directive. |
| 24 | (Plaintiff's Exhibit 22 was marked for |

*Nannette Ferri*

|   |   |
|---|---|
| 1 | identification.) |
| 2 | Q. Mark as Exhibit 22, a three page document, Defendant |
| 3 | 0097 through 99. Can you identify that document, |
| 4 | please. |
| 5 | A. Mm-hmm. |
| 6 | Q. What is it? |
| 7 | A. It's a vending machine directive. |
| 8 | Q. Who did this directive go to? |
| 9 | MR. SCHULZE: Objection. |
| 10 | A. It goes to all facilities. |
| 11 | Q. Anyone else? |
| 12 | A. I'm not sure. |
| 13 | Q. And from whose office was it promulgated or sent? |
| 14 | A. I believe internal controls keeps track of the |
| 15 | directives. They're all online. They get sent out |
| 16 | every once in a while for review -- not once in a |
| 17 | while -- probably once a year. |
| 18 | Q. Whose signature is at the top? |
| 19 | A. That's Charles Devain(phonetic). |
| 20 | Q. Who was he at the time? |
| 21 | A. He was the Deputy for Administration. |
| 22 | Q. In the document that you submitted to the Court on |
| 23 | July 23rd or thereabouts of 2007, paragraph seven |
| 24 | reads, quoting, "I recently asked each facility that |

*Nannette Ferri*

|   |   |
|---|---|
| 1 | has contact with Rockland for a status report |
| 2 | regarding monies due from Rockland relating to the |
| 3 | vending machine contracts." I'm showing you the |
| 4 | document, and can you tell us what that was referring |
| 5 | to when you say you "recently asked"? |
| 6 | MR. SCHULZE: I'll instruct you not to |
| 7 | reveal any communications with counsel. |
| 8 | MR. SUSSMAN: Counsel, it has nothing to do |
| 9 | with counsel. "I recently asked each facility" |
| 10 | -- it has nothing to do with counsel. |
| 11 | MR. SCHULZE: I'll instruct you not to |
| 12 | reveal any communications with counsel. |
| 13 | A. Okay. I'm sorry, what's your question on that, |
| 14 | regarding number seven? |
| 15 | Q. What is the reference in number seven where it says, |
| 16 | quoting, "I recently asked each facility"? When did |
| 17 | you do that? |
| 18 | A. I don't recall. |
| 19 | Q. How did you do that? |
| 20 | A. I believe -- |
| 21 | Q. Phone? |
| 22 | A. -- I phoned. |
| 23 | Q. Who did you speak to? |
| 24 | A. In most cases the stewards. |

75

*Nannette Ferri*

|   |   |
|---|---|
| 1 | Q. Are there any records of those calls? |
| 2 | A. I don't believe so. Like -- |
| 3 | Q. Are there any e-mails reflecting those contacts? |
| 4 | A. For this specific reason, I don't believe so. |
| 5 | Q. Reference paragraph seven, I don't mean for this |
| 6 | reason, with respect to paragraph seven, in support of |
| 7 | the statement made in paragraph seven, are there any |
| 8 | e-mails in regard to the context you are referencing |
| 9 | there? |
| 10 | A. There may have been if -- when I contacted, they may |
| 11 | have chosen to answer me by e-mail. I don't |
| 12 | specifically recall. |
| 13 | Q. When did you make the contact referenced in that |
| 14 | paragraph; what month? |
| 15 | A. I don't recall. |
| 16 | Q. Paragraph eight says, "On May 16th, 2007 the Office of |
| 17 | the State Comptroller informed DOCS, specifically the |
| 18 | stewards office at Eastern Correctional Facility that |
| 19 | there were several issues relating to Plaintiff being |
| 20 | required further investigation before OSC would |
| 21 | approve renewal of the Eastern contract", and there's |
| 22 | an attachment here that's marked as D. |
| 23 | MR. SCHULZE: I'll note for the record that |
| 24 | I'm taking Counsel's word on all of this because |

76

*Nannette Ferri*

|   |   |
|---|---|
| 1 | I haven't been provided with a copy of this |
| 2 | document. |
| 3 | Was there a question? |
| 4 | MR. SUSSMAN: Not yet. I've shown her |
| 5 | Exhibit D. |
| 6 | MR. SCHULZE: He's asked you to review |
| 7 | Exhibit D. |
| 8 | THE WITNESS: Mm-hmm. |
| 9 | BY MR. SUSSMAN: |
| 10 | Q. What was the outcome with regard to Eastern in that |
| 11 | review? |
| 12 | A. I don't know. |
| 13 | Q. So you attached to the document you filed in the Court |
| 14 | a -- was filed in the Court under your name, a |
| 15 | document dated May 16th, 2007 and you swore to |
| 16 | something on July 23rd, 2007; between May 16th, 2007 |
| 17 | and July 23rd, had you made any inquiry with regard to |
| 18 | the status of that matter? |
| 19 | MR. SCHULZE: "That matter", meaning? |
| 20 | Objection. |
| 21 | MR. SUSSMAN: New York State Comptroller and |
| 22 | Eastern. |
| 23 | A. No, I don't believe so. |
| 24 | Q. Do you have any personal knowledge of the outcome of |

*Nannette Ferri*

```
1      what's referenced in paragraph eight?
2              MR. SCHULZE:  Asked and answered.
3   A.  I don't.  I don't recall the outcome, no.
4              MR. SUSSMAN:  Okay.  Thank you very much.
5      Five minutes and we'll start with the next
6      witness.
7              MR. SCHULZE:  We're done?
8              MR. SUSSMAN:  Yes.
9              MR. SCHULZE:  Okay.  I have no questions.
10             (Whereupon, the examination of NANNETTE
11     FERRI in the above-entitled matter concluded at
12     12:43 p.m.)
13                      *****
14
15
16
17
18
19
20
21
22
23
24
```

---

```
1   STATE OF NEW YORK      )
                                 ss.
2   COUNTY OF              )
3
4              I, NANNETTE FERRI, have read the foregoing
5      record of my testimony taken at the time and
6      place noted in the heading hereof, and I do
7      hereby acknowledge it to be a true and accurate
8      transcript of same.
9
10
11             _____
12                  NANNETTE FERRI
13
14  DATED:      _____
15
16  Sworn to before me this _____
17  day of _____, 20_____
18
19  _____
20  Notary Public
21
22
23
24
```

---

```
1            C E R T I F I C A T I O N
2
3       I, SADIE L. HERBERT, Shorthand Reporter and
4   Notary Public in and for the State of New York,
5   do hereby CERTIFY that the foregoing record taken
6   by me at the date and place noted in the heading
7   hereof is a true and accurate transcript of same,
8   to the best of my ability and belief.
9
10          _____
11          SADIE L. HERBERT
12
13  Dated:  February 3, 2008
14
15
16
17
18
19
20
21
22
23
24
```

---

```
1
2
3
4                  WITNESS INDEX
5          WITNESS: NANNETTE FERRI
6   BY MR. SUSSMAN.................................PAGE 4
7
8
9
10
11
12
13             EXHIBIT INDEX
14  PLF                                          IDN
15  1    E-mail, Glassanos to Creen, 5/9/07, D0049      14
16  2    E-mail, Creen to Rockland, 12/11/06, D0068     37
17  3    E-mail, Creen to Freed, 12/18/06, D0067        39
18  4    E-mail, Creen to Freed, 1/19/07, D0142         39
19  5    E-mail, Creen to Freed, 1/30/07, D0065         40
20  6    E-mail, Ferri to Creen, 2/13/07, D0139         42
21  7    E-mail, Creen to Freed, 2/16/07, D0060         43
22  8    E-mail, Freed to Creen, 2/16/07, D0062         44
23  9    E-mail, Creen to Freed, 2/22/07, D0061         44
24  10   E-mail, Creen to Freed 3/2/07, D0059           45
```

| | | | |
|---|---|---|---|
| 1 | 11 | Memo, Kidder to stewards, 3/7/07, D0006 | 46 |
| 2 | 12 | Memo, Creen to Kidder, 3/13/07, D0137 | 48 |
| 3 | 13 | E-mail, Creen to Freed, 4/4/07, D0056 | 50 |
| 4 | 14 | E-mail, Ferri to Dayton, 4/5/07, D0004 | 51 |
| 5 | 15 | Letter, Matthews to Freed, 4/5/07, D0005 | 51 |
| 6 | 16 | E-mail, Creen to Freed, 4/19/07, D0096 | 52 |
| 7 | 17 | E-mail, Glassanos to Creen, 5/8/07 | 52 |
| 8 | 18 | E-mail, Glassanos to Ferri, 5/9/07, D149 | 57 |
| 9 | 19 | Letter, Freed to Creen, 6/15/07, D0032 | 62 |
| 10 | 20 | Letter, Freed to Creen, w/attachments 6/15/07, D0104-D0106 | 62 |
| 11 | | | |
| 12 | 21 | Affidavit of N. Ferri | 65 |
| 13 | 22 | Vending Machines Contracts Directive, revision date 7/21/04 | 72 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |