ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X

ROCKLAND VENDING CORP.,

                    Plaintiff,

        -against-                    07 CIV 6268 (WP)(MPF)

ROXANNE CREEN,
        sued in her individual capacity,
MARSHA F. RILEY,
        sued in her individual capacity,
STEWART KIDDER,
        sued in his individual capacity,

                    Defendants.
------------------------------------------------X

                    Date:  November 15, 2007
                    Time:  10:10 a.m.
                    Place: 235 Main Street
                           Poughkeepsie, New York


        DEPOSITION OF ROXANN CREEN,

a Defendant in the above-captioned matter, held pursuant to

Agreement, at the above time and place, before Gail M.

Sherry, CRR, RPR, RMR, a Notary Public of the State of

New York.

----------------------------------------------------------

            COURT REPORTING ASSOCIATES, INC.
                1699 Route 6; P.O. Box 113
                Carmel, New York  10512

                    (845) 225-0024

---

2

APPEARANCES

        SUSSMAN & WATKINS
        Attorneys for Plaintiff
            40 Park Place
            P.O. Box 1005
            Goshen, New York  10924
        BY:  MICHAEL H. SUSSMAN, ESQ.


        STATE OF NEW YORK
        OFFICE OF ATTORNEY GENERAL
        Attorney for Defendants
            235 Main Street
            Poughkeepsie, New York  12601
        BY:  DANIEL SCHULZE, ESQ.


ALSO PRESENT:

        Michael Freed

---

3

            STIPULATIONS


        IT IS HEREBY STIPULATED AND AGREED, by and between the

attorneys for the respective parties hereto, that the

sealing and filing of the within deposition be waived.


        IT IS FURTHER STIPULATED AND AGREED that this

deposition may be signed and sworn to before any officer

authorized to administer an oath with the same force and

effect as if signed and sworn to before the officer before

whom said deposition is taken.


        IT IS FURTHER STIPULATED AND AGREED that all

objections, except as to form, are reserved to the time of

trial.

---

4

                    ROXANN CREEN,

        having been first duly sworn by Gail M. Sherry, a

        Notary Public of the State of New York, was

        examined and testified as follows:

                    * * * * * *

EXAMINATION BY MR. SUSSMAN:

        Q.   Please state your name and address for the

record.

        A.   Roxann Creen, R-O-X-A-N-N, C-R-E-E-N.

             MR. SCHULZE:  She can be reached through

our office.

        Q.   Good morning, Ms. Creen.  I'm Michael Sussman.

I represent the plaintiffs in this case, and you're here

for what's called a deposition.

             Have you ever had a deposition taken before?

        A.   Yes, I have.

        Q.   How many years ago?

        A.   About eight.

        Q.   Just to briefly review, then, I'll ask you a

single question at a time.  Assuming you do understand

the question, please answer that question.  If for

whatever reason you don't understand the question, then

please don't answer the question and indicate in

whatever verbal way you can that you don't understand

5

ROXANN CREEN

1
2  the question, and I'll ask you it in a different way or
3  louder or some other way that hopefully gets you to
4  understand and answer the question.
5       It's important that you answer the question
6  that's asked of you.
7       A.   Okay.
8       Q.   So if you don't understand it, as I said,
9  that's fine, and we'll try to get to a point where you
10  do understand it.
11       You have to answer verbally.
12       A.   Okay.
13       Q.   And I'll ask you a question and I'll let you
14  then answer that question fully.  Please give me the
15  courtesy of allowing me to finish my question even
16  though you may know where I'm going and, likewise, even
17  if I know your answer or if I don't like your answer,
18  I'm going to let you answer.  I'm not going to interrupt
19  you, certainly not knowingly.
20       As I say, give your answers verbally.  We're
21  not at a less formal setting.  This is just like being
22  in a court, so you have to give an answer.  You can't
23  nod, gesticulate.  Ms. Sherry, while she's a wonderful
24  reporter, she can't interpret what you're trying to say.
25  It's really not her role here today.

---

6

ROXANN CREEN

1
2       A.   Okay.
3       Q.   Counsel has a right to object, which I know he
4  knows and it's specified in the rules, but unless he
5  directs you not to answer the question, please answer
6  the question.  He may want to preserve certain
7  objections, and that is within his rights.
8       If he does interpose an objection and you need
9  the question rephrased or read back, I may ask
10  Ms. Sherry to read the question back.
11       Do you understand all of that?.
12       A.   Yes.
13       Q.   Okay.  Do you currently work for the State of
14  New York?
15       A.   Yes, I do.
16       Q.   What position do you now hold?
17       A.   An Institutional Steward.
18       Q.   How long have you been an Institutional
19  Steward?
20       A.   Since January of 2004.
21       Q.   How did you become an Institutional Steward?
22       A.   I had taken a test and passed the test and was
23  selected to fill that position.
24       Q.   Civil service position?
25       A.   Yes.

---

7

ROXANN CREEN

1
2       Q.   And you were appointed?
3       A.   Yes.
4       Q.   Do you know who the appointing authority is?
5       A.   It has to go through our Central Office.  It
6  has a four-way sign-off, so I'm assuming someone in
7  Central Office has to do the final approval.
8       Q.   By "Central Office," you're talking about
9  DOCS?
10       A.   Yes.
11       Q.   Were you interviewed for this position?
12       A.   Yes, I was.
13       Q.   And who interviewed you?
14       A.   Deputy Superintendent for Administration, Kay
15  Knott, K-N-O-T-T.
16       Q.   Did anyone in Albany interview you for this
17  position?
18       A.   No.
19       Q.   Immediately before January 2004 and assuming
20  this position, what job did you hold?
21       A.   Purchasing Agent.
22       Q.   How long did you work as a Purchasing Agent?
23       A.   I don't recall.  I had held various titles
24  since I started with the State.
25       Q.   When did you start with DOCS?

---

8

ROXANN CREEN

1
2       A.   January of 1986.
3       Q.   Were you always in the purchasing area at
4  DOCS?
5       A.   I was clerical for the first two years, and
6  then I went into purchasing.
7       Q.   So by 1990 were you in purchasing?
8       A.   Yes.
9       Q.   Did you remain in purchasing as between 1990
10  and 2007?
11       A.   Yes.
12       Q.   As an Institutional Steward, to whom do you
13  report?
14       A.   To the Dep of Administration, which is Kay
15  Knott, at Shawangunk.
16       Q.   Do you report to anyone else?
17       A.   She's my immediate supervisor.
18       Q.   Do you report to anyone in Albany?
19       A.   No.
20       Q.   When you were Institutional Steward, did you
21  have a staff?
22       A.   Yes, I do.
23       Q.   How many individuals as of May 2007 were part
24  of your staff?
25       A.   I have to count them.

9

ROXANN CREEN

1
2    Q.    Take your time.
3    A.    I would believe ten at that time.
4    Q.    What job titles did those people hold?
5    A.    They are Head Account Clerk.  Principal
6    Account Clerk.  Commissary Clerk 4.  Commissary Clerk 3.
7    Calculations Clerk 2.  Calculations Clerk 1.
8    Storehouse.  And Stores Clerk.
9    Q.    What were your duties and responsibilities as
10   of May 2007 as Institutional Steward?
11   A.    I was responsible for the State shop, the
12   storehouse, the commissary operations, and the
13   operations of the business office.  Do you want to know
14   the rest of them too?
15   Q.    Yes.
16   A.    I conduct Tier 3 hearings.  I am a part of the
17   Environmental Services Committee.  I'm the core leader
18   for the accreditation for the business area.  And I act
19   when Dep Knott is not in the facility.
20   Q.    You act as what?
21   A.    Acting Deputy Superintendent for
22   Administration.
23   Q.    Had you had that panoply of duties for the
24   period since 2004 since you took the position?
25   A.    Yes.

10

ROXANN CREEN

1
2    Q.    Now, as of 2004 January when you took the
3    position, there were vending machines at your facility;
4    is that correct?
5    A.    Yes, there were.
6    Q.    And there was in place a contract with regard
7    to those vending machines; is that correct?
8    A.    Yes, there was.
9    Q.    And Rockland Vending had that contract; is
10   that correct?
11   A.    Yes, they did.
12          MR. SCHULZE:  Let him finish his
13   question.
14   Q.    And that contract commenced in February 2003
15   for a period of three years; is that correct?
16   A.    Yes, it is.
17   Q.    And the contract was subject on its terms to
18   two renewals; is that right?
19   A.    Two one-year renewals, yes.
20   Q.    As of the due date of the contract, meaning
21   the termination date of the first three years, that
22   would have been in February of 2006, you were the
23   Institutional Steward at that time; is that right?
24   A.    Yes, that's correct.
25   Q.    Was the contract renewed at that time?

11

ROXANN CREEN

1
2    A.    Yes, it was, for one year.
3    Q.    And that renewal date then came as of February
4    2007 for the second one-year renewal; is that correct?
5    A.    Yes.
6    Q.    Was the contract renewed at that time?
7    A.    Yes, it was.
8    Q.    Who determined to renew the contract in
9    February 2007, if you know?
10   A.    Well, that is the responsibility of the
11   facility, so basically it was my responsibility to
12   determine to renew it or not.
13   Q.    Did you determine then to renew it?
14   A.    Yes, I did.
15   Q.    As of February of 2007 when you determined to
16   renew the contract, were there any outstanding
17   commissions owed to your facility by Rockland Vending,
18   if you know?
19   A.    I do not know.  I would have to check that.
20   Q.    At the time in February of 2007, did you know?
21   A.    Yes, I would have.
22   Q.    Do you recall your state of knowledge at this
23   point?
24          MR. SCHULZE:  Objection.
25   A.    I'm sorry?

12

ROXANN CREEN

1
2    Q.    Do you recall at this point the state of
3    knowledge you had in February 2007 with regard to
4    whether there were commissions outstanding or not?
5          MR. SCHULZE:  Objection.
6    A.    I'm not sure what you're asking me.
7    Q.    Okay.  You're sitting here today and telling
8    me that today, if I hear you, you don't know whether in
9    February 2007 there were or were not commissions
10   outstanding; is that accurate?
11   A.    Yes.
12   Q.    You had a chance to prepare for today's
13   deposition; is that accurate?
14          MR. SCHULZE:  Objection.
15   Q.    Did you have a chance to prepare for today's
16   deposition?
17          MR. SCHULZE:  Objection.
18   A.    I don't know what you're asking me.
19   Q.    Did you review any documents in preparing for
20   today's deposition?
21   A.    No, I did not.
22   Q.    Did you have conversations in January or
23   February of 2007 about the renewal of the contract with
24   anyone else?
25   A.    Yes.

13

```
 1                    ROXANN CREEN
 2      Q.   With whom did you converse?
 3      A.   My Head Account Clerk.
 4      Q.   Who was that?
 5      A.   Sharon Davis.
 6      Q.   What did Ms. Davis tell you at that time with
 7  regard to the contract?
 8      A.   We just discussed whether we were going to
 9  renew it or not.
10      Q.   What was the discussion, if you remember?
11      A.   That there was one year remaining on it and
12  whether we were going to bid it out at that time or
13  whether we were going to go with Rockland for another
14  year.
15      Q.   Do you remember anything else about the
16  conversation?
17      A.   No, other than we probably discussed their
18  past performance.
19      Q.   Well, apart from probably, since you're under
20  oath, probably doesn't help me, and I don't want to
21  pursue probably unless you remember that's what
22  happened.  Do you remember that's what happened?
23           MR. SCHULZE:  Objection.
24      A.   We discussed it.  I'm not sure exactly what we
25  discussed.
```

COURT REPORTING ASSOCIATES, INC.

14

```
 1                    ROXANN CREEN
 2      Q.   Do you remember any of your discussion about
 3  Rockland's past performance in the context of
 4  discussions about renewing the contract?
 5           MR. SCHULZE:  Objection.
 6      A.   Repeat that.
 7           MR. SUSSMAN:  Read it back, please.
 8           (Question read by the reporter.)
 9      A.   You're going to have to rephrase that because
10  I'm not sure what you're asking me.
11      Q.   You said you had conversations with Ms. Davis
12  regarding renewal of the contract; is that accurate?
13      A.   Yes.
14      Q.   And you say that you believe you had in those
15  discussions some conversation about Rockland's past
16  performance; is that correct?
17      A.   Yes.
18      Q.   What did you discuss with regard to their past
19  performance?
20      A.   We discussed their payments.  We discussed
21  their service, their maintenance.
22      Q.   Any other subjects which you discussed at that
23  time with Ms. Davis?
24      A.   I don't recall that.
25      Q.   Did Ms. Davis provide you with any written
```

COURT REPORTING ASSOCIATES, INC.

15

```
 1                    ROXANN CREEN
 2  material showing the payment history of Rockland Vending
 3  in the context of discussing whether or not to renew?
 4      A.   No.
 5      Q.   Did you ask for any?
 6      A.   No.
 7      Q.   Did you have any?
 8      A.   Written proof?
 9      Q.   Yes, written.
10      A.   Just -- we don't keep any particular log on
11  it.  We keep a receipt book showing his payments, and we
12  keep a folder regarding his payments.
13      Q.   Did you review the receipt book in or around
14  February of 2007 in the context of deciding whether to
15  renew?
16      A.   No, because I knew what the past performance
17  was.
18      Q.   What was the past performance?
19      A.   That Rockland was consistently late with their
20  payments.
21      Q.   For how many years had that been true, that
22  statement?
23      A.   Well, since I came on, which was January of
24  '04.
25      Q.   When you say "consistently late," how late
```

COURT REPORTING ASSOCIATES, INC.

16

```
 1                    ROXANN CREEN
 2  were they consistently with their payments?
 3      A.   Three to four months.
 4      Q.   Had that been a practice, to your knowledge,
 5  since 2004?
 6      A.   Yes.
 7           MR. SCHULZE:  Objection.
 8      Q.   With regard to the maintenance, you mentioned
 9  another subject you discussed was maintenance?
10      A.   Uh-huh.
11      Q.   What did you and Ms. Davis discuss concerning
12  maintenance?
13      A.   We discussed about when they came in, if there
14  was a problem with the machine, how often -- you know,
15  if they came in quickly to respond to a machine being
16  broken.
17      Q.   What did you and she say regarding maintenance
18  at that time?
19      A.   That, I discussed with someone else.
20      Q.   Who was that with?
21      A.   Marjorie Davis -- Marjorie Gardner.
22      Q.   What was Ms. Gardner's role?
23      A.   She was the contact with Rockland when the
24  machines were not functioning properly.
25      Q.   What did she say to you, if anything, about
```

COURT REPORTING ASSOCIATES, INC.

17

ROXANN CREEN

2  the timeliness of their maintenance in early 2007?

3      A.    I remember we talked about different times

4  they would come in and try to repair the machine but

5  needed parts and would have to take a few days to repair

6  them.

7      Q.    Did Ms. Gardner express any opinion as to

8  whether she felt the second renewal should be entered

9  into or not?

10     A.    I don't believe so.

11     Q.    Did Ms. Davis express any opinion on that

12  subject?

13     A.    Yes, probably.

14     Q.    Do you remember her opinion?

15     A.    Well, we discussed at length whether we would

16  renew it or we weren't going to renew it.

17     Q.    I understand that.  What was her opinion?

18     A.    I don't recall.

19     Q.    You mentioned service as a third area which

20  you discussed with regard to Rockland Vending at or

21  about the time the decision on renewal came up in 2007.

22  With whom did you discuss the issue of service?

23     A.    Service would have been again with Sharon

24  Davis or Marjorie Gardner.

25     Q.    What, if anything, did either of those women

---

18

ROXANN CREEN

2  tell you about service?

3      A.    That we were -- you know, that they would be

4  able to talk to them at different times and explain the

5  problems.  By "service," I mean the maintenance also

6  portion of it, not really anything else.

7      Q.    In 2007, January or February, did you have any

8  conversations with Mr. Freed concerning Rockland Vending

9  and its performance at Shawangunk?

10     A.    Probably not.  I communicated most of the time

11  by e-mails.  He was difficult to get ahold of.

12     Q.    So you made efforts in January and February to

13  speak with him?

14     A.    By e-mail.

15     Q.    By phone?

16     A.    I don't recall that.

17     Q.    Did you have any conversations in January,

18  February of 2007 with Mrs. Freed?

19     A.    I don't recall speaking with her, no.

20     Q.    Did you have any conversations with anyone

21  else who you understand to be representative of Rockland

22  Vending in January, February of 2007 concerning the

23  company's performance?

24     A.    No, I wouldn't have.  Most of the

25  conversations with Rockland were done by Marjorie

---

19

ROXANN CREEN

2  Gardner.

3      Q.    Do you know whether Ms. Gardner had any

4  conversations with Mr. Freed in the time period I've

5  specified?

6      A.    I don't believe so.

7      Q.    Did you direct her to, in that time period,

8  have any conversations?

9      A.    I don't believe so.

10     Q.    What about with regard to Mrs. Freed, did you

11  direct Ms. Gardner to have any conversations with her in

12  that time period?

13     A.    I didn't, but Marjorie made some phone calls

14  herself.  Whether they were during that time period or

15  not, I don't know.

16     Q.    Are there any records that you know of

17  of those phone calls and what was communicated?

18     A.    There may be a record of them, but I don't

19  know what was said during the conversations.

20     Q.    Who has the record; do you know?

21     A.    No, I do not.

22     Q.    After the second renewal of the contract

23  around February of 2007, when did you next speak with

24  Mr. Freed, you yourself?

25           MR. SCHULZE:  You're talking about oral

---

20

ROXANN CREEN

2  communication?

3           MR. SUSSMAN:  Yes.  Speak.

4      A.    It was May 11th.

5      Q.    What day of the week is May 11th; do you know?

6      A.    Friday.

7      Q.    Was this after the incident at the facility

8  involving Mr. Gallagher?

9      A.    Yes, it was.

10     Q.    What time of the day did you speak with him on

11  May 11th?

12     A.    It was probably around 11:00.

13     Q.    Is this a call you made or he made?

14     A.    I made.

15     Q.    To whom did you make the call?

16     A.    To Rockland Vending.

17     Q.    And you asked to speak to Mr. Freed?

18     A.    Yes.

19     Q.    And you did speak to Mr. Freed?

20     A.    Yes, I did.

21     Q.    When before May 11th and after the renewal, if

22  ever, had ycu called to speak with Mr. Freed before May

23  11th?

24     A.    I don't recall.

25     Q.    Do you recall ever doing that?

21

```
 1                    ROXANN CREEN
 2      A.   Well, I had spoken to him probably in 2006.
 3      Q.   I'm talking about the period after the renewal
 4  in February of 2007 and you've given me a date of May
 5  11th when you say you did speak to him, and I asked you
 6  between the renewal and May 11th, did you call to speak
 7  with Mr. Freed on any other occasions?
 8      A.   I had called Rockland on different occasions,
 9  but he was never available to speak to.
10      Q.   When did you call?
11      A.   I spoke -- on May 9th, I definitely spoke with
12  Cheryl that day.
13      Q.   Who is Cheryl?
14      A.   Cheryl Freed.
15      Q.   What time did you speak with her?
16      A.   That was shortly after 9:00.
17      Q.   Did you initiate the call?
18      A.   Yes, I did.
19      Q.   Were you at your facility?
20      A.   Yes, I was.
21      Q.   Where were you?
22      A.   In my office.
23      Q.   What phone number did you call from?
24      A.   What phone number?  The facility phone.
25      Q.   What phone number did you call from?
```

COURT REPORTING ASSOCIATES, INC.

22

```
 1                    ROXANN CREEN
 2      A.   My extension.
 3      Q.   Which is?
 4      A.   3100.
 5      Q.   What's the phone number?
 6      A.   845-895-2081.
 7      Q.   And this is around 9:00 on the 9th?
 8      A.   Yes.
 9      Q.   Did you reach her?
10      A.   Yes, I did.
11      Q.   What was the conversation?
12      A.   I had explained to her what had happened that
13  morning.
14      Q.   What did you say?
15      A.   With the driver.  I explained to her that when
16  the driver had come in that morning, that we had
17  requested him to give us the money from the machines
18  that he was opening and filling that day and that he had
19  done that and that we had given him receipts for the
20  money that he collected out of the machines.
21      Q.   So this is after that had happened?
22      A.   Yes.
23      Q.   And you're saying it's about 9:00 in the
24  morning you had this conversation?
25      A.   Yes.  Nine, 9:10, something like that.
```

COURT REPORTING ASSOCIATES, INC.

23

```
 1                    ROXANN CREEN
 2      Q.   Did you say anything else that you can now
 3  recollect to Cheryl Freed on that date?
 4      A.   She requested that I fax her copies of the
 5  receipts, which I did.
 6      Q.   Did you say anything else?  That was the
 7  question.
 8           MR. SCHULZE:  Objection.        .
 9      Q.   Did you say anything else that morning to her?
10           MR. SCHULZE:  Objection.
11      A.   I don't believe so.
12      Q.   How long did you converse with Ms. Freed for
13  at approximately 9:00 or 9:10 on May 9th?
14      A.   Just a few minutes.
15      Q.   Would you say more than ten minutes?
16      A.   No.
17      Q.   Do you have a recollection of the time before
18  that that you spoke with Ms. Freed?
19      A.   No, I do not.
20      Q.   You said you had made efforts to speak to
21  Mr. Freed but you were unable to speak to him.  When,
22  to your knowledge, did you last make that effort before
23  May 9th?
24      A.   I don't remember.
25      Q.   Do you know what month it was in?
```

COURT REPORTING ASSOCIATES, INC.

24

```
 1                    ROXANN CREEN
 2      A.   No, I don't.
 3           MR. SUSSMAN:  Mark this as Exhibit 1.
 4           (Creen Ex. 1 - DOCS INVITATION FOR BIDS
 5           marked for identification.)
 6  BY MR. SUSSMAN:
 7      Q.   I'm showing you a document which has been
 8  marked here today as Exhibit 1 to your deposition.  It's
 9  a lengthy document.
10           MR. SCHULZE:  What is this being marked
11  as?
12           MR. SUSSMAN:  Exhibit 1 to her
13  deposition.
14      Q.   The first page is an Invitation for Bids for
15  Vending Machine Services, and it relates to a bid
16  opening date of November 4, 2002.  And the document
17  consists of -- the first 11 pages seem to relate to that
18  Invitation for Bids.  Do you see that?
19      A.   Yes.
20      Q.   Are you familiar with those 11 pages?
21      A.   I understand what they are, yes.
22      Q.   And are they on a form which is provided by
23  the Department of Correctional Services to potential
24  vendors?
25      A.   Each -- it's kind of a boilerplate, but each
```

COURT REPORTING ASSOCIATES, INC.

25

1          ROXANN CREEN
2   facility does their own.
3       Q.   And is the boilerplate provided by DOCS?
4       A.   Yes.
5       Q.   Can you identify those 11 pages as an
6   Invitation for Bids which Shawangunk Correctional
7   Facility did provide in this time frame of October 2002?
8       A.   It's prior to me going to that facility.
9       Q.   You were not there at that facility then?
10      A.   No, I was not.
11      Q.   What facility were you at?
12      A.   I was at Eastern New York Correctional
13  Facility.
14      Q.   And you've never seen this document before, or
15  have you?
16      A.   I have seen it.  It's been in the Rockland
17  folder.
18      Q.   So you've seen it before?
19      A.   Yes.
20      Q.   In this form signed on page 11 by Mr. Freed?
21      A.   Yes.
22           MR. SCHULZE:  You're still referring to
23  just the first 11 pages?
24           MR. SUSSMAN:  That's correct.
25      Q.   Have you ever read this document?

COURT REPORTING ASSOCIATES, INC.

26

1          ROXANN CREEN
2       A.   Not in its entirety, no.
3       Q.   And you mentioned earlier that it was in part
4   boilerplate.  Are you familiar with the boilerplate
5   sections of this document?
6       A.   Pretty much, yes.
7       Q.   I direct your attention to paragraph 13, page
8   6.  There's a provision in bold caps which says,
9   "Termination of Contractor's Employment for the
10  Convenience of the State of New York."  Do you see that?
11      A.   Yes.
12      Q.   Are you familiar with that provision?
13      A.   I believe so.
14      Q.   As of May 9th, was the contract with Rockland
15  Vending terminated at your facility?
16      A.   I'm sorry?
17      Q.   As of May 9th, was the contract for Rockland
18  Vending terminated at your facility?
19           MR. SCHULZE:  Objection.
20      A.   I don't believe that it was May 9th.
21      Q.   The answer is no?
22      A.   The answer would be I don't believe.  It is
23  either the 9th or the 11th.
24      Q.   So it might have been the 9th; is that your
25  testimony?

COURT REPORTING ASSOCIATES, INC.

27

1          ROXANN CREEN
2           MR. SCHULZE:  Objection.
3       A.   It may have been the 9th or it may have been
4   the 11th.  I don't have the document in front of me
5   stating what day I terminated them.
6       Q.   Let me ask you this.  When Mr. Gallagher came
7   to the facility on the 9th, had the contract been
8   terminated by then?
9       A.   No.
10      Q.   There's a provision in paragraph 14,
11  Suspension of Work.  First paragraph, quoting, "The
12  Facility may order the Contractor, in writing, to
13  suspend performance of all or any part of the work for a
14  reasonable period of time as determined by the agency,"
15  close quote.
16           Do you see that provision?
17      A.   Yes.
18      Q.   Had the Rockland Vending contract been
19  suspended as of the time Mr. Gallagher came to your
20  facility on May 9th?
21      A.   No, it was not.
22      Q.   Was a suspension order ever entered with
23  regard to Rockland Vending at Shawangunk at any time, to
24  your knowledge?
25           MR. SCHULZE:  Objection.

COURT REPORTING ASSOCIATES, INC.

28

1          ROXANN CREEN
2       A.   Not that I'm aware of.
3       Q.   Directing your attention to "Inspection and
4   Acceptance of the Work," page 7, paragraph 17, did you
5   ever make a demand that Rockland Vending promptly
6   correct any work it had done at the facility?
7           MR. SCHULZE:  Objection.
8       A.   With regard to the repair of their machines.
9       Q.   Is the answer to that question yes?
10      A.   Yes, with regard to the repair of their
11  machines.
12      Q.   Was that demand made in writing?
13      A.   No, it was not.
14      Q.   When was the last time such a demand was made,
15  to your knowledge, before May 9th?
16      A.   I do not know.
17      Q.   Do you know if such a demand was made during
18  calendar year 2007 and before May 9th?
19      A.   I don't know.
20      Q.   Directing your attention to paragraph 22,
21  entitled "Right to Audit," before May 9, 2007, if you
22  know, did anyone at Shawangunk request to see any
23  records and accounts of services by or from Rockland
24  Vending?
25      A.   You're going to have to repeat that.

COURT REPORTING ASSOCIATES, INC.

29

ROXANN CREEN

2       MR. SUSSMAN:  Read it back.

3       (Question read by the reporter.)

4    A.   Request to see, no, they did not, but there

5 were inquiries into Rockland Vending's payments.

6    Q.   Inquiries by whom?

7    A.   Inquiries by Support Operations, by Nan Ferri.

8    Q.   When did Ms. Ferri make such inquiries?

9    A.   Prior to that date, but I do not know the

10 exact date.

11    Q.   To whom did she make the inquiries?

12    A.   To myself.

13    Q.   How did you respond to her inquiries?

14    A.   Over the phone, verbally.

15    Q.   What did you say?

16    A.   I gave them the past performance of their

17 payments.

18    Q.   When did this occur?

19    A.   Well, it was prior to November 2006.

20    Q.   What about after November 2006, did Ms. Ferri

21 make any contact with you after November 2006 about

22 Rockland Vending?

23    A.   Yes, I believe she did.

24    Q.   When?

25    A.   I don't know.

30

ROXANN CREEN

2    Q.   What month?

3    A.   Don't know.

4    Q.   Was anything provided Ms. Ferri in writing

5 after November 2006 by you?

6    A.   I would have to check my folder.  I don't know

7 that.

8    Q.   Directing your attention to paragraph ten,

9 "Insurances."

10    A.   What page?

11    Q.   Four.  To your knowledge, did Rockland Vending

12 have any form of insurance when it did business at

13 Shawangunk?

14    A.   I believe that's a requirement of the

15 contract.

16    Q.   Were the submissions of any of those insurance

17 policies made to your office, to your knowledge?

18    A.   I don't know.

19    Q.   Do you know whether they had insurance

20 covering you for any claim of lost commission or failure

21 to pay commission?

22    A.   I don't know.

23    Q.   The document which is after those 11 pages

24 says Vending Machine Services Detailed Specifications.

25 And, again, it's numbered at the bottom 1 through 4 and

31

ROXANN CREEN

2 it's followed by Bid Pricing Tabulation Sheet.  Do you

3 know if the Vending Machine Services Detailed

4 Specifications was part of the Invitation for Bids?

5    A.   My personal knowledge, I would not know.  This

6 was done by the prior steward.  But I will assume that

7 it was.

8    Q.   Are you familiar with the Vending Machine

9 Services Detailed Specifications which are set forth

10 here, pages 1 through 4?

11    A.   Yes.

12    Q.   According to page 4, as of 3/02, it was

13 contemplated there would be nine vending machines in the

14 visiting room.  Do you see that?

15    A.   Uh-huh -- I'm sorry.  Wait a minute.  I think

16 it says five here in the visiting room.

17    Q.   It says, "Visiting room.  Two microwaves, two

18 bill changers" --

19    A.   Okay.  You're including the bill changers and

20 the microwaves as equipment?

21    Q.   Everything there.

22    A.   Okay.  That's five.

23    Q.   Were those installed, to your knowledge?

24    A.   Yes.

25    Q.   Were all of the 18 vending machines which are

32

ROXANN CREEN

2 specified on page 4 installed?

3    A.   Yes.

4    Q.   The Attachment 1, which follows and proceeds

5 until a page which says Total Bid Tabulation Sheet and

6 is signed by Mr. Freed, do you know if that's a true and

7 accurate copy of the bid that Mr. Freed made which is

8 maintained in your offices?

9    A.   I believe so.

10    Q.   With regard to paragraph 14 on page 3 of the

11 Detailed Specifications, it says, "The contractor agrees

12 to pay the facility 15 percent of total gross sales by

13 the 10th of the following month."  Do you see that?

14    A.   Yes, I do.

15    Q.   Did your facility take any steps to determine

16 total gross sales from the vending machines?

17    A.   We were only given what Mr. Freed provided or

18 Rockland provided, and we never had -- to my knowledge,

19 while I was there, we were not given the detailed

20 explanation.

21    Q.   So where it says, "This payment shall include

22 a detailed explanation per machine," the second sentence

23 of paragraph 14 -- do you see that language?

24    A.   Yes, I do.

25    Q.   And you're saying from January 2004 on, that

33

```
 1                    ROXANN CREEN
 2   was not done?
 3        A.    That's correct.
 4        Q.    Was it ever demanded?
 5        A.    No, it was not.
 6        Q.    Attached to the actual bid which we've just
 7   been talking about, there is a Standard Clauses For All
 8   New York State Contracts.  It's in smaller print and
 9   three pages.  Are you familiar with those provisions?
10        A.    Yes.
11        Q.    You are familiar with them?
12        A.    Vaguely.
13        Q.    If you skip a number of pages, you'll find a
14   document which says State of New York Department of
15   Correctional Services, Shawangunk Correctional Facility,
16   "This agreement is made between Shawangunk Correctional
17   Facility (facility) and the contractor."
18              MR. SCHULZE:  Where are you referring to?
19              MR. SUSSMAN:  Right there (indicating).
20        A.    Okay.
21        Q.    If you look at the second page of that, you
22   will you see a paragraph 8 which deals with
23   "Termination."  And do you see the provision, "This
24   agreement may be terminated at any time upon mutual
25   written consent of the facility and the contractor.
```

COURT REPORTING ASSOCIATES, INC.

34

```
 1                    ROXANN CREEN
 2   Also, the facility may terminate the agreement
 3   immediately upon written notice of termination to the
 4   contractor if the contractor fails to comply with the
 5   terms and conditions of this agreement..."?  Do you see
 6   that?
 7        A.    Yes, I do.
 8        Q.    Before May 11 of 2007, was this agreement ever
 9   terminated, to your knowledge?
10        A.    No.
11        Q.    Towards the end of this document, there's a
12   Table of Contents which says "July 2006" at the bottom
13   and the top right says "Appendix B."  Do you know what
14   that document is?
15        A.    It's a standard document that's attached to
16   various contracts.
17        Q.    Is that boilerplate provided by the State of
18   New York, to your knowledge?
19        A.    Yes, I believe it is.
20        Q.    And did this govern this contract, this
21   document, to your knowledge?
22        A.    Yes, it was attached and made a part of, too.
23        Q.    Please look at page 11, paragraph 60.  Do you
24   see where it says "Termination for Cause"?
25        A.    Yes.
```

COURT REPORTING ASSOCIATES, INC.

35

```
 1                    ROXANN CREEN
 2        Q.    Are you familiar with that provision?
 3        A.    No.  I would have to reread it.
 4        Q.    Had you ever read it before May 11th of 2007?
 5        A.    I don't recall.
 6        Q.    The For Cause provision says, "For a material
 7   breach that remains uncured for more than thirty (30)
 8   days or other specified period after written notice to
 9   the Contractor..."  Do you see that?
10        A.    Yes, I do.
11        Q.    Were you aware there was that provision in
12   this contract?
13              MR. SCHULZE:  Objection.
14        A.    I don't know.  I don't know if I was or not.
15        Q.    On May 11th you don't know whether you were
16   aware of that?
17        A.    I don't know if I remember reading it or not.
18        Q.    B says, For Convenience, quoting, "By written
19   notice, this contract may be terminated at any time by
20   the State for convenience upon sixty (60) days' written
21   notice or other specified period without penalty or
22   other early termination charges due."
23              Do you see that?
24        A.    Yes, I do.
25        Q.    Are you familiar with that provision?
```

COURT REPORTING ASSOCIATES, INC.

36

```
 1                    ROXANN CREEN
 2        A.    The same as the first one.
 3        Q.    Were you present at the facility on May 9,
 4   2007?
 5        A.    Yes, I was.
 6        Q.    What time did you arrive?
 7        A.    7:45.
 8        Q.    Is that your normal time of arrival?
 9        A.    Yes, it was.
10        Q.    Did there come a time when you were aware that
11   a Mr. Gallagher from Rockland Vending had arrived at the
12   facility?
13        A.    Yes.
14        Q.    Where were you when you first saw
15   Mr. Gallagher that day?
16        A.    I met him down in the entrance to the facility
17   by the visiting room.
18        Q.    Had he come through any security gates by that
19   time?
20        A.    No, he had not.
21        Q.    What did he have with him, if anything, at
22   that time?
23        A.    He had his cart to fill the machines.
24        Q.    He had his cart.  And did the cart have
25   anything on it?
```

COURT REPORTING ASSOCIATES, INC.

37

ROXANN CREEN

1
2    A.   Yes.
3    Q.   What did it have?
4    A.   It had supplies to fill the vending machines.
5    Q.   Were you and Mr. Gallagher alone then there or
6    was someone else present?
7    A.   Marjorie Gardner was present at the time.
8    Q.   Was there a conversation at that point between
9    you and Mr. Gallagher?
10   A.   Yes, there was.
11   Q.   Who initiated the conversation?
12   A.   I did.
13   Q.   And what did you say?
14   A.   I explained to Mr. Gallagher that we were
15   going to go into the visiting room and when he was
16   emptying the machines, that we were going to request
17   that he give us the money and we were going to give him
18   a receipt for the money.
19            MR. SUSSMAN:   Read back the answer.
20            (Answer read by the reporter.)
21   BY MR. SUSSMAN:
22   Q.   So this was a request; is that right?
23   A.   Yes.
24   Q.   How did he respond to your request?
25   A.   Well, I --

38

ROXANN CREEN

1
2            MR. SCHULZE:   Objection to the tone of
3    voice of that question.
4    A.   I further explained to him that the reason we
5    were --
6            MR. SUSSMAN:   Counsel, excuse me.
7    Counsel, that tone of voice was a whisper.  If you want
8    me to start yelling at this witness, I will.  Please
9    don't make any frivolous statements.
10           MR. SCHULZE:   Well, for the record, the
11   term "request" was said in a sarcastic manner.
12   BY MR. SUSSMAN:
13   Q.   How did he respond to your request?
14           MR. SCHULZE:   Same objection.
15   Q.   Go right ahead.  It's not an objection.
16   A.   I explained to Mr. Gallagher that the reason
17   we were doing this was because --
18   Q.   How did he respond to your request?  That's
19   the question that was asked of you.
20           MR. SCHULZE:   Harassing the witness.
21   Q.   That's the question asked of you.
22           MR. SCHULZE:   Harassing the witness.
23   Q.   Answer the question.
24   A.   He responded to me by saying that Mr. Freed
25   was going to be very upset, would I please call the

39

ROXANN CREEN

1
2    office and let him know what was going on.  I advised
3    him that I would call the office; however, the office
4    wasn't available until 9:00.
5    Q.   How did you know that?
6    A.   Because different times when other people had
7    called him, there was no response before 9:00.  Which he
8    also said, yes, he understood that.
9    Q.   Okay.  So he responded by asking you to call
10   Mr. Freed.
11   A.   Yes, he did.
12   Q.   And what did you do?  What did you next do?
13   A.   We proceeded into the visiting room and then I
14   started -- when he started to empty the machines, he
15   gave us the money, and we started to record how much he
16   had given us and wrote receipts per machine and signed
17   off on it.  Marjorie Gardner signed off on it and
18   Mr. Gallagher signed off on it.
19   Q.   And how long did all that take?
20   A.   Probably a little over an hour.
21   Q.   Did you have any other conversation with
22   Mr. Freed during that hour?
23           MR. SCHULZE:   Mr. Freed?
24   A.   With Mr. Freed?
25   Q.   Mr. Freed.

40

ROXANN CREEN

1
2            MR. SCHULZE:   Objection.
3    A.   No, I did not.
4    Q.   Did you have any conversation with
5    Mr. Gallagher during that hour?
6    A.   No.
7    Q.   Were you present in the visiting room during
8    that hour?
9    A.   Part of the time.
10   Q.   For how much of the hour were you present?
11   A.   Probably only ten minutes.
12   Q.   Where were you the other 50 plus minutes?
13   A.   I had to attend a department head meeting.  I
14   was acting Dep of Administration that day, and we also
15   had a civilian medical emergency that I had to go to the
16   infirmary for.
17   Q.   During the ten minutes that you say you were
18   in the visiting room, did you have any conversation with
19   Mr. Gallagher?
20   A.   No.  He just opened the machines and started
21   filling them and taking the money out.
22   Q.   So the conversation you had with Mr. Gallagher
23   that you recounted earlier was in a hallway?
24   A.   Yes, it was.
25   Q.   Once you got into the visiting room, you and

41

ROXANN CREEN

2 Mr. Gallagher had no conversation; is that right?

3    A.    I don't know there was none, but we didn't

4 really converse about anything.  He may have just again

5 asked me to call Mr. Freed.

6    Q.    You remember him asking you to call Mr. Freed

7 when you were both in the visiting room?

8    A.    No, I don't recall that, but he did definitely

9 ask that in the hallway several times.

10    Q.    And the hallway where you had the conversation

11 with Mr. Freed, where was that hallway?

12    A.    Right as you come in the facility before you

13 go through any of the locked gates.

14    Q.    Did Mr. Gallagher replenish your machines that

15 day in the visiting room?

16    A.    Yes, he did.

17    Q.    And that was to your witness?  You saw him do

18 that?

19    A.    On the first machine while I was there.

20    Q.    Do you know if he replenished any of the other

21 machines?

22    A.    I believe he did.

23    Q.    Do you have records which would show whether

24 he replenished the machines?

25    A.    No.

COURT REPORTING ASSOCIATES, INC.

42

ROXANN CREEN

2    Q.    How much money was collected from the machines

3 on the 9th from Mr. Gallagher?

4    A.    $455.

5    Q.    After the period of time spent in the visiting

6 room, where did Mr. Gallagher go?

7    A.    He went to the employee lounge.

8    Q.    Did you go with him?

9    A.    No, I did not.

10    Q.    Do you know what happened in the employee

11 lounge?

12    A.    Well, he finished replenishing the machines in

13 there and took the money out of the machines he normally

14 would take it from.

15    Q.    What did he do with that money?

16    A.    He was also given receipts for that.

17    Q.    What did he do with that money?

18    A.    He gave it over to the people who were

19 collecting the money.

20    Q.    Who was that?

21    A.    Marjorie Gardner.

22    Q.    How much money was collected from those

23 machines?

24    A.    The $455 was the total collected from all of

25 the machines that day.  The specific amount from each

COURT REPORTING ASSOCIATES, INC.

43

ROXANN CREEN

2 machine, I don't know.  I would have to look at the

3 receipts.

4    Q.    In the previous three-and-a-half years that

5 you were the steward at the facility -- and you

6 indicated earlier that Rockland Vending was three and

7 four months behind on the payments -- had you ever done

8 this before?

9    A.    No.

10    Q.    Why did you do it on this date?

11    A.    He continued to be behind in his payments, and

12 the Inmate Liaison Committee, that's the money that they

13 use for their family events -- the money that they

14 receive from Rockland Vending, the commissions from

15 machines is used for their family events, so they had

16 very little money and they were all complaining that

17 they did not get their commissions.

18    Q.    Any other reason?

19    A.    No.  They were behind in their payments.  And

20 that was the main one, that the Inmate Liaison Committee

21 had not been getting anything, and that's the money that

22 they rely on for things that they do for their families.

23    Q.    What I asked you was, were there any other

24 reasons?

25        MR. SCHULZE:  Objection.

COURT REPORTING ASSOCIATES, INC.

44

ROXANN CREEN

2    A.    No.

3    Q.    Did you clear this action with anyone else?

4    A.    Yes, I did.

5    Q.    Who did you clear it with?

6    A.    With the counsel for Department of

7 Corrections.

8    Q.    What's that individual's name?

9    A.    George Glassanos.

10    Q.    Can you spell it?

11    A.    G-L-A-S-S-A-N-O-S.

12    Q.    Where is Mr. Glassanos's office?

13    A.    Albany.

14    Q.    When did you clear this with him?

15    A.    Prior to that day.

16    Q.    When?

17    A.    It was either the Monday or Tuesday before.

18    Q.    How did you clear it with him?

19    A.    Verbally.

20    Q.    Is there any e-mail exchange about this?

21    A.    There may be.

22    Q.    You don't know?

23    A.    No, I don't know.

24    Q.    Are there any other documents concerning your

25 conversation with Mr. Glassanos that you're aware of?

COURT REPORTING ASSOCIATES, INC.

45

ROXANN CREEN

2    A.    Yes, there is.

3    Q.    What documents are there?

4    A.    There are some e-mails between himself and

5  myself and Nan Ferri.

6    Q.    What date are those e-mails?

7    A.    I don't know.

8    Q.    Were they before the incident or after?

9    A.    Both.

10   Q.    Had you conversed with Mr. Glassanos about

11 Rockland Vending before either the Monday or Tuesday in

12 question, which would be the 7th or 8th of May?

13   A.    No.   That would have been a weekend.

14   Q.    Well, at any time before that had you ever

15 spoken with him?

16   A.    No.

17   Q.    You say you had verbal contact with him and it

18 was either Monday or Tuesday.  How many contacts did you

19 have with him verbally?

20   A.    I don't recall.

21   Q.    More than one?

22   A.    I don't know.

23   Q.    Were these contacts from your office?

24   A.    Yes.

25   Q.    You called him?

---

46

ROXANN CREEN

2    A.    Yes.

3    Q.    What did you say?

4    A.    I explained to him what we had thought about

5  doing with Rockland Vending and wanted to see if it was

6  an okay thing to do or not.

7    Q.    Well, what exactly did you tell him?

8    A.    I asked --

9            MR. SCHULZE:  Just so we're clear on

10 this, we are not going to assert privilege on the

11 subject matter of these communications.

12           MR. SUSSMAN:  Right.  You told the judge

13 that the other day.  I understand.

14           MR. SCHULZE:  Go ahead.

15 BY MR. SUSSMAN:

16   Q.    Go ahead.  What did you tell him?

17   A.    Well, I explained to him that Rockland was

18 behind in their payments and we wanted to know if we

19 would be able to do what we were planning -- what

20 happened on the 9th, if we would be able to collect the

21 money from the vending machines as they were being taken

22 out.

23   Q.    Did you tell him how far behind they were?

24   A.    Yes.

25   Q.    What did you tell him?

---

47

ROXANN CREEN

2    A.    I told him they were behind from February.

3    Q.    Did he ask you any questions about what you

4  had done to collect the money?

5    A.    Yes.

6    Q.    What did you tell him?

7    A.    I had written various e-mails.

8    Q.    Did you send him the e-mails you wrote?

9    A.    I don't know if I did or not.

10   Q.    When was the last such e-mail you wrote?

11   A.    To Rockland?

12   Q.    Yes.

13   A.    Well, I remember one e-mail saying they were

14 behind February, March, and April, so it would have been

15 probably -- I don't remember when it was written, but

16 there was one stating that fact.

17   Q.    So you don't know whether that was written in

18 April or May?

19   A.    No, I don't.

20   Q.    Did you say anything else to counsel that you

21 can now recall?

22   A.    No.

23   Q.    What did he say to you?

24   A.    He told me that what we had intended to do

25 with taking the money and receipting it was okay to do.

---

48

ROXANN CREEN

2    Q.    Was that all he said?

3    A.    Yeah.

4    Q.    You mentioned an individual earlier named Nan

5  or Nanette Ferri, F-E-R-R-I.

6    A.    Yes.

7    Q.    Who is she?

8    A.    She works in Support Operations.  I believe

9  she's the Assistant Director.

10   Q.    What is Support Operations?

11   A.    It's a division of Corrections, and they

12 handle some of the big contracts and stuff for the

13 facilities.  They handle vehicles, capital equipment,

14 copier contracts.

15   Q.    Do they handle vending contracts?

16   A.    No.  Well -- no.

17   Q.    Does the division that she works for handle

18 contracts that are not handled at the facility?  Is that

19 the division of labor?

20           MR. SCHULZE:  Objection.

21   A.    The division of labor?  I'm sorry.

22   Q.    Does the division that she works for in DOCS

23 handle matters that are not handled at the facilities?

24           MR. SCHULZE:  Objection.

25   A.    She handles some of the large contracts that

49

ROXANN CREEN

1  are not handled at the facilities.

2     Q.  When did you first have contact with Ms. Ferri

3  regarding this vending contract?

4     A.  Sometime probably in 2006.

5     Q.  Can you be any more precise?

6     A.  No.

7     Q.  How was that contact initiated?

8     A.  Phone.

9     Q.  By you to her?

10    A.  Could have been the other way around.

11    Q.  Or from her to you?

12    A.  It could have been either way.

13    Q.  You don't remember?

14    A.  No, I don't.

15    Q.  Did you provide her any kind of report in

16  writing in 2006 concerning Rockland Vending?

17    A.  There was information given to her.  Whether

18  it was in writing or not, I don't know.  I would have to

19  look in my folder.

20    Q.  What was the substance of the information

21  given to her?

22    A.  Whether Rockland was behind in their payments

23  or not and when their payments were made, how late they

24  were in making their payments.

*Note: The line numbering above reflects the left column. The first numbered line (1) reads "are not handled at the facilities."*

COURT REPORTING ASSOCIATES, INC.

---

50

ROXANN CREEN

1     Q.  Did you receive any direction from Ms. Ferri

2  other than providing you certain information -- other

3  than providing her certain information?

4    A.  No.

5    Q.  Did you speak with Ms. Ferri with regard to

6  the renewal of the Rockland Vending contract in or about

7  February of 2007?

8    A.  Probably not.

9    Q.  Who is Stewart Kidder?

10    A.  He is the Director of Support Operations.

11    Q.  Is he Ms. Ferri's boss?

12    A.  Yes.

13    Q.  Did you speak with Mr. Kidder regarding

14  Rockland Vending in 2006?

15    A.  No.

16    Q.  Did you speak with him about Rockland Vending

17  in 2007?

18    A.  No.

19    Q.  Did you speak with him between May 7th,

20  Monday, and May 11th, Friday, concerning Rockland

21  Vending?

22         MR. SCHULZE:  Objection.

23    A.  I don't believe so.  Most of my conversations

24  were with Ms. Ferri and Mr. Glassanos.

COURT REPORTING ASSOCIATES, INC.

---

51

ROXANN CREEN

1     Q.  Did you speak with him at all?  I'm not asking

2  about most of your conversations.  Did you speak with

3  him?

4    A.  I don't remember.

5    Q.  Did you get approval for taking the money on

6  the 9th as you did from Mr. Kidder?

7    A.  No.

8    Q.  Did you ask him for his approval?

9    A.  No.

10    Q.  Did Mr. Glassanos indicate to you that he had

11  spoken to Mr. Kidder about this?

12    A.  He did not indicate that.

13    Q.  Between May 7th and May 11th, did you talk to

14  Ms. Ferri --

15    A.  Yes.

16    Q.  -- concerning your plan?

17    A.  Yes, I did.

18         MR. SCHULZE:  Make sure you let him

19  finish the question.  He might not be asking you what

20  you think he is.

21         THE WITNESS:  Okay.

22    Q.  When did you speak with her?

23    A.  I don't recall the exact dates or times.

24    Q.  It was the week, though, that you got the

COURT REPORTING ASSOCIATES, INC.

---

52

ROXANN CREEN

1  money from Rockland Vending?

2    A.  Yes, it was.

3    Q.  What did you tell her?

4    A.  I had also talked with her about what we

5  had -- would like to do with collecting the money from

6  Rockland, and she too said to contact George Glassanos

7  for his final approval.

8    Q.  Did she give you her approval?

9    A.  She thought it was a good idea if we were able

10  to do it.

11    Q.  Did she indicate to you she knew of any

12  precedence for doing that?

13    A.  No, she did not.

14    Q.  Did Mr. Glassanos indicate to you he knew of

15  any precedence for doing that?

16    A.  No.

17    Q.  Did you ask him whether it had ever been done

18  before?

19    A.  No, I did not.

20    Q.  And did he tell you whether it had ever been

21  done before?

22    A.  He did not.

23    Q.  When you spoke with Ms. Ferri the week of May

24  7th and before May 9th, did you indicate to Ms. Ferri

COURT REPORTING ASSOCIATES, INC.

53

ROXANN CREEN

1
2   that you had suspended the Rockland Vending contract?
3          MR. SCHULZE:  Objection.
4    A.   We had not suspended it.
5    Q.   Did you indicate to her that you had?  I
6   understand that you hadn't.  Did you indicate to her you
7   had?
8          MR. SCHULZE:  Objection.
9    A.   No.
10   Q.   Did you indicate to her you had terminated the
11  contract?
12         MR. SCHULZE:  Objection.
13   A.   No.
14   Q.   Did you discuss with her in your conversation
15  whether to suspend or terminate the contract?
16         MR. SCHULZE:  Objection.
17   A.   No.
18   Q.   And did she suggest in that conversation the
19  week of May 7th terminating or suspending the contract?
20   A.   The end of the week, after we found out that
21  Rockland wasn't going to be coming back.
22   Q.   So earlier in the week and before the incident
23  with Mr. Gallagher, you had not discussed with her
24  suspending or terminating the contract; is that
25  accurate?

COURT REPORTING ASSOCIATES, INC.

---

54

ROXANN CREEN

1
2    A.   That is correct.
3    Q.   After November of 2006 and before May of 2007,
4   do you have any recollection of conversations with
5   Ms. Ferri concerning Rockland Vending?
6    A.   I'm sure there were conversations, yes.
7    Q.   Do you know when you had any such
8   conversations?
9    A.   No, I don't.
10   Q.   Are you sure there were such conversations
11  between November and February of 2007?
12   A.   I'm sure there were.
13   Q.   What was the substance of those conversations?
14   A.   Whether or not Rockland Vending was up-to-date
15  on their payments.
16   Q.   What did you report to her?
17   A.   That they were not.
18   Q.   Did she give you any direction between
19  November of 2006 and February 2007 with regard to that?
20   A.   No, she did not.
21   Q.   Did you ask her for any direction?
22   A.   No.
23   Q.   So other than reporting that Rockland Vending
24  was not up-to-date on their contract, was anything else
25  said about Rockland Vending by you to Ms. Ferri during

COURT REPORTING ASSOCIATES, INC.

---

55

ROXANN CREEN

1
2   those conversations?
3    A.   No.
4    Q.   Do you have a recollection in February of 2007
5   receiving reports from Mr. Freed that certain product
6   being put in certain of the vending machines was missing
7   without payment?
8    A.   Yes.
9    Q.   Did you ever discuss that with Mr. Freed?
10   A.   By e-mail.
11   Q.   Did you ever discuss it talking with him?
12   A.   I don't remember that.
13   Q.   Was that issue ever resolved, to your
14  knowledge?
15   A.   I wrote back to him information that he was
16  requesting, and then I never heard any more about it.
17   Q.   Did you do any investigation of his charge
18  that the product was being taken without payment?
19   A.   Yes, I did.
20   Q.   What investigation did you do?
21   A.   I checked in the visiting room to see if
22  anyone was aware of them going in at odd hours, and
23  Mr. Freed asked for video from the visiting room, but
24  the cameras are not always running.  They do not run in
25  the visiting room unless there is a reason that they

COURT REPORTING ASSOCIATES, INC.

---

56

ROXANN CREEN

1
2   feel that there's going to be a problem in the visiting
3   room.
4    Q.   So how did you respond to his request for a
5   video?
6    A.   Just the same that I explained it; the cameras
7   are not constantly running and they're only put on when
8   there's a problem in the visiting room.
9    Q.   So were you able to ascertain in any form or
10  fashion what was happening to the produce he said he was
11  delivering and not getting paid for?
12   A.   No.
13   Q.   And did he report to you in that time period
14  that between $250 and $450 a week of product was being
15  pilfered?
16   A.   That was in his e-mails, yes.
17   Q.   And did he indicate to you for what time
18  period that was happening?
19   A.   I thought it was -- he said a couple of
20  months.  But that was the first -- I only heard the one
21  time about it.
22   Q.   You only got one e-mail about that?
23   A.   I believe so, yes.
24   Q.   Are you sure of that?
25   A.   There was e-mails back and forth, the first

COURT REPORTING ASSOCIATES, INC.

57

```
 1                    ROXANN CREEN
 2   one stating when -- how much had been taken.
 3        Q.   Did Mr. Freed report to you after the first
 4   e-mail that it was a continuing problem?
 5        A.   Yes.
 6        Q.   Between the time he first reported that and
 7   May 9th of 2007, did you and he, to your memory, ever
 8   have a discussion of that problem?
 9        A.   No.  Not that I recall.
10        Q.   Did Ms. Gardner or Ms. Davis report to you
11   that she had had a discussion of that problem with
12   anyone at Rockland Vending?
13        A.   I don't remember that.
14        Q.   Apart from that issue, did Mr. Freed make
15   requests of you to increase the price of product sold in
16   his vending machines?
17        A.   Once a year by contract they are allowed to
18   raise the prices.
19        Q.   When during the year does that time come; do
20   you know?
21        A.   I believe it's in February.  January,
22   February.
23        Q.   Is that the renewal date?
24        A.   Yes, I believe so.
25        Q.   Were the prices raised in February 2006, the
```

58

```
 1                    ROXANN CREEN
 2   first renewal?
 3        A.   Yes.
 4        Q.   How much were they raised?
 5             MR. SCHULZE:  Objection.
 6        A.   I don't remember.  It wasn't a lot.
 7        Q.   Did Mr. Freed make a proposal as to what he
 8   wanted the raise to be?
 9        A.   Yes.
10        Q.   Was that proposal accepted or rejected?
11        A.   It was accepted.
12        Q.   What about in 2007, February?
13        A.   Yes.
14        Q.   He made a proposal?
15        A.   Yes, he did.
16        Q.   And it was accepted?
17        A.   Yes.
18        Q.   According to an affidavit filed in this
19   lawsuit by Nanette Ferri on July 23, 2007, quoting, page
20   3, regarding Rockland Vending, "The contract was
21   terminated by written notice for nonpayment on May 11,
22   2007."
23             Are you familiar with that statement by
24   Ms. Ferri?
25             MR. SCHULZE:  Objection.
```

59

```
 1                    ROXANN CREEN
 2        A.   I'm not familiar with her statement.  I
 3   understand what she's talking about.
 4        Q.   Didn't you say a few minutes ago the contract
 5   was terminated because you learned Mr. Freed was not
 6   going to come and replenish Shawangunk?
 7        A.   Yes.
 8        Q.   Did you ever have a conversation with
 9   Ms. Ferri concerning the termination of the Shawangunk
10   contract with Rockland Vending?
11        A.   Yes, we talked about it.
12        Q.   When did you have that conversation?
13        A.   It would have probably been the 10th or the
14   11th when we found out Mr. Freed was not going to
15   continue to service our machines.
16        Q.   How did you find that out?
17        A.   When I spoke with him.
18        Q.   You told me earlier you spoke with him on the
19   11th?
20        A.   Yes, I did.
21        Q.   So that's when you found out?
22        A.   Yes.
23        Q.   What time of day on that date did you speak
24   with him?
25        A.   It was probably around 11:00.
```

60

```
 1                    ROXANN CREEN
 2        Q.   Were you the only participants, to your
 3   knowledge, in the conversation?
 4        A.   Yes, on my end.
 5        Q.   Did he introduce anyone else as being party to
 6   the conversation?
 7        A.   No.
 8        Q.   Was that a conversation you initiated or he
 9   initiated?
10        A.   I did.
11        Q.   What, as you recall it, was the conversation
12   you had with Mr. Freed on the 11th of May about 11:00?
13        A.   I had called him to find out that -- the 11th
14   was a normal day that they would service the vending
15   machines, and they normally came into the facility
16   between 8:00 and 9:30 to do that.  By 11:00, no one had
17   shown up to service the machines, so I inquired as to
18   whether or not he had planned to come in that day to
19   fill the machines, and he told me that they did not plan
20   to come back.
21        Q.   Is that all he said?
22        A.   I believe he told me that the drivers were
23   afraid to come back into the facility.
24        Q.   Did he say anything else?
25        A.   Not that I recall.
```

61

ROXANN CREEN

2    Q.   Did you say anything else?

3    A.   Not that I recall.

4    Q.   Had you told Mr. Freed on the 9th of May that

5 it was your intent to have whatever driver came give the

6 monies retrieved to your facility?

7            MR. SCHULZE:  Objection.

8    A.   I did not speak with Mr. Freed.

9    Q.   Did you tell Mr. Gallagher that?

10    A.   What is the question?

11    Q.   Did you tell Mr. Gallagher on the 9th that you

12 intended to take the monies retrieved from the machines

13 from the drivers in the future?

14    A.   No.

15    Q.   Never had that conversation at all?

16    A.   No.

17    Q.   Do you know whether any of your subordinates

18 had that conversation with him?

19    A.   I don't know that.

20    Q.   Did you give them a direction to tell

21 Mr. Gallagher that?

22    A.   No.

23    Q.   Was that your intention?

24    A.   No.

25    Q.   Was it your understanding as of May 11th when

62

ROXANN CREEN

2 you spoke with Mr. Freed that Mr. Freed owed you

3 approximately $1800 in commissions?

4    A.   Repeat that.

5    Q.   Was it your understanding when you spoke to

6 Mr. Freed on May 11th that Rockland Vending owed you

7 approximately $1800 in commissions?

8    A.   Yes.

9    Q.   And that was subtracting from a larger total

10 the $455 retrieved on the 9th; is that correct?

11    A.   Yes.  I'm not sure if the $1800 is accurate.

12 I'm not positive of that, but it sounds about right.

13    Q.   Well, you had no accounting; correct?

14    A.   I could only estimate by prior months.

15    Q.   By your testimony, the last month you received

16 any commission for was January, correct, before May 9th?

17 Is that right?

18    A.   Yes.

19    Q.   So you derived the $1800 from estimates made

20 since January; correct?

21    A.   Prior to January.

22    Q.   Prior to.

23            MR. SUSSMAN:  We're going to mark an

24 exhibit as 2 which is Ferri Exhibit 3, but let's just

25 mark it separately from her affidavit.

63

ROXANN CREEN

2            MR. SCHULZE:  If you're going to mark

3 that separately, do you want to take it apart first?

4            MR. SUSSMAN:  No.  We're marking as

5 Exhibit 2 a letter dated May 11, 2007, from Ms. Creen to

6 Mr. Freed.  That's what's being marked.

7            MR. SCHULZE:  I don't object to marking

8 that letter as an exhibit, but I do object to marking

9 the entire Ferri declaration as an exhibit and saying

10 you're only marking the letter.

11            MR. SUSSMAN:  No, we're not marking

12 anything other than that.  I said it was part of that.

13 I didn't say the whole thing was being marked.

14            (Creen Ex. 2 - 5/11/07 LETTER TO FREED

15            FROM CREEN marked for identification.)

16            MR. SCHULZE:  Do you have a copy?

17            MR. SUSSMAN:  No.

18 BY MR. SUSSMAN:

19    Q.   Showing you what's been marked as Exhibit 2 to

20 your deposition, did you author that document?

21    A.   Yes, I did.

22    Q.   Did you author that document before or after

23 you spoke with Mr. Freed on May 11th?

24    A.   After.

25    Q.   And you authorized that document after

64

ROXANN CREEN

2 Mr. Freed told you that he was not going to further

3 service your facility at that point?

4    A.   Yes.

5    Q.   Is there any reference to your conversation

6 with Mr. Freed in that document?

7    A.   Yes, there is.

8    Q.   Where is the reference?

9    A.   The very first paragraph, first sentence.

10    Q.   What does it say?

11    A.   "This is to confirm our conversation of

12 Friday, May 11, 2007, at approximately 10:25 a.m."

13    Q.   Is that the only reference there to your

14 conversation?

15    A.   To the conversation with Mr. Freed?

16    Q.   Yes.

17    A.   I believe so.

18    Q.   Is there any reference in your letter to

19 Mr. Freed telling you that he was not going to service

20 your facility?

21            MR. SCHULZE:  Objection.  The letter

22 speaks for itself.

23    Q.   Do you see any reference in the letter --

24 you're the author of the letter --

25    A.   Yes.

65

1                  ROXANN CREEN

2      Q.   -- to any statement by Mr. Freed that he was

3  not going to service your facility?

4                  MR. SCHULZE:  Objection.

5      A.   I don't believe so.  Just the conversation

6  with Cheryl.

7      Q.   You said, "Just the conversation with Cheryl."

8  What's that a reference to?

9      A.   It says that I spoke with Cheryl to find out

10 if she intended to stop the machines on Friday, and she

11 replied she did not know.

12     Q.   Did you have a conversation with Cheryl on

13 Friday in which she said that?

14     A.   No.  It was on Thursday the 10th.

15     Q.   There's a reference in the letter to paragraph

16 12, Termination for Cause.  You have in front of you

17 Exhibit 1.  The first page 5 of Exhibit 1, is that the

18 Termination for Cause provision you're referring to?

19     A.   Yes.

20     Q.   Did you share your letter with anyone else

21 before sending it?

22     A.   Yes, I did.

23     Q.   With whom?

24     A.   George Glassanos, the attorney.

25     Q.   What form did you share it?  By e-mail?  By

66

1                  ROXANN CREEN

2  fax?

3      A.   Fax.

4      Q.   When was that?

5      A.   On the 11th.

6                  MR. SCHULZE:  Just so you know, we're not

7  asserting privilege in this area either.

8      Q.   Did you get any response from Mr. Glassanos?

9      A.   Yes, I did.

10     Q.   Was the response verbal?

11     A.   Yes, I believe it was.

12     Q.   Was it a call he made to you?

13     A.   Yes.

14     Q.   What did he say?

15     A.   He said that he had read the letter and that

16 it was okay.

17     Q.   Anything else?

18     A.   Not that I remember.

19     Q.   Is Mr. Glassanos employed, if you know, by

20 DOCS?

21     A.   Yes.

22     Q.   Was he in Albany?

23     A.   Yes, he is.

24     Q.   Did Mr. Glassanos make any changes to your

25 letter?

67

1                  ROXANN CREEN

2      A.   I don't believe he did.

3      Q.   Did you share it with anyone other than him?

4      A.   Dep Knott, probably.

5      Q.   Do you remember doing that?

6      A.   Probably.  She is my supervisor.

7      Q.   Did you get approval from her?

8      A.   Yes.

9      Q.   Do you remember getting approval from her?

10     A.   Yes.

11     Q.   And that was on the 11th?

12     A.   Yes.

13     Q.   Did the letter go out the 11th?

14     A.   Yes.

15     Q.   Do you know how it went out?

16     A.   Certified mail, return receipt.

17     Q.   Did you receive a return receipt?

18     A.   Yes.

19                 MR. SUSSMAN:  Let's take a five-minute

20 break.

21                 (Brief recess taken.)

22 BY MR. SUSSMAN:

23     Q.   You testified you had a conversation on May

24 10th with Ms. Freed; is that right?

25     A.   Yes.

68

1                  ROXANN CREEN

2      Q.   Was that at your initiative?

3      A.   Yes.

4      Q.   Do you know what time of day that conversation

5  was?

6      A.   I want to say morning, but I'm not positive.

7      Q.   During that conversation, did Ms. Freed ask

8  you whether your policy would be to confiscate funds

9  taken by any driver coming to the facility?

10     A.   I don't recall.

11     Q.   Do you recall any discussion of that with

12 Ms. Freed?

13     A.   I really -- on my part of it, I just remember

14 asking her about if they were going to actually come in

15 on Friday to fill the machines.  That was my main

16 question.  If they were going to continue with their

17 contract.

18     Q.   And in that light, do you remember if

19 Ms. Freed asked you whether you were going to confiscate

20 the funds that the driver collected on the next date?

21     A.   I don't.

22     Q.   Do you remember if that subject was or was not

23 discussed during that conversation?

24     A.   I don't remember.

25     Q.   And by that time, had you spoken with

69

ROXANN CREEN

2  Mr. Glassanos regarding whether you would, in fact,

3  continue this policy of collecting or practice of

4  collecting from the drivers directly?

5        MR. SCHULZE:  Objection.

6     A.  I don't recall if I asked him that or not.

7     Q.  So as of the 10th, as I understand it, the

8  next day the driver was supposed to come would have been

9  the 11th; is that right?

10    A.  That's correct.

11    Q.  Did you have approval for collecting monies

12  directly from the driver on the 11th?

13    A.  No, because I didn't know if he was coming or

14  not.

15    Q.  Well, did you -- before he would come, you

16  would seek approval whether or not to collect money from

17  him; correct?

18        MR. SCHULZE:  Objection.

19    A.  I would seek approval from --

20    Q.  Mr. Glassanos or whoever you would seek

21  approval from?

22    A.  Yes, probably.

23    Q.  Had you done that?  That's all I'm asking.

24    A.  I don't recall.

25    Q.  You don't recall whether you had done that.

COURT REPORTING ASSOCIATES, INC.

70

ROXANN CREEN

2        When you spoke to Mr. Glassanos and got

3  approval the first time, did he give you approval to do

4  this once, or did he give you approval to do it as many

5  times as you wanted to, or do you not recall?

6     A.  I don't recall, but I -- I just don't recall.

7     Q.  Do you remember what you asked him for

8  approval for?

9     A.  For the first day.  I don't recall if I asked

10  him for continuation or not.

11    Q.  Did you ask him for approval to collect monies

12  up to the commissions due or commissions you thought

13  were due?

14    A.  Yes, I believe -- yes, I believe I did.

15    Q.  And is that what he approved?

16    A.  Yes.

17    Q.  So as of the 9th after Mr. Gallagher left, you

18  had ongoing approval from him, as far as you understood

19  it, to continue this practice; right?

20        MR. SCHULZE:  Objection.

21    Q.  You can answer.

22    A.  He did say we can collect up to the amount

23  that was due, so, yes, I would have to say yes.

24    Q.  And did you convey that to Ms. Freed when you

25  spoke to her on the 10th?

COURT REPORTING ASSOCIATES, INC.

71

ROXANN CREEN

2     A.  That, I don't remember.

3     Q.  Did you convey that to Mr. Gallagher when you

4  spoke to him on the 9th?

5     A.  No.

6     Q.  Did you convey that to Mr. Freed when you

7  spoke to him on the 11th?

8     A.  No, I don't believe so.

9     Q.  Do you know why you didn't convey that to

10  Mr. Gallagher?

11        MR. SCHULZE:  Objection.

12    A.  To Mr. Gallagher?

13    Q.  Yes.

14    A.  No.  I just told him that day we were

15  collecting the money from him that day.

16    Q.  Was Mr. Gallagher, to your knowledge, the

17  person who regularly serviced your facility?

18    A.  Yes, I believe he was.

19    Q.  Did Mr. Gallagher ask you whether you were

20  going to do this again subsequent days?

21    A.  I don't believe he did.

22    Q.  But from the permission that you sought from

23  Mr. Glassanos, you would agree that you intended to

24  continue to do that; is that right?

25        MR. SCHULZE:  Objection.

COURT REPORTING ASSOCIATES, INC.

72

ROXANN CREEN

2     A.  I would believe that's true.

3     Q.  Now, you told us earlier that you worked at

4  Eastern Correctional Facility, as I understand it, in

5  the period before 2000 or before 2004?

6     A.  Before 2004.

7     Q.  And is Eastern the place you had been working

8  for a number of years?

9     A.  Actually, it was for Division of Industry.  I

10  had a field office at Eastern New York Correctional

11  Facility.

12    Q.  Division of Industry is a part of DOCS?

13    A.  Yes, it is.

14    Q.  Were you involved before 2004 in the

15  purchasing matters?

16    A.  Yes.

17    Q.  Were you involved with vending machines?

18    A.  No.

19    Q.  You were not involved with vending machines at

20  all before 2004.

21    A.  That's correct.

22    Q.  Before 2004, when you were at Eastern, did you

23  have any knowledge of Mr. Freed?

24    A.  No.

25    Q.  Did you have any knowledge of Ellenville

COURT REPORTING ASSOCIATES, INC.

73

ROXANN CREEN

1
2  Vending?

3       A.   No.

4       Q.   Do you know who replaced Mr. Freed at

5  Shawangunk?

6       A.   Yes.

7       Q.   Who?

8       A.   Ellenville Vending.

9       Q.   And it's your testimony, if I understand your

10  testimony, that before then, that is before May of 2007,

11  you didn't know Ellenville Vending?

12            MR. SCHULZE:  Objection.

13       A.   That's correct.

14       Q.   How did they come into your facility in May?

15  Was that by bid?

16       A.   We had contacted several local vending

17  companies to see if they would be able to come in on an

18  emergency basis to replace the machines if Rockland was

19  not going to continue to service the machines.

20       Q.   So you had no intention to use Rockland's

21  machines; is that right?

22            MR. SCHULZE:  Objection.

23       A.   If Rockland was going to continue to service

24  the machines, they could have stayed as our vendor.

25       Q.   But if they weren't?  If they weren't going to

COURT REPORTING ASSOCIATES, INC.

---

74

ROXANN CREEN

1
2  continue to service them, you weren't going to use their

3  machines?

4       A.   That's correct, we were not going to use their

5  machines.

6       Q.   Okay.  And did Ellenville Vending come in at

7  the same prices as Rockland had?

8       A.   No, they did not.

9       Q.   What was the difference in prices?

10       A.   I don't know.

11            MR. SCHULZE:  Objection.

12       Q.   Do you remember that the difference in prices

13  were significant?

14            MR. SCHULZE:  Objection.

15       A.   They were higher.  Most of them.  I don't

16  remember what their prices were compared to Rockland's.

17       Q.   Just so I'm clear on your testimony, the first

18  contact you say you had with Ellenville Vending was when

19  they responded to the outreach you made for someone to

20  replace Rockland; is that accurate?

21       A.   Yes.

22       Q.   Now, with regard to Mr. Kidder, just let me

23  make sure I understand your testimony.  As you sit here

24  today, do you have any memory of speaking directly with

25  Mr. Kidder about Rockland Vending at any time before

COURT REPORTING ASSOCIATES, INC.

---

75

ROXANN CREEN

1
2  this lawsuit was filed?

3       A.   Before the lawsuit is filed?  Yes, I had

4  spoken to Mr. Kidder.

5       Q.   Okay.  When did you speak to Mr. Kidder about

6  Rockland Vending?

7       A.   I don't believe I know the exact dates of

8  that.

9       Q.   What month?

10       A.   Probably in May.

11       Q.   Was it after the incident with Mr. Gallagher

12  or before?

13       A.   I believe it was after.

14       Q.   At whose initiative was the conversation?

15       A.   I don't recall.

16       Q.   What was the conversation?

17       A.   I don't recall that either.  Most of the time

18  I spoke with Nan Ferri.

19       Q.   I'm not asking you about Ms. Ferri; I'm asking

20  you about Mr. Kidder.

21       A.   I understand that.

22       Q.   So what conversation did you and he have about

23  this matter?

24       A.   I don't recall.

25       Q.   You don't recall any of it?

COURT REPORTING ASSOCIATES, INC.

---

76

ROXANN CREEN

1
2       A.   No, I don't.

3       Q.   And as far as you remember, May of 2007 is the

4  first month you spoke to him about Rockland Vending from

5  the time you took over as Institutional Steward in

6  January of '04; is that accurate?

7       A.   I believe so.

8       Q.   And it's your testimony, as I understand it --

9  and, again, I just want to make sure I'm not misstating

10  your testimony or am unclear on it -- that between May

11  7th and May 9th, you did advise Ms. Ferri of your desire

12  to take the funds directly from the machine when the

13  driver came?

14       A.   Yes.

15       Q.   And it's your testimony she did say that was

16  okay?

17            MR. SCHULZE:  Objection.

18       A.   She told me to contact Mr. Glassanos for final

19  approval.

20       Q.   You're using the word "final approval" which

21  you used before.  She said it was okay but she wanted

22  you to contact him for final approval; is that fair?

23            MR. SCHULZE:  Objection.

24       A.   She said that I needed to contact

25  Mr. Glassanos.  She did not say one way or the other.

COURT REPORTING ASSOCIATES, INC.

77

```
 1                    ROXANN CREEN
 2      Q.   She didn't say one way or the other.  Okay.
 3   Did you ask her whether this had ever been done before?
 4      A.   No.
 5      Q.   Did she tell you whether it had ever been done
 6   before?
 7      A.   No.
 8      Q.   Had you ever done this before?
 9      A.   No.
10      Q.   Do you administer other contracts?
11      A.   Yes.
12      Q.   Or just vending?
13      A.   No, any contracts with our facility.
14      Q.   Do all of the contracts that you administer
15   have the same boilerplate language we looked at with
16   regard to termination?
17                    MR. SCHULZE:  Objection.
18      A.   Yes, I would believe that.
19      Q.   Have you ever been involved in terminating one
20   of those contracts before?
21      A.   No.
22      Q.   Have you ever been involved in dealing with
23   nonperformance of a contract before?
24      A.   No.
25      Q.   Before this incident, had you ever been
```

COURT REPORTING ASSOCIATES, INC.

78

```
 1                    ROXANN CREEN
 2   involved -- and by "this incident," I mean your dealings
 3   with Rockland Vending -- had you ever been involved in
 4   the period 2004 to 2007 with any form of nonperformance
 5   on a contract?
 6      A.   No.
 7      Q.   This is the first incident?
 8      A.   Yes.
 9                    MR. SUSSMAN:  Okay.  Thank you for being
10   here.
11                    MR. SCHULZE:  I have, I think, just two
12   or three questions.
13   EXAMINATION BY MR. SCHULZE:
14      Q.   After you left the visiting room on May 9th,
15   did you attempt to call Rockland?
16      A.   Yes, I did.
17      Q.   What time was that?
18      A.   That was shortly after 9.
19      Q.   Was that before or after the meeting you
20   referred to?
21      A.   It was after the meeting.
22      Q.   I refer you to Creen Exhibit 1 and
23   specifically to Appendix A entitled Standard Clauses for
24   all New York State Contracts.  Was this Appendix A part
25   of your contract with Rockland Vending?
```

COURT REPORTING ASSOCIATES, INC.

79

```
 1                    ROXANN CREEN
 2      A.   Yes, it would have been.
 3      Q.   And is this a standard clause in all the
 4   vending contracts in New York State, to your knowledge?
 5                    MR. SUSSMAN:  Objection to the form.
 6      A.   Yes.
 7                    MR. SCHULZE:  That's all I've got.
 8   EXAMINATION BY MR. SUSSMAN:
 9      Q.   When you answered the last question, is this a
10   standard contract, what provision are you referring to?
11      A.   The Appendix A.
12                    MR. SUSSMAN:  Thank you.  Nothing
13   further.
14                    (At 11:48 a.m., the examination of this
15                    witness was concluded.)
16                    * * * * *
17
18
19
20
21
22
23
24
25
```

COURT REPORTING ASSOCIATES, INC.

80

```
 1                    ROXANN CREEN
 2                    J U R A T
 3
 4   STATE OF          )
 5   COUNTY OF         )
 6            I, _____, have read the foregoing
 7   record of my testimony taken at the time and place noted in
 8   the heading hereof and do hereby acknowledge: (Check one)
 9
10            (  )  That it is a true and correct transcript
11                  of same
12
13            (  )  With the exceptions noted in the attached
14                  errata sheet, it is a true and correct
15                  transcript of same
16
17                  _____
                          ROXANN CREEN
18   Subscribed and sworn to before me
19   this _____ day of _____, 200__.
20   _____
21                    Notary Public
22   My commission expires: _____.
23
24
25
```

COURT REPORTING ASSOCIATES, INC.

81

```
1                   ROXANN CREEN
2            E R R A T A   S H E E T
3    Please note any errors or corrections on this sheet.
4    Indicate a reason for any change or correction.
5    PAGE \ LINE \ CHANGE \ REASON
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24
25              _____
                      ROXANN CREEN
```

COURT REPORTING ASSOCIATES, INC.

82

```
1                   ROXANN CREEN
2
3               C E R T I F I C A T E
4
5
6         I, GAIL M. SHERRY, a Certified Realtime Reporter,
7    and Notary Public within and for the State of New York, do
8    hereby certify:
9         That the witness whose deposition is hereinbefore
10   set forth was duly sworn by me and that the within
11   transcript is a true and accurate record to the best of my
12   knowledge and ability.
13        I further certify that I am not related to any of
14   the parties to this action by blood or marriage and that I
15   am in no way interested in the outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto set my hand.
17
18                          _____
19                          Gail M. Sherry, CRR, RMR
20
21
22
23
24
25
```

COURT REPORTING ASSOCIATES, INC.

83

```
1                   ROXANN CREEN
2
3               INDEX TO EXAMINATION
4
     EXAMINATION BY MR. SUSSMAN            4    7
5
     EXAMINATION BY MR. SCHULZE           78   13
6
     EXAMINATION BY MR. SUSSMAN           79    8
7
8
9          EXHIBITS MARKED FOR IDENTIFICATION
10
     Creen Ex. 1 - DOCS INVITATION FOR BIDS   24    4
11   marked for identification.
12   Creen Ex. 2 - 5/11/07 LETTER TO FREED    63   14
     FROM CREEN marked for identification.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

COURT REPORTING ASSOCIATES, INC.