---

2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------
ROCKLAND VENDING CORP.,

        Plaintiff,

        -against-                    07-CIV-6268
                                     (WP)(MPF)
ROXANNE CREEN,
    sued in her individual capacity,
MARSHA F. RILEY,
    sued in her individual capacity,
STEWART KIDDER,
    sued in his individual capacity,

        Defendants.
------------------------------------------------
```

STENOGRAPHIC MINUTES OF EXAMINATION BEFORE TRIAL conducted of GEORGE GLASSANOS on the 23rd day of January, 2008, at the offices of the New York State Attorney General, State Capitol, Albany, New York, commencing at 12:56 p.m.; before SADIE L. HERBERT, a Shorthand Reporter and Notary Public within and for the State of New York.

ORIGINAL

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

---

APPEARANCES:

ON BEHALF OF PLAINTIFF:

   SUSSMAN & WATKINS

   PO Box 1005

   Goshen, New York 10924

   BY: MICHAEL SUSSMAN, ESQ.


ON BEHALF OF DEFENDANTS:

   OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

   120 Broadway

   New York, New York 10271

   BY: DANIEL SCHULZE, ESQ.
       Assistant Attorney General


ALSO PRESENT:

   MICHAEL FREED, Plaintiff

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

---

3

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the attorneys for the respective parties hereto that the signing and filing of the Notary's Oath be waived; that the examination be conducted before Sadie L. Herbert, a Shorthand Reporter and Notary Public in and for the State of New York; that the filing of the transcript of testimony in the Office of the Clerk of the Court be waived; that the examining party will furnish the examined party one copy of the transcript of testimony as taken without cost or charge; that all objections to questions, except as to the form thereof, are specifically reserved to the time of trial; and that the transcript of testimony may be signed before any Notary Public or other officer authorized to administer oaths.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

---

4

George Glassanos

GEORGE GLASSANOS,
   (first duly sworn by the Notary Public, was examined and testified as follows:)

EXAMINATION

BY MR. SUSSMAN:

Q. Good afternoon, Mr. Glassanos.

A. Good afternoon.

Q. Is that the correct pronunciation?

A. Yes, that is correct.

Q. I'm Mike Sussman from Goshen, New York, and I represent Mr. Freed, Mr. Gallagher, Rockland Vending in this federal case which is now pending in the Southern District and has been so pending for about eight or nine months.

   By agreement, we're here taking your deposition, understanding that you are counsel, perhaps deputy counsel at DOCS. And normally, information that you have might be attorney-client privilege, but due to conversations we previously had with the Court and with Counsel, I am here to ask you some questions concerning those contacts.

   If during the course of the day, however long this takes, we have questions, we may have to call the Court to get rulings. I don't want to have to bring

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

*George Glassanos*

1     you back. I'm not entirely sure of the parameters of
2     the exception of the attorney-client privilege which
3     we've agreed upon, since there's no real documentation
4     of that. So if issues come up that you at least feel
5     are without what you understand to be the parameters,
6     you'll have to let us know, Mr. Schulze know, and we
7     can determine how to proceed.
8         Otherwise, it's a normal deposition, meaning that
9     I'll ask you a simple question and a single question,
10    please understand and answer the question. If you
11    don't understand the question, indicate that and I'll
12    ask you a question that hopefully you will understand.
13    If you don't know an answer, like any other witness,
14    indicate you don't know or don't recall, and don't
15    speculate or guess. If you do know an answer, whoever
16    it helps or hurts, provide the answer. And if you
17    need a break at any time, please indicate that and
18    we'll take a break. Okay?
19 A. Very good.
20 Q. And you know to answer questions in a verbal manner as
21    opposed to gesticulating, gesturing or other more
22    informal means?
23 A. Mm-hmm.
24 Q. Have you ever had a deposition of yours taken before?

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

*George Glassanos*

1 A. Once.
2 Q. How many years ago?
3 A. 20.
4 Q. Have you ever taken a deposition of another person?
5 A. No.
6 Q. What is your current job title?
7 A. I beg your pardon?
8 Q. What is your current job title?
9 A. Deputy Counsel.
10 Q. Are you the only deputy counsel?
11 A. No, there are two.
12 Q. Who do you report to as of May of 2007?
13 A. The General Counsel.
14 Q. Whose name was?
15 A. Anthony Annucci, A-N-N-U-C-C-I, Deputy Commissioner
16    and Counsel, that's his full title.
17 Q. How long have you worked for DOCS?
18 A. Since March 1981.
19 Q. When did you graduate law school?
20 A. 1976.
21 Q. Did you work for another State agency between '76 and
22    '81?
23 A. No.
24 Q. And you've worked continuously for DOCS since 1981?

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

7

*George Glassanos*

1 A. Correct.
2 Q. And always in the General Counsel's Office?
3 A. Yes.
4 Q. And in Albany?
5 A. Yes.
6 Q. In that 26 year period, between '81 and '07, had you
7    ever before given an opinion with regard to self-help
8    by a facility?
9        MR. SCHULZE: You can answer yes or no.
10 A. I don't believe I've given advice, but I've had
11    discussions.
12 Q. So the answer is no, you've never given an opinion to
13    a facility?
14 A. That's correct.
15 Q. Okay. That was the question.
16 A. That's correct.
17 Q. There's a document which has previously been marked,
18    Invitation to Bids for Vending Machine Services, as
19    Exhibit 1 to a deposition a number of months ago. Can
20    you yourself identify that document as a document
21    you've seen and read before today?
22        MR. SCHULZE: We're referring to Creen
23    Exhibit 1.
24        MR. SUSSMAN: Right.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

8

*George Glassanos*

1        THE WITNESS: I beg your pardon?
2        MR. SCHULZE: I'm just identifying the
3    document for the record as Creen Exhibit 1.
4 A. I don't recall seeing it, but I may have been shown
5    it, but I don't recall it.
6 Q. It's a lengthy document, did you play -- and you can
7    look at it if you need to, I'm not trying to rush
8    you -- the question is: Did you play any part in
9    composing any of that?
10 A. No.
11 Q. Do you have any knowledge of who composed the
12    Invitation to Bid?
13 A. No.
14 Q. Do you know whether it was done in the Counsel's
15    Office?
16 A. I don't know that.
17 Q. Would you take a look, please, to facilitate this,
18    would you take a look -- I'm showing you Appendix A,
19    Standard Clauses for all New York State Contracts,
20    that's an appendix which is part of Creen 1. Have you
21    ever seen those pages before today, to your knowledge?
22 A. I'm quite sure that I have because I think that I've
23    seen every reissue of the Standard State Clauses from
24    1981 when I started work with Correctional Services to

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

George Glassanos

1 the present time. This one is dated November, 2000,
2 so I would guess, yes.
3 Q. Did you read that document over in 2007 with regard to
4 this controversy?
5 A. I read the current version of this document, of
6 Appendix A.
7 Q. And when did you do that?
8 A. Probably 20 times in the entire calendar year in
9 connection with other contractual matters.
10 Q. So you would consider yourself fully familiar with
11 that appendix?
12 A. I'm familiar with it.
13 Q. Did any part of that -- did you discuss any part of
14 that appendix with Stew Kidder in May of 2007?
15 A. I might have.
16 Q. Well, do you remember doing so? That's the question.
17 A. No I don't. No, I don't.
18 Q. Might have is a speculation. If you sit here and
19 remember, please tell me. If you don't know, you can
20 say you don't know.
21 A. I don't know.
22 Q. Did you read any document signed by Mr. Freed in May
23 of 2007, to your recollection?
24 A. Yes.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795   1-877 NYS DEPO

George Glassanos

1 Q. What did you read in May?
2 A. I believe I read letters.
3 Q. Anything other than letters signed by Mr. Freed? Did
4 you read any contracts he signed?
5 A. I don't think so.
6 Q. Were you provided at any time, to your recollection,
7 with any contracts that Mr. Freed signed?
8 A. What's the question?
9 Q. Were you provided in May of 2007 by anyone from DOCS
10 with any contracts that Freed signed?
11 A. I don't recall.
12 Q. You don't recall that happening?
13 A. I don't recall that happening.
14 Q. When was the first time, if ever, that you spoke
15 directly with Roxann Creen concerning Rockland
16 Vending?
17 A. I can't give you a date, sir.
18 Q. Okay. Do you have any records which would allow you
19 to indicate when it was?
20     MR. SCHULZE: Were you done with your
21 answer?
22     THE WITNESS: I beg your pardon?
23     MR. SCHULZE: Were you done with your
24 answer?

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795   1-877 NYS DEPO

11

George Glassanos

1     THE WITNESS: Well, no, I actually wasn't.
2     MR. SCHULZE: Please finish your answer.
3     THE WITNESS: But I know that it was prior
4 to the conversation that I had with her on the
5 telephone when I did advise her that she could
6 exercise the State's right of set-off in view of
7 the circumstances.
8     MR. SUSSMAN: Read back the answer, please.
9     THE WITNESS: I just don't know the date.
10     (The requested testimony was read back by
11 the Court Reporter.)
12 BY MR. SUSSMAN:
13 Q. How many conversations that you can remember did you
14 have with Ms. Creen before she took the money from the
15 Rockland Vending machines on May 9th?
16 A. I don't have a specific recollection of how many
17 conversations.
18 Q. Do you know if it was more than two?
19 A. I believe it was.
20 Q. And this is directly with Ms. Creen?
21 A. Yes.
22 Q. Was anyone else party to any of those conversations?
23 A. Not that I'm aware of.
24 Q. Did you ever speak with Ms. Ferri concerning --

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795   1-877 NYS DEPO

12

George Glassanos

1 A. Nan Ferri?
2 Q. Nan Ferri.
3 A. Yes.
4 Q. Did you speak with her concerning Ms. Creen's proposal
5 to take money from the vending machine?
6 A. Well, no.
7 Q. Did you ever speak --
8 A. But the reason is, it wasn't her proposal.
9 Q. Whose proposal was it?
10 A. It was my proposal.
11 Q. You are the one that came up with the idea?
12 A. Yes.
13 Q. When did you come up with the idea?
14 A. At some point in my conversations with Roxann Creen
15 and Nan Ferri.
16 Q. Do you have a recollection of Nan Ferri and Stew
17 Kidder calling you on any occasion?
18 A. Yes, I do.
19 Q. And do you recall them calling you and asking you
20 whether Ms. Creen could take the money from the
21 vending machine?
22 A. I don't have a specific recollection of that.
23 Q. Let's go --
24 A. But I do know that I discussed set-off with Nan Ferri.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795   1-877 NYS DEPO

14

*George Glassanos*

1  Q. Hold on. Let's go back. Tell us, even if you don't
2     remember the dates, to your best current recollection,
3     the sequence of contacts you had telephonically, the
4     ones you can remember, obviously --
5  A. Okay.
6  Q. -- with regards to this issue, starting from the
7     beginning.
8  A. It's going to be --
9        MR. SCHULZE: Objection.
10 A. -- general.
11 Q. Well, tell us the best you can.
12 A. And it might not be in the exact chronological order.
13 Q. The best you can.
14 A. But I'm very sure of the substance of the
15    conversations I had.
16 Q. Well, let's start with the first one you remember, who
17    it was with, what was said.
18 A. I believe I got a call from Nan Ferri and that she was
19    concerned about the stocking of vending machines by
20    Rockland that didn't conform to the, I'm going to call
21    it, the deposit or the bottle law.
22       MR. SCHULZE: Just for the record here.
23       MR. SUSSMAN: You should not be interrupting
24    Mr. Schulze. He's giving an answer.

*George Glassanos*

1        MR. SCHULZE: Do you want to excuse him for
2     a minute?
3        MR. SUSSMAN: He's in the middle of an
4     answer. I don't know what you possibly could be
5     doing to interrupt in the middle of an answer.
6        MR. SCHULZE: Do you want to excuse the
7     witness or not? Yes or no?
8        MR. SUSSMAN: I think we better call the
9     judge, because you are not going to be able to do
10    this. This is not appropriate. Let's just call
11    the judge and get an order from the judge.
12       MR. SCHULZE: No. Then I'm going to make my
13    statement.
14       MR. SUSSMAN: You are not going to make a
15    statement.
16       MR. SCHULZE: I'm going to make a statement.
17       MR. SUSSMAN: No, I'm going to call the
18    judge before you make a statement. I don't think
19    you are allowed to make a statement during the
20    middle of an answer. I'm sorry.
21       MR. SCHULZE: You don't even know what I am
22    going to say.
23       MR. SUSSMAN: You are not allowed to
24    interrupt during a witness' state- -- testimony.

15

*George Glassanos*

1        MR. SCHULZE: For the record, we are
2     asserting an advice of counsel defense in this
3     case. I'm going to allow Mr. Glassanos to give
4     this testimony as long as Mr. Sussman does not
5     contend that this testimony itself expands the
6     scope of waiver. Now, do you have any problem
7     with that?
8        MR. SUSSMAN: Yes, I do. No statements --
9     I'm not going to discuss anything. I'm asking
10    him a question, okay. The question is on the
11    table, he's giving his answer.
12       MR. SCHULZE: I'm going to direct him not to
13    answer unless you agree to that.
14       MR. SUSSMAN: Agree to what?
15       MR. SCHULZE: I'm saying, if you agree that
16    the answer itself does not expand the scope of
17    waiver, I'm going to allow it so we can get in
18    and out of here faster.
19       MR. SUSSMAN: I don't know what you mean by
20    "expand the scope of waiver". Would you like to
21    explain?
22       MR. SCHULZE: Would you like to excuse the
23    witness?
24       MR. SUSSMAN: Go ahead, sir, go outside.

16

*George Glassanos*

1        THE WITNESS: Okay.
2        MR. SUSSMAN: Mr. Freed, go outside also.
3     Put this on the record, though, whatever is said.
4     Go ahead.
5        MR. SCHULZE: The only thing I'm getting at
6     here is the scope of subject matter waiver is
7     vague, the opinions about it are vague. What I
8     am saying is, I'm going to allow you to inquire
9     into things like these prior conversations with
10    Nan, as long as you don't later contend, then, we
11    have waived privilege in another area.
12       MR. SUSSMAN: That's fine. I'm only
13    inquiring as to this area, his contacts with
14    Rockland Vending.
15       MR. SCHULZE: That's fine. That's fine,
16    then.
17 BY MR. SUSSMAN:
18 Q. Sir, at a deference to you, what we're going to do is
19    we're going to have the last question where I asked
20    you about telling me the chronology of your
21    contacts --
22 A. Okay.
23 Q. -- I'm going to have that question reread, and I'm
24    going to have what you said so far reread.

George Glassanos

1  A.  Okay.
2  Q.  And then you can pick up, sir, at that point and give
3      me the rest of your answer to the best of your
4      ability.
5  A.  Okay.
6           (The requested testimony was read back by
7      the Court Reporter.)
8  Q.  Pick up from that. Did you hear that?
9  A.  Yes, yes.
10 Q.  Go ahead, sir.
11 A.  Well, I believe I got a call from Nan Ferri, and I
12     believe that she was concerned with -- one of the
13     facilities was reporting that the Rockland Vending
14     Company representative must be stocking products that
15     don't conform to the New York State Bottle Law because
16     people who are purchasing from the machine are getting
17     these cans and bottles, whatever they are, without
18     that type of labeling.
19 Q.  Okay.
20 A.  And there was a concern about that.
21 Q.  When was that? What month?
22 A.  I don't know.
23 Q.  Do you have any way of knowing?
24 A.  The only way that I can place it is that it all

George Glassanos

1      predates the discussion of Rockland's omission to pay
2      commissions when due.
3  Q.  What's the next conversation you remember? Did you
4      give any -- strike that.
5           Did you give any advice with regard to the bottle
6      law issue?
7  A.  No.
8  Q.  What was the next conversation you remember about
9      Rockland with some other employee at DOCS, whether at
10     a facility or the central office?
11 A.  You are changing your question. You don't want me to
12     go chronologically?
13 Q.  I'm asking you: What's the next? That means
14     chronologically.
15 A.  Well, it wasn't with an employee or a facility or
16     anyone.
17 Q.  Who was it with?
18 A.  A representative from the Department of Environmental
19     Conservation, which is the agency within State
20     government that enforces that law, at least one of
21     them.
22 Q.  You had a conversation with them, do you know what
23     month that was?
24 A.  No, I don't.

19

George Glassanos

1  Q.  What was the upshot of that conversation?
2  A.  There were probably at least four or five return calls
3      from the DEC representative, whose name I don't
4      recall, and probably three or four from me. And it
5      was all concentrated on establishing some type of an
6      intercept. When Rockland was in the process of
7      delivering, the DEC, Department of Environmental
8      Conservation, wanted to surveil the products that were
9      being loaded into the machines.
10 Q.  Did you arrange that?
11 A.  No.
12 Q.  Why not?
13 A.  I tried to.
14 Q.  Who did you try to arrange it with?
15 A.  The DEC representative that I spoke with.
16 Q.  Did you try to arrange it at any of the facilities?
17 A.  Well, that was the logical place for that to occur,
18     that's what the DEC representative wanted to know,
19     what are your delivery dates and where.
20 Q.  Did you ascertain that?
21 A.  Not really because he said I will get back to you.
22 Q.  So the upshot of it was he'd get back to you?
23 A.  Kind of.
24 Q.  What's the next contact you had regarding Rockland

20

George Glassanos

1      Vending?
2  A.  I think Nan Ferri at some point after that mentioned,
3      oh, and by the way, a lot of the facilities that
4      Rockland has contracts with are reporting that they're
5      not receiving the commissions that they were promised
6      under the contract. And it didn't seem to be like a
7      trifling matter; it seemed to be substantial, as far
8      as dollar amounts, and it seemed to be substantial, as
9      far as the longevity of the failure to pay
10     commissions.
11 Q.  Well, apart from what is seemed to be, what did she
12     say, to your best current recollection?
13 A.  That's exactly what she said in sum and substance.
14     Those were the subjects. It's not sporadic, and it's
15     not insubstantial, and it's widespread.
16 Q.  Did she ask you for assistance?
17 A.  She, I'm quite sure, asked, what can we do.
18 Q.  You have a distinct memory of this?
19 A.  I do.
20 Q.  And these are in phone calls?
21 A.  Yes.
22 Q.  How many such calls did you have concerning the
23     general issue of Rockland Vending omitting to pay
24     timely commissions to a number of facilities?

21

23

*George Glassanos*

1  A.  From start till today?
2  Q.  No, at that point, how many conversations did you and
3      Ferri have?
4          MR. SCHULZE: Objection.
5  A.  At what point is tough. If you give me, like, a
6      period of time.
7  Q.  Well, when did they start? What month did the
8      conversations start?
9  A.  I don't know, sir. All I know is that it preceded my
10     giving specific advice to Roxann Creen that you were
11     well within your rights to have the driver count out
12     the money that was in the change box, sit down with
13     him or her, give a receipt, tell the person that you
14     are going to credit Rockland's account and get a
15     signature on it, and that if the person didn't feel
16     comfortable about doing that, let the person know that
17     they would not be allowed to restock the machine, but
18     they had to leave.
19 Q.  What was the time frame, was it weeks or months,
20     between when you first talked to Nan Ferri about
21     Rockland not making payments and when you spoke to
22     Ms. Creen?
23 A.  I would say not more than a month. Maybe -- I don't
24     know -- four to six weeks. That's a tough guess, I'm

*George Glassanos*

1      I received calls from the facility where Roxann was
2      employed.
3  Q.  What facility is that?
4  A.  I think that's Shawangunk. I'm not positive.
5  Q.  Who called you from Shawangunk?
6  A.  Oh, I think Roxann.
7  Q.  And who called you from Fishkill in that period?
8  A.  I don't know. I don't know the person's name.
9  Q.  Is it a man or woman?
10 A.  Don't know that either, and I may have also had a
11     conversation with someone in one of our New York
12     facilities. And I know that I tried to make a phone
13     call to an organization in New York who I was told,
14     kind of through the grapevine, was having a similar
15     type of a situation with Rockland.
16 Q.  That's not a DOCS facility?
17 A.  No.
18 Q.  Okay.
19 A.  I think it was a City -- it was the City of New York
20     or a school district in New York. They also, I think,
21     had terminated Rockland for failure to pay
22     commissions, and I think --
23         MR. SUSSMAN: Move to strike. It's not
24     responsive to the question.

24

*George Glassanos*

1          MR. SCHULZE: Go ahead and finish your
2      answer.
3  A.  -- was barred from doing business.
4  Q.  That's not a DOCS facility; is that right?
5  A.  No, it's not.
6  Q.  Are you hearing my questions?
7  A.  I am.
8  Q.  You are, okay, very good.
9          MR. SCHULZE: Objection, harassing the
10     witness.
11 Q.  Now, with regard to Ms. Creen, when is the first time
12     Ms. Creen talked to you about Mr. Freed and his
13     company?
14 A.  I don't know the dates, sir.
15 Q.  Was it before the call from Ms. Ferri?
16 A.  No, it was after. Nann's call was about the bottle
17     law.
18 Q.  And then you said after that there was a call from Nan
19     about the general issue, by the way, there's a general
20     problem?
21 A.  Yeah. And it might have been my call to her. I don't
22     really know. There's a lot of back and forth.
23 Q.  So there was a lot of back and forth about this before
24     the --

25

*George Glassanos*

1  A.  Multiple calls per day. Sometimes days would go by
2      and there wouldn't be any, any phone call.
3  Q.  Okay.
4  A.  It wasn't just like a one time event. It was, we have
5      a situation, we don't know exactly what to do, we're
6      trying to do a -- take a reasonable course, and they
7      want to be in contact with me throughout.
8  Q.  Take a look at Exhibit 1, please.
9  A.  Yes.
10 Q.  Are you familiar with that e-mail?
11 A.  There are a few of them.
12 Q.  Are you familiar with all of them?
13 A.  Yes.
14 Q.  Had you had conversations with Ms. Creen before
15     May 8th of 2007 about Rockland Vending?
16 A.  Why do you ask about May 8th? This looks like it's a
17     May 9 --
18 Q.  Did you have conversations before May 8th with
19     Ms. Creen about Rockland Vending?
20 A.  I'm quite sure, provided that it's a fact that this is
21     a May 9th document, and I'm not sure that it is. I
22     can't tell if this -- the date this was printed or the
23     date it was transmitted.
24 Q.  When did Ms. Creen take the funds from Rockland

26

*George Glassanos*

```
 1      Vending, do you know?
 2  A.  No.
 3  Q.  Before she took the funds from Rockland Vending, how
 4      many days or weeks had you been in touch with her
 5      about her concerns about Rockland Vending?
 6          MR. SCHULZE: Objection.
 7  A.  Four weeks, minimum.
 8  Q.  And about how many conversations had you had with
 9      Ms. Creen during those four weeks?
10  A.  Somewhere between 8 and 17, 8 and 20.
11  Q.  How many conversations had you had in that period of
12      time with Ms. Ferri regarding the same issues,
13      Rockland Vending?
14  A.  Many.
15  Q.  Same number, roughly?
16  A.  No. Sometimes as many as four a day. Probably 20 to
17      30.
18  Q.  What about Mr. Kidder?
19  A.  I don't believe I spoke to Mr. Kidder more than once
20      or twice.
21  Q.  When was that in the sequence of events?
22  A.  It would have been somewhere between what I described
23      as the four to six week period.
24  Q.  What was your conversation with Mr. Kidder as you
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

27

*George Glassanos*

```
 1      recall it?
 2  A.  I think he was actually sharing the phone with Nan
 3      Ferri and I was speaking to Nan and Stew -- either Nan
 4      wanted Stew Kidder to participate, because I think she
 5      reports to him --
 6  Q.  What was the substance of the conversation?
 7          MR. SCHULZE: You need to let him finish his
 8      answers.
 9  Q.  What was the substance of the conversation?
10          MR. SCHULZE: Please finish your answer, and
11      then you can ask a question.
12          MR. SUSSMAN: That was the initial question.
13  A.  I think my conversation was with Nan, but she wanted
14      Stew to hear so that he would know firsthand from the
15      Legal Division what we were proposing to do, how we
16      were trying to handle this.
17  Q.  What was the substance of your conversation with him?
18  A.  It was with Nan Ferri, and it was about self-help.
19  Q.  What was said?
20  A.  I think, I'm quite sure, that I told Nan that it's
21      certainly possible that when the Rockland
22      representative comes to restock the machine, in view
23      of the amount of commissions that haven't been paid,
24      that maybe we'll sit down with the Rockland
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

28

*George Glassanos*

```
 1      representative, count out the change on a table, our
 2      representative and Rockland's representative would
 3      agree on the amount, the Rockland representative would
 4      be given a receipt to take back to his or her employer
 5      and he or she would be told that Rockland's account
 6      would be credited with the amount of money that the
 7      corrections official kept, and that that money would
 8      be deposited either in the State's General Fund, or
 9      wherever you deposit commission payments.
10  Q.  And that proposal came from you?
11  A.  That came from me.
12  Q.  Not from the facility?
13  A.  No.
14  Q.  And that came from you in response to complaints from
15      both Nan and the facility that Rockland was not
16      paying?
17  A.  Yes. It was one of the things that was considered.
18  Q.  Did you ever put this proposal in writing?
19  A.  I don't recall.
20  Q.  Did you ever put the proposal in an e-mail?
21  A.  I don't recall. I took the e-mail to be in writing,
22      one in the same.
23  Q.  All right.
24  A.  I would guess that I did. I don't know how I could
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

29

*George Glassanos*

```
 1      have talked about it without it, but I don't have a
 2      specific recollection.
 3  Q.  You've mentioned the words "set-off"?
 4  A.  Yes.
 5  Q.  What does "set-off" mean?
 6  A.  Set-off is described in the document you showed me.
 7  Q.  Where is it described there?
 8  A.  Paragraph 9.
 9          MR. SCHULZE: The witness is referring to
10      Creen Exhibit 1.
11  Q.  Can you find what you are referring to.
12  A.  There's a document entitled Appendix A that's attached
13      to exhibit --
14  Q.  Do you have it? Did you find it?
15  A.  Yeah.
16  Q.  Okay.
17  A.  It's entitled, "Set-Off Rights". But this was
18      actually the second basis for the actions that were
19      taken. The first was just a common law notion of
20      self-help.
21  Q.  What's that?
22  A.  Self-help.
23  Q.  What is the common law notion of self-help, sir?
24  A.  As I understand it, it's kind of calm, low level
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

George Glassanos

30

1 assertion of your legal rights while maintaining the
2 public peace.
3 Q. And what basis do you have for that statement?
4     MR. SCHULZE: Objection.
5 A. Common law, notion of self-help.
6 Q. Have you ever employed self-help yourself?
7     MR. SCHULZE: Objection.
8 A. I think that I have.
9 Q. Have you ever advised the Department to employ
10 self-help previously?
11 A. I think I have advised the representatives in the
12 Department many, many times over the years that
13 self-help is an alternative, mostly in low level types
14 of transaction.
15 Q. Can you remember any other examples?
16     MR. SCHULZE: Objection. I'm going to have
17     to instruct him not to answer that.
18     MR. SUSSMAN: All I asked him is can he
19     remember any other examples. I haven't asked him
20     for the examples.
21     MR. SCHULZE: You can answer yes or no.
22 A. Yeah, I do.
23 Q. You do?
24 A. I don't remember specifics, but I remember generally.

George Glassanos

31

1 Q. And do they involve third parties, like Rockland
2 Vending Company?
3 A. Yeah, almost always vendor.
4 Q. So there's a pattern in history of the Department, to
5 your knowledge, of employing self-help with vendors?
6     MR. SCHULZE: Objection.
7 A. No.
8 Q. To your knowledge?
9 A. No.
10 Q. Has self-help ever been employed, to your knowledge,
11 as a factual matter in the Department before?
12 A. Yes.
13 Q. When?
14 A. Somewhere between 1997 and maybe 2000.
15 Q. And who are the parties?
16 A. There were probably two or three parties. One was
17 probably CMS, I think it's Correctional Medical
18 Services. I think another one is PHS, Prison Health
19 Services. And there was a third, but I don't recall
20 the name.
21 Q. What was the self-help employed with respect to CMS?
22 A. The state had a contract with this CMS company.
23 Generally, it was for the provision of what they
24 called managed care. The State contracts with a third

George Glassanos

32

1 party to screen inmates for necessary medical health,
2 and the Department has an obligation under this
3 particular contract to pay a stated sum at the
4 beginning of each and every month for the period of
5 the contract.
6 Q. Who has that obligation --
7 A. The State.
8 Q. -- the State?
9 A. It became apparent to the people who were the contract
10 administrators for this service that the managed care
11 entity, the CMS --
12 Q. CMS?
13 A. -- entity wasn't paying the bills that were being
14 submitted by the health care providers with the money
15 that we gave them at the beginning of each month. So
16 we exercised self-help by stopping the payments that
17 would be automatically transmitted on the first of
18 every month, until we got an accounting from the
19 provider, the managed care provider and until we had
20 some type of, kind of, a confirming statement from the
21 physicians and hospitals which provided the care, but
22 which weren't getting paid.
23 Q. Did you provide notice to CMS before you did?
24 A. Yes.

George Glassanos

33

1 Q. What was the form of your notice?
2 A. I think we had conversations. I'm not positive
3 because it was a higher level type of transaction.
4 Q. So you provided, someone provided some notice to CMS
5 to what effect?
6 A. That we were aware from all of the parties that were
7 complaining that they weren't being paid that
8 something seemed to be seriously wrong.
9 Q. Did you provide notice the checks were going to be
10 stopped?
11 A. We discussed it.
12 Q. With CMS representatives?
13 A. Yeah, yeah. We wanted to work out some type of a
14 solution.
15 Q. And you weren't able to, and then you stopped the
16 checks?
17 A. I actually don't know how it all ended.
18 Q. Do you know if the checks were ever stopped?
19 A. I know that we stopped making these payments.
20 Q. And does that fall squarely within the language of 9,
21 Set-Off Rights?
22     MR. SCHULZE: Objection. Go ahead.
23 A. I don't know, we were following the lead that the
24 State Comptroller provided.

34

George Glassanos

1  Q. Okay.
2  A. Because it was very, very concerned. We're not
3     talking about a few thousand dollars; we're talking
4     quite a bit more.
5  Q. PHS, what was the circumstances, to your knowledge, if
6     you have knowledge, with regard to PHS?
7  A. I think it was the same, the same. And probably
8     exactly the same with the third company whose name I
9     just don't recall. But the State is regionalized as
10    far as the delivery of health care services, and every
11    region would advertise for the service and make an
12    award, just as we regionalize for lots of services and
13    goods.
14 Q. If you would look at -- you've mentioned Paragraph 9
15    of Appendix A, so would you take a look at that,
16    please.
17 A. Okay. I have it.
18 Q. It says, "The State shall have all of its common law
19    equitable and statutory rights of set-off." Do you
20    see that?
21 A. Yes, I do.
22 Q. And do you know what set-off means in that context?
23         MR. SCHULZE: Objection.
24 A. Just in that one sentence --

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

35

George Glassanos

1  Q. That sentence.
2  A. -- not knowing anything more, no, I couldn't tell you.
3     I couldn't guess -- I mean, I could guess --
4  Q. Let me ask you this.
5  A. But the first sentence doesn't disclose everything.
6  Q. Well, let me ask you this: The notion of a set-off,
7     does that mean, if you know, that you have a just debt
8     to me, I owe you something and because you have a just
9     debt to me, I subtract from what I'm going to give to
10    you whatever you owe me?
11 A. Mm-hmm.
12 Q. Is that set-off to your understanding?
13 A. Sounds right.
14 Q. It says, "These rights shall include, but not be
15    limited to, the State's option to withhold for the
16    purposes of set-off, any monies due to the contract or
17    under this contract up to any amounts due and owing to
18    the State with regard to this contract." Do you see
19    that?
20 A. Yes.
21 Q. And the vending machines in question here, were those
22    Rockland vending machines? Did they own the vending
23    machines?
24 A. I don't know.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

36

George Glassanos

1  Q. You don't know who owned them?
2  A. I don't know if they were leased or owned.
3  Q. Were they the State's vending machines?
4  A. I do not believe so.
5  Q. Did anyone represent to you that the State had any
6     proprietary right to the vending machines?
7         MR. SCHULZE: Objection.
8  A. No.
9  Q. And there was money in the vending machines; is that
10    right?
11        MR. SCHULZE: Objection.
12 A. I don't know.
13 Q. Well, it was represented to you --
14 A. I was told.
15 Q. -- that there was money in the vending machines;
16    right?
17 A. That's correct.
18 Q. Whose money was that?
19        MR. SCHULZE: Objection.
20 Q. You can answer.
21 A. That's the question.
22 Q. Whose money was it?
23        MR. SCHULZE: Objection.
24 A. A lot of it, probably most of it or all of it,

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

37

George Glassanos

1     probably ten times over, was owed to the State of New
2     York.
3  Q. It may have been owed to other people; right?
4         MR. SCHULZE: Objection.
5         MR. SUSSMAN: Excuse me.
6  A. No.
7  Q. Let's say Rockland Vending was doing a business and
8     they got money from vending machines and they owed a
9     supplier or they owed an accountant or they owed any
10    one of a number of people, don't they have a right to
11    that money as well?
12        MR. SCHULZE: Objection.
13 Q. You can answer.
14 A. They have a right to be paid according to their
15    contract with your client just as the State does.
16 Q. Does the State have a --
17 A. I can't say that that particular money can be
18    identified to Mr. Freed's contract with National Grid.
19 Q. Does the State have a superior right to that money
20    than any of the people I just referenced?
21        MR. SCHULZE: Objection.
22 A. I would probably guess yes.
23 Q. Why?
24 A. Because we're in possession.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

**Page 40**

George Glassanos

1  they could take monies out of a machine which was the
2  sole -- solely owned by that company?
3  A. I misunderstood your question. I thought you were
4  talking about contracts in general.
5  Q. Not contracts in general.
6  A. No, I believe that this particular facility was the
7  first. Others seemed to be interested once they found
8  out.
9  Q. You had conversations with other facilities about what
10 happened at Shawangunk?
11 A. Yes.
12 Q. And you told them about what had happened at
13 Shawangunk?
14 A. Yes.
15 Q. And you advised that they follow the same course?
16 A. No, I didn't.
17 Q. Why not?
18 A. We never got to that stage.
19 Q. Didn't you advise Ms. Ferri to recommend to other
20 facilities to follow the same course?
21 A. No, I did not.
22 Q. You never did that?
23 A. No.
24    Each facility has a different situation, and each

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

**Page 39**

George Glassanos

1  one would have to be looked at. The key factors that
2  I was considering were the amount of the arrearages
3  and commissions, the longevity of the history of
4  nonpayment and to try and get a feel for whether the
5  Rockland people were willing to bring their accounts
6  current or whether they were just so financially
7  strapped that there was no possible way they could do
8  it -- it could do it.
9  Q. What factual information did you have on any of those
10 points?
11    MR. SCHULZE: Objection.
12 A. As far as the longevity of the problem and the amount
13 of the arrearage?
14 Q. Yes.
15 A. Just what I was told.
16 Q. What were you told?
17 A. I don't recall, but I do remember suggesting to Nan
18 Ferri that she solicit from the business offices of
19 all effected institutions a status report so that we
20 would have a handle on how widespread the problem was,
21 how long it had been going on and to try and get a fix
22 on how much money totally is owed to the State.
23 Q. And after you suggested that, did you get a report
24 back from Ms. Ferri with that information?

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

**Page 41**

George Glassanos

1  A. I believe Nan got it.
2  Q. Did you get it, was the question.
3  A. I think I got a summary or I got the entire thing in
4  the form of an e-mail. I'm not positive.
5  Q. What was the content of whatever you got back?
6  A. My recollection is that there were probably a dozen or
7  so facilities that had contracts with the Rockland
8  Vending Company and that it seemed like at least
9  seven, eight or nine had difficulties in receiving
10 commission payments and that the total, total might
11 have been as high as about $22,000, and it might have
12 gone on for almost a year at some facilities, just a
13 couple of months with other facilities. It was a
14 whole range.
15 Q. And this you got all from Nan Ferri?
16 A. I believe so.
17 Q. In an e-mail?
18 A. It could have been over a telephone and in e-mail, but
19 I have seen the summary.
20 Q. Look at Exhibit 11.
21 A. Yes.
22 Q. Is that the document that, to your knowledge, was
23 generated from your suggestion?
24    MR. SCHULZE: Objection.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

**Page 42**

George Glassanos

1  A. No.
2  Q. You just testified, sir, that you made a suggestion to
3  Nan Ferri that she survey all the facilities to
4  determine their status with regard to the vending
5  machine contract. Do you remember saying that?
6  A. Yes.
7  Q. And is this document the document which makes that
8  request of all the facilities on March 7th?
9     MR. SCHULZE: Objection.
10 A. Yes.
11 Q. And was this done at your direction?
12    MR. SCHULZE: Objection.
13 A. Yes.
14 Q. Thank you.
15    So as of March 7th, 2007, you were involved with
16 this situation; is that correct?
17    MR. SCHULZE: Objection.
18 A. That would be, because I remember asking Nan, this is
19 what you need to do to get a grip on what's going on.
20 Q. And after this, you saw some sort of summarization,
21 before you rendered your legal advice, you saw some
22 sort of summarization prepared by Ms. Ferri
23 aggregating the issues from the various facilities?
24 A. Yes.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

43   44

*George Glassanos*

1  Q. And that was in writing?
2  A. I believe it was in the form of an e-mail.
3         MR. SUSSMAN: (REQUEST) Please produce that,
4     Counsel.
5         MR. SCHULZE: I don't know what we're
6     talking about yet. I think there's some
7     confusion.
8         MR. SUSSMAN: We have a witness who is
9     testifying under oath. I've asked you to please
10    produce the document he's referring to, sir.
11        MR. SCHULZE: Do you want to excuse the
12    witness?
13        MR. SUSSMAN: No, I do not want to excuse
14    the witness.
15        MR. SCHULZE: I'll take it under
16    advisement --
17        MR. SUSSMAN: Thank you.
18        MR. SCHULZE: -- but I think there's some
19    confusion.
20 Q. Look at Exhibit 18, please.
21 A. (Witness complies.)
22 Q. There's an e-mail at the bottom, you can read both,
23    but I'm going to ask you about the one at the bottom.
24 A. Okay. (Witness complies.)

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

*George Glassanos*

1     Okay.
2  Q. Did you write that e-mail at the bottom?
3  A. Yes.
4  Q. And that was your advice?
5  A. It's what I wrote.
6  Q. Was that implemented?
7  A. What do you mean when you say, was it implemented?
8  Q. Here, let me read a part, I'll ask you a question more
9     directly, sir.
10 A. All right.
11 Q. "If two or more facilities deal with Rockland and
12    Rockland is current with some but in breach with
13    others, the one who are paid in full may still deduct
14    what is owed to the other or others as was done this
15    morning at Roxann's facility." Was that implemented?
16 A. I don't believe that it was.
17 Q. Do you know why it wasn't?
18 A. No.
19 Q. Why did you give that advice?
20 A. Because I believe it to be true.
21 Q. Were you asked for it by anyone?
22 A. I'm trying to develop the full breadth of what I
23    consider to be the State's right of self-help under
24    the common law and also under a provision of the

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

45

*George Glassanos*

1     contract.
2  Q. Okay.
3  A. I think I even went so far as to say that if a vendor
4     had a contract with a sister agency, the provisions in
5     Appendix A would even allow that sister agency to
6     assist a sister agency in deducting --
7  Q. I think you did say that, that's another e-mail.
8     Ms. Creen testified as follows under oath: "Had
9     you conversed with Mr. Glassanos about Rockland
10    Vending before either the Monday or Tuesday in
11    question, which would be the 7th or 8th of May?
12    Answer: "No, that would have been a weekend."
13    You told us earlier that you think you had 8 to
14    13 conversations with this woman before the self-help
15    was executed. Do you still believe that?
16        MR. SCHULZE: Objection.
17 A. I do.
18 Q. You said that you originated the idea of the
19    self-help. Ms. Creen said the following under oath at
20    her deposition, which was held on November 15th, in
21    reference to the contact she had with you on May 8th:
22    "What did you say?"
23    "I explained to him what we had thought about
24    doing with Rockland Vending and wanted to see if it

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

46

*George Glassanos*

1     was an okay thing to do or not."
2     Do you recall that conversation?
3        MR. SCHULZE: Objection.
4  A. I don't have a specific recollection of it, but it
5     sounds like something that might have been said.
6  Q. It might have been said that she called you and asked
7     you whether she could take the money out of the
8     machines, not that you initiated the idea?
9        MR. SCHULZE: Objection.
10 A. I'm not sure about that.
11 Q. You were pretty sure a few minutes ago that it was
12    your idea, so do you remember saying that?
13       MR. SCHULZE: Objection, harassing the
14    witness.
15       MR. SUSSMAN: It's not harassing.
16 Q. Yes, go ahead.
17       MR. SCHULZE: Objection, harassing the
18    witness.
19 A. I believe it was my idea.
20 Q. Do you know if it was your idea, sitting here today?
21       MR. SCHULZE: Objection.
22 A. I believe it was.
23 Q. Do you know? You are under oath. Do you know if it
24    was? I am not asking you about what you believe.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

47

*George Glassanos*

```
1         MR. SCHULZE: Objection, harassing the
2      witness. Don't bother answering.
3  Q.  I'm not asking about what you believe. I'm asking
4      about what you know.
5         Do you know if it was your idea?
6         MR. SCHULZE: Objection, asked and answered.
7      Harassing the witness.
8  A.  I can't tell what was in Roxann's mind.
9  Q.  I'm asking about expression between the two of you,
10     not what was in her mind.
11        She said she called and asked you whether it was
12     okay to do that, that it was her idea, she called and
13     asked you if it was okay; is that what happened?
14        MR. SCHULZE: Objection, asked and answered,
15     harassing the witness, assuming facts not in
16     evidence.
17        MR. SUSSMAN: What are you talking about?
18 Q.  Please answer the question.
19 A.  I believe I advised her it was within the State's
20     right to exercise self-help, and that, in addition,
21     that there was a provision in the contract, and I'm
22     specifically referring to the set-off paragraph in
23     Appendix A, that also buttressed that type of an
24     action.
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795   1-877 NYS DEPO*

48

*George Glassanos*

```
1  Q.  The self-help provision in Appendix A, Counsel, has
2      nothing to do with it, does it?
3         MR. SCHULZE: Objection.
4  A.  The what? The self-help provision --
5  Q.  You are an attorney; right?
6  A.  The self-help provision is the common law. The
7      set-off is the contractual provision.
8  Q.  Set-off has nothing to do with this problem, does it?
9         MR. SCHULZE: Objection.
10        MR. SUSSMAN: Your objection is noted.
11        MR. SCHULZE: That directly contradicts his
12     earlier testimony.
13        MR. SUSSMAN: I'm allowed to press a witness
14     at a deposition, Mr. Schulze. I don't know what
15     depositions you have ever been in.
16        MR. SCHULZE: He answers the question, you
17     ask him again and you ask him to give him the
18     opposite answer.
19        MR. SUSSMAN: I'm allowed to ask him
20     whether, as an attorney, he acknowledges sitting
21     here today that Paragraph 9, which has to do with
22     set-off, has absolutely nothing to do with this
23     situation.
24 Q.  Do you acknowledge that or not?
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795   1-877 NYS DEPO*

49

*George Glassanos*

```
1         MR. SCHULZE: Objection.
2  A.  No, I don't.
3  Q.  You do not?
4         MR. SCHULZE: Asked and answered, harassing
5      the witness and grossly improper, Counsel.
6  Q.  Have you consulted with any other attorney with regard
7      to your interpretation of Paragraph 9?
8         MR. SCHULZE: You can answer yes or no.
9         THE WITNESS: I have to take that. It's for
10     my wife.
11        MR. SUSSMAN: Go right ahead.
12        (A break was taken in the proceedings.)
13 BY MR. SUSSMAN:
14 Q.  You said you had conferred or had not conferred with
15     any other attorney concerning that interpretation of
16     the paragraph?
17 A.  I actually answered that yes.
18 Q.  You had conferred?
19 A.  Yes.
20 Q.  And before you gave the advice or after?
21 A.  No. After.
22 Q.  Now, just so we go back to a document that we went
23     over earlier, this document, it's actually Defendant's
24     0001, I think it was previously shown to you as
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795   1-877 NYS DEPO*

50

*George Glassanos*

```
1      Exhibit 11. Did you see that document -- here's
2      Exhibit 11 (proffering) -- did you see that document
3      before it went out?
4  A.  I don't know for certain.
5  Q.  Is it familiar to you?
6  A.  The content is familiar with me because it sounds like
7      something I would have told Nan to do.
8  Q.  And did you write it, or do you not know if you wrote
9      it?
10 A.  No, I didn't write it.
11 Q.  You didn't write it?
12 A.  But I think I probably, over the telephone, listed the
13     things that she has written here.
14 Q.  The e-mail report that you testified to earlier that
15     you saw back summarizing the results of this
16     inquiry --
17 A.  (Witness nods.)
18 Q.  -- did you have that in your possession before you
19     gave the advice regarding self-help?
20 A.  I don't recall.
21 Q.  You don't know when you got it?
22 A.  No, I don't.
23 Q.  Do you know who you got if from?
24 A.  I believe I got it from Nan Ferri.
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795   1-877 NYS DEPO*

52

*George Glassanos*

```
 1  Q.  At any time, sir, did you advise Ms. Creen to notify
 2      Mr. Freed or his company that you intended to employ
 3      self-help?
 4          MR. SCHULZE:  Objection.
 5  A.  I don't believe so.
 6  Q.  Did you ever advise Mr. Kidder or Ms. Ferri to so
 7      advise Ms. Creen, that notice should be provided to
 8      the company that the State intended to do whatever it
 9      did?
10  A.  Yes.
11  Q.  What did you say with regard to that?
12  A.  Upon the arrival of the representative for what was
13      described to me as a routine restocking trip, that's
14      when I suggested that she disclose to the driver what
15      our intentions were.  And if he agreed, let's just go
16      do it, take an accounting, exchange receipts --
17  Q.  And if he didn't agree?
18  A.  Then he would leave.  He didn't have to submit to
19      that.
20  Q.  And that's what you advised?
21  A.  Yes.
22  Q.  Do you know if that was followed, that advice?
23  A.  I believe that it was.
24  Q.  What's the basis for that belief?
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

*George Glassanos*

```
 1  A.  I think it's an e-mail that I read this morning, which
 2      I have read on prior occasions, authored by Roxann
 3      recounting everything that happened, which is
 4      something that I think I solicited from her, tell me
 5      in writing what happened.
 6          MR. SUSSMAN:  Let's take about a two minute
 7      break.  I want to talk to Mr. Freed.
 8          (A break was taken in the proceedings.)
 9          (Plaintiff's Exhibit 23 was marked for
10      identification.)
11  BY MR. SUSSMAN:
12  Q.  We've marked as Exhibit 23 this document, it's an
13      e-mail.  Tell me if you have seen that account of the
14      event before today.
15          THE WITNESS:  Do you want to see this?
16          MR. SCHULZE:  I'll just look over your
17      shoulder.
18          THE WITNESS:  It's from Roxann.
19  A.  Okay.
20  Q.  Have you seen that document before today?
21  A.  Yes, I have.
22  Q.  Keep it in front of you, please.
23      The document says, in part, "On Wednesday,
24      May 9th, 2007, I met the Rockland Vending filler at
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

53

*George Glassanos*

```
 1      the front door at 8:00 a.m."  Do you see that?
 2  A.  Yes.
 3  Q.  It says, "I escorted him to his first area of fill,
 4      the inmate visit room."  Do you see that?
 5  A.  Yes, I do.
 6  Q.  Do you know whether the inmate visit room is behind
 7      any locked doors or gates?
 8  A.  I have never been to this inmate visit room, assuming
 9      that this is Shawangunk, but I've been to many, many
10      others and they're certainly behind security gates.
11  Q.  Do you have any knowledge as to how many security
12      gates the filler would have had to pass with Ms. Creen
13      before he got to the inmate visit room at Shawangunk?
14  A.  No.
15  Q.  It then goes on, quoting, "I explained to him that
16      Rockland was behind"; do you see that?
17  A.  Yes, I do.
18  Q.  Had you advised that that explanation be given before
19      the filler went into the facility?
20          MR. SCHULZE:  Objection.
21  A.  I don't think that I made my instructions that
22      precise, but what I did say was, upon arrival, inform
23      the driver that this is what we're going to do.
24  Q.  What did you mean, though?  What I'm asking you, sir,
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

---

54

*George Glassanos*

```
 1      is, what did you mean by, quote, "upon arrival", close
 2      quote?
 3          MR. SCHULZE:  Objection.
 4  A.  When I use a word, it means what I intend it to mean,
 5      nothing more, nothing less.
 6  Q.  Well, did it mean at the point --
 7  A.  Upon arrival, Mr. Sussman, I don't know.
 8  Q.  Does it mean at the point you get into the inmate
 9      visit room and are behind several --
10  A.  I --
11  Q.  -- locked gates and doors --
12  A.  I didn't --
13  Q.  -- is that what it means?
14          MR. SCHULZE:  Objection.
15  A.  I didn't specify that.  I just said upon arrival.
16  Q.  Thank you.
17          MR. SCHULZE:  You need to let him ask his
18      question, even if you know where he is going.
19          And objection, harassing the witness.
20  Q.  Did you believe that notification to the driver when
21      he arrived at the facility and was behind several
22      locked or closed doors and gates was notice to
23      Rockland --
24          MR. SCHULZE:  Objection.
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

55

*George Glassanos*

```
1   Q.   -- of the State's intent to engage in self-help?
2        MR. SCHULZE: Objection.
3   A.   It certainly is notice.  The person was supposed to be
4        advised that he or she could leave just by indicating
5        that he or she wanted to leave.
6   Q.   Is there any indication in Exhibit 23 that the person
7        was notified that he or she could leave?
8        MR. SCHULZE: Objection.
9   Q.   That's the report that was provided to you by
10       Ms. Creen.
11  A.   Not here.  But I have read something elsewhere where
12       it seemed like everything went smoothly, that the
13       person was not disturbed --
14       MR. SUSSMAN: Move to strike as
15       nonresponsive.
16  A.   -- and that they counted out the money.
17       MR. SCHULZE: Objection.  This is
18       directly --
19       MR. SUSSMAN: Move to strike.
20       There's a very specific question.  I am not
21       letting him finish anything.
22       MR. SCHULZE: You are not letting him finish
23       his answer.
24       MR. SUSSMAN: He's not responding to the
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

56

*George Glassanos*

```
1        question, Counsel.
2        MR. SCHULZE: I move to terminate the
3        deposition.
4        MR. SUSSMAN: He's not responding.
5        MR. SCHULZE: I move to terminate the
6        deposition.
7        MR. SUSSMAN: You can move to do whatever
8        you want to do.  Do you want to --
9        MR. SCHULZE: We're walking out unless you
10       let him answer --
11       MR. SUSSMAN: He's going to answer the
12       question asked, Counsel, not the question he
13       wants to.
14       MR. SCHULZE: I'm instructing the witness --
15       MR. SUSSMAN: The question -- make sure he
16       knows the question.
17       You can instruct whatever you like.
18       MR. SCHULZE: I'm instructing the witness to
19       finish what he was saying no matter what counsel
20       on the other side is --
21  BY MR. SUSSMAN:
22  Q.   Mr. Glassanos, you are an English speaker, you are a
23       distinguished attorney, the question was very simple:
24       Is there any indication in the document that I've
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

57

*George Glassanos*

```
1        shown you, which is a report, that this gentleman was
2        told he could leave?  That's the only question.
3        MR. SCHULZE: Objection.
4   A.   I'm going to read it.
5   Q.   Read it, please.
6        MR. SCHULZE: Objection, harassing the
7        witness.  If you don't drop the condescending
8        tone, we are walking out.
9        MR. SUSSMAN: Mr. Schulze, I don't need for
10       you to lecture me.  Your objections are
11       frivolous.  No one is harassing anyone.  I am
12       asking the gentleman a specific question to which
13       he needs to answer.  That's the issue.  Let's
14       proceed.
15       MR. SCHULZE: You think noting the --
16       MR. SUSSMAN: You think nothing.  I'm not
17       thinking anything.  I'm asking him specific
18       questions.  Let him answer.
19       MR. SCHULZE: Do you think asking the
20       witness whether he is an English speaker is a
21       proper question?
22       MR. SUSSMAN: I didn't ask him.  I said, he
23       is an English speaker, he can answer the
24       question.
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

58

*George Glassanos*

```
1        MR. SCHULZE: You think stating that in your
2        question is proper?
3        MR. SUSSMAN: I think it's proper if there's
4        a nonresponsiveness shown, which there has been
5        repeatedly.
6   A.   To me, it suggests that the driver knew he or she had
7        a choice.
8   Q.   Where does it say that?
9   A.   "I told him that I would do that", and that's a
10       reference to letting him call his company to find out
11       what his directions were, or if they knew what we had
12       advised the driver.
13  Q.   The driver asked to call, as you understand it,
14       himself?
15       MR. SCHULZE: Objection.
16  A.   Could you repeat that.
17  Q.   Did the driver, to your understanding of the event,
18       ask to make a phone call --
19       MR. SCHULZE: Objection.
20  Q.   -- to Rockland Vending?
21  A.   I have no way of knowing.  I'm just reading the
22       account that was given here.
23  Q.   And the account that you were given, as you understood
24       the account, did the driver himself ask to contact
```

*AMF REPORTING/CRITCHER VIDEO*
*(518) 452-1795    1-877 NYS DEPO*

59

*George Glassanos*

1   Rockland Vending?
2       MR. SCHULZE: Objection.
3   A.  I can only read back what it says. The drive- -- it's
4       pure, this is a reference to the driver, "requested
5       that I" -- Roxann, the author of this e-mail
6       ostensibly -- "call and let them" -- Rockland, the
7       employer -- "know what we were doing. I told them
8       that I would do that."
9   Q.  Was that done?
10  A.  I don't know that.
11  Q.  Were you advised at any time during the period of
12      March 7th to May 8th or 9th that Rockland Vending
13      contended that various product was being pilfered or
14      stolen from its machines at Shawangunk?
15  A.  I heard that at some point.
16  Q.  Did you hear it in the period I specified?
17  A.  I would say it would have to be within that period. I
18      don't have a specific recollection.
19  Q.  Who did you hear it from?
20  A.  I don't recall.
21  Q.  What did you hear in that regard?
22  A.  Just what you said, that Rockland was reporting that
23      they thought their machines were being pilfered.
24  Q.  You are laughing; did you find that funny when you

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

60

*George Glassanos*

1       heard it?
2       MR. SCHULZE: Objection, harassing the
3       witness.
4   A.  I didn't find it funny, but it seemed to be very
5       consistent with all the other accounts that our
6       business reps had had with Mr. Freed and another
7       representative from his office.
8   Q.  Who was that?
9   A.  I don't know, but I think it was a woman, and it might
10      have been the woman that's described there as Cheryl.
11  Q.  How long had Rockland Vending been working for the
12      State by 2007 on these contracts?
13  A.  I have no idea.
14  Q.  Was it a year?
15  A.  I have no idea.
16  Q.  Was it more than a year?
17  A.  I have no idea.
18  Q.  Did you ever find that out?
19  A.  I have no idea.
20  Q.  You mentioned earlier that one of the things that you
21      considered was the longevity of the issue?
22  A.  Yes.
23  Q.  So in that context, when you say you have no idea, did
24      you know that Rockland Vending had been doing business

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

61

*George Glassanos*

1       with the State since early 2001?
2   A.  No.
3   Q.  Did you make any inquiry as to how long they had been
4       doing business with the State?
5   A.  No.
6   Q.  And no one so advised you?
7   A.  Someone may have told me. I don't recall it. I was
8       mostly concerned about what was going on right now.
9   Q.  Take a look, please, at Exhibit 1, particularly the
10      directed e-mail to you, which says, starting,
11      "Mr. Glassanos, this is to follow up..."
12  A.  Okay.
13  Q.  Does reviewing this document refresh your recollection
14      that on May 8th you had a conversation with Stew
15      Kidder and Nan Ferri regarding Rockland Vending?
16      MR. SCHULZE: You shouldn't write on the
17      exhibit.
18      THE WITNESS: Do not write?
19      MR. SCHULZE: If you have something you want
20      to say about it, go ahead.
21      THE WITNESS: This is what I was referring
22      to (indicating).
23      MR. SCHULZE: The sentence the witness is
24      pointing to right now is: "He had no problem

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

62

*George Glassanos*

1       with our collection of the money."
2       THE WITNESS: That's what I was referring to
3       before.
4       Now, I lost your question because I wanted
5       to read this.
6   BY MR. SUSSMAN:
7   Q.  Does this refresh your recollection that on 8, May,
8       2007 you had a conversation with Stew Kidder and Nan
9       Ferri regarding Rockland Vending?
10  A.  I believe it's true. I don't have any independent
11      recollection that that's what happened.
12  Q.  How long was the conversation?
13  A.  I don't know.
14  Q.  Was it a minute or two?
15  A.  I don't know.
16  Q.  Was that the first conversation you had with Ms. Ferri
17      and Mr. Kidder regarding any issue with Rockland
18      Vending being behind on commissions?
19  A.  I don't think so.
20  Q.  Can you testify under oath whether it was or not, or
21      don't you know?
22  A.  I don't know.
23  Q.  So it might have been?
24  A.  No, definitely couldn't have been.

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795    1-877 NYS DEPO

64

*George Glassanos*

1  Q. So you know it wasn't?
2  A. I'm pretty sure it wasn't, just by the date. This is
3     way, way into the transaction. I'm pretty sure I had
4     conversations with those people much earlier. You've
5     shown me a document that seems to show that this
6     started in March of 2007, which surprised me. I
7     thought it was closer to April or May.
8  Q. The statement which is written here, you said
9     something about this -- you pointed to something to
10    your counsel here, and I'm not sure what you pointed
11    to and why you pointed to it. This was dated May 8th,
12    the day before the event --
13 A. Yeah, in the one, two -- in the third full paragraph
14    from the top, disregarding the inside addresses and
15    all that stuff, the third line down begins with the
16    words, "he had no problem", and I was referring to
17    that sentence and commenting to my attorney that I
18    think this suggests that the representative knew that
19    he or she had a choice and could have left at any time
20    whether they were behind one locked door or two locked
21    doors.
22       MR. SCHULZE: Just so the record is clear,
23    the witness had taken my pen and was about to
24    write on the exhibit. I told him not to write on

65

*George Glassanos*

1     the exhibit, and he pointed to that sentence, so
2     I read it out loud for opposing counsel.
3  Q. Focusing, sir, on the e-mail that I am asking you
4     about, which is not the e-mail that you referred to.
5     This first e-mail here, which says, "Mr. Glassanos",
6     as I indicated in my first question; do you see that
7     e-mail? That's one e-mail; do you see that, what I'm
8     pointing to?
9  A. Yeah. Yes, I do.
10 Q. Okay. And with regard to that e-mail, do you have a
11    recollection of a conversation with Ms. Ferri,
12    Mr. Kidder and Ms. Creen and you, all four of you, in
13    which you discussed the strategy which is related in
14    that e-mail?
15 A. I don't have a specific recollection of that, but I
16    know that at some point or other, prior to the actual
17    occurrence, I spoke with every single one of them and
18    probably more than once. But I don't think it was
19    just the four of us on the same phone call just once.
20 Q. So this is an e-mail from Roxann Creen, it's to you --
21    see the line, original author, Roxann Creen? Do you
22    see that?
23 A. Mm-hmm.
24 Q. And it starts off, "Mr. Glassanos, this is to

65

*George Glassanos*

1     follow-up today's conversation with Stew Kidder and
2     Nan Ferri regarding Rockland Vending." Do you see
3     that?
4  A. Yes, I do.
5  Q. Was Ms. Creen part of that conversation which she's
6     reporting about?
7  A. It's hard to tell.
8  Q. You don't remember?
9  A. Not only do I not remember, but I wouldn't draw that
10    conclusion from that statement either.
11 Q. The question for you as a witness is: Do you remember
12    that phone conversation?
13 A. No.
14    MR. SCHULZE: Objection.
15 Q. Did you have any other information about Rockland
16    Vending before this phone conversation than what's
17    related in this paragraph?
18 A. Is this document the same as the one that's in front
19    of me?
20 Q. That e-mail is the same.
21 A. Okay.
22 Q. That e-mail. I'm looking at that e-mail.
23    MR. SCHULZE: We've got to refer to the
24    exhibit, unless you want to mark something else.

66

*George Glassanos*

1  Q. I'm referring to the e-mail specifically, in May of
2     2007.
3  A. Could you ask the question again because I am a little
4     confused.
5  Q. Did you have any other information about Rockland
6     vending on May 8th or as of May 8th than is referred
7     to in this e-mail?
8     MR. SCHULZE: Objection.
9  A. I must have.
10    MR. FREED: Can I confer with you when you
11    get a sec.
12    MR. SUSSMAN: No, hold on.
13 BY MR. SUSSMAN:
14 Q. Why do you say you must have?
15 A. Because I think I've been dealing with this subject,
16    based on the documents you've shown me, since March of
17    2007.
18 Q. And you've been dealing with Ms. Ferri and Ms. Creen?
19 A. And probably Roxann and probably people from Fishkill
20    and the investigator from the State Police and the
21    person from the DEC --
22 Q. What investigator from the State Police?
23 A. -- people from the State Comptroller's Office.
24 Q. What investigator from the State Police?

*George Glassanos*

```
 1  A.  I got a call from an Investigator Dickson(phonetic),
 2      his name was in one of these, and he wanted to know
 3      what had transpired and was I an attorney for the
 4      Department.
 5  Q.  But that was after this, after May 8th; right?
 6  A.  Yes. Yes, it was after the date where the driver
 7      came, they counted out the change, agreed on the
 8      amount, gave a receipt, credited the account. It
 9      followed that.
10  Q.  And Dickson called you and you were in Albany?
11  A.  Yes.
12  Q.  And did he tell you that there had been a complaint
13      filed?
14  A.  I'm not sure if he said that.
15  Q.  Did he tell you why he was calling?
16  A.  Yes. He mentioned the situation where a
17      representative from the State retained the money, gave
18      a receipt, credited the account.
19  Q.  Why was he calling you?
20  A.  That's what I wanted to know.
21  Q.  Did he indicate someone was there complaining to him?
22  A.  He didn't disclose that to me. He just wanted me to
23      say what I thought happened and was I involved.
24          MR. SUSSMAN: You wanted to say something.
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

---

68

*George Glassanos*

```
 1          MR. FREED: Yes.
 2          MR. SUSSMAN: Excuse us.
 3          (A break was taken in the proceedings.)
 4  BY MR. SUSSMAN:
 5  Q.  Do you remember whether after this event, the first
 6      event on May 10th where the -- or May 9th where the
 7      money was actually taken, do you remember advising
 8      Ms. Creen that if someone from Rockland Vending came
 9      back, to do the same thing the next day?
10          MR. SCHULZE: Objection.
11  A.  I don't recall.
12  Q.  Do you recall if that issue came up?
13          MR. SCHULZE: Objection.
14  A.  I don't recall.
15          MR. SCHULZE: Can you read back that
16      question, the first one.
17          (The requested testimony was read back by
18      the Court Reporter.)
19          MR. SUSSMAN: His answer was he doesn't
20      recall?
21          THE WITNESS: That's correct.
22          MR. SUSSMAN: Thanks for your attendance
23      here today.
24          MR. SCHULZE: We're done?
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

---

69

*George Glassanos*

```
 1          MR. SUSSMAN: We're done.
 2          (Whereupon, the examination of GEORGE
 3      GLASSANOS in the above-entitled matter concluded
 4      at 2:20 p.m.)
 5                        *****
```

AMF REPORTING/CRITCHER VIDEO
(518) 452-1795     1-877 NYS DEPO

---

70

```
STATE OF NEW YORK     )
                      ) ss.
COUNTY OF             )

        I, GEORGE GLASSANOS, have read the foregoing
record of my testimony taken at the time and
place noted in the heading hereof, and I do
hereby acknowledge it to be a true and accurate
transcript of same.


                    _____
                         GEORGE GLASSANOS

DATED: _____

Sworn to before me this _____
day of _____, 20____


_____
Notary Public
```

71

```
 1                CERTIFICATION
 2
 3         I, SADIE L. HERBERT, Shorthand Reporter and
 4    Notary Public in and for the State of New York,
 5    do hereby CERTIFY that the foregoing record taken
 6    by me at the date and place noted in the heading
 7    hereof is a true and accurate transcript of same,
 8    to the best of my ability and belief.
 9
10                  [signature]
11                SADIE L. HERBERT
12
13    Dated: February 3, 2008
```

72

```
 3                    WITNESS INDEX
 4           WITNESS: GEORGE GLASSANOS
 5    BY MR. SUSSMAN..............................PAGE 4

12                    EXHIBIT INDEX
13    PLF                                          IDN
14    23   E-mail authored by Roxann Creen, D0126   52
```