UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

ROCKLAND VENDING CORP.,

                    Plaintiff,

          -against-

ROXANNE CREEN, sued in her individual capacity;

MARSHA F. RILEY, sued in her individual

capacity; and STEWART KIDDER, sued in his

individual capacity,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

                    101 East Post Road

                    White Plains, New York

                    February 12, 2008

                    10:00 a.m.

          EXAMINATION UNDER OATH of

CHERYL FREED, a witness on behalf of

the Plaintiff, ROCKLAND VENDING, CORP.,

held at the above time and place and

before a Notary Public of the State of

New York.

                    U.S. LEGAL SUPPORT, INC.

                    1 Penn Plaza, Suite 1410

                    New York, New York 10119

                    (212) 759-6014

APPEARANCES:

SUSSMAN LAW OFFICE
Attorney for Plaintiff
PO Box 1005
Goshen, New York 10924
BY: MICHAEL H. SUSSMAN, ESQ.
    (845) 294-3991

STATE OF NEW YORK
OFFICE OF ATTORNEY GENERAL
ANDREW M. CUOMO
Attorneys for Defendants
120 Broadway
New York, New York 10271-0332
BY: DANIEL SCHULZE
    Assistant Attorney General
    (212) 416-6557

ALSO PRESENT:
MICHAEL FREED

[Page 2]

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto that all rights provided by the C.P.L.R., including the right to object to any question except as to form, or to move to strike any testimony at this examination are reserved, and in addition, the failure to object to any questions or to move to strike testimony at this examination shall not be a bar or waiver to make such motion at and is reserved for the trial of this action.

IT IS FURTHER STIPULATED AND AGREED that this examination may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun; but failure to do so or to return the original of this examination to counsel shall not be deemed a waiver of the rights provided by Rules 3116 and 3117 of the C.P.L.R., and shall be controlled thereby.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the original of this examination shall be and the same are hereby waived.

[Page 3]

---

4

2    C H E R Y L   F R E E D, having been sworn by
3        Kathryn MacDonald, a Notary Public of
4        the State of New York, and stating her
5        address as 11 South DeBaun Avenue,
6        Airmont, New York, was examined and
7        testified as follows:
8    EXAMINATION BY
9    MR. SCHULZE:
10       Q.   Good morning, Ms. Freed.
11   Have you ever been deposed before?
12       A.   No.
13       Q.   Without telling me what you
14   said, did you talk to your attorney in
15   preparation for this deposition?
16       A.   Just for a few moments.
17       Q.   Did he explain to you how a
18   deposition works?
19       A.   Yes.
20       Q.   I'm just going to go over some
21   ground rules. I'm going to be asking you
22   questions and you are under oath. You have to
23   answer; do you understand that?
24       A.   Yes.
25       Q.   Your answers have the same force
[Page 4]

---

Cheryl Freed                5
2    and effect as if you were giving them in court.
3    Do you understand that?
4        A.   Yes.
5        Q.   And unless your attorney gives
6    you an instruction not to answer, you have to
7    answer my questions; do you understand that?
8        A.   Yes.
9        Q.   Are you on any medication today?
10       A.   Yes.
11       Q.   What's the medication?
12       A.   I'm on an anti-cancer
13   medication. I'm on stomach medication and an
14   antidepressant.
15       Q.   Does any of that medication
16   affect your ability to give true and accurate
17   testimony?
18       A.   No.
19       Q.   Does it affect your memory in
20   any way?
21       A.   No.
22       Q.   Is there any other reason why
23   your deposition can't go forward this morning?
24       A.   No.
25       Q.   What did you do to prepare for
[Page 5]

[2]  (Pages 2 to 5)

```
 1          Cheryl Freed        6
 2  your deposition today?
 3      A.  Nothing really.  Just think
 4  about things in my head, what took place during
 5  certain dates and times and things like that;
 6  to the best of my knowledge.
 7      Q.  You met with Mr. Sussman this
 8  morning?
 9      A.  For a few minutes, yes.
10      Q.  Did you review any deposition
11  transcripts?
12      A.  No.
13      Q.  Did you talk to your husband?
14      A.  Yes.
15      Q.  What did you say to him and what
16  did he say to you?
17          MR. SUSSMAN:  You don't have
18      to answer that.  Conversations between
19      husband and wife are privileged.
20      A.  We didn't talk about anything
21  specific.  He was just that I shouldn't be
22  nervous and just answer to the best of my
23  knowledge.
24      Q.  You are employed by Rockland
25  Vending Corporation?
                        [Page 6]
```

```
 1          Cheryl Freed        7
 2      A.  Yes.
 3      Q.  What is your position?
 4      A.  I'm the office manager.
 5      Q.  Any other title?
 6      A.  No.
 7      Q.  How long have you acted as the
 8  office manager?
 9      A.  It's got to be at least twenty
10  years.
11      Q.  Have you had the same position
12  the whole time?
13      A.  Yes, basically.
14      Q.  What are your duties as office
15  manager?
16      A.  I do all the purchasing.  I do
17  all the employee payroll.  I do accounts
18  receivable, accounts payable.  And at the
19  present time, I'm processing money, also.
20  And what else do I do?  Basically, that's it;
21  just oversee the office.
22      Q.  Did you say you were processing
23  money?
24      A.  Yes.
25      Q.  What does that mean?
                        [Page 7]
```

```
 1          Cheryl Freed        8
 2      A.  In the vending business you have
 3  to count money and receipts.
 4      Q.  How long have you been doing
 5  that?
 6      A.  I have been doing it on and off
 7  for years.  Sometimes I have help, sometimes I
 8  don't.
 9          MR. SCHULZE:  If at any time I
10      start to ask a question and you were
11      not finished, you just tell me you
12      were not finished; okay?
13          THE WITNESS:  Okay.
14      Q.  Were you counting money in May
15  of 2007?
16      A.  No.
17      Q.  When you say you handle all the
18  purchases for Rockland Vending, what are you
19  referring to?
20      A.  All the supplies that go into
21  the vending machines; snacks, sodas, chips.
22  Anything related to what we need to stock the
23  vending machines.
24      Q.  How about the machines
25  themselves?
                        [Page 8]
```

```
 1          Cheryl Freed        9
 2      A.  No.
 3      Q.  When you say "payroll," what are
 4  you referring to?
 5      A.  I have to do the time cards,
 6  figure out how much everyone is going to make
 7  for their work, call in to pay checks.
 8      Q.  In May of 2007, how many
 9  employees were on Rockland's payroll?
10      A.  I would say approximately
11  eighteen to twenty.  We were not exactly sure
12  but around that figure.
13      Q.  Is that eighteen to twenty
14  employees?
15      A.  Yes; including my husband and
16  myself.
17      Q.  Was Mr. Gallagher on the payroll
18  in May of 2007?
19      A.  Yes.
20      Q.  So he was an employee of
21  Rockland?
22      A.  Yes, he was.
23      Q.  As part of your duties in 2007,
24  did you monitor the status of payments on
25  contracts with the Department of Correctional
                        [Page 9]
```

Cheryl Freed          10

1    Services?
2    A.    I didn't really monitor them.
3    I had a bookkeeper at the time. Usually her
4    and Mr. Freed worked together as far as things,
5    you know, she would cut checks for. I mean,
6    obviously, I understood what was going on but I
7    wasn't directly making payments at that time.
8        Q.    How did you understand what was
9    going on?
10       A.    Well, I was usually in on the
11   meetings for accounts payable.
12       Q.    Who was in on those meetings?
13       A.    Myself, Mike and Gail who was
14   the bookkeeper at the time.
15       Q.    At those meetings, did you
16   discuss the current payment status of the
17   Department of Correctional Services contracts?
18       A.    Sometimes.
19       Q.    Do you have a log of phone calls
20   that you make and receive at the office?
21       A.    A log?
22       Q.    Yes.
23       A.    No.
24       Q.    Do you keep any kind of records

[Page 10]

Cheryl Freed          12

1    A.    Yes.
2        Q.    Which facilities; if you recall?
3        A.    Probably Shawangunk, Otisville,
4    Woodburne Correctional.
5        Q.    Is it fair to say there could
6    have been others?
7        A.    Yes, but I can't know exactly
8    off the top of my head.
9        Q.    Do you know how far behind
10   Rockland was in payments to Shawangunk in May
11   of 2007?
12       A.    I would estimate one to two
13   months.
14       Q.    What's the basis of your
15   estimate? What do you recall?
16       A.    Because that's usually -- one to
17   two months was probably what it was.
18       Q.    Why do you think that?
19       A.    Just off the top of my head.
20   I don't know.
21       Q.    Have you reviewed the complaint
22   in this case?
23       A.    Reviewed what complaint?
24       Q.    Do you know what a legal

[Page 12]

Cheryl Freed          11

1    of phone calls on a regular basis?
2        A.    Just, basically, the
3    receptionist and I both have a spiral notebook
4    that we take messages. We started doing that,
5    I don't know, just recently, because if you
6    don't, sometimes you lose messages.
7        Q.    When you say you started doing
8    that just recently, when did you start?
9        A.    The receptionist, I don't recall
10   how long she has been -- she's always done
11   that. I used to just scribble on a pad and
12   then throw the messages away, but when you are
13   taking orders and things like that, sometimes
14   things get lost. When I saw her doing that,
15   I thought that's not a bad idea so I started
16   doing it also. Might be a month or so.
17       Q.    Were you keeping such a spiral
18   notebook in May of 2007?
19       A.    No.
20       Q.    Was the receptionist?
21       A.    She could have been but I'm not
22   sure.
23       Q.    In May of 2007, did Rockland owe
24   commissions to any DOCS facilities?

[Page 11]

Cheryl Freed          13

1    complaint is?
2        A.    Not really. I don't know the
3    terminology.
4        Q.    Have you ever seen a document
5    that was filed in court on behalf of Rockland
6    Vending Corporation in which you ask for money
7    from various DOCS employees?
8            MR. SUSSMAN:  Objection.
9        A.    Where I asked for money?
10       Q.    Where Rockland Vending
11   Corporation asked for money.
12       A.    Asked for money?  We usually had
13   to pay them. I don't understand.
14       Q.    Are you aware that the Rockland
15   Vending Corporation has sued various DOCS
16   employees?
17       A.    Well, just recently.
18       Q.    That's what I am referring to.
19       A.    Oh, okay.
20       Q.    Have you seen the complaint in
21   this case?
22       A.    The actual complaint? I don't
23   know if I have actually seen the written
24   complaint. No.

[Page 13]

[4]   (Pages 10 to 13)

1          Cheryl Freed          14
2          Q. For the record, is this your
3     husband in the room here?
4          A. Yes.
5          Q. And he is the president of
6     Rockland Vending Corporation; is that right?
7          A. Yes.
8          Q. Have you seen an affidavit that
9     your husband prepared in connection with this
10    case?
11         A. I never saw anything in writing,
12    no.
13         Q. Did he ever talk to you about
14    filing an affidavit in this case?
15         A. What do you mean "an affidavit"?
16         Q. A sworn written statement.
17         A. In regards to?
18         Q. This case.
19         A. We talked about it but I have
20    never seen anything in writing.
21         Q. What have you talked about in
22    this connection?
23         A. Just about what had occurred in
24    Shawangunk in May.
25         Q. When did you have that
                                        [Page 14]

1          Cheryl Freed          15
2     conversation?
3          A. Various times; when it happened,
4     afterwards.
5          Q. Let's go to the date it
6     happened. When was that?
7          A. May 9th.
8          Q. When was the first time you
9     heard anything about what was going on in
10    Shawangunk on that date?
11         A. I had received a call from
12    Roxanne Creen from Shawangunk.
13         Q. Were you the one that answered
14    the phone?
15         A. I believe so. I don't know if I
16    answered the phone or if she was on the phone
17    for me --
18         Q. What time was this?
19         A. Mid-morning. I don't know
20    exactly but I would say mid-morning.
21         Q. When you say "mid-morning," what
22    time are you referring to?
23         A. Ten-ish; ten, eleven.
24         Q. When you answered the phone, who
25    was on the other end?
                                        [Page 15]

1          Cheryl Freed          16
2          A. It was Roxanne Creen.
3          Q. What did she say to you and what
4     did you say to her on that phone call?
5          A. Basically, she said to me, "I'm
6     going to tell you something and you are not
7     going to be happy about what I am going to tell
8     you." But she said, "You owe us commissions.
9     Your driver was here. We proceeded to hold him
10    in our facility and we demanded that he take
11    the money out of the machine."
12              And I said to her, "How can you
13    do that?"
14              And she said to me, "Well, we
15    did it. We are going to keep doing it until
16    you pay us all of the money."
17              And I said, "You can't do that."
18    Or something to that affect. I don't remember
19    the exact words. So I asked, "Is my driver
20    okay?" And she said, yes, that he was probably
21    on the way back. That he had already left.
22    And I said, I told her that, you know, we have
23    to process the money and that usually the
24    driver is not allowed to count money. She told
25    me that she took the money and wrote down each
                                        [Page 16]

1          Cheryl Freed          17
2     machine, what money came out of what machine
3              And I was in shock. And I don't
4     even know what I said after that. And I just
5     remember her telling me that, "I am going to
6     keep doing this until you pay us all the
7     money." And at that point we hung up. And
8     about maybe ten or fifteen minutes later my
9     driver Ken Gallagher walked in the door.
10         Q. Have you told me everything you
11    recall about that phone call?
12         A. Yes.
13         Q. Did you ask Ms. Creen to fax you
14    copies of the invoices?
15         A. I think she told me she was
16    going to do that. Either I asked her or she
17    told me. I don't know if I asked her or she
18    said she was going to but I did receive them on
19    the fax.
20         Q. Did you keep them?
21         A. Yes.
22         Q. Do you still have them in your
23    possession?
24         A. Probably in the files.
25              MR. SCHULZE: I'm going to ask
                                        [Page 17]

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

| | |
|---|---|
| 1    Cheryl Freed         18 | 1    Cheryl Freed         20 |
| 2    that those be turned over. | 2    that conversation? |
| 3         MR. SUSSMAN: What do you want? | 3         A.    We probably discussed about what |
| 4    The receipts? The faxes that you all | 4    happened. |
| 5    sent, you have the originals | 5              MR. SUSSMAN: Don't guess. If |
| 6    of them. | 6         you don't remember, please indicate |
| 7         MR. SCHULZE: I particularly | 7         that you don't remember. You are |
| 8    want the faxes with the fax line on it | 8         under oath. If you don't know what |
| 9    showing when it was received. | 9         happened, don't say "probably." |
| 10        MR. SUSSMAN: Sure. | 10             MR. SCHULZE: Yes, I agree with |
| 11        (To witness): That means | 11        that. |
| 12   you have to go back to your records. | 12             MR. SUSSMAN: The question is, |
| 13   If you have that document, give that | 13        did you talk to anybody else -- |
| 14   document to me; okay? | 14        A.    Yes. What the conversation was, |
| 15        THE WITNESS: Okay. | 15   I don't know. I can't tell you word-for-word. |
| 16        MR. SCHULZE: Thank you. | 16        Q.    Can you tell me generally? |
| 17   Q.    I believe you just said that ten | 17        A.    Not word-for-word. |
| 18   or fifteen minutes after you hung up with | 18        Q.    Okay. I'm not asking |
| 19   Roxanne, Mr. Gallagher walked in the door? | 19   word-for-word. |
| 20   A.    Yes. | 20             MR. SUSSMAN: When you are |
| 21   Q.    Between the time you hung up | 21        asked about a conversation and it |
| 22   with Roxanne and Mr. Gallagher walked in the | 22        happened months ago, you can give the |
| 23   door, did you talk to anybody else about what | 23        substance of the conversation, even if |
| 24   happened at Shawangunk? | 24        you don't remember the exact words. |
| 25   A.    Yes, I immediately called Mike, | 25        Counsel is asking you what happened in |
|                                    [Page 18] |                                    [Page 20] |
| | |
| 1    Cheryl Freed         19 | 1    Cheryl Freed         21 |
| 2    my husband. | 2    this conversation. The expectation |
| 3    Q.    Did you reach him? | 3    is not that you remember every word |
| 4    A.    He was out on the road at that | 4    but if you have some understanding or |
| 5    time but I reached him by cell phone. | 5    memory, other than speculation as to |
| 6    Q.    What did you say to him and what | 6    what you said, if you have that much, |
| 7    did he say to you? | 7    you can testify under oath about what |
| 8    A.    I exactly related what Roxanne | 8    was said even though it's not |
| 9    told me what happened and I told him -- he | 9    word-for-word. |
| 10   asked me, you know, where is Ken, is he okay | 10   A.    I believe we spoke about the |
| 11   I said, he just walked in. This was like a few | 11   situation, what happened to the driver, |
| 12   minutes ago. And then he said, okay, and he | 12   what-not. But word-for-word, I don't know. |
| 13   hung up and that was it. | 13   Q.    Do you remember if she said |
| 14   Q.    Did he tell you to do anything? | 14   anything to you? |
| 15   A.    No. | 15   A.    No, I don't believe so. |
| 16   Q.    Did he say he was going to do | 16   Q.    What happened when Mr. Gallagher |
| 17   anything? | 17   came? |
| 18   A.    Not at that point, no. | 18   A.    I asked him, "How are you?" |
| 19   Q.    Did you talk to anybody else | 19   He proceeded to tell me what had happened at |
| 20   before Mr. Gallagher walked in? | 20   Shawangunk. He was pretty shook up. You know, |
| 21   A.    I might have talked to someone | 21   he told me he tried to call our office. He |
| 22   in the office. | 22   asked them to call. They would not let him |
| 23   Q.    Who? | 23   call. I asked him, did you have your cell |
| 24   A.    Maybe the receptionist. | 24   phone at the time? He said no. And that was |
| 25   Q.    Do you recall anything about | 25   basically it. |
|                                    [Page 19] |                                    [Page 21] |

[6]  (Pages 18 to 21)

|  | Cheryl Freed | 22 |
|---|---|---|

```
 1              Cheryl Freed          22
 2       Q.  Did you talk to Mr. Gallagher in
 3   preparation for this deposition?
 4       A.  No.
 5       Q.  You said he told you what had
 6   happened at Shawangunk. Do you recall exactly
 7   what he said?
 8       A.  Basically, that, you know, they
 9   had, Roxanne Creen had demanded the money from
10   the machines and that he said he tried to call
11   the office but they would not let him have
12   access to a phone and that he proceeded to take
13   the money out of the machines. And I told him
14   it's okay. Normally, the driver would not be
15   allowed to give the money to anyone. And I
16   told him it's okay. He was very nervous that
17   he was doing that. I explained to him it's
18   okay, and that was about it. And he
19   immediately came back from the facility after
20   that happened.
21       Q.  Do you know what time it was
22   when he came into the office?
23       A.  Not the exact time; no.
24       Q.  How many times did you talk to
25   Roxanne Creen that day?
                              [Page 22]
```

```
 1              Cheryl Freed          23
 2       A.  Just the one time that she
 3   called.
 4       Q.  Had she left any messages
 5   earlier that day?
 6       A.  Not that I recall.
 7       Q.  Did you ask?
 8       A.  Did I ask her?
 9       Q.  Did you ask anyone that day
10   whether there were any messages left?
11       A.  No, because usually my
12   receptionist is pretty diligent about who
13   called. Normally, we have voice mail so if I
14   was on the phone she would have transferred it
15   to the voice mail.
16       Q.  Did you check your voice mail
17   that day?
18       A.  Yes, I check it like every five
19   minutes. There was no one on the phone.
20       Q.  When you say there was no one on
21   the phone --
22       A.  There was no one on the voice
23   mail.
24       Q.  When you saw Mr. Gallagher, was
25   he angry?
                              [Page 23]
```

```
 1              Cheryl Freed          24
 2       A.  He was more shook up. You know,
 3   nervous and shook up. I don't recall him being
 4   angry. He was more shook up.
 5       Q.  What led you to that belief?
 6       A.  He was very nervous, talking a
 7   mile a minute. Just very nervous. He didn't
 8   appear to be angry.
 9       Q.  After he told you what had
10   happened at Shawangunk, what did you do?
11       A.  At that point, I just continued
12   on with what I was doing in the office. I had
13   already called Mike at that point. Ken had
14   gone back to load his truck and I just
15   continued on with what I was doing.
16       Q.  Is it fair to say that you were
17   letting Mike handle it?
18       A.  At that point, yes.
19       Q.  When you say, "at that point,"
20   what do you mean?
21       A.  Well, after the phone call; yes.
22       Q.  In other words, after you had
23   talked to Mr. Freed, you were letting Mr. Freed
24   handle it; is that fair?
25       A.  Basically, he was handling it at
                              [Page 24]
```

```
 1              Cheryl Freed          25
 2   that point.
 3       Q.  Did there come a time when
 4   Mr. Freed called you back on that date?
 5       A.  I believe so, yes.
 6       Q.  Do you recall when that was?
 7       A.  No.
 8       Q.  Can you tell me whether it was
 9   morning or afternoon?
10       A.  Probably afternoon. I mean, we
11   talk to each other ten times a day, probably
12   more.
13       Q.  Before or after lunch?
14       A.  I don't recall.
15       Q.  What did he say on this phone
16   call and what did you say to him?
17           MR. SUSSMAN: Basically, asking
18       about the next phone call that you
19       have memory of with your husband.
20       A.  I don't know. Like I said, we
21   spoke, could be ten, fifteen times a day, so I
22   don't know what the conversation of the next
23   phone call was.
24       Q.  How many times did you speak to
25   Mr. Freed on this day?
                              [Page 25]
```

[7]  (Pages 22 to 25)

Cheryl Freed                26
1
2      A.  I have no idea.
3      Q.  More or less than usual?
4      A.  I don't know.  Honestly, I don't
5   know.  We go back and forth all day long with
6   situations and conversations.  I don't know.
7      Q.  Did there come a point when
8   Mr. Gallagher talked to the police?
9      A.  He didn't tell me that.  At that
10  point, when he walked in, he didn't say that to
11  me.
12     Q.  Who?
13     A.  Ken.
14     Q.  He didn't say that he had gone
15  to the police?
16     A.  No.  He just came from
17  Shawangunk when I saw him.
18     Q.  Did there come a point when
19  anyone at Rockland told Mr. Gallagher to go to
20  the police?
21     A.  I believe Mr. Freed but I was
22  not part of that conversation.
23     Q.  Were you aware of that
24  conversation?
25     A.  Yes.
                                    [Page 26]

Cheryl Freed                27
1
2      Q.  How were you aware of it?
3      A.  Hearsay; hearing about it.
4      Q.  On that day?
5      A.  I assume so.
6      Q.  Let's try it this way.  After
7   Mr. Gallagher talked to you about what had
8   happened at Shawangunk, what did he do?
9      A.  He went to the warehouse to load
10  his truck.
11     Q.  Why was he going to the
12  warehouse to load his truck?
13     A.  That's what he does everyday.
14     Q.  He was going to the next
15  facility?
16     A.  They load the truck for the next
17  day.
18     Q.  So he was preparing for his work
19  for the next day; is that correct?
20     A.  Yes.
21     Q.  Is that the last time you saw
22  him that day?
23     A.  I don't know.
24     Q.  Did you have any more
25  conversations that day with Mr. Gallagher about
                                    [Page 27]

Cheryl Freed                28
1
2   what happened at Shawangunk?
3      A.  I don't believe so but I'm not
4   one hundred percent sure.
5      Q.  Do you know whether Roxanne
6   Creen spoke to anybody else at Rockland Vending
7   on May 9th?
8      A.  Not that I am aware of.
9      Q.  Do you know whether such a call
10  occurred or not?
11         MR. SUSSMAN:  Objection.  She
12      just said, not that she's aware of.
13     Q.  I'm trying to find out if that
14  means that you know that such calls didn't
15  occur or you're not sure whether such calls
16  occurred.
17     A.  I don't believe there was any
18  such call.
19     Q.  Why?
20     A.  If she called the receptionist,
21  the receptionist would have said I was on the
22  phone and sent it to my voice mail at that
23  time, so I would have known if someone had
24  called.  That's usual protocol in the office.
25     Q.  Do you know whether anyone
                                    [Page 28]

Cheryl Freed                29
1
2   called Mr. Freed directly?
3      A.  I know I did.
4      Q.  Do you know whether anyone from
5   DOCS called Mr. Freed directly?
6      A.  I would not know.
7      Q.  Do you know whether Mr. Freed
8   called anyone at DOCS directly that day?
9      A.  I don't know.
10     Q.  Without telling me what was
11  said, did you consult an attorney that day?
12     A.  Not me personally, no.
13     Q.  Do you know if anyone did?
14     A.  I don't know.
15     Q.  Did Mr. Gallagher come to work
16  on May 10th?
17     A.  I believe so.
18     Q.  Did he go out on his route?
19     A.  Yes.
20     Q.  Did you ever instruct
21  Mr. Gallagher not to return to Shawangunk?
22     A.  Honestly, he, himself, was a
23  little nervous to do that and I did not think
24  it was a safe situation.  I did not personally
25  tell him not to do that but I didn't think it
                                    [Page 29]

[8]  (Pages 26 to 29)

```
 1          Cheryl Freed        30
 2   was a safe situation for him to put himself in.
 3        Q.  Did Mr. Freed tell him not to go
 4   back to Shawangunk?
 5        A.   That, I don't know.
 6        Q.  What was the first DOCS facility
 7   that terminated its contract with Rockland?
 8            MR. SUSSMAN: Ever?
 9            MR. SCHULZE: Ever.
10        A.   That terminated? I think
11   Shawangunk might have been the first.
12        Q.  Did any other facility terminate
13   a contract with Rockland?
14        A.   Not that I know of.
15        Q.  Did any other facilities not
16   exercise an option to renew a contract with
17   Rockland?
18        A.   Just recently? What time frame
19   are we talking about?
20        Q.  I'm referring to "ever" right
21   now, but if that's too hard I will narrow it
22   down.
23        A.   I think definitely Shawangunk.
24   I don't know if we were on extension there.
25        Q.  From 2000 --
                                    [Page 30]
```

```
 1          Cheryl Freed        32
 2   Shawangunk on May 9th; right?
 3        A.   I have never been to Shawangunk.
 4        Q.  So is it fair to say that all
 5   you know about what happened in Shawangunk on
 6   that day is coming from what Mr. Gallagher told
 7   you?
 8        A.   No. From the phone call from
 9   Roxanne Creen, that was basically where I found
10   out everything.
11        Q.  Anything else?
12        A.   From Mr. Gallagher. I guess
13   that's about it.
14        Q.  If a contract is terminated, do
15   you keep any written record of the event?
16        A.   If there was a written
17   correspondence we might have that; yes.
18        Q.  Do you make an entry anywhere
19   into a log?
20        A.   No.
21        Q.  Do you keep a calendar?
22        A.   Yes.
23        Q.  At the office?
24        A.   Yes. Basically for employees,
25   who is to be taking a vacation day; that kind
                                    [Page 32]
```

```
 1          Cheryl Freed        31
 2        A.   I really wasn't -- my position,
 3   I really wasn't into the actual contracts of
 4   the facility.
 5        Q.  When you say you are not into
 6   the actual contracts --
 7        A.   I'm not the one who bids on the
 8   locations and I'm not familiar with which
 9   facility had additional -- what do you call it
10   -- you just referred to what it was -- I'm not
11   sure which facilities were on a full contract
12   or extended. I'm not familiar with that.
13        Q.  Do you have any legal training?
14        A.   No.
15        Q.  Do you have any involvement with
16   the drafting of the contracts?
17        A.   In the drafting? No.
18            My only situation with contracts
19   is if we were bidding on, say, a bulk where
20   someone wanted the prices on the candy, I would
21   work up the percentage on the product, because
22   I'm the one that's ordering them. But as far
23   as the overall contracting, I did not do any of
24   that.
25        Q.  You were not present in
                                    [Page 31]
```

```
 1          Cheryl Freed        33
 2   of thing.
 3        Q.  Would it have any entries
 4   relating to contracts?
 5        A.   No.
 6        Q.  Do you keep a correspondence log
 7   showing when letters are received?
 8        A.   No.
 9        Q.  Have you ever spoken to Stewart
10   Kidder?
11        A.   No.
12        Q.  Have you ever spoken to George
13   Glassano?
14        A.   No.
15        Q.  Do you know who any of those
16   people are?
17        A.   I know Stewart Kidder is head of
18   Corrections, I think.
19        Q.  Not quite.
20        A.   I don't know his official title.
21   And I'm not sure who the other person is;
22   Glassano? I'm not sure.
23        Q.  He's a lawyer from the
24   Department of Corrections.
25            Do you know who Nan Ferri is?
                                    [Page 33]
```

U.S. LEGAL SUPPORT, INC.
1 PENN PLAZA, NEW YORK, NY 10119 Tel: 212-759-6014

```
 1          Cheryl Freed        34
 2      A.  I believe she worked with Stew
 3  Kidder.
 4      Q.  Have you ever spoken to Nan
 5  Ferri?
 6      A.  No.
 7      Q.  When was the first time you ever
 8  spoke to Roxanne Creen?
 9      A.  Several times throughout our
10  contract.
11      Q.  What were the conversations
12  about in general?
13      A.  I can't recall. You know,
14  I honestly don't know but we did have
15  conversations.
16      Q.  About day-to-day matters on the
17  contracts?
18      A.  Basically, yes.
19      Q.  Did you ever have conversations
20  with her about missed payments?
21      A.  I'm trying to think if I,
22  personally, had that conversation with her.
23  She might have said that we were behind a
24  commission.
25      Q.  But you are not sure?
                                   [Page 34]
```

```
 1          Cheryl Freed        35
 2      A.  Yes. I am not one hundred
 3  percent sure.
 4      Q.  Did you ever have conversations
 5  with stewards from other DOCS correctional
 6  facilities about missed payments?
 7      A.  Sometime, I believe I spoke to
 8  Natalie from Otisville.
 9      Q.  Did you ever speak to Marsha
10  Riley?
11      A.  Yes, I have spoken to Marsha
12  before.
13      Q.  What do you recall speaking to
14  her about?
15      A.  I have spoken to her about
16  moving equipment, commissions. I can't recall
17  anything else.
18      Q.  What did you speak to her about
19  in relation to commissions?
20      A.  She probably told us that we
21  were late on commissions.
22      Q.  Do you know what facility she
23  worked at?
24      A.  Marsha? Lincoln Correctional,
25  I believe.
                                   [Page 35]
```

```
 1          Cheryl Freed        36
 2      Q.  Did you ever go to a meeting at
 3  Lincoln Correctional?
 4      A.  No.
 5      Q.  Have you ever been to Lincoln
 6  Correctional?
 7      A.  No.
 8      Q.  Do you know whether a contract
 9  at Lincoln was terminated or not?
10      A.  I thought it was finished.
11  I thought it was complete.
12      Q.  "Finished," meaning that it
13  expired?
14      A.  Right.
15      Q.  As it's supposed to in the
16  contract; correct?
17      A.  Yes.
18      Q.  When Mr. Gallagher returned to
19  your offices on May 9th, did he give you any
20  money?
21      A.  I don't recall if he had
22  collections from other facilities. I don't
23  remember.
24      Q.  Did he have copies of the
25  receipts from Shawangunk?
                                   [Page 36]
```

```
 1          Cheryl Freed        37
 2      A.  I don't recall. I know I had
 3  them from the fax. I don't recall if he had
 4  receipts, also.
 5      Q.  Did Mr. Gallagher tell you
 6  whether he had ever asked to leave Shawangunk
 7  on May 9th.
 8      A.  I'm sorry?
 9      Q.  Did Mr. Gallagher ever say to
10  you that he had ever asked to leave Shawangunk
11  on May 9th?
12      A.  I know he wanted to call us.
13  I don't know if he ever asked to leave.
14      Q.  You know that because he told
15  you?
16      A.  About?
17      Q.  Wanting to call you.
18      A.  Yes.
19      Q.  But he didn't say whether he had
20  ever asked to leave; is that correct?
21      A.  He didn't say anything to me,
22  no.
23          MS. SCHULZE: Okay. That's it.
24          MR. SUSSMAN: I have a couple
25  of questions I would like to ask you.
                                   [Page 37]
```

[10] (Pages 34 to 37)

Cheryl Freed                38

1    Cheryl Freed                38
2    EXAMINATION BY
3    MR. SUSSMAN:
4        Q.  Ms. Freed, basically, the same
5    rules apply. If you don't understand, please
6    indicate that you don't understand. If you do,
7    please answer the question.
8            Why were commissions, if you
9    know, why were commissions paid late by your
10   company? Do you have any knowledge as to that?
11       A.  No.
12       Q.  You don't know why they were
13   paid late?
14       A.  I know we had a problem with
15   Shawangunk with food.
16       Q.  What was the problem?
17       A.  There were shortages on the
18   food.
19       Q.  What does that mean, "there were
20   shortages"?
21       A.  The machines are inventoried and
22   there is a meter taken from the machine and we
23   were getting shortages on the inventories of
24   the machines.
25       Q.  For how long a period of time
                                    [Page 38]

1    Cheryl Freed                40
2        Q.  Had this ever happened before in
3    your experience with the Department of
4    Correctional Services contracts?
5        A.  No.
6        Q.  Did you ever receive from
7    Shawangunk, to your knowledge, in the period
8    from, let's say thirty days before May 9th,
9    let's say April 9th on, any demand letter
10   saying that you owe so much money and if you
11   don't pay so much money, the facility is going
12   to consider you in breach? Did you ever get
13   any such letter; that you know of?
14           MR. SCHULZE: Objection.
15       A.  No.
16       Q.  Did you receive any letter from
17   the facility, Ms. Creen or anyone else,
18   indicating that if certain payments were not
19   made by certain dates, your driver would be
20   required to provide the monies directly from
21   the machine to Shawangunk?
22           MR. SCHULZE: Objection.
23       A.  No.
24       Q.  You said you were shocked; your
25   reaction was one of shock. Why were you
                                    [Page 40]

1    Cheryl Freed                39
2    was that, that shortages were going on at
3    Shawangunk?
4        A.  I'm not exactly sure. I'm
5    saying a few months.
6        Q.  Do you know whether anyone from
7    your company ever notified Shawangunk of the
8    shortages?
9        A.  I believe Mike did, yes.
10       Q.  Do you know whether by the time
11   that money from the machines was demanded of
12   Mr. Gallagher, that the issue of shortages had
13   been resolved?
14       A.  I don't believe so, no.
15       Q.  Now, before you got this call in
16   the mid-morning on the 9th of May from
17   Ms. Creen, had Ms. Creen ever called to speak
18   with you and advise you that she was
19   considering doing what she did on the 9th?
20           MR. SCHULZE: Objection.
21       Q.  Did anyone from Shawangunk ever
22   call you in advance on the 9th and advise you
23   that money was going to be demanded of your
24   driver?
25       A.  No.
                                    [Page 39]

1    Cheryl Freed                41
2    shocked?
3            MR. SCHULZE: Objection.
4            MR. SUSSMAN: You can explain.
5        A.  Why I was shocked?
6        Q.  Yes.
7        A.  It just sounded unbelievable to
8    me.
9            MR. SCHULZE: Objection.
10       Q.  Why?
11       A.  That he could be held in a
12   correctional facility against his will.
13       Q.  Now you say you spoke to
14   Mr. Gallagher when he came back and he appeared
15   to you quite nervous; is that right?
16       A.  Yes.
17       Q.  How long have you known
18   Mr. Gallagher?
19       A.  I believe he has worked with us
20   for a year or two.
21       Q.  Had you ever seen him as you saw
22   him that morning?
23           MR. SCHULZE: Objection.
24       A.  No.
25       Q.  You were asked questions about
                                    [Page 41]

[11]  (Pages 38 to 41)

Cheryl Freed                42

1
2  contacts with other stewards and,
3  specifically, the name of Marsha Riley came up.
4  Did you have any contact with Ms. Riley in
5  which Ms. Riley indicated to you that
6  commissions were late?
7       A.  Yes.
8       Q.  And did Ms. Riley indicate to
9  you that as a consequence of commissions being
10 late, she was going to demand of the driver
11 money from the machines?
12      A.  No.
13      Q.  Did any other steward ever make
14 any statements like that to you?
15      A.  Like what?
16      Q.  That he or she would command of
17 the driver monies directly from the machines
18 because commissions were late?
19      A.  No.
20      Q.  You mentioned that Ms. Creen and
21 you had this conversation in mid-morning.
22 Approximately how long did that conversation
23 last?
24      A.  Maybe five minutes.
25      Q.  Was there any other party to the

[Page 42]

Cheryl Freed                44

1
2       A.  No.
3            MR. SUSSMAN:  Okay, thank you
4       very much.  Counsel is permitted to
5       ask you questions if he has anything
6       further.
7            MR. SCHULZE:  Yes, I do.
8  CONTINUING EXAMINATION
9  BY MR. SCHULZE:
10      Q.  If you recall, your counsel just
11 asked you if you had any reason for being
12 delinquent in payments at Shawangunk and you
13 mentioned that there were problems with the
14 food.
15      A.  Right.
16      Q.  Are you claiming that you were
17 withholding commissions?
18      A.  What do you mean, "withholding
19 commissions"?
20      Q.  That you were able to pay but
21 were not because of that.
22      A.  I don't believe so.
23      Q.  Did you ever tell DOCS that you
24 were withholding commissions because of
25 problems with the food?

[Page 44]

Cheryl Freed                43

1
2  conversation from your end?
3       A.  I don't believe so.
4       Q.  In this conversation, did
5  Ms. Creen say anything to you about having
6  conferred with legal counsel and having been
7  authorized to take the steps she took by legal
8  counsel?
9       A.  No.
10      Q.  You told counsel earlier that
11 during the conversation with Ms. Creen, you
12 told Ms. Creen words to the affect that how
13 could you do this and you protested; is that
14 accurate?
15      A.  Yes.
16      Q.  And do you recall in response to
17 your protesting, what it is she said --
18           MR. SCHULZE:  Objection.
19      Q.  During the conversation?
20      A.  She did say that we owe her the
21 money and she was going to keep doing this
22 until we pay up all the money.
23      Q.  Did she give you during that
24 conversation any figure which she claimed you
25 owed?

[Page 43]

Cheryl Freed                45

1
2       A.  I never spoke to them.
3       Q.  Did anyone at Rockland?
4       A.  I don't know.  I don't speak to
5  them so I don't know.
6       Q.  Did anyone ever tell you that
7  Rockland was doing that?
8       A.  That we were holding back
9  commissions?
10      Q.  Yes.
11      A.  Not that I know of.
12      Q.  Do you have any reason to
13 believe that was the case?
14      A.  Because of the problem, you are
15 saying?
16      Q.  Yes.
17      A.  Not really.
18      Q.  You just testified that in your
19 call of May 9th, Ms. Creen did not state that
20 she had conferred with legal counsel?
21      A.  She didn't tell me that.
22      Q.  Do you know whether or not she
23 had conferred with legal counsel?
24      A.  I only found that afterwards.
25      Q.  How did you find that out?

[Page 45]

[12]  (Pages 42 to 45)

```
                    Cheryl Freed        46
 1
 2         A.  From talking to Mike and
 3   Mr. Sussman.
 4              MS. SCHULZE: Okay. I don't
 5         know if you want to waive privilege
 6         here, do you?
 7              MR. SUSSMAN:  No, of course not.
 8              It's not relevant when she
 9         found out that fact.
10              (To witness):  You don't have to
11         speak.  Please don't discuss your
12         conversations you had with me.
13              MR. SCHULZE:  I don't want to
14         get into this.  Here's all I am
15         getting at; okay?
16         Q.  When Roxanne talked to you on
17   May 9th, do you know whether or not she had
18   conferred with legal counsel before that?
19         A.   I don't know.
20              MR. SCHULZE:  Okay. I'm all done.
21
                 _____
22              CHERYL CREEN
23   Sworn and subscribed to before me
     this ____ day of _____, 2008.
24
     _____
25   Notary Public
```

[Page 46]

```
                          47
        I N D E X

     WITNESS:              PAGE

     CHERYL FREED              4


        E X H I B I T S

          None.


     I N F O R M A T I O N
     R E Q U E S T E D

     Copies of Faxes:  pg. 18
```

[Page 47]

```
                          48
           CERTIFICATION


     STATE OF NEW YORK      )
                            )  ss.
     COUNTY OF WESTCHESTER  )


          I, KATHRYN MACDONALD, a
     Stenographic Reporter and Notary Public of the
     State of New York, do hereby certify:
          That the witness whose
     deposition is herein set forth was duly sworn
     by me; that the within transcript is an
     accurate record of the testimony given by such
     witness, to the best of my knowledge and
     ability.
          That I am not related to any of
     the parties involved in this matter, and that I
     have no personal interest whatsoever in the
     outcome thereof.


                 _____
                 Kathryn MacDonald
```

[Page 48]

```
 1                        49
 2          E R R A T A   P A G E
 3   Pg. Ln. CORRECT:       TO:
 4   ____  _____  _____
 5   ____  _____  _____
 6   ____  _____  _____
 7   ____  _____  _____
 8   ____  _____  _____
 9   ____  _____  _____
10   ____  _____  _____
11   ____  _____  _____
12   ____  _____  _____
13   ____  _____  _____
14   ____  _____  _____
15   ____  _____  _____
16   ____  _____  _____
17   ____  _____  _____
18   ____  _____  _____
19   ____  _____  _____
20   ____  _____  _____
21   ____  _____  _____
22   ____  _____  _____
23   ____  _____  _____
24   ____  _____  _____
25
```

[Page 49]

[13]  (Pages 46 to 49)