UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROCKLAND VENDING CORP., KENNETH GALLAGHER, | 07 CV 6268 (KMK)(MDF) |
| *Plaintiffs*, | (Electronically Filed) |
| -against- | |
| ROXANNE CREEN, sued in her individual capacity, MARSHA F. RILEY, sued in her individual capacity, STEWART KIDDER, sued in his individual capacity, | |
| *Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Defendants
120 Broadway - 24th Floor
New York, New York  10271
(212) 416-6557


Daniel A. Schulze
Assistant Attorney General
Of Counsel

## INTRODUCTION

Defendants Roxann Creen, Marsha Riley and Stewart Kidder respectfully submit this memorandum of law in support of their motion for an order pursuant to FRCP 56 dismissing all claims in this action.

The claims plaintiff Rockland Vending Corporation asserts in this case do not come close to implicating the Constitution. The Due Process claim fails *ab initio* - assuming *arguendo* that the application of funds from the vending machines to offset to amounts admittedly owed by Rockland or the temporary holding of the machines as protection for the admitted debt was a breach of contract rather than a legitimate exercise of self-help directly authorized by the contract's language, the Second Circuit directly holds that a breach of contract by the State does not give rise to a due process claim. In any event, the availability of an action on the contract in State Court constitutes a sufficient post-deprivation remedy.

The retaliation claims asserted by Rockland fare no better. Most simply, plaintiff's speech was not chilled in the slightest – Rockland's president continued to complain vociferously to various State agents long after the alleged retaliation at issue. The claim against Ms. Riley is a complete non-starter – she terminated Rockland's contract with her facility well <u>before</u> Rockland engaged in the allegedly protected speech at issue. Similarly, the undisputed evidence shows that Ms. Creen did not terminate Rockland's contract with her facility in retaliation for its complaints – the contract was in effect up to the very day that Rockland conclusively stated that it would no longer perform. Finally, the claims against Mr. Kidder must be dismissed for the additional reason that he was not personally involved in the decisions regarding the Rockland contracts – they were handled at the facility level.

Mr. Gallagher's claim for false imprisonment against Ms. Creen fails as well. Mr. Gallagher was free to leave at anytime, and admits that he neither made an attempt nor requested to leave the facility in which he contends he was "detained."

In any event, defendants are entitled to qualified immunity. A reasonable official would not have believed that any of the actions taken were violations of plaintiff's clearly established constitutional rights. Further, plaintiffs must "proffer particularized evidence of direct or circumstantial facts supporting the claim of an improper motive in order to avoid summary judgment" on the issue of qualified immunity.[1] Plaintiffs cannot possibly meet their burden in this regard, particularly because the acts of defendants at issue were taken on the express advice of DOCS' counsel. This demonstrates that defendants did not act with a constitutionally improper motive.

## FACTS

**A.      The Parties**

Plaintiff Rockland Vending Corporation ("Rockland") is a vending machine company doing business in the State of New York. (Complaint, ¶ 1). Rockland's president is Michael Freed and his wife, Cheryl Freed, is employed as its office manager. (Schulze Affirmation, Ex. A at 3-7).[2] Rockland has informed defendants' counsel that it is currently undergoing reorganization in a Title 11 bankruptcy proceeding. (Schulze Aff., ¶ 30).

---

[1] Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir. 1996).

[2] The Schulze Affirmation is submitted with these motion papers.

2

Plaintiff Michael Gallagher is an employee of Rockland whose duties were to fill, service and collect money from Rockland's vending machines. His route included Shawangunk Correctional Facility ("Shawangunk") at all times relevant to this case. (Id., Ex. B at 8-12; Complaint, ¶ 2).[3]

Defendant Stewart Kidder is the Director of Support Operations for DOCS. (Schulze Aff., Ex. C at 7-9). Nan Ferri is his Assistant Director. (Id., Ex. D at 5). Support Operations works from DOCS' Central Office, and is responsible for purchasing large items common to all facilities, such as security equipment, vehicles and uniforms. (Id., Ex. C at 7-9). Support Operations further supplies form contracts and bid documents for vending machine contracts to facilities. Neither Mr. Kidder nor his unit are responsible for bidding, signing, administering, renewing or terminating the vending machine contracts, all functions performed at the facility level, and neither Mr. Kidder nor his unit were involved in the decisions to renew or terminate Rockland's contracts. (Id., Ex. C at 11-12, 28, 30; Ex. D at 11; Ex. F at ¶ 7; Ex. V; Ex. W; Ex. X). However, Support Operations fields questions regarding contracts, including vending machine contracts, from the facilities. (Id., Ex. C at 11-12, 28, 30; Ex. D at 11).

Defendant Roxann Creen is the Institutional Steward of Shawangunk, reporting to Shawangunk's Deputy of Administration and its Superintendent. Ms. Creen and her direct subordinates administered the Shawngunk vending contact with Rockland. (Id., Ex. C at 28; Ex. E at 6, 9-11; Ex. F at ¶¶ 5, 7; Complaint ¶ 3).

Defendant Marsha F. Riley was the Institutional Steward of Lincoln Correctional Facility at times relevant to this action. Ms. Riley and her direct subordinates administered the Lincoln vending contract with Rockland. (Schulze Aff., Ex. C at 28; Ex. G at ¶¶ 2-3; Complaint, ¶ 4).

---

[3]Citations to "Complaint" refer to plaintiffs' operative "Amended Complaint" dated September 4, 2007.

Non-party George Glassanos is an attorney serving as Deputy Counsel of DOCS in DOCS Central Office. (Schulze Aff., Ex. H at 6).

**B.    The Rockland Contracts With DOCS' Correctional Facilities**

In 2006 and early 2007, Rockland had contracts with ten DOCS' facilities regarding provision of vending services. (Id., Ex. I, ¶ 9). These contracts were originally for three year terms, with two one year renewal options upon the agreement of both parties. (July 2, 2007 Affidavit of Michael Freed ("Freed Aff."),[4] Ex. 1 at 4; Schulze Aff., Ex. J at ¶¶ 3, 4). Each contract required Rockland to pay the facility a space rental fee and a commission, usually equal to 15% of gross sales from its vending machines at the facilities, on a specified date of the following month. (Freed Aff.. Ex. 1 at 14; Schulze Aff., Ex. I at ¶¶ 2-3; Ex. J at ¶¶ 3, 4). The money from these commissions was placed in inmate benefit funds and employee benefit funds at the facilities and was used for the benefit of DOCS inmates and employees. DOCS does not make a profit on the vending machine contracts. (Schulze Aff., Ex. I at ¶ 3).

Each contract incorporated the Standard Clauses For All New York State Contracts, which included a provision stating that "The State shall have all of its common law, equitable and statutory rights of sett-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amount due and owing to the State with regard to this contract, [or] any other contract with any State department or agency." (Freed Aff.. Ex. 1 at 22, ¶ 9; Schulze Aff., Ex. C at 25, Ex. E at 78-79).

---

[4] The Affidavit of Michael Freed was previously filed by plaintiff Rockland in support of its application for a temporary restraining order in this case. A courtesy copy is provided to the Court with this brief.

4

**Rockland's Failure to Make Timely Payments**

Sometime in 2006, it became apparent that Rockland was not paying commissions to the facilities in a timely fashion, and several facilities had contacted Nan Ferri at DOCS' Support Operations for assistance in collecting. (Schulze Aff., Ex. I at ¶¶ 4-5). On November 9, 2006, Mr. Kidder signed a letter to Mr. Freed advising him that Rockland was delinquent, and must pay its commissions on time in the future or risk loss of State contracts. (Id., Ex. I at Exhibit 1). Mr. Freed wrote back apologizing for the delinquencies, and stating that Rockland would pay commissions in a timely fashion going forward. Despite this assurance, Rockland continued to be delinquent in its payments of commissions, and several of its checks bounced. (Id., Ex. A at 14-15, 28-29; Ex. I at ¶¶ 6-9; Freed Aff. at ¶ 21).

**C.    Termination of the Lincoln Contract**

As of March, 2007, Rockland was four months behind in its payments to Lincoln. On March 27, 2007, defendant Riley wrote to Mr. Freed stating that Rockland's contract with Lincoln would be terminated on May 31, 2007 for non-payment. (Schulze Aff., Ex. G at ¶¶ 2-4; Ex. L). On May 4, 2007, a second letter was sent by Ms. Riley to Mr. Freed stating that the Lincoln contract was terminated and demanding that Rockland pick up its vending machines at the facility on or before May 30, 2007. (Id., Ex. G at ¶ 4; Ex. M). Rockland picked up its vending machines at Lincoln on June 1, 2007. (Id., Ex. I at ¶ 9(f)).

**D.    The Decision to Use Funds Collected at Shawangunk as a Set-Off to Rockland's Debt**

As of May, 2007, Rockland was two months behind in its payments to Shawangunk. The total commissions and fees it owed the facility approximated $1,800, (Id., Ex. A at 28; Ex. E at 62; Ex. I at ¶ 9(a), Ex. N; Freed Aff., ¶ 21), and the inmate benefit account that was supposed to be funded by those payments was overdrawn. (Schulze Aff., Ex. E at 43, Ex. O).

On May 8, 2007, Ms. Creen spoke to Nan Ferri at Support Operations and asked whether, when Rockland's employee came to service the machines the next day, she could have the money counted immediately and retain the 15% commission that was owed to Shawangunk from the funds that were collected. Ms. Ferri briefly discussed Ms. Creen's question with the head of Support Operations, defendant Kidder, and they agreed that the issue needed to be referred to DOCS counsel. (Id., Ex. C at 18; Ex. D at 18-19; Ex. E at 76-77).

Ms. Ferri and Mr. Kidder then called George Glassanos, DOCS' Deputy Counsel, informed him of the situation, and asked whether Shawangunk was legally entitled to retain 15% of the money collected from the Rockland vending machines. Mr. Glassanos responded that Shawangunk was entitled to confiscate all the funds collected from the vending machines as a set-off up to the amount owed by Rockland. (Id., Ex. D at 20, 31-34; Ex. H at 27-30). He stated that this was based upon both the common-law notion of self-help, and paragraph 9 of the Standard Clauses For All New York State Contracts entitled "Set Off Rights" attached as Appendix A to the Shawangunk contract. (Id. See Freed Aff., Ex. 1 at 22). His advice was communicated to Ms. Creen, and she then sent a e-mail to Mr. Glassanos confirming that the following day, when Rockland's employee arrived to service the machines, she intended to confiscate the funds to offset Rockland's debt and give the employee a receipt. Mr. Glassanos approved of her plan, stating: "GOOD. DO NOT LET THE REP WALK AWAY WITH THE STATE'S MONEY. IF THERE IS ANY RESISTANCE, SHO[W] THE REP THE DOOR, IMPOUND THE MACHINE AND EXERCISE THE STATE'S RIGHT TO LOCATE AN ALT[ERNATE] SOURCE. YOU ARE WITHIN THE STATE'S RIGHT OF SELF HELP TO RETAIN POSSESSION OF THE MACHINE UNTIL THE VENDOR CURES HIS DEFAULT." (Schulze Aff., Ex. N).

**E.**    **The Collection of Funds at Shawangunk on May 9, 2007**

On May 9, 2007, at approximately 8:00 a.m. plaintiff Gallagher arrived at Shawangunk CF

to collect money and service some of Rockland's vending machines. (Id., Ex. B at 25; Ex. E 36-37).

He entered the facility through the visitor's entrance, signed the log book, and was met by defendant

Creen and Ms. Gardner in the hallway passage leading to the secure areas of the facility. (Id., Ex. B

at 28-32; Ex. E at 36-39; Ex. P at D0145; Ex. V at ¶ 2). This was the first time that Mr. Gallagher

had seen defendant Creen. (Id., Ex. B at 28). When they met in the hallway, defendant Creen told

Mr. Gallagher that Rockland owed commissions to Shawangunk CF, and they wanted payment. Mr.

Gallagher, Ms. Creen and Ms. Gardner continued to discuss the matter as they proceeded down the

hallway and passed through the security gates and up a hallway to the visiting room, where the first

group of machines that Mr. Gallagher was scheduled to empty and service were located. (Id., Ex. B

at 28-32; Ex. E at 36-39).

When they reached the visiting room, Ms. Creen informed Mr. Gallagher that they were

instructed by their lawyer to retain the money that Mr. Gallagher removed from the machines to

offset the monies owed by Rockland under the contract, and that she would have the money counted

in his presence and provide him with a receipt. (Id., Ex. B at 43-44).[5] Mr. Gallagher said that his

boss, Mr. Freed, would be upset, and asked Ms. Creen to contact Mr. Freed and inform him of what

was being done. Ms. Creen said that she would do so, and left the visiting room to make the call.

(Id., Ex. B at 50-53; Ex. E at 41).

--------------------------------------------------------

[5]Mr. Gallagher's account of this conversation is accepted as true for purposes of this
motion. However, both Ms. Creen and Ms. Gardner state that the entire conversation took place
in the hallway before Mr. Gallagher passed through the security gate. (See Id., Ex. E at 40-41).

After Ms. Creen left, Mr. Gallagher removed the money from the Rockland machines in the visiting room. The money was counted by Mr. Gallagher, Ms. Gardner, and another DOCS employee, Ms. Reynolds, and placed into an envelope that was retained by DOCS. Mr. Gallagher was given a receipt. (Id., Ex. B at 49, 50, 55; Ex. E at 39). During this process Ms. Creen returned briefly and told Mr. Gallagher that she had been unable to reach Mr. Freed. Mr. Gallagher asked her to keep trying, and she said she would do so. She then left the area to attend a meeting and was not seen again by Mr. Gallagher on May 9, 2007. (Id., Ex. B at 50-59; Ex. E at 40).

Mr. Gallagher, Ms. Gardner and Ms. Reynolds then proceeded across the hall to the employee's lounge area, and the process was repeated with the Rockland machines that Mr. Gallagher was scheduled to service that day. Although he would have been able to do so, Mr. Gallagher was not asked to remove the money from any of the machines that he was not scheduled to service that day. (Id.). After giving the money from these machines to DOCS and receiving receipts, Mr. Gallagher left the facility without further incident. (Id., Ex. B at 58-60).

Ms. Creen then sent a e-mail to Mr. Glassanos explaining what had occurred, and Mr. Glassanos confirmed again that it was his opinion that her actions were appropriate, and stated "I GUESS THE OWNER IS SURPRISED YOU DO NOT ACT LIKE A RUG. I AM SURPRISED HE IS. NICE GOING!" (Id., Ex. Q).

Mr. Gallagher was inside Shawangunk CF from 7:55 a.m. until 10:00 a.m. on May 9, 2007, a total of 2 hours, 5 minutes. (Id., Ex. P at D0145). On his two prior trips to service the Rockland machines at Shawangunk, on May 2, 2007 and May 4, 2007, he was inside the facility for, respectively, 1 hour, 50 minutes and 1 hour, 58 minutes. (Id., Ex. P at D0143, D0146).

On May 9, 2007, Mr. Gallagher never attempted to leave Shawangunk CF, nor asked to do so, until after he completed the removal of money from the Rockland vending machines. Mr.

Gallagher also did not attempt to contact Mr. Freed or any other person affiliated with Rockland, or ask that he be allowed to do so, while he was inside Shawangunk CF. (Id., Ex. B at 46-48, 52-53, 59; Ex. F at ¶¶ 3-4, Ex. V at ¶¶ 2-4).

**F.    Rockland's Initial Complaints About The Events at Shawangunk on May 9, 2007**

Sometime between 9:15 a.m and 11:00 a.m. Ms. Creen reached Rockland by telephone, and was transferred to Cheryl Freed, Mr. Freed's wife and the office manager of Rockland. Ms. Creen told Ms. Freed that they had confiscated the money removed from the Rockland Vending machines to offset the commissions owed by Rockland under the contract and provided the driver with receipts, and would continue to do so until the amounts were paid. Ms. Freed objected, asked for copies of the receipts, which were faxed to her, and called her husband, who was in Maryland on business. (Id., Ex. E at 21-23; Ex. R at 15-17).

After hearing from his wife and Mr. Gallagher, Mr. Freed called defendant Kidder and said that what had occurred at Shawangunk CF was against the law and constituted "grand larceny and extortion." Mr. Kidder stated that DOCS' counsel had instructed Ms. Creen to take the actions that she did, and that Mr. Freed should contact counsel George Glassanos if he wished to discuss the matter further. (Id., Ex. A at 41-45, 49-50; Ex. S).

Mr. Freed elected not to contact Mr. Glassanos. Instead he called Mr. Gallagher and instructed him to file a report with the State Police. (Id., Ex. A at 44-52). Mr. Gallagher proceeded to the police barracks and told the officer on duty that he went to Shawangunk CF and DOCS' lawyer had instructed the facility to confiscate the money he removed from the vending machines. The officer said that he would check it out, but that it was probably a civil matter and there was nothing he could do. (Id., Ex. B at 70-71). Later that same day, the officer called Mr. Freed and stated that the investigation "could not be pursued any further" and would be closed. (Id., Ex. A at

54-56). Mr. Freed then called the Ulster County District Attorney's Office, and spoke to ADA Paul O'Neal, who told him that the dispute involving the events at Shawangunk was a civil matter, and could not be pursued by the District Attorney's Office. (Id., Ex. A at 60-61).

**G.    Rockland's Refusal to Service the Vending Machines at Shawangunk and the Termination of the Shawangunk Contract**

On the night on May 9, 2007, Mr. Freed instructed Rockland's employees that they were not to return to Shawangunk CF. (Id., Ex. A at 62-63, 72-73; Ex. B at 79-80).

Rockland was next scheduled to send an employee to stock the vending machines at Shawangunk on May 11, 2007, and the Rockland employee would normally arrive at the facility between 8 a.m. and 9:30 a.m. (Id., Ex. E at 60). On May 10, 2007, Ms. Creen called Rockland to ask whether Rockland would be sending an employee the following day to stock the vending machines. Ms. Freed said that she did not know. (Id., Ex. T, Ex. U).

On May 11, 2007 between 10:25 a.m. and 11:00 a.m., when no Rockland employee had come, Ms. Creen called Mr. Glassanos for advice on how to proceed. Mr. Glassanos told her to contact Rockland and find out whether or not they intended to come to fill the vending machines. (Id., Ex. F at ¶¶ 5-6, Ex. U). When Ms. Creen called Rockland, she was told that Rockland would not be sending its employees into the Shawangunk facility again because they were afraid. (Id., Ex. A at 62-63, 72-73; Ex. E at 60; Ex. S; Ex. T; Ex. U). Later that day, Ms. Creen and Mr. Glassanos drafted a letter to Mr. Freed stating that the contract between Rockland and Shawangunk CF was terminated and Rockland's machines were being impounded pending Rockland's payment of amounts owed under the contract. (Id., Ex. E at 73-74, Ex. F at ¶¶ 5-6; Ex. H at 49-50; Ex. T).

**H.      Rockland's Subsequent Complaints**

On May 28, 2007, Rockland, through counsel, made a complaint to New York Attorney General Andrew Cuomo in regard to the events of May 9, 2007 at Shawangunk. This letter was copied to the Commissioner of DOCS and the Superintendent of Shawangunk. (Complaint, ¶ 36; Schulze Aff., Ex. Z).

On May 31, 2007, Mr. Freed wrote an e-mail to Mr. Kidder complaining that Ms. Riley had not allowed Rockland's trucks access to Lincoln on May 30, 2007, which stated that he believed Ms. Riley was "playing games" and would "imprison" his employees. (Id., Ex. Y).

On June 15, 2007, Mr. Freed wrote a letter to Ms. Creen calling her "an extremely hateful and sick person" who "committed grand larceny and extortion," and stating that "[w]e intend to pursue all legal remedies against you." He copied this letter to New York Attorney General Andrew Cuomo. (Schulze Aff., Ex. S).

**I.      Procedural History**

Rockland commenced this litigation by seeking a Temporary Restraining Order to allow it to pick up its vending machines at Shawangunk without payment of amounts owed under the contract. Shortly thereafter, in early July, 2007, Rockland was notified by defendant's counsel that DOCS was releasing the machines to Rockland unconditionally. Rockland did not then pick up its machines and pressed forward with its TRO application, which sought other relief as well, and on July 26, 2007 obtained an Order allowing it to pick up its vending machines at Shawangunk on 24 hours notice without payment of amounts owed under the contract. (Id., ¶ 27).

After obtaining this emergency relief, Rockland did not make any attempt to pick up its vending machines from Shawangunk until August 28, 2007. (Id., ¶ 28).

## ARGUMENT

### POINT I

### ROCKLAND'S DUE PROCESS CLAIM IS MERITLESS

Plaintiff Rockland's first claim alleges that defendants confiscated Rockland's funds at Shawangunk and temporarily impounded its machines without providing a pre- or post-deprivation remedy, and thus took Rockland's property without due process of law. (Complaint, ¶ 68). This claim is meritless.

Rockland was behind in its contractual payments in May, 2007. (Schulze Aff., Ex. A at 14-15, 28-29; Ex. I at ¶¶ 6-9). The Rockland contracts included a clause expressly giving the State "all of its common law, equitable and statutory rights of set off."(Freed Aff.. Ex. 1 at 22, ¶ 9; Schulze Aff., Ex. C at 25, Ex. E at 78-79). DOCS counsel advised defendants that they were contractually entitled to confiscate the funds removed from the vending machines at Shawangunk on May 9, 2008, and to impound the machines pending payment of the amounts owed by Rockland under the contracts, both pursuant to the set-off clause, and as an exercise of the common law right of self-help under the contracts. (Id., Ex. D at 20, 31-34; Ex. H at 27-30).

It can hardly be disputed that the actions taken, correct or not, were taken pursuant to an interpretation of the contracts the DOCS facilities had with plaintiff. The Second Circuit directly holds that such contract disputes, no matter how artfully pled, cannot be morphed into Section 1983 actions. Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d Cir. 1987). Accord TM Park Ave. Assocs. v. Pataki, 214 F.3d 344, 348-49 (2d. Cir. 2000)("the state, like any private party, must be able to breach contracts without turning every breach into a violation of the federal constitution"). See also Shawnee Sewerage & Drainage Co. v. Sterns, 220 U.S. 462, 471 (1911)("the breach of a contract is neither a confiscation of property nor a taking of property without due process of law").

Further, even assuming <u>arguendo</u> that DOCS' interpretation of the contracts was incorrect and the actions constituted a breach, Rockland could sue in State court on the contract and obtain compensatory damages. The Second Circuit holds that this is a perfectly adequate post-deprivation remedy, and satisfies any due process concerns. <u>TM Park Ave. Assocs.</u>, 214 F.3d at 348-50; <u>Costello</u>, 811 F.2d at 784.

Almost directly on point is <u>Hellenic Am. Neighborhood Action Comm. v. City of New York</u>, 101 F.3d 877 (2d Cir. 1996). In that case, a government official, believe there was evidence of misconduct, ordered the termination of existing contracts and gave instructions that no further contracts be entered into with the plaintiff company. The Second Circuit held that these allegations did not state a due process claim, because the former availability of an Article 78 action in State Court was an adequate post-deprivation remedy. <u>Id.</u> at 881-82.

The availability of an adequate post-deprivation remedy also defeats plaintiff's Due Process claim <u>ab initio</u>.

## POINT II

### ROCKLAND'S RETALIATION CLAIMS ARE MERITLESS

Rockland also asserts retaliation claims under the First Amendment alleging that defendants terminated or failed to renew contracts with Rockland in retaliation for Rockland's May 9, 2007 complaint to the State police about the confiscation of funds at Shawangunk. (Complaint, ¶ 70). These claims fail on several independently sufficient grounds.

## A.    <u>Plaintiff's Speech Was Not Chilled</u>

To prevail on his retaliation claim, plaintiff must demonstrate "that his First Amendment rights were 'actually chilled.'" <u>Curley v. Village of Suffern</u>, 268 F.3d 65, 73 (2d Cir. 2001). <u>Accord Davis v. Village Park II Realty Co.</u>, 578 F.2d 461, 464 (2d Cir. 1978)(citing <u>Laird v. Tatum</u>, 408

U.S. 1, 13-14 n.7 (1972). "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." Curley, 268 F.3d at 73 (citing Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995)).

Here, on June 15, 2007, long after Rockland's contracts were ended and machines allegedly detained at Shawangunk and Lincoln, Rockland's President Mr. Freed wrote a scathing letter to Ms. Creen calling her "an extremely hateful and sick person" who "committed grand larceny and extortion," and stating that "[w]e intend to pursue all legal remedies against you." He copied this letter to New York Attorney General Andrew Cuomo. (Schulze Aff., Ex. S). Similarly, on May 31, 2007, after the contracts were ended and machines allegedly detained, Mr. Freed wrote an e-mail to Mr. Kidder that included a bitter personal attack on defendant Riley and sarcastic references to the events at Shawangunk. (Id., Ex. Y). And the Rockland complaints to the New York Attorney General, the Commissioner of DOCS and the Superintendent of Shawangunk about the events of May 9, 2007 referred to in the Complaint occurred on May 28, 2007, well after the Lincoln and Shawangunk contracts were ended. (Complaint, ¶ 36; Schulze Aff., Ex. Z).

Clearly Rockland's speech was not chilled in the slightest by the alleged termination of its contracts and detention of its machines. The complaint does not even allege the contrary – unsurprising, given the evidence cited above. The Court need proceed no further.

**B.      The Lincoln Contract Was Ended Long Before the Allegedly Protected Speech at Issue**

The retaliation claim against defendant Riley, Steward of Lincoln CF, is all but frivolous. To prevail, Rockland must first demonstrate that the termination of its contracts was motivated by its speech on a matter of public concern. Board of County Comm'rs v. Umbehr, 518 U.S. 668, 685 (1996). But Ms. Riley gave notice that the contract Rockland had with her facility would be ended

for non-payment on March 27, 2007 (Schulze Aff., Ex. G at ¶¶ 3-4; Ex. L; Ex. M), well over one month before the allegedly protected speech at issue. (Id., Ex. A at 44-52; Complaint, ¶¶ 23, 34-37).

**C.    The Shawangunk Contract Was Terminated Only After Rockland Refused To Perform**

The claim against defendant Creen regarding the Shawangunk facility contract fails for similar reasons. She did not terminate the contract Rockland had with her facility after learning of the police complaint made against her – to the contrary, she called Rockland on May 10, 2007 to confirm that they intended to continue performance and was rebuffed. (Id., Ex. T, Ex. U). It was only on May 11, 2007, after Rockland conclusively stated that they had no intention of returning to Shawangunk to service the vending machines, which created an emergency situation and constituted a complete repudiation of the contract, that she sent a letter stating that the Shawangunk contract was terminated. (Id., Ex. A at 62-63, 72-73; Ex. E at 60, 73-74; Ex. F at ¶¶ 5-6; Ex. H at 49-50; Ex. S; Ex. T; Ex. U). See, e.g., Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38, 351 F.3d 43, 46 (2d Cir. 2003)("Upon repudiation, a contract ... becomes voidable, and the non-repudiating party may enforce the contract or rescind it")(citing Corbin on Contracts; Williston on Contracts). Accord Net2globe Int'l v. Time Warner Telecom of N.Y., 273 F. Supp. 2d 436, 456-57 (S.D.N.Y. 2003). Indeed, Rockland's president and 30(b)(6) designee admits that Rockland's refusal to return to the facility had rendered them unable to perform the contract even before Ms. Creen sent her letter. (Schulze Aff., Ex. A at 72-73).

**D.    Defendant Kidder Was Not Involved in Decisions Regarding Whether or Not To Terminate or Renew Rockland's Contracts**

Liability under 42 U.S.C. § 1983 requires that the defendant be personally involved in a constitutional deprivation; liability cannot be based on a respondeat superior theory. Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978). Defendants cannot be held

15

personally responsible simply because they were in positions of authority in the prison system. See

Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).

Here, neither defendant Kidder[6] nor DOCS Support Operations were personally involved in

the decisions to terminate or not renew any of the Rockland contracts – all those decisions were

made at the facility level. Mr. Kidder had no contact whatsoever with the facilities other than

Shawangunk in this regard. (Schulze Aff., Ex. C at 11-12, 28, 30; Ex. D at 11; Ex. V; Ex. W; Ex. X).

In regard to Shawangunk, Mr. Kidder's only role was to refer Ms. Creen's initial questions regarding

whether funds could be confiscated from the vending machines under the contract to DOCS'

Counsel Glassanos. Mr. Kidder did not endorse Ms. Creen's or Mr. Glassanos's plans in this regard,

and Mr. Kidder had no contact with the facility in regard to the May 11, 2007 termination of the

contract after Rockland refused to perform, and did not participate in any decision in that regard. (Id.,

Ex. C at 18; Ex. D at 18-20, 31-34; Ex. F at ¶¶ 6-7; Ex. H at 27-30).

**E.    The Alleged Detention of Rockland's Machines Pending Payment of Money Owed is Constitutionally De Minimus**

Plaintiff appears to further contend that defendants Creen and Riley detained Rockland's

equipment pending payment of amounts due under the contract, and that this was an act of

retaliation. This contention would have no merit.

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness

from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.

---

[6]Plaintiffs do not even allege that defendant Creen, the Steward at Shawangunk, or defendant Riley, the former Steward at Lincoln, were involved with any Rockland contracts at DOCS facilities other than their own – and, in fact, they were not involved with any such contracts. (Id., Ex. F at ¶2). The allegations in this regard are made solely against defendant Kidder. (Complaint, ¶¶ 39-42, 53-54, 57, 60).

Otherwise, the retaliatory act is simply de minimus and therefore outside the ambit of constitutional protection." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001).

Regarding Shawangunk, it is undisputed that Rockland was behind in contractual payments. (Id., Ex. A at 28; Ex. E at 62; Ex. I at ¶ 9(a), Ex. N; Freed Aff., ¶ 21). Defendant Creen's letters stated not that Rockland's equipment was being confiscated – although she actually had a contractual right to do just that (see Freed Aff., Ex. A at 5)[7] – but that the equipment would be held pending the payment of Rockland's admittedly delinquent commissions, (Schulze Aff., Ex. T), which amounted to approximately $1,800 less the money retrieved from the machines on May, 9, 2007. (Id., Ex. A at 28; Ex. E at 62; Ex. I at ¶ 9(a), Ex. N; Freed Aff., ¶ 21). Given that Rockland could have retrieved its equipment immediately though a payment of past-due amounts of less than $1,800, the holding of the machines to secure payments is constitutionally de minimus.

Regarding Lincoln, the matter is even simpler. Rockland's equipment was not detained at Lincoln; Rockland was unable to pick it up on May 30, 2007 only because they failed to make advance arrangements with the Lincoln facility. Rockland did pick up their equipment without incident on June 1, 2007, only two days later. (Schulze Aff., Ex. G at ¶¶ 2-4; Ex. I at ¶ 9(f); Ex. L, Ex. M). Even assuming arguendo that there was a retaliatory two day detention, it would be a de minimus act for First Amendment purposes.

In any event, even if the Court were to find that a reasonable person's speech would have been chilled by these acts, the fact that Rockland's speech was not "actually chilled" still mandates summary judgment for defendants on these claims. See Point II(A), supra.

---

[7]"[Upon termination for cause or a refusal to perform] the Department ... may take possession of and utilize in completing the work such of the contract's materials equipment, and plant as may be on the site of the work."

## POINT III

## PLAINTIFF GALLAGHER'S FALSE IMPRISONMENT
## CLAIM AGAINST DEFENDANT CREEN IS MERITLESS

The elements of a false imprisonment claim under Section 1983 are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995).[8] "In addition, a false imprisonment claim requires a prima facie showing of actual confinement or threatening conduct." Albury v. J.P. Morgan Chase, 2005 U.S. Dist. LEXIS 5363 at *42 (S.D.N.Y. March 31, 2005)(collecting cases).  Here, Mr. Gallagher's claim fails because he was not actually confined – he was free to leave at any time without the funds he came to collect. Nor did defendant Creen intend to confine him.

First, the mere fact that on May 9, 2007 Mr. Gallagher was inside a secure correctional facility with locked doors is obviously insufficient in and of itself to support his claim. He was employed to service vending machines inside correctional facilities, where doors obviously must be locked for security reasons, he voluntarily entered the Shawangunk facility, and being in such secure locations was a required component of his job.

Mr. Gallagher could certainly surmount the prima facie hurdle of showing actual confinement if Ms. Creen had actually refused a request to unlock the security doors and prevented him from leaving the facility. But it is undisputed that Mr. Gallagher never even asked to leave Shawangunk CF, nor made any attempt to do so, until after he completed the removal of money from the

---

[8] Plaintiff Gallagher does not assert a false imprisonment claim under New York law (Complaint, ¶ 69), but Singer notes that the analysis of the State law claim would be identical.

Rockland vending machines, at which point he left without incident. (Id., Ex. B at 46-48, 52-53, 59; Ex. F at ¶¶ 3-4, Ex. V at ¶¶ 2-4). This ends his claim.

In any event, Mr. Gallagher testified only that Ms. Creen and her associates were "insisting that they wanted their money ... and I felt that if I didn't give it up, that I wasn't getting out that door." (Gallagher 48). But even absent the undisputed evidence demonstrating that he was not confined noted above, the law is clear that Mr. Gallagher could not make a prima facie showing of actual confinement based on his testimony that these requests for money gave him a vague "feeling" that he was not free to leave if he did not comply. See, e.g., Cellamare v. Millbank, Tweed, Hadley & McCloy LLP, 2003 U.S. Dist. LEXIS 22336 at **24-25 (S.D.N.Y. Dec. 2, 2003)("allegations that [plaintiff] was brought to a small room, interrogated for hours, called names, not told that she could leave or have counsel present, and was induced to sign the statement with a promise that she would then be able to leave" did not satisfy prima facie showing of actual confinement); Lee v. Bankers Trust Co., 1998 U.S. Dist. LEXIS 2784 at **13-15 (S.D.N.Y. March 11, 1998)(five hour interrogation by "high ranking security personnel" demanding that plaintiff sign a confession did not satisfy prima facie showing of actual confinement), aff'd 166 F.3d 540 (2d Cir. 1999);[9] Bower v. Weisman, 639 F. Supp. 532, 540-41 (S.D.N.Y. 1986)(posting of several armed guards around plaintiff's home did not satisfy prima facie showing of actual confinement; "even if the conduct of defendant's agents caused [plaintiff] to feel like a prisoner, this is not enough to sustain a cause of action for false imprisonment"); Arrington v. Liz Claiborne, Inc., 688 N.Y.S.2d 544, 546 (N.Y. App. Div., 1st Dep't 1999)(testimony that plaintiffs "'felt' that they were not free to leave because they

---

[9]The Lee plaintiff did not appeal the dismissal of his false imprisonment claim on these grounds. Id. at 543.

were told if they did not cooperate and sign written agreements, the police would be called" did not satisfy prima facie showing of actual confinement).

Finally, Ms. Creen and Ms. Gardner state that plaintiff was free to leave whenever he requested, and there is not a scrap of evidence to the contrary. (Id., Ex. F at ¶¶ 3-4, Ex. V at ¶¶ 2-4). Thus, even if plaintiff subjectively believed that he was confined, plaintiff cannot possibly demonstrate that defendant Creen intended to confine him on May 9, 2007, and summary judgment on his claim must still be granted.  See, e.g., Rendely v. Town of Huntington, 2006 U.S. Dist. LEXIS 97203 at **11-15 (S.D.N.Y. Aug. 20, 2006)(collecting cases).

### POINT IV

### DEFENDANTS, AT A BARE MINIMUM, ARE ENTITLED TO QUALIFIED IMMUNITY

State officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 614 (1999). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Whether an official may invoke qualified immunity "generally turns on the 'objective legal reasonableness' of the action." Id. at 639, 3038.

"[T]he objective legal reasonableness of an official's actions must be viewed in light of the action's relationship to the clearly established law at the time, and not to some more general standards of reasonable and appropriate governmental conduct." Walentas v. Lipper, 862 F.2d 414, 423 (2d Cir. 1988), cert. denied, 490 U.S. 1021 (1989). Qualified immunity precludes the imposition of liability for "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Thus, where "officers of reasonable competence could disagree on this issue, immunity should be recognized."  Id..

20

"The first step" in the qualified immunity analysis "is to determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." Mozzochi v. Borden, 959 F.2d 1174, 1179 (2d Cir. 1992)(citing Siegert v. Gilley, 500 U.S. 226 (1991)). Here, as demonstrated in Points I-III above, plaintiffs cannot demonstrate that defendants violated any constitutionally protected rights. They are therefore entitled to qualified immunity.

Further, a reasonable official would not have been on notice that any of the actions taken were violations of plaintiff's clearly established constitutional rights. Regarding defendant Creen, It was objectively reasonable for her to believe that the termination of the Shawangunk contract in the face of Rockland's flat refusal to perform, and the holding of its equipment to secure payment of amounts owed, were authorized under the contract – or, at a bare minimum, that the actions did constitute clearly established constitutional violations. A reasonable official could also have believed that preventing Mr. Gallagher from taking the money in the machines with him when he left Shawangunk on May 9, 2007 did not constitute false imprisonment under the Constitution.

Similarly, a reasonable official in the place of defendant Riley could have believed that the actions she took were not constitutional violations. Indeed, it is hard to see how a reasonable official could believe otherwise: there had been no "protected speech" whatsoever at the time she terminated the Lincoln contract for non-payment, Rockland's equipment was not impounded at her facility, and the alleged two-day delay in pick-up would be constitutionally de minimus in any event.

To the extent that defendant Kidder is found to have been involved in the above actions at all – and all the evidence is to the contrary – he would be entitled to qualified immunity for the reasons above as well. But Kidder is further entitled to qualified immunity on the grounds that there

is no "clearly established" doctrine that would render him personally liable for any of the actions taken at the facilities. See Poe v. Leonard, 282 F.3d 123, 126 (2d Cir. 2002)("in order for a supervisor to be held liable under section 1983, both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established").

Finally, "[u]pon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts supporting the claim of an improper motive in order to avoid summary judgment." Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir. 1996)(quoting Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995)).

Both plaintiff's retaliation and false imprisonment claims require defendants to have acted with a subjectively improper intent, and there is no evidence whatsoever to support such an allegation. To the contrary, defendants sought the advice of counsel and then followed that advice. This is powerful evidence that they did not act with a constitutionally improper motive. See, e.g., Ponterio v. Kaye, 2007 U.S. Dist. LEXIS 65350 at **26-28 (S.D.N.Y. Sep. 6, 2007); East Coast Novelty Co. v. City of New York, 781 F. Supp. 999, 1011 (S.D.N.Y. 1992). See also Sueiro Vazquez v. Torregrosa de la Rosa, 494 F.3d 227, 236 (1st Cir. 2007)(good-faith reliance on mistaken advice of agency counsel, as opposed to private counsel, will generally be conclusive on issue of qualified immunity absent proof of a conspiracy).

## <u>CONCLUSION</u>

For the reasons given above, defendants' motion for summary judgment should be granted.


Dated:  New York, New York
        April 10, 2008

                                        ANDREW M. CUOMO
                                        Attorney General of the State of New York
                                        <u>Attorney for Defendants</u>
                                        By:


                                        _____/s/_____
                                        Daniel Schulze
                                        Assistant Attorney General
                                        120 Broadway - 24th Floor
                                        New York, New York  10271
                                        (212) 416-6557

23

# TABLE OF CONTENTS

_____

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Rockland Contracts With DOCS' Correctional Facilities . . . . . . . . . . . . . . 4

    C.    Rockland's Failure to Make Timely Payments . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    Termination of the Lincoln Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.    The Decision to Use Funds Collected at Shawangunk as a Set-Off
        to Rockland's Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    F.    The Collection of Funds at Shawangunk on May 9, 2007 . . . . . . . . . . . . . . . . 7

    G.    Rockland's Initial Complaints About The Events at Shawangunk . . . . . . . . . . 9

    H.    Rockland's Refusal to Service the Vending Machines at Shawangunk
        and the Termination of the Shawangunk Contract . . . . . . . . . . . . . . . . . . . . . . 10

    I.    Rockland's Subsequent Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    J.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

POINT I      ROCKLAND'S DUE PROCESS CLAIM IS MERITLESS . . . . . . . . . . . . . . . 12

POINT II     ROCKLAND'S RETALIATION CLAIMS ARE MERITLESS . . . . . . . . . . . . . 13

    A.    Plaintiff's Speech Was Not Chilled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    The Lincoln Contract Was Ended Long Before the Allegedly
        Protected Speech at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.    The Shawangunk Contract Was Terminated Only After Rockland
        Refused To Perform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

D.    Defendant Kidder Was Not Involved in Decisions Regarding
Whether or Not To Terminate or Renew Rockland's Contracts . . . . . . . . . . . . 15

E.    The Alleged Detention of Rockland's Machines Pending Payment
of Money Owed is Constitutionally De Minimus . . . . . . . . . . . . . . . . . . . . . . . 16

POINT III    PLAINTIFF GALLAGHER'S FALSE IMPRISONMENT
CLAIM AGAINST DEFENDANT CREEN IS MERITLESS . . . . . . . . . . . . . 18

POINT IV    DEFENDANTS, AT A BARE MINIMUM, ARE ENTITLED
TO QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23