UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROCKLAND VENDING CORP., KENNETH GALLAGHER,<br><br>*Plaintiffs*,<br><br>-against-<br><br>ROXANNE CREEN, sued in her individual capacity, MARSHA F. RILEY, sued in her individual capacity, STEWART KIDDER, sued in his individual capacity,<br><br>*Defendants*. | **DEFENDANTS' RULE 56.1 STATEMENT**<br><br>07 CV 6268 (KMK)(MDF)<br><br>(Electronically Filed) |

Pursuant to Local Civil Rule 56.1, defendants state that as to the following material facts, there is no genuine issue to be tried:

**The Parties**

1. Plaintiff Rockland Vending Corporation ("Rockland") is a vending machine company doing business in the State of New York. (Complaint, ¶ 1).

2. Rockland's president is Michael Freed and his wife, Cheryl Freed, is employed as its office manager. (Schulze Affirmation, Ex. A at 3-7).

3. Plaintiff Michael Gallagher is an employee of Rockland whose duties were to fill, service and collect money from Rockland's vending machines. His route included Shawangunk Correctional Facility ("Shawangunk") at all times relevant to this case. (Id., Ex. B at 8-12; Complaint, ¶ 2).

4. Defendant Stewart Kidder is the Director of Support Operations for DOCS. (Schulze Aff., Ex. C at 7-9). Nan Ferri is his Assistant Director. (Id., Ex. D at 5).

5.      Support Operations works from DOCS' Central Office, and is responsible for purchasing large items common to all facilities, such as security equipment, vehicles and uniforms. (Id., Ex. C at 7-9). Support Operations further supplies form contracts and bid documents for vending machine contracts to facilities.

6.      Neither Mr. Kidder nor his unit are responsible for bidding, signing, administering, renewing or terminating vending machine contracts, all functions performed at the facility level. (Id., Ex. C at 11-12, 28, 30; Ex. D at 11; Ex. F at ¶ 7; Ex. V; Ex. W; Ex. X). However, Support Operations fields questions regarding contracts, including vending machine contracts, from the facilities. (Id., Ex. C at 11-12, 28, 30; Ex. D at 11).

7.      Neither Mr. Kidder nor his unit were involved in the decisions to renew or terminate Rockland's contracts. (Id., Ex. C at 11-12, 28, 30; Ex. D at 11; Ex. F at ¶ 7; Ex. V; Ex. W; Ex. X).

8.      Defendant Roxann Creen is the Institutional Steward of Shawangunk, reporting to Shawangunk's Deputy of Administration and its Superintendent. Ms. Creen and her direct subordinates administered the Shawngunk vending contact with Rockland. (Id., Ex. C at 28; Ex. E at 6, 9-11; Ex. F at ¶¶ 5, 7; Complaint ¶ 3).

9.      Defendant Marsha F. Riley was the Institutional Steward of Lincoln Correctional Facility at times relevant to this action. Ms. Riley and her direct subordinates administered the Lincoln vending contract with Rockland. (Schulze Aff., Ex. C at 28; Ex. G at ¶¶ 2-3; Complaint, ¶ 4).

10.     Non-party George Glassanos is an attorney serving as Deputy Counsel of DOCS in DOCS Central Office. (Schulze Aff., Ex. H at 6).

**The Rockland Contracts With DOCS' Correctional Facilities**

11. In 2006 and early 2007, Rockland had contracts with ten DOCS' facilities regarding provision of vending services. (Id., Ex. I, ¶ 9).

12. These contracts were originally for three year terms, with two one year renewal options upon the agreement of both parties. (July 2, 2007 Affidavit of Michael Freed ("Freed Aff."), Ex. 1 at 4; Schulze Aff., Ex. J at ¶¶ 3, 4).

13. Each contract required Rockland to pay the facility a space rental fee and a commission, usually equal to 15% of gross sales from its vending machines at the facilities, on a specified date of the following month. (Freed Aff.. Ex. 1 at 14; Schulze Aff., Ex. I at ¶¶ 2-3; Ex. J at ¶¶ 3, 4).

14. The money from these commissions was placed in inmate benefit funds and employee benefit funds at the facilities and was used for the benefit of DOCS inmates and employees. DOCS does not make a profit on the vending machine contracts. (Schulze Aff., Ex. I at ¶ 3).

15. Each contract incorporated the Standard Clauses For All New York State Contracts, which included a provision stating that "The State shall have all of its common law, equitable and statutory rights of sett-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amount due and owing to the State with regard to this contract, [or] any other contract with any State department or agency." (Freed Aff.. Ex. 1 at 22, ¶ 9; Schulze Aff., Ex. C at 25, Ex. E at 78-79).

**Rockland's Failure to Make Timely Payments**

16. Sometime in 2006, several facilities had contacted Non Ferri at DOCS' Support Operations for assistance in collecting past-due commissions from Rockland. (Schulze Aff., Ex. I

at ¶¶ 4-5). On November 9, 2006, Mr. Kidder signed a letter to Mr. Freed advising him that Rockland was delinquent, and must pay its commissions on time in the future or risk loss of State contracts. (Id., Ex. I at Exhibit 1). Mr. Freed wrote back apologizing for the delinquencies, and stating that Rockland would pay commissions in a timely fashion going forward.

17.   Rockland continued to be delinquent in its payments of commissions, and several of its checks bounced. (Id., Ex. A at 14-15, 28-29; Ex. I at ¶¶ 6-9; Freed Aff. at ¶ 21).

**Termination of the Lincoln Contract**

18.   As of March, 2007, Rockland was four months behind in its payments to Lincoln. On March 27, 2007, defendant Riley wrote to Mr. Freed stating that Rockland's contract with Lincoln would be terminated on May 31, 2007 for non-payment. (Schulze Aff., Ex. G at ¶¶ 2-4; Ex. L).

19.   On May 4, 2007, a second letter was sent by Ms. Riley to Mr. Freed stating that the Lincoln contract was terminated and demanding that Rockland pick up its vending machines at the facility on or before May 30, 2007. (Id., Ex. G at ¶ 4; Ex. M).

20.   Rockland picked up its vending machines at Lincoln on June 1, 2007. (Id., Ex. I at ¶ 9(f)).

**The Decision to Use Funds Collected at Shawangunk as a Set-Off to Rockland's Debt**

21.   As of May, 2007, Rockland was two months behind in its payments to Shawangunk. The total commissions and fees it owed the facility approximated $1,800, (Id., Ex. A at 28; Ex. E at 62; Ex. I at  ¶ 9(a), Ex. N; Freed Decl., ¶ 21).

22.   The inmate benefit account that was supposed to be funded by those payments was overdrawn. (Schulze Aff., Ex. E at 43, Ex. O).

23.   On May 8, 2007, Ms. Creen spoke to Nan Ferri at Support Operations and asked whether, when Rockland's employee came to service the machines the next day, she could have the

4

money counted immediately and retain the 15% commission that was owed to Shawangunk from the funds that were collected. Ms. Ferri briefly discussed Ms. Creen's question with the head of Support Operations, defendant Kidder, and they agreed that the issue needed to be referred to DOCS counsel. (Id., Ex. C at 18; Ex. D at 18-19; Ex. E at 76-77).

24.  Ms. Ferri and Mr. Kidder then called George Glassanos, DOCS' Deputy Counsel, informed him of the situation, and asked whether Shawangunk was legally entitled to retain 15% of the money collected from the Rockland vending machines. Mr. Glassanos responded that Shawangunk was entitled to confiscate all the funds collected from the vending machines as a set-off up to the amount owed by Rockland. (Id., Ex. D at 20, 31-34; Ex. H at 27-30).

25.  Mr. Glassanos further stated that this was based upon both the common-law notion of self-help, and paragraph 9 of the Standard Clauses For All New York State Contracts entitled "Set Off Rights" attached as Appendix A to the Shawangunk contract. (Id. See Freed Aff., Ex. 1 at 22).

26.  Mr. Glassanos's advice was communicated to Ms. Creen, and she then sent a e-mail to Mr. Glassanos confirming that the following day, when Rockland's employee arrived to service the machines, she intended to confiscate the funds to offset Rockland's debt and give the employee a receipt. Mr. Glassanos approved of her plan, stating: "GOOD. DO NOT LET THE REP WALK AWAY WITH THE STATE'S MONEY. IF THERE IS ANY RESISTANCE, SHO[W] THE REP THE DOOR, IMPOUND THE MACHINE AND EXERCISE THE STATE'S RIGHT TO LOCATE AN ALT[ERNATE] SOURCE. YOU ARE WITHIN THE STATE'S RIGHT OF SELF HELP TO RETAIN POSSESSION OF THE MACHINE UNTIL THE VENDOR CURES HIS DEFAULT." (Schulze Aff., Ex. N).

**The Collection of Funds at Shawangunk on May 9, 2007**

27.     On May 9, 2007, at approximately 8:00 a.m. plaintiff Gallagher arrived at Shawangunk CF to collect money and service some of Rockland's vending machines. (Id., Ex. B at 25; Ex. E 36-37).

28.     He entered the facility through the visitor's entrance, signed the log book, and was met by defendant Creen and Ms. Gardner in the hallway passage leading to the secure areas of the facility. (Id., Ex. B at 28-32; Ex. E at 36-39; Ex. P at D0145; Ex. V at ¶ 2).

29.     This was the first time that Mr. Gallagher had seen defendant Creen. (Id., Ex. B at 28).

30.     When they met in the hallway, defendant Creen told Mr. Gallagher that Rockland owed commissions to Shawangunk CF, and they wanted payment. Mr. Gallagher, Ms. Creen and Ms. Gardner continued to discuss the matter as they proceeded down the hallway and passed through the security gates and up a hallway to the visiting room, where the first group of machines that Mr. Gallagher was scheduled to empty and service were located. (Id., Ex. B at 28-32; Ex. E at 36-39).

31.     When they reached the visiting room, Ms. Creen informed Mr. Gallagher that they were instructed by their lawyer to retain the money that Mr. Gallagher removed from the machines to offset the monies owed by Rockland under the contract, and that she would have the money counted in his presence and provide him with a receipt. (Id., Ex. B at 43-44).[1]

---

[1] Mr. Gallagher's account of this conversation is accepted as true for purposes of this motion. However, both Ms. Creen and Ms. Gardner state that the entire conversation took place in the hallway before Mr. Gallagher passed through the security gate. (See Id., Ex. E at 40-41).

32.     Mr. Gallagher said that his boss, Mr. Freed, would be upset, and asked Ms. Creen to contact Mr. Freed and inform him of what was being done. Ms. Creen said that she would do so, and left the visiting room to make the call. (Id., Ex. B at 50-53; Ex. E at 41).

33.     After Ms. Creen left, Mr. Gallagher removed the money from the Rockland machines in the visiting room. The money was counted by Mr. Gallagher, Ms. Gardner, and another DOCS employee, Ms. Reynolds, and placed into an envelope that was retained by DOCS. Mr. Gallagher was given a receipt. (Id., Ex. B at 49, 50, 55; Ex. E at 39).

34.     During this process Ms. Creen returned briefly and told Mr. Gallagher that she had been unable to reach Mr. Freed. Mr. Gallagher asked her to keep trying, and she said she would do so. She then left the area to attend a meeting and was not seen again by Mr. Gallagher on May 9, 2007. (Id., Ex. B at 50-59; Ex. E at 40).

35.     Mr. Gallagher, Ms. Gardner and Ms. Reynolds then proceeded across the hall to the employee's lounge area, and the process was repeated with the Rockland machines that Mr. Gallagher was scheduled to service that day. Although he would have been able to do so, Mr. Gallagher was not asked to remove the money from any of the machines that he was not scheduled to service that day. (Id.).

36.     After giving the money from these machines to DOCS and receiving receipts, Mr. Gallagher left the facility without further incident. (Id., Ex. B at 58-60).

37.     Ms. Creen then sent a e-mail to Mr. Glassanos explaining what had occurred, and Mr. Glassanos confirmed again that it was his opinion that her actions were appropriate, and stated "I GUESS THE OWNER IS SURPRISED YOU DO NOT ACT LIKE A RUG. I AM SURPRISED HE IS. NICE GOING!" (Id., Ex. Q).

7

38. Mr. Gallagher was inside Shawangunk CF from 7:55 a.m. until 10:00 a.m. on May 9, 2007, a total of 2 hours, 5 minutes. (Id., Ex. P at D0145). On his two prior trips to service the Rockland machines at Shawangunk, on May 2, 2007 and May 4, 2007, he was inside the facility for, respectively, 1 hour, 50 minutes and 1 hour, 58 minutes. (Id., Ex. P at D0143, D0146).

39. On May 9, 2007, Mr. Gallagher never attempted to leave Shawangunk CF, nor asked to do so, until after he completed the removal of money from the Rockland vending machines. (Id., Ex. B at 46-48, 52-53, 59; Ex. F at ¶¶ 3-4, Ex. V at ¶¶ 2-4).

40. Mr. Gallagher also did not attempt to contact Mr. Freed or any other person affiliated with Rockland, or ask that he be allowed to do so, while he was inside Shawangunk CF. (Id.).

**Rockland's Complaints About The Events at Shawangunk on May 9, 2007**

41. Sometime between 9:15 a.m and 11:00 a.m. Ms. Creen reached Rockland by telephone, and was transferred to Cheryl Freed, Mr. Freed's wife and the office manager of Rockland. Ms. Creen told Ms. Freed that they had confiscated the money removed from the Rockland Vending machines to offset the commissions owed by Rockland under the contract and provided the driver with receipts, and would continue to do so until the amounts were paid. Ms. Freed objected, asked for copies of the receipts, which were faxed to her, and called her husband, who was in Maryland on business. (Id., Ex. E at 21-23; Ex. R at 15-17).

42. After hearing from his wife and Mr. Gallagher, Mr. Freed called defendant Kidder and said that what had occurred at Shawangunk CF was against the law and constituted "grand larceny and extortion." Mr. Kidder stated that DOCS' counsel had instructed Ms. Creen to take the actions that she did, and that Mr. Freed should contact counsel George Glassanos if he wished to discuss the matter further. (Id., Ex. A at 41-45, 49-50; Ex. S).

43. Mr. Freed elected not to contact Mr. Glassanos. Instead he called Mr. Gallagher and instructed him to file a report with the State Police. (Id., Ex. A at 44-52).

44. Mr. Gallagher proceeded to the police barracks and told the officer on duty that he went to Shawangunk CF and DOCS' lawyer had instructed the facility to confiscate the money he removed from the vending machines. The officer said that he would check it out, but that it was probably a civil matter and there was nothing he could do. (Id., Ex. B at 70-71).

45. Later that same day, the officer called Mr. Freed and stated that the investigation "could not be pursued any further" and would be closed. (Id., Ex. A at 54-56).

46. Mr. Freed then called the Ulster County District Attorney's Office, and spoke to ADA Paul O'Neal, who told him that the dispute involving the events at Shawangunk was a civil matter, and could not be pursued by the District Attorney's Office. (Id., Ex. A at 60-61).

**Rockland's Refusal to Service the Vending Machines at Shawangunk and the Termination of the Shawangunk Contract**

47. On the night on May 9, 2007, Mr. Freed instructed Rockland's employees that they were not to return to Shawangunk CF. (Id., Ex. A at 62-63, 72-73; Ex. B at 79-80).

48. Rockland was next scheduled to send an employee to stock the vending machines at Shawangunk on May 11, 2007, and the Rockland employee would normally arrive at the facility between 8 a.m. and 9:30 a.m. (Id., Ex. E at 60).

49. On May 10, 2007, Ms. Creen called Rockland to ask whether Rockland would be sending an employee the following day to stock the vending machines. Ms. Freed said that she did not know. (Id., Ex. T, Ex. U).

50. On May 11, 2007 between 10:25 a.m. and 11:00 a.m., when no Rockland employee had come, Ms. Creen called Mr. Glassanos for advice on how to proceed. Mr. Glassanos told her to

contact Rockland and find out whether or not they intended to come to fill the vending machines. (Id., Ex. F at ¶¶ 5-6, Ex. U).

51.     Ms. Creen called Rockland and was told that Rockland would not be sending its employees into the Shawangunk facility again because they were afraid. (Id., Ex. A at 62-63, 72-73; Ex. E at 60; Ex. S; Ex. T; Ex. U).

52.     Later that day, Ms. Creen and Mr. Glassanos drafted a letter to Mr. Freed stating that the contract between Rockland and Shawangunk CF was terminated and Rockland's machines were being impounded pending Rockland's payment of amounts owed under the contract. (Id., Ex. E at 73-74, Ex. F at ¶¶ 5-6; Ex. H at 49-50; Ex. T).

53.     On May 28, 2007, Rockland, through counsel, made a complaint to New York Attorney General Andrew Cuomo in regard to the events of May 9, 2007 at Shawangunk. This letter was copied to the Commissioner of DOCS and the Superintendent of Shawangunk. (Complaint, ¶ 36; Schulze Aff., Ex. Z).

54.     On May 31, 2007, Mr. Freed wrote an e-mail to Mr. Kidder complaining that Ms. Riley had not allowed Rockland's trucks access to Lincoln on May 30, 2007, which stated that he believed Ms. Riley was "playing games" and would "imprison" his employees. (Id., Ex. Y).

55.     On June 15, 2007, Mr. Freed wrote a letter to Ms. Creen calling her "an extremely hateful and sick person" who "committed grand larceny and extortion," and stating that "[w]e intend to pursue all legal remedies against you." He copied this letter to New York Attorney General Andrew Cuomo. (Schulze Aff., Ex. S).

56.     Rockland subsequently commenced this litigation, and sought a Temporary Restraining Order to allow it to pick up its vending machines at Shawangunk without payment of amounts owed under the contract. Rockland was then notified in early July, 2007 that DOCS was

releasing the machines to Rockland unconditionally. Rockland pressed forward with its TRO application which sought other relief as well, and on July 26, 2007 obtained an Order allowing it to pick up its vending machines at Shawangunk on 24 hours notice without payment of amounts it owed under the contract. (Id., ¶ 28).

57. After obtaining this emergency relief, Rockland did not make any attempt to pick up its vending machines from Shawangunk until August 28, 2007. (Id., ¶ 29).


Dated: New York, New York
April 10, 2008

        ANDREW M. CUOMO
        Attorney General of the State of New York
        Attorney for Defendants
        By:


        /s/
        Daniel Schulze
        Assistant Attorney General
        120 Broadway - 24th Floor
        New York, New York  10271
        (212) 416-6557