UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROCKLAND VENDING CORP. and KENNETH
GALLAGHER,

                                   Plaintiffs,

        -v-

ROXANNE CREEN, sued in her individual capacity,
MARSHA F. RILEY, sued in her individual capacity,
and STEWART KIDDER, sued in his individual
capacity,

                                   Defendants.

---

Case No. 07-CV-6268 (KMK)

OPINION AND ORDER

Appearances:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiffs*

Daniel A. Schulze, Esq.
Office of the Attorney General of the State of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiffs Rockland Vending Corp. ("Rockland") and Kenneth Gallagher (collectively,

"Plaintiffs") filed this action against Defendants Roxann Creen,[1] Marsha F. Riley, and Stewart

Kidder (collectively, "Defendants"), officials of the New York State Department of Correctional

Services ("DOCS"), in their individual capacities, pursuant to 42 U.S.C. § 1983 ("Section

1983").  Plaintiffs allege that (1) Creen violated Gallagher's Fourth and Fourteenth Amendment

---

[1] Plaintiffs' Amended Complaint misspells this Defendant's name as "Roxanne Creen."

rights "[b]y holding him against his will without due process and restricting his liberty" (Am. Compl. ("AC") ¶ 69), (2) all Defendants violated Rockland's Fourteenth Amendment due process rights by taking Rockland's property "without any pre[-] or post-deprivation proceeding" (*id.* ¶ 68), and (3) all Defendants violated Rockland's First Amendment rights by retaliating against Rockland for "complaints made to the State Police and public officers" (*id.* ¶ 70). Plaintiffs seek compensatory and punitive damages, attorney's fees, and costs.[2] (*Id.* ¶ V(e)-(f).) Before the Court is Defendants' motion for summary judgment. For the reasons stated herein, summary judgment is granted as to all claims.

## I.  Background

The Court assumes the Parties' familiarity with the factual and procedural background of this case as it is set forth in Magistrate Judge Paul E. Davison's Report & Recommendation dated February 10, 2009 ("R&R").[3] In his R&R, Magistrate Judge Davison recommended that Defendants' motion for summary judgment be granted as to Gallagher's false imprisonment claim and Rockland's due process claim, and denied as to Rockland's First Amendment retaliation claim. (R&R 5.) All Parties filed timely objections to the R&R. Oral argument was held before this Court on June 24, 2009.

---

[2] Plaintiffs also seek "temporar[y], preliminar[y] and permanent[]" injunctive relief. (AC ¶ V(c)-(d).) However, such relief is unavailable in this action, as Plaintiffs have brought suit against Defendants only in their individual capacities. *See Corr. Officers Benevolent Ass'n v. Kralik*, No. 04-CV-2199, 2009 WL 856395, at *8 n.7 (S.D.N.Y. Mar. 26, 2009) ("[I]njunctive relief against a state official may be recovered only in an official capacity suit." (internal quotation marks omitted).) The Court thus considers only Plaintiffs' claims for monetary relief.

[3] On the date the original Complaint was filed, the case was referred to Magistrate Judge Mark D. Fox for all purposes. The case was assigned to this Court on August 6, 2007. The referral to Magistrate Judge Fox was reassigned to Magistrate Judge Davison on January 12, 2009.

## II.  Discussion

### A.  Standard of Review

#### 1.  Review of Magistrate Judge's Report & Recommendation

A district court reviewing a magistrate judge's report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *see also Donahue v. Global Home Loans & Fin., Inc.*, No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007).  Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), parties may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 10 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Fed. R. Civ. P. 5(b)(2)(C)-(F), *see* Fed. R. Civ. P. 6(d), as was the case here (R&R 18).

Where a party submits timely objections to a report and recommendation — as Plaintiffs did here by submitting objections on February 20, 2009, and as Defendants did here by submitting objections on March 12, 2009, following an extension of time granted by the Court — the district court reviews de novo the parts of the report and recommendation to which the party objected.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Donahue*, 2007 WL 831816, at *1.  The district court "may adopt those portions of the . . . report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."  *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008)

(quoting Fed. R. Civ. P. 72(b)(2)).

### 2.  Motion for Summary Judgment

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

### B.  Gallagher's Fourth and Fourteenth Amendment Claims

Gallagher claims that Creen violated his Fourth and Fourteenth Amendment rights "[b]y

holding him against his will without due process and restricting his liberty." (AC ¶ 69.)

Magistrate Judge Davison, after considering these claims, concluded that because it is

undisputed that Gallagher "voluntarily entered [Shawangunk Correctional Facility

('Shawangunk')] and never asked to or attempted to leave, and was never told he could not

leave," that "the doors were locked only in the manner that was customary," and that Gallagher

"believed that . . . Creen would allow him to leave so long as he left the vending machine

proceeds behind," Gallagher "failed to set forth evidence from which a reasonable factfinder

could determine that the elements of false imprisonment have been established or that the

parallel constitutional rights were violated with respect to a deprivation of liberty." (R&R 14

(emphasis omitted).) Magistrate Judge Davison therefore recommended that the Court grant

Defendants' motion for summary judgment as to Gallagher's claims. (*Id.* 14-15.) Plaintiffs

objected to this recommendation, arguing that they had established a genuine issue of material

fact as to whether Gallagher had been falsely imprisoned. (Pls.' Objections to R&R ("Pls.'

Obj.") 7-9.) The Court therefore reviews the R&R de novo on this issue, and concurs with

Magistrate Judge Davison that summary judgment is warranted.

"A section 1983 claim for false arrest arises under the Fourth Amendment right to be free

from unreasonable seizures and is identical to a claim for false arrest under New York law.

False arrest and false imprisonment are synonymous under New York law. To establish a claim

for false arrest or false imprisonment, a plaintiff must show that (1) the defendant intended to

confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement, and (4) the confinement was not otherwise privileged." *Dones v.*

*City of New York*, No. 07-CV-3085, 2008 WL 2742108, at *6 (S.D.N.Y. July 9, 2008) (internal

footnotes and quotation marks omitted).  "In addition, [a] false imprisonment claim requires a prima facie showing of actual confinement or threatening conduct."  *Albury v. J.P. Morgan Chase*, No. 03-CV-2007, 2005 WL 746440, at *13 (S.D.N.Y. Mar. 31, 2005) (internal quotation marks omitted) (alteration in original).  "In the absence of a formal arrest, a seizure under the Fourth Amendment occurs where a 'reasonable person would have believed that he was not free to leave.'"  *Munoz v. City of New York*, No. 04-CV-1105, 2008 WL 464236, at *4 (S.D.N.Y. Feb. 20, 2008) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)).

For essentially the reasons stated by Magistrate Judge Davison, Gallagher has failed to raise a genuine issue of material fact as to his claim that Creen falsely imprisoned him in violation of the Fourth Amendment.  There is no evidence from which a reasonable jury could find that Creen intended to confine Gallagher within the prison facility.  Gallagher argues that Creen's intent not to allow him to leave the prison with the vending machine proceeds is sufficient to establish her intent to confine him, but this view of confinement — i.e., that an individual who enters a place in order to remove what he believes is his property is confined if he is not permitted to leave with that property — is not supported by any authority cited by Plaintiffs, and the Court is unaware of any such authority.

The undisputed evidence is that Gallagher freely entered the prison on May 9, 2007, as he had done several times before (Aff. of Daniel Schulze in Supp. of Mot. for Summ. J. ("Schulze Aff.") Ex. B (Dep. of Kenneth Gallagher ("Gallagher Dep.")), at 12-13, 28-29), that as Gallagher walked through the prison the doors were locked in the normal manner, that Gallagher was taken to the location in the prison where he normally did his job, that no one indicated to Gallagher that he was not free to leave at any time either before or after he serviced the vending

6

machines, that Gallagher never attempted to contact any other person while inside the prison (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 40), that Gallagher never attempted to leave or asked to leave until he had serviced the vending machines and turned over the cash to prison staff (*id.* ¶ 39), and that Gallagher spent only seven minutes longer inside the prison on May 9, 2007 than he did during his previous service call on May 4, 2007 (*id.* ¶ 38).  In light of this evidence and Creen's sworn and unchallenged statement that she did not intend to confine Gallagher (Schulze Aff. Ex. F (Aff. of Roxann Creen in Supp. of Mot. for Summ. J. ("Creen Aff.") ¶¶ 3-4)), no reasonable jury could find that there was any actual confinement or that Creen intended to confine Gallagher.[4]

The Court briefly notes that Plaintiffs' Amended Complaint alleges that Creen's actions,

---

[4] Even assuming *arguendo* that Gallagher was confined, no jury could find that Gallagher did not consent to the confinement.  This is an independent reason to grant summary judgment as to this claim.  *See Albury*, 2005 WL 746440, at *14 ("Plaintiff has failed to offer sufficient evidence of a *prima facie* case of false imprisonment, particularly with respect to [defendant's] intent to confine plaintiff in his office. . . . [P]laintiff's meeting with [defendant] lasted only eight minutes and there is no evidence that [defendant] indicated to plaintiff in any way that she was not free to leave."); *Cellamare v. Millbank, Tweed, Hadley & McCloy LLP*, No. 03-CV-39, 2003 WL 22937683, at *8 (E.D.N.Y. Dec. 2, 2003) (finding allegations insufficient to state a claim for false imprisonment where plaintiff alleged that she "was brought to a small room, interrogated for hours, called names, not told that she could leave or have counsel present, and was induced to sign [a] statement [stating that she had disclosed her employer's confidential information] with a promise that she would then be able to leave"); *Lee v. Bankers Trust Co.*, No. 96-CV-8153, 1998 WL 107119, at *5 (S.D.N.Y. Mar. 11, 1998) (holding that plaintiff's allegations that "three of Defendant's high level security personnel told him that they were former FBI agents" and "prepared a confession for him to sign without permitting Plaintiff to add anything to the statement" did "not amount to an actual confinement or anything more than a lengthy interview," and noting that "[s]ummoning an employee into an interview in familiar surroundings . . . does not indicate an intent to confine").  Plaintiffs assert that cases "ar[ising] from lengthy employer/employee interviews" are "distinguishable" (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Mem.") 12), but they do not explain why, and the Court is not aware of any authority supporting the proposition that independent contractors are subject to greater liability for false imprisonment than employers, or that a plaintiff's claim of false imprisonment is strengthened if he is not subjected to questioning during his detention.

in addition to violating Gallagher's Fourth Amendment rights against false imprisonment, also violated his Fourteenth Amendment due process rights, and that Magistrate Judge Davison recommended that this due process claim should also be dismissed.  Because Plaintiffs' objections to the R&R focused solely on Gallagher's false imprisonment claim and did not specifically object to its conclusion as to Gallagher's due process claim (Pls.' Obj. 7-9), the Court reviews this part of the R&R for clear error only.

The Court finds that there is no error, clear or otherwise, in Magistrate Judge Davison's recommendation that Gallagher's claims be dismissed in full.  Gallagher's failure to establish an issue of material fact as to whether he was actually confined negates his claim of a deprivation of liberty for due process purposes; moreover, a due process claim relying on the same facts as a false imprisonment claim cannot be sustained even if confinement could be shown.  *See Farag v. United States*, 587 F. Supp. 2d 436, 450 n.22 (E.D.N.Y. 2008) ("[P]laintiffs' Fourth Amendment and Fifth Amendment due-process claims are both premised on the same factual allegations of false arrest and false imprisonment.  Consequently, the Fourth Amendment's specific guarantee of freedom from unreasonable seizures, not the Fifth Amendment's general guarantee of due process, provides the appropriate framework of analysis."); *Hall v. Brown*, 489 F. Supp. 2d 166, 174-75 (N.D.N.Y. 2007) ("Plaintiff's claim that she was deprived of liberty without due process of law, being duplicative of her false imprisonment claim, cannot stand.").

Accordingly, all of Gallagher's claims are dismissed.

C.  Rockland's Fourteenth Amendment Due Process Claims

Rockland claims that, by retaining the cash collected from Rockland's vending machines on May 9, 2007, and impounding Rockland's machines, "without any pre[-] or post-deprivation

proceeding" (AC ¶ 68), Defendants violated Rockland's Fourteenth Amendment due process rights.  Magistrate Judge Davison considered these claims and concluded that Rockland had at least raised a genuine issue of material fact as to whether Defendants were obliged to provide predeprivation process before impounding Rockland's machines or retaining the money in those machines.  (R&R 9-10.)  In particular, because it was undisputed that Defendants had not provided any such proceeding, Magistrate Judge Davison concluded that Rockland had established "for purposes of deciding Defendants' Motion" that Defendants "violated Rockland's due process rights."  (*Id.* 10.)  However, because "the withholding of equipment and money was objectively reasonable, as a matter of law," Magistrate Judge Davison concluded that "Defendants are entitled to the protection of qualified immunity" as to Rockland's due process claims, and recommended that the Court grant Defendants' motion for summary judgment as to these claims.  (*Id.* 12.)  Plaintiffs objected to this recommendation, arguing that Defendants were not entitled to qualified immunity.  (Pls.' Obj. 3-7.)  Defendants objected to the R&R's preliminary conclusion that Rockland had asserted a valid due process claim.  (Defs.' Objections to R&R ("Defs.' Obj.") 12-17.)  The Court thus reviews de novo this portion of the R&R, and concludes that Defendants are entitled to summary judgment on grounds that Rockland has not established a genuine issue of material fact as to whether its due process rights were violated.

"In order to sustain an action for deprivation of property without due process of law, a plaintiff must first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process."  *Local 342, Long Island Pub. Serv. Employees v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (internal quotation marks and emphasis omitted).

9

### 1.  Identifying a Property Right

"Identifying the relevant property interest is . . . a two-step process."  *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005).  "First, [the court] must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff."  *Id.*  "Once such a property right is found, [the court] must determine whether that property right constitutes a property interest for purposes of the Fourteenth Amendment."  *Id.* (internal quotation marks omitted).

In opposing Defendants' motion for summary judgment as to Rockland's due process claims, Rockland asserts that it was deprived of its property rights in "its machines, product and funds" (Pls.' Mem. 13) when Defendants engaged in "self-help at Shawangunk," and when they "refus[ed] to allow plaintiff [to] retrieve its property at Lincoln [Correctional Facility ('Lincoln')]" (*id.* 14).  According to Rockland, it had "settled property interests" in "ownership of the vending machines, [and] the contents thereof, including the proceeds of prior sales."  (*Id.*; *id.* 15 (identifying as property rights the "use of vending machines and their contents, including funds").)

Defendants argue that any property rights Rockland might assert in its vending equipment, products, and proceeds cannot constitute property interests protectable by the Due Process Clause, because it is undisputed that Defendants' actions were "taken pursuant to an interpretation of the contracts the DOCS facilities had with [Rockland]," and "contract disputes . . . cannot be morphed into Section 1983 actions."  (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 12.)  Defendants note that "the type of interest a person has in the enforcement of an ordinary commercial contract often 'is qualitatively different from the interests the

Supreme Court has . . . viewed as "property" entitled to procedural due process protection,'"

*Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994) (quoting *S & D Maint. Co. v.*

*Goldin*, 844 F.2d 962, 966 (2d Cir. 1988)), and assert that the Second Circuit has avoided

extending procedural due process protection to such interests.  (Defs.' Obj. 13-14.)

Magistrate Judge Davison correctly concluded that Rockland properly asserted a

cognizable property interest in its vending equipment, citing *New Windsor Volunteer Ambulance*

*Corps, Inc. v. Meyers*, 442 F.3d 101 (2d Cir. 2006).  (R&R 8.)  In that case, the Second Circuit

held that where the plaintiff ambulance corps "owned the ambulances and other vehicles and

equipment that were seized and withheld" by the municipal defendant, those "tangible physical

assets . . . constituted property within the meaning of the Due Process Clause."  *New Windsor*,

442 F.3d at 115.  The *New Windsor* court distinguished *S & D Maintenance* as a case in which

the plaintiff's claimed property deprivations were the municipal defendant's refusal to pay

invoices pursuant to a contract and its termination of a contract between the plaintiff and

defendant, noting that the *New Windsor* plaintiff did not claim a "property right to the

continuation of its contractual relationship" with the defendant or to "money unpaid" by the

defendant.  *Id.*  Here, as Magistrate Judge Davison noted, it is undisputed that Rockland owned

the vending machines at issue.  (R&R 8.)  Defendants do not address *New Windsor* in their

objections to this portion of the R&R (Defs.' Obj. 13-15); instead, they cite *Resource Services,*

*LLC v. City of Bridgeport*, 590 F. Supp. 2d 347 (D. Conn. 2008), another case of the sort that

*New Windsor* distinguished, i.e., one in which a plaintiff alleged "a property interest in a benefit

such as the right to collect payment under a contract" or the right to a prospective contract, and

claimed deprivation of that interest because the government defendant "breached the [existing]

11

contract" or "improperly failed to award [a] contract[]" to the plaintiff, *id.* at 358. Here, as in *New Windsor*, Rockland claims a property right in its vending machines independent of any contract with DOCS; it owned the machines before it entered into contracts with DOCS, title never passed from Rockland to DOCS under these contracts, and Defendants' claim of a contractual right to seize the machines is separate from Rockland's claim of a property right in ownership of the machines. *Cf. Ford Motor Credit Co. v. NYC Police Dep't*, 503 F.3d 186, 191 (2d Cir. 2007) (stating that a security interest is "indisputably a property interest protected by the Fourteenth Amendment," and distinguishing between the two rights of a secured creditor: "the *contractual* right to repayment of the debt owed and the *property* right to the collateral that secures the debt in the event of non-payment").

### 2.  Deprivation of a Property Right

Having found that Rockland asserted a cognizable property interest in its vending machines, the Court next considers whether there is any disputed issue of material fact as to whether Defendants denied Rockland of that right. Defendants do not specifically contest that DOCS officials caused such a deprivation, and the Court finds no error in Magistrate Judge Davison's apparent finding that Defendants effected a constitutionally cognizable deprivation by "withholding the vending equipment and retaining the money collected by Plaintiffs." (R&R 10.)

### 3.  Lack of Due Process

"While it is clear that some form of hearing is required before an individual is finally deprived of a property interest, due process is flexible and calls for such procedural protections as the particular situation demands." *Brody v. Vill. of Port Chester*, 434 F.3d 121, 134 (2d Cir.

2005) (internal citation and quotation marks omitted).

"If [a defendant's] conduct [effecting a deprivation of property] was random and unauthorized . . . , the existence of a meaningful post-deprivation remedy . . . would automatically satisfy procedural due process." *Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006); *see also DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) ("Generally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest.  However, due process does not require the impossible.  Where a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a post-deprivation proceeding." (internal citations omitted)). "If, on the other hand, . . . [the] decision was part of an established state procedure, such that the availability of a post-deprivation remedy would not *automatically* satisfy due process, [a court must] merely go on to determine what process was due." *Rivera-Powell*, 470 F.3d at 466.  What process is due in this latter situation is determined by reference to *Mathews v. Eldridge*, 424 U.S. 319 (1976), which instructs courts to "balanc[e] . . . three factors." *Rivera-Powell*, 470 F.3d at 466.  These factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

Defendants contend that they are entitled to summary judgment on Rockland's due process claim because "even assuming *arguendo* that DOCS' interpretation of the contracts was

incorrect and [Defendants'] actions constituted a breach, Rockland could sue in State court on the contract and obtain compensatory damages," which would be "a perfectly adequate post-deprivation remedy."  (Defs.' Mem. 13.)  However, Magistrate Judge Davison concluded that there was a genuine issue of material fact regarding "Kidder's decision-making authority and his involvement in the administration of the contracts at issue," thus barring a finding as a matter of law that Defendants' "conduct [was] 'random' and 'unauthorized' such that post-deprivation remedies could be deemed sufficient"; moreover, Defendants "have not established that a particular post-deprivation remedy was available and sufficient."  (R&R 9-10.)  Defendants objected to the R&R on this issue, maintaining that "a postdeprivation remedy is sufficient for ordinary contractual disputes."  (Defs.' Obj. 17.)

The weight of authority in the Second Circuit supports Defendants' position that a plaintiff alleging property deprivation by way of contract breach has an adequate postdeprivation remedy in a state court breach of contract action or Article 78 proceeding.  *See Signet Constr. Corp. v. Borg*, 775 F.2d 486, 491 (2d Cir. 1985) (holding that where the plaintiff claimed a "property interest . . . [in] the right to prompt payment of monies due" under contracts with a government defendant, and where "it is undisputed that the parties' differences regarding the amounts due under [plaintiff's] various contracts . . . will be resolved in . . . breach of contract actions . . . in the New York State Supreme Court," the postdeprivation remedy of bringing suit in state court was adequate, because "[t]here is . . . no risk that [plaintiff] will be deprived permanently of property without a hearing"); *Christ Gatzonis Elec. Contractors, Inc. v. N.Y. City Sch. Constr. Auth.*, No. 93-CV-2418, 1993 WL 666697, at *2 (E.D.N.Y. Sept. 17, 1993) (holding that where the plaintiffs claimed deprivation of sums allegedly due under government contracts,

14

assuming that those deprivations could give rise to a due process claim, "as a matter of law the availability of a postdeprivation hearing in the form of a state court action based on breach of contract was all the process that was due plaintiffs under the Fourteenth Amendment"); *Washington v. White*, 805 F. Supp. 191, 193 (S.D.N.Y. 1992) ("Even assuming arguendo that the alleged contract guaranteed release and thus created a constitutionally protected property interest, plaintiff received an adequate state court remedy, i.e., a breach of contract cause of action."); *cf. Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996) (holding that an Article 78 proceeding was an adequate postdeprivation remedy for alleged de facto disbarment of plaintiff contractor).

These cases, however, might be distinguished on the grounds suggested by the Second Circuit in *New Windsor*, as they involve alleged deprivations of the right to contract with the government or the right to receive the benefit of a government contract, rather than deprivation of an interest in property owned by the plaintiff.  The Supreme Court explained the potential significance of this distinction in *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001).  In *Lujan*, the Court "assume[d] . . . that [plaintiff] ha[d] a property interest in its claim for payment [on a government contract]," but held that "it is an interest, unlike the interests discussed [by the Court in previous cases], that can be fully protected by an ordinary breach-of-contract suit." *Lujan*, 532 U.S. at 196.  In reversing the lower court's holding that plaintiff was "entitled to a reasonably prompt hearing when payments were withheld," the *Lujan* Court distinguished its prior decisions mandating such a result, noting that "[i]n each of these cases, the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation."  *Id.* at 195-96; *see also Baird*

15

*v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 691 (7th Cir. 2004) ("Not all injuries are equal, and not all parties can be made whole through a breach of contract action.  The somewhat obscure quality that separates one from the other is important and yet eludes precise definition.  The Supreme Court has referred to this mysterious element as a 'present entitlement,' and identifies cases involving this factor as ones in which 'the claimant was denied a right by virtue of which he was presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation.'").

The Parties have not cited, and the Court is unable to find, any cases directly on point, i.e., where a government defendant, pursuant to his or her interpretation of a contract with the plaintiff, allegedly deprives the plaintiff of property to which the plaintiff claims a present entitlement independent of the plaintiff's contractual relationship with the government.  In the absence of such a case, the Court finds that the reasoning of the court in *A. Aiudi & Sons v. Town of Plainville*, 862 F. Supp. 737 (D. Conn. 1994), is persuasive in this context.  In *A. Aiudi*, plaintiffs asserted a property interest in letter-of-credit funds held by the defendant municipality.  *See id.* at 742.  Accepting *arguendo* plaintiffs' claim to "a concrete property interest in the actual funds . . . disbursed pursuant to the Letter of Credit," which plaintiffs characterized as "the actual ownership of real estate, chattels or money," *id.* (internal quotation marks omitted), the court held that plaintiffs were not entitled to a predeprivation hearing, because the essence of the alleged deprivation was a breach of contract.  The court stated:

> In breach of contract cases it is difficult to see how the decision complained of, i.e. the determination to engage in behavior that is later challenged as constituting a breach, can ever be said to be based on "some established state procedure." Even if the official nature of the decision by a body to breach a contract renders it analogous to an established procedure, "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process,

16

> when coupled with the availability of some meaningful means by which to assess
> the propriety of the State's action at some time after the initial taking, can satisfy
> the requirements of procedural due process."

*Id.* at 743 (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by*

*Daniels v. Williams*, 474 U.S. 327 (1986)).[5]  The court noted that plaintiffs did not allege that the

state failed to provide them a remedy for the alleged breach of contract, and concluded that that

postdeprivation process — a breach of contract suit in state court — was adequate.  *See id.*  "A

contrary conclusion," the court held, "would result in the somewhat puzzling holding that, before

engaging in behavior that *may* later be judicially determined to constitute a breach, the state must

hold some kind of hearing to determine whether the proposed behavior is a breach."  *Id.*

The same result should obtain in the instant case.  There is no dispute that the alleged

deprivation of property here — the seizure of Rockland's vending machines and its contents —

was done pursuant to Defendants' interpretation of the contracts between Rockland and the

DOCS facilities; the dispute is whether the actions taken were in compliance with or in breach of

the contracts.  A rule that made Section 1983 liability for such alleged commercial contract

---

[5] Thus, the involvement of a high-level official in a deprivation reflecting a mistaken view of a commercial contract does not defeat the conclusion that the deprivation was random and unauthorized.  *See Van-Go Transp. Co. v. N.Y. City Bd. of Educ.*, 53 F. Supp. 2d 278, 295 (E.D.N.Y. 1999) (holding that where "plaintiffs contend that defendants' acts were not random or unauthorized," yet "do not expressly argue that the alleged due process violation at issue was caused by an 'established state procedure,'" instead "claim[ing] that high-level . . . officials plotted to deprive [plaintiff] of its property rights to the . . . contract . . . , plaintiff's claim states a classic case of random, unauthorized acts by individual state or local officials," for which an Article 78 proceeding would have been an adequate postdeprivation remedy for the deprivation of a putatively cognizable property interest).  Assuming *arguendo* that there is sufficient evidence from which a reasonable jury could conclude that "Kidder possessed and exercised high-level authority" in orchestrating the impounding of Rockland's property (R&R 9), this is not dispositive proof of an established state procedure that was followed to deprive Rockland of its property and therefore does not negate the possibility that postdeprivation process could adequately satisfy the demands of the Fourteenth Amendment.

breaches depend on the initial ownership of the property at issue would comport poorly with the *Mathews* factors.  For instance, such a rule might require DOCS to provide Rockland with a predeprivation hearing before arguably exercising its contract rights by temporarily impounding Rockland's merchandise or else risk having to litigate its contract dispute in federal court in a Section 1983 action, while at the same time limiting Rockland to a breach of contract suit in state court in the event that a government counterparty refused to pay invoices worth millions of dollars.  Rockland does not allege that it could not be made whole via a state court suit for damages, nor is there any evidence in the record from which a reasonable jury could so find.[6]  In other words, assuming *arguendo* that Rockland was deprived of its property interest in its vending equipment for several weeks following May 2007, the postdeprivation remedy of state court litigation was adequate, because "the remedy [wa]s available before the loss . . . bec[a]me complete and irrevocable," *Baird*, 389 F.3d at 692 (noting that "[t]he postdeprivation remedies appropriate to the deprivation of an interest to which there is a present entitlement are characterized by promptness and by the ability to restore the claimant to possession").[7]

---

[6] The Amended Complaint alleges that Rockland's "[l]oss of vending contracts" with DOCS facilities "will decrease [Rockland's] annual gross sales by about $725,000 or 30% and cause [Rockland] irreparable financial harm," and that this "sudden business loss" — not Defendants' allegedly improper seizure of Rockland's vending machines — was what "caused [Rockland] to proceed into Chapter 11 status."  (AC ¶¶ 63-64.)  Rockland does allege that Defendants' seizure of Rockland's vending machines "impeded its capacity to cover [its] substantial economic losses" (*id.* ¶ 65), but does not assert or offer evidence to prove either that the prompt release of such equipment would have enabled Rockland to stay out of bankruptcy or that the value of the equipment lost to Rockland during the period of the allegedly improper withholding could not be measured and repaid as damages in a state court suit for contract breach.

[7] The fact that postdeprivation litigation was adequate to protect Rockland's property interests is underscored by the lack of urgency with which Rockland attempted to reassert possession over its vending equipment that had allegedly been impounded at Shawangunk.  It is

A formal analysis under the *Mathews* balancing test confirms that the ability to sue for breach of contract in state court or bring an Article 78 proceeding was all the process due Rockland.  First, although Rockland's property interests in possession and control of its vending equipment are not insubstantial, prior to the alleged deprivation Rockland had already willingly given up considerable control over that equipment by entering into contracts with DOCS facilities; moreover, as Defendants point out, a corporation's right to use its property is not akin to the property interests traditionally accorded procedural due process protection, such as welfare benefits and tenured public employment.  (Defs.' Obj. 13-14.)  *See North Star Contracting Corp. v. Long Island R.R. Co.*, 723 F. Supp. 902, 910 (E.D.N.Y. 1989) ("This case is a far cry from cases where the deprivation could result in consequences so serious as the wrongful termination of the right to receive public assistance.").  Second, permitting Defendants to seize Rockland's property in pursuit of their asserted right of "self-help" without any predeprivation process would risk erroneous deprivation of Rockland's property interest in its vending equipment in the event that Defendants misinterpreted the relevant contracts, but that deprivation would be temporary and could — unlike, for instance, deprivation of education during a lengthy suspension from school, *see Goss v. Lopez*, 419 U.S. 565, 576 (1975) — be completely remediated through state court litigation after the fact; thus, requiring additional procedural safeguards would probably add little value.  *Cf. United States v. Any & All Radio Station Equip.*, 93 F. Supp. 2d 414, 423 (S.D.N.Y. 2000) (holding that "while pre-seizure hearings provide additional safeguards and are generally preferable to an *ex parte* seizure, in this case the

---

undisputed, for example, that Rockland was "notified in early July, 2007 that DOCS was releasing the machines to Rockland unconditionally" and yet "did not make any attempt to pick up its vending machines from Shawangunk until August 28, 2007."  (Defs.' 56.1 ¶¶ 56-57.)

probable value of a pre-seizure hearing would have been minimal," where "claimants have had the opportunity to be fully heard in the current motions before this Court").  Third, and most importantly, DOCS has an important interest in enforcing what it perceives as its contractual rights without first having to provide its independent contractors with procedures to determine the scope of those rights.  *Cf. North Star*, 723 F. Supp. at 910 ("[I]mposing the requirement of a pre-termination hearing every time a state actor wishes to end a contractual relationship would delay work on public contracts and place an undue burden on the state.").  To require this would effectively bar government entities from protecting their commercial contracts through self-help, even if such self-help may be common in a given industry, contravening the principle that "[t]he state, like any private party, must be able to breach contracts without 'turn[ing] every breach . . . into a violation of the federal Constitution,'" *TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344, 348-49 (2d Cir. 2000) (quoting *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996)) (second alteration in *TM Park Ave.*).

Accordingly, Defendants are entitled to summary judgment on Rockland's due process claims, because there is no genuine issue of material fact as to the adequacy of the procedures provided to Rockland to protect against deprivation of its property interests.

### 4.  Qualified Immunity

In the alternative, assuming *arguendo* that the Fourteenth Amendment entitled Rockland to some predeprivation hearing prior to Defendants' impounding of Rockland's vending equipment, the Court agrees with Magistrate Judge Davison's conclusion that Defendants are nonetheless entitled to qualified immunity.  "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (internal quotation marks omitted). "The question of whether a right is 'clearly established' is determined by reference to the case law extant at the time of the violation." *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008). "This is an objective, not a subjective, test, and reliance upon advice of counsel therefore cannot be used to support the defense of qualified immunity." *Id.*

As Magistrate Judge Davison noted, "it is undisputed that the Defendants withheld the vending equipment and money based on a belief that contract law and/or common law principles entitled them to do so." (R&R 12.) For the reasons discussed above, *see supra* Section II.C.3, the Court finds that Rockland had no clearly established constitutional right to notice and opportunity to be heard prior to the deprivations of property at issue.[8] The Court therefore agrees with Magistrate Judge Davison that Defendants' belief that they were not violating Rockland's constitutional rights was "objectively reasonable, as a matter of law." (R&R 12.)

Accordingly, Defendants are entitled to qualified immunity as to Rockland's due process claims.

### D.  Rockland's First Amendment Retaliation Claims

Rockland asserts claims against Defendants for violation of Rockland's First Amendment rights, alleging that in retaliation for Rockland's "requests for assistance from the New York

---

[8] In response to Defendants' assertion that Creen acted at the direction of DOCS counsel George Glassanos (Defs.' Mem. 22; Defs.' Obj. 7-8), Plaintiffs contend that there is evidence that Creen failed to follow Glassano's advice, demonstrating that Creen had an improper motive and that her qualified immunity defense should fail. However, as Defendants point out, "subjectively improper intent" is relevant only to Plaintiffs' false imprisonment and retaliation claims (Defs.' Mem. 22), and so the Court need not address this issue in assessing whether Defendants are entitled to qualified immunity as to Rockland's due process claims.

State police and its exercise of the right to petition the government to investigate its grievances,"
Defendants (1) "cancelled or non-renewed [sic]" Rockland's contracts to provide vending
services at DOCS facilities, and (2) "disallowed [Rockland] from retrieving its vending
equipment from Lincoln . . . in late May 2007" and "from removing one [vending] machine from
[Coxsackie Correctional Facility ('Coxsackie')]."  (AC ¶¶ 38-39, 42.)  Magistrate Judge Davison
concluded that Defendants are not entitled to summary judgment on the merits of these claims,
because they "turn on an assessment of each Defendant's subjective intent (about which the
parties are in dispute)," and therefore "these claims necessarily require a factual determination
for resolution."  (R&R 17.)  Magistrate Judge Davison also recommended that the Court reject
Defendants' assertion of qualified immunity, because "[a]ssuming Plaintiffs' allegations are true
(i.e., that Defendants terminated contracts with Rockland in retaliation for Plaintiffs' complaints
to the authorities), that conduct would unquestionably violate clearly established law" and
"could not be described as objectively reasonable."  (*Id.* 16.)  Defendants objected to this
recommendation (Defs.' Obj. 2-12), and so the Court reviews this portion of the R&R de novo.

### 1.  First Amendment Retaliation Against Government Contractors

According to the Supreme Court:  "The government needs to be free to terminate both
employees and contractors for poor performance, to improve the efficiency, efficacy, and
responsiveness of service to the public, and to prevent the appearance of corruption.  And, absent
contractual, statutory, or constitutional restriction, the government is entitled to terminate them
for no reason at all."  *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996).  However,
"[t]he First Amendment's guarantee of freedom of speech protects government employees from
termination *because* of their speech on matters of public concern.  To prevail, an employee must

22

prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination.  If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct."  *Id.* at 675 (internal citation omitted).

In *Umbehr*, the Supreme Court held that courts considering claims of First Amendment retaliation should "apply[] [the Court's] existing framework for government employee cases to independent contractors."  *Id.* at 677.  "To prevail, [an independent contractor claiming retaliation] must show that the termination of his contract was motivated by his speech on a matter of public concern . . . .  If he can make that showing, the [government] will have a valid defense if it can show, by a preponderance of the evidence, that, in light of their knowledge, perceptions, and policies at the time of the termination, the [government] would have terminated the contract regardless of his speech."  *Id.* at 685; *see also Afr. Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) ("*Umbehr* addressed and answered . . . [the] question . . . whether the protections enjoyed by government employees against termination based on protected speech should be extended to the termination of contracts with independent contractors who do business with the government.  The Supreme Court held that it should . . . ." (internal citation omitted)); *Ansell v. D'Alesio*, 485 F. Supp. 2d 80, 84 (D. Conn. 2007) ("Numerous courts, including the Supreme Court, have concluded that for purposes of retaliation claims brought under the First Amendment, there is no legal distinction between independent contractors with pre-existing contracts . . . and full-time employees.").

The Court thus analyzes Defendants' motion for summary judgment on Rockland's First Amendment retaliation claims under the case law governing public employee speech.  "To

establish a First Amendment retaliation claim, a plaintiff must show:  (1) his speech addressed a

matter of public concern; (2) he suffered an adverse employment action; and (3) a causal

connection between the speech and the adverse employment action."  *Singh v. City of New York*,

524 F.3d 361, 372 (2d Cir. 2008).

### 2.  Speech on a Matter of Public Concern

In their motion for summary judgment, Defendants did not dispute that Rockland's

complaints addressed a matter of public concern, and their objections to the R&R did not address

Magistrate Judge Davison's conclusion that Rockland's "complaints to law enforcement about

Defendants' conduct w[ere] protected speech" (R&R 15).  However, at the request of the Court

during oral argument, the Parties submitted letter briefs on the issue of whether Rockland's

complaints constituted speech on a matter of public concern.

"Whether an employee's speech addresses a matter of public concern is a question of law

for the court to decide, taking into account the content, form, and context of a given statement as

revealed by the whole record."  *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008)

(internal quotation marks omitted).  "The heart of the matter is whether the employee's speech

was calculated to redress personal grievances or whether it had a broader public purpose."  *Id.*

(internal quotation marks omitted).  "A generalized public interest in the fair or proper treatment

of public employees is not enough" to "transform a personal grievance into a matter of public

concern."  *Id.* at 190 (internal quotation marks omitted).

Rockland's complaints to law enforcement officials about the May 9, 2007 events at

Shawangunk were essentially complaints about a civil contract dispute between Rockland and

24

DOCS — notwithstanding Plaintiffs' various hyperbolic allegations of criminal conduct.[9]  There

is no evidence in the record that Rockland ever alleged that DOCS was pursuing an unfair policy

or regularly engaged in illegal practices that affected anyone other than Rockland.[10]  While

Plaintiffs could suggest that their complaints about Gallagher's alleged false imprisonment might

involve a matter of public concern, *cf. White Plains Towing Corp. v. Patterson*, 991 F.2d 1049,

1060 (2d Cir. 1993) (observing that "alleged defamation by state police officers of a citizen with

---

[9] At his deposition, Gallagher testified that when he spoke to the police he thought he was reporting the crimes of "[r]obbery, theft and they were holding me in there."  (Gallagher Dep. 72.)  What he "[s]pecifically" told the police was that Shawangunk officials "confiscate[d] [his] money bags" and that he "thought it was insane that they did that."  (*Id.* 70.)  Rockland's president, Michael Freed, also told the police that he "thought a crime had been committed."  (Schulze Aff. Ex. A (Dep. of Michael Freed ("Freed Dep.")), at 56.)  Freed also testified that he spoke to the Ulster County District Attorney, but could not remember anything that was said during the conversation other than the assistant district attorney explaining to Freed, at some length, that "it was a civil matter."  (*Id.* 61.)  Plaintiffs' current counsel wrote a letter, on behalf of Rockland and Freed, to the New York Attorney General, describing Creen's conduct as "outrageous" and "not in keeping with an orderly society," asserting that Creen "acted in an entirely illegal manner by conditioning Gallagher's freedom on his agreement to break his fiduciary relationship with his employer," and stating that "[c]ondoning such behavior would be a tragedy for our state and set a terrible precedent."  (Schulze Aff. Ex. Z (Letter of Michael Sussman, dated May 28, 2007), at 2.)  Freed also sent a letter to Creen, copied to the New York Attorney General, stating that her actions "transcend a business relationship of any kind and were clearly criminal in nature," that she "incarcerated" Gallagher and "denied him his civil rights," that she was "an extremely hateful and sick person," and that she "committed grand larceny and extortion."  (Schulze Aff. Ex. S (Letter of Michael Freed, dated June 15, 2007), at 1.)

[10] In this regard, the instant case presents a situation quite different from *Umbehr*, which was the only authority cited in the R&R for the proposition that Rockland's complaints were protected speech.  For one thing, the plaintiff in *Umbehr* was "an outspoken critic of . . . the Board of County Commissioners . . . ; [he] spoke at the Board's meetings, and wrote critical letters and editorials in local newspapers regarding the County's landfill user rates, the cost of obtaining official documents from the County, alleged violations by the Board of the Kansas Open Meetings Act, the County's alleged mismanagement of taxpayers' money, and other topics."  *Umbehr*, 518 U.S. at 671.  Here, by contrast, the sum total of Plaintiffs' inflammatory statements about Defendants concerned only Defendants' interactions with Rockland regarding its performance on the contract.

whom the police department is doing business may well be a matter of interest to the community"),[11] it is clear from the record that the complaints merely "stated private commercial grievances that do not appear to relate to any matter of political, social, or other concern to the community," *id.* In fact, the record is devoid even of isolated "comments [that] could be construed broadly to implicate matters of public concern," *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (holding that plaintiff's statements, which were "personal in nature and generally related to her own situation," did not address matters of public concern, as the record reflected that plaintiff "was not on a mission to protect the public welfare," notwithstanding her allegations of race and gender discrimination).[12]

Accordingly, Defendants are entitled to summary judgment on Rockland's First Amendment retaliation claim on grounds that the allegedly protected speech was not on a matter

---

[11] In *White Plains Towing*, the plaintiffs' First Amendment retaliation claim arose out of the same alleged defamation that was the basis of a "stigma plus" due process claim that the district court, following a bench trial, had found meritorious. *See White Plains Towing*, 991 F.2d at 1052. Though the Second Circuit found the due process portion of the district court's judgment "inappropriate" due to the absence of "a finding that there had been any dissemination of defendants' stigmatizing statements sufficient to affect plaintiffs' standing in the community or to foreclose future job opportunities," it agreed that "the potential injury to their reputation stemming from defendants' characterization of [a plaintiff] as dishonest or as related to organized crime, combined with his status as an exclusive assignee of towing rights on a portion of the Expressway, may have sufficed to give plaintiffs a liberty interest that could not properly be terminated without a hearing." *Id.* at 1063.

[12] The Court notes that Plaintiffs' conclusory attempts to label their complaints as plausible reports of suspected criminal activity, *see supra* note 9, do not change what the evidence shows, which is the existence of a civil contract dispute. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted) (alteration in *Twombly*)).

of public concern.[13]

### 3.  Adverse Action

Assuming *arguendo* that the complaints to law enforcement officials constituted speech on a matter of public concern, the Court considers the other prongs of Rockland's retaliation claim.  With respect to the second prong — whether Rockland suffered adverse action akin to the "adverse employment action" discussed in the case law dealing with government employees — Defendants do not contest that the termination or non-renewal of Rockland's contracts with

---

[13] In their supplemental briefing following oral argument, Plaintiffs advance the argument that Defendants unconstitutionally retaliated against Plaintiffs not for exercising the First Amendment right to freedom of speech, but rather for exercising the First Amendment right to *petition* government for redress of grievances.  (Pls.' Supplemental Mem. of Law in Supp. of First Amendment Claim 5.)  According to Plaintiffs, "[r]eports to police seeking redress are constitutionally protected as instances of the right to petition," regardless of "whether the underlying cause of the petition concerns a private or public matter."  (*Id.*)  In support of this assertion, Plaintiffs do not cite any authority in the Second Circuit, relying solely on *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007).  In *Foraker*, the Third Circuit stated that "a public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance is protected under the Petition Clause from retaliation for that activity, even if the petition concerns a matter of solely private concern."  *Id.* at 236.  Here, Plaintiffs merely made oral and written complaints to the State Police, District Attorney, and Attorney General, and did not formally file a lawsuit or grievance.  More importantly, *Foraker* is directly contrary to binding law of the Second Circuit, which has held that "retaliation claims premised on the First Amendment right to petition are subject to [the] public concern requirement," *Cobb v. Pozzi*, 363 F.3d 89, 105 (2d Cir. 2004).  This is the majority rule in the courts of appeals, and it is has long been settled law in the Second Circuit.  *See White Plains Towing*, 991 F.2d at 1059 (holding that "right to petition the government for a redress of grievances . . . is generally subject to the same constitutional analysis as the right to free speech" and that "the trial court could properly find plaintiffs' First Amendment claims meritorious only if [plaintiff's] speech constituted comments upon a matter of public concern"); *Peele v. N.Y. City Dep't of Soc. Servs.*, No. 92-CV-3765, 1995 WL 728478, at *6 (S.D.N.Y. Dec. 8, 1995) (noting that *White Plains Towing* is contrary to *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994), the case on which *Foraker* relies).  Indeed, it is the law in the Second Circuit that retaliation for filing a lawsuit against a government employer is only actionable under the First Amendment if the lawsuit is speech on a matter of public concern.  *See Ruotolo*, 514 F.3d at 189.  The Court therefore is constrained to reject Plaintiffs' argument on this issue.

DOCS facilities would qualify as adverse for purposes of a retaliation claim, arguing instead that

Kidder had no personal involvement in the decisions to terminate or not to extend the contracts.

(Defs.' Mem. 15-16.)  Defendants also argue that the detention of Rockland's vending

equipment at Shawangunk "to secure payments" owed to DOCS was "constitutionally de

minim[i]s," and that the detention of Rockland's equipment at Lincoln was not adverse at all,

since "Rockland was unable to pick it up on May 30, 2007 only because [Rockland] failed to

make advance arrangements with the Lincoln facility," and that in any event it was only a two-

day detention and thus de minimis.  (*Id.* 17; Defs.' Obj. 4.)  In his R&R, Magistrate Judge

Davison stated that "[t]ermination of a government contract constitutes an 'adverse action'

within the meaning of the First Amendment" (R&R 15), and concluded that the following

alleged actions provided grounds for Plaintiff's retaliation claims to survive summary judgment:

> Plaintiffs allege that Defendant Riley impounded [Rockland's] vending machines
> at Lincoln Correctional Facility; that Defendant Creen impounded vending
> machines at [Sha]wangunk; and that Defendant Kidder was involved in the
> impounding of the machines and in the termination of various contracts with
> Rockland, alleged to have occurred even at facilities where there had been no
> disputes, where no money was owed or past-due, and where the facility stewards
> had recommended that [Rockland's] contract be extended.

(*Id.* 17 (internal citations omitted).)  These allegations aside, the question is whether there is

sufficient *evidence* from which a reasonable jury could conclude that Rockland suffered any

actionable adverse action by Defendants.

"[T]he proper legal test in determining whether an employment action is adverse in First

Amendment retaliation cases is whether the alleged acts would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights."  *Dillon v.

Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (internal quotation marks omitted).  "A plaintiff

cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006).

Adverse employment actions may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id.* (internal quotation marks omitted). The Supreme Court has made clear that termination of a government contract qualifies as an adverse action for First Amendment retaliation purposes. *See Umbehr*, 518 U.S. at 677 ("To prevail, [the independent contractor] must show that the termination of his contract was motivated by his speech on a matter of public concern . . . ."). In addition, "[t]he weight of authority supports the proposition that failure to renew a[] . . . contract may constitute an adverse . . . action." *McFarlane v. Chao*, No. 04-CV-4871, 2007 WL 1017604, at *23 (S.D.N.Y. Mar. 30, 2007) (collecting cases).

"It is well settled in [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks omitted). "Because personal involvement is a question of fact[,] . . . summary judgment may be granted only if no issues of material fact exist and the defendant[] is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted) (alterations in original).

### a.  Detention of Rockland's Equipment

The alleged detention of Rockland's equipment at Lincoln, as a matter of law, was not adverse action. Plaintiffs have proffered no evidence from which a reasonable jury could conclude that the two-day delay in retrieving Rockland's equipment from Lincoln was the type of action that was severe enough to deter the exercise of constitutional rights, especially in light

of the undisputed evidence that Rockland was not prompt in attempting to collect that equipment (or its equipment at Shawangunk) after receiving permission to do so.  *Cf. Menes v. City Univ. of N.Y. Hunter Coll.*, 578 F. Supp. 2d 598, 615 (S.D.N.Y. 2008) ("Plaintiff's transfer to a position that required him to learn how to use a new computer program imposed at most a de minimis burden and does not constitute an adverse employment action.").  Because the delay at Lincoln is the only allegedly retaliatory action in which Riley is alleged to have been personally involved, Riley is entitled to summary judgment as to Rockland's First Amendment claim against her.

With respect to the equipment "held hostage at Shawangunk" (AC ¶ 33), the Amended Complaint does not allege that this action was taken in retaliation for any protected speech. Whereas Plaintiffs allege that the cancellation and non-renewal of Rockland's contracts and the retention of Rockland's equipment at Lincoln were "a direct consequence of [Rockland's] requests for assistance from the New York State police" (*id.* ¶ 38) and "in retaliation for [Rockland's] complaint about the treatment it received at Shawangunk" (*id.* ¶ 42), the only allegation regarding Defendants' intent with respect to the equipment at Shawangunk was that "Creen demanded disputed commissions and threatened to treat [Rockland's] machines as abandoned property if [Rockland] did not pay her disputed sums" (*id.* ¶ 32).  As Rockland's alleged refusal to pay disputed sums pursuant to a contract is not alleged to be the basis of Rockland's First Amendment retaliation claim, and in any event does not qualify as speech on a matter of public concern, *see White Plains Towing*, 991 F.2d at 1060 (holding that the airing of "private commercial grievances . . . [un]relate[d] to any matter of political, social, or other concern to the community" is not speech on a matter of public concern), Plaintiffs have failed to state a claim that Defendants' actions pertaining to Rockland's equipment at Shawangunk were

adverse for purposes of First Amendment retaliation.[14]

<u>b.  Termination and Non-Renewal of Rockland's Contracts</u>

Defendants do not dispute that the termination of Rockland's contract with Shawangunk, as expressed in Creen's letter dated May 11, 2007, was an adverse action for purposes of Rockland's retaliation claim.  As to the allegation that Defendants retaliated against Rockland by cancelling or refusing to renew Rockland's contracts with other DOCS facilities — namely, Eastern Correctional Facility ("Eastern"), Ulster Correctional Facility ("Ulster"), Coxsackie, Woodbourne Correctional Facility ("Woodbourne"), Otisville Correctional Facility ("Otisville"),

---

[14] The Amended Complaint also alleges that Kidder retaliated against Rockland with respect to vending machines at Coxsackie.  According to Plaintiffs, "upon the direction of defendant Kidder," Rockland was "[1] directed to remove its vending machines and then [2] disallowed from removing one machine because of a dispute concerning payment of commission."  (AC ¶ 39 (brackets in original).)  Defendants did not specifically address this allegation in their summary judgment motion, other than generally to deny Kidder's involvement in decisions relating to Rockland's contracts. (Defs.' Mem. 15-16.)  Plaintiffs restated the allegation in their opposition to the motion, though without adding any dates, other specifics, or citations to the record (Pls.' Mem. 7-8); Defendants again did not specifically respond (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Defs.' Reply Mem.") 5-6).  Plaintiffs did not mention the allegation in their Rule 56.1 statement, nor did Magistrate Judge Davison make reference to it in his R&R.  The only citation to record evidence regarding the alleged seizure of equipment at Coxsackie appears in Plaintiffs' submission replying to Defendants' objections to the R&R, in which Plaintiffs refer to a May 10, 2007 email exchange between DOCS deputy counsel George Glassanos and DOCS official Nannette Ferri.  (Pls.' Reply to Defs.' Resp. to Pls.' Obj. ("Pls.' Reply Obj.") 15.)  In that correspondence, Ferri advised Glassanos that Coxsackie staff wanted to tell Rockland that it could not take its machines on May 30 unless its commissions were fully paid, and Glassanos replied that Coxsackie staff could do so.  (Aff. of Michael Sussman in Opp'n to Mot. for Summ. J. ("Sussman Aff.") Ex. 18.)  There is no evidence in the record as to whether Coxsackie staff actually prevented Rockland from taking its vending machines on May 30, and no evidence that Kidder was involved in any decision to prevent Rockland from doing so.  The evidence is simply that "Rockland picked up all their machines on June 27, 2007."  (Schulze Aff. Ex. I (Aff. of Nannette Ferri in Opp'n to Req. for TRO ("Ferri Aff.") ¶ 9(b)).)  Thus, the disposition of Rockland's equipment at Coxsackie is not a basis to deny summary judgment on this claim.

and Fulton Correctional Facility ("Fulton")[15] (AC ¶¶ 38, 53, 57) — Defendants assert that there

is no genuine issue of material fact as to whether there was adverse action taken as to those

contracts by any of the three Defendants.  There is no allegation that either Creen or Riley was

personally involved in any action relating to those contracts, and so the issue is whether

Plaintiffs have adduced evidence from which a reasonable jury could find that Kidder was

involved in the decisions to terminate or not renew the contracts.

      In support of their motion for summary judgment, Defendants argue that "the decisions to

---

      [15] Plaintiffs allege that the non-renewal of Rockland's contract with Fulton was in retaliation not for Rockland's complaints to law enforcement personnel, but instead for Plaintiffs' filing of their original Complaint in this lawsuit.  (AC ¶ 57.)  As with the complaints to the police, Ulster County prosecutor, and Attorney General, Plaintiffs' filing of this lawsuit was not speech on a matter of public concern, because the "lawsuit sought to redress [Plaintiffs'] personal grievances" and "did not seek to advance a public purpose," *Ruotolo*, 514 F.3d at 189. The filing of a lawsuit in which a plaintiff alleges adverse acts "bear[ing] upon the circumstances and perquisites of his employment" and resulting in "adverse . . . effects that [he] suffered personally," and in which the "relief sought is also almost entirely personal to [him]," is not speech on a matter of public concern.  *Id.* at 190; *see also Kempkes v. Marvin*, No. 07-CV-11351, 2008 WL 5330673, at *8 (S.D.N.Y. Dec. 19, 2008) (holding that the filing of a retaliation complaint was not speech on a matter of public concern where "all of defendants' alleged retaliatory . . . acts . . . related to Plaintiff's employment[,] Plaintiff did not allege that anyone other than himself suffered the effects of defendants' acts[, and] Plaintiff [did not] . . . allege[] that he sought any relief in order to deter future adverse acts by defendants against others"); *cf. Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125-26 (2d Cir. 2005) (holding that the filing of a retaliation lawsuit could be speech on a matter of concern where plaintiff had claimed retaliation for her "speech about gender discrimination against a fellow employee that directly implicated the access of the courts to truthful testimony"); *Sassone v. Quartararo*, 598 F. Supp. 2d 459, 466 (S.D.N.Y. 2009) (holding that plaintiffs stated a claim that their filing of a lawsuit "involved something more than 'the airing of generally personal grievances,'" because it "s[ought] an injunction that would remove the barriers to Plaintiffs' speech as citizens on a matter of public concern . . . [and thus] plausibly raised the possibility that prospective injunctive relief could directly benefit the larger public").  Accordingly, Defendants are entitled to summary judgment as to Rockland's retaliation claim based on the non-renewal of the Fulton contract.  However, assuming *arguendo* that the filing of the original Complaint in this action was speech on a matter of public concern, the Defendants are still entitled to summary judgment on this claim for the reasons stated below.

terminate or not renew . . . the Rockland contracts . . . were made at the facility level," and that "Kidder had *no contact whatsoever* with the facilities other than Shawangunk in this regard." (Defs.' Mem. 16.)  In response, Plaintiffs assert that a jury "could disbelieve [Kidder's] claims of non-involvement" based on (1) the deposition testimony of George Glassanos that he "had several conversations with Kidder as he assisted [Nannette] Ferri and Creen [to] plan the self help at Shawangunk," and (2) the fact that "all the documents from the facilities which manifest an intent to consider termination [of Rockland's] contract[s] are addressed . . . to Ferri, Kidder's deputy and a woman he acknowledged speaking with continually about work-related matters." (Pls.' Mem. 19.)  In his R&R, Magistrate Judge Davison noted that "Plaintiffs allege . . . that Defendant Kidder was involved . . . in the termination of various contracts with Rockland," and concluded that "Plaintiffs have therefore set forth sufficient evidence . . . to create a genuine issue of material fact."  (R&R 17.)  However, as Defendants note in their objections to the R&R, on the issue of Kidder's involvement, Magistrate Judge Davison cited only to the Amended Complaint and did not explain what evidence in the record might be the basis for finding that Kidder was involved in decisions to terminate or not to renew Rockland's contracts.  (Defs.' Obj. 9.)

Defendants are correct, as there is no evidence in the record from which a reasonable jury could find that Kidder was personally involved in the decisions to terminate or not to renew Rockland's contracts with Eastern, Ulster, Coxsackie, Woodbourne, Otisville, or Fulton.  There is no evidence in the record regarding the decisions to terminate Rockland's contract with

Ulster[16] and not to renew Rockland's contract with Fulton.  The only evidence as to Woodbourne is that the Head Account Clerk, Steward, and other facility administrators jointly decided not to renew Rockland's contract in August 2007, and did so without any input from Kidder.  (Schulze Aff. Ex. W (Aff. of Deborah Fleury in Supp. of Mot. for Summ. J. ¶¶ 2-3).)  The only evidence as to Otisville is that the facility Steward decided to terminate Rockland's contract by letter of July 9, 2007, and did so without any input from Kidder.  (Schulze Aff. Ex. X (Aff. of Sandra House in Supp. of Mot. for Summ. J. ¶¶ 2-3).)  The only evidence as to Coxsackie is that a facility administrator informed Rockland, by letter of April 5, 2007, that due to Rockland's nonpayment of commissions and fees its contract would not be renewed.[17]  (Sussman Aff. Ex. 16.)  There is no evidence that Kidder, who was sent a carbon copy of the letter, was involved in this decision, and in any event the decision could not have been in retaliation for Plaintiff's complaints about the Shawangunk incident that had not yet transpired.

The only admissible evidence in the record as to Eastern is that the facility Steward, Martha Denardo, made the decision in June 2007 not to extend Rockland's contract, and did so without any input from Kidder.  (Schulze Aff. Ex. V (Aff. of Martha Denardo in Supp. of Mot. for Summ. J. ("Denardo Aff.") ¶¶ 2-3).)  Plaintiffs point to Freed's deposition testimony that "Marti" told him, "[j]ust prior to their not renewing our extension," that she "did everything

---

[16] Apparently Rockland had a single contract covering both Ulster and Eastern.  (Ferri Aff. ¶ 9(c); Freed Dep. 120.)  Assuming that the evidence as to the non-renewal of the Eastern contract (discussed below) applies equally to Ulster, this would have no impact on the instant motion.

[17] Freed stated during his deposition that he did not think Rockland's contract with Coxsackie expired, but rather that it was terminated by Coxsackie prior to its expiration.  (Freed Dep. 74-75.)

[she] could" to get Rockland's contract renewed, and in fact that "[t]hey accused [her] in Albany of being [Freed's] relative," but "[t]hey will not renew any of [Rockland's] contracts because of what is going on."  (Freed Dep. 84-85.)  As Defendants note (Defs.' Surreply to Pls.' Reply Obj. 6 n.5), this testimony is hearsay, and thus cannot help Plaintiffs create a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(e)(1) (requiring affidavits opposing summary judgment to "set out facts that would be admissible in evidence"); *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (noting that "inadmissible hearsay . . . [is] an insufficient basis for opposing a motion for summary judgment").  Moreover, Plaintiffs' assertion that this testimony supports the inference that Kidder was personally involved in the renewal or termination of Rockland's contracts is based only on speculation — Rockland's president testified that Marti did not mention Kidder's name, and that "[he] can only *guess* based on the conversation [he] had with Marti that when she was talking about Albany that Stewart Kidder is the decisions maker [sic] in Albany" (Freed Dep. 86-88 (emphasis added)) — and therefore could not be grounds for defeating summary judgment even if admissible.  *See ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 163 (2d Cir. 2008) ("Conjecture, of course, is insufficient to withstand summary judgment.").  In any event, Denardo clarified in her sworn affidavit that if she had referred to "Albany" in her conversation with Rockland's president, she would have been referring to "the State Comptroller's Office in Albany" — not Kidder's office (DOCS Support Opperations).  (Denardo Aff. ¶ 4.)  Plaintiffs did not depose Denardo, and during Kidder's deposition they did not inquire about his conversation with Denardo.  Therefore, there is no admissible evidence in the record to dispute Denardo's sworn statement that Kidder had no involvement in the termination of the contract with Eastern.

Plaintiffs' view is that Kidder made broad "claims of non-involvement" in the administration of Rockland's contracts that are inconsistent both with Glassanos's testimony that he spoke with Kidder regarding his advice to Creen about retaining the funds from the Shawangunk vending machines on May 9, 2007, and with the contract-related communications between facility administrators and Ferri, who was Kidder's subordinate.  (Pls.' Mem. 19.) According to Plaintiffs, a reasonable jury could infer from these purported inconsistencies that Kidder was not telling the truth and that he actually orchestrated the various terminations and non-renewals of Rockland's DOCS contracts.  This conjectural leap is not supported by the evidence.  First, just as there is no actual evidence that Kidder was involved in the decisions to terminate or not to renew Rockland's contracts, there is no evidence that Ferri was personally involved in the decisions, so linking Kidder to the terminations through her would be futile even if Section 1983 liability could properly be based on such a connection.[18]  Second, as Defendants point out, for a jury to conclude — in the absence of any evidence aside from its assessment of Kidder's credibility — that Kidder was personally involved in the terminations and non-renewals of Rockland's contracts, the jury would have to disbelieve not only Kidder, but also several other DOCS officials, all of whom denied Kidder's involvement in the relevant decision-making processes.  (Defs.' Reply Mem. 6.)  Against this evidence, a reasonable jury could not conclude that Kidder was involved.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (noting that a party opposing summary judgment "may not rely simply on conclusory

---

[18] The Court further notes that Plaintiffs do not argue that Kidder should be held liable for failure to supervise Ferri or any other DOCS official, but instead maintain that Kidder was personally involved in making the decisions adverse to Rockland.  If Plaintiffs' theory is that Ferri was directly involved in carrying out the retaliation, Plaintiffs could have named Ferri as a defendant in this action, but did not.

statements or on contentions that the affidavits supporting the motion are not credible").

Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' allegations that the terminations and non-renewals of Rockland's contracts were adverse actions in which Defendants were personally involved, except with respect to Shawangunk.  It is undisputed that the termination of Rockland's contract with Shawangunk was an adverse action for purpose of Rockland's First Amendment retaliation claim, as Defendants concede that Creen terminated the contract.

### 4.  Causal Connection

"To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action . . . ."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006) (internal quotation marks omitted); *see also Hoyt v. Andreucci*, 433 F.3d 320, 327 (2d Cir. 2006).  "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).  "No bright line . . . define[s] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  *Cioffi*, 444 F.3d at 168 (internal quotation marks omitted) (alteration in original).  "Even if the plaintiff demonstrates [a causal relationship], the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct."  *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251-52 (2d Cir. 2006) (internal quotation marks omitted).  "Summary judgment is

precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris*, 196 F.3d at 110.

Defendants argued that Plaintiffs had failed to adduce evidence from which a jury could find a causal relationship between Rockland's protected speech and the adverse actions against Rockland, but Magistrate Judge Davison disagreed, concluding that "Plaintiffs' proffered evidence is . . . sufficient to create a genuine issue of material fact" as to "[t]he motive behind . . . the contract terminations." (R&R 17.)

With respect to the May 11, 2007 termination of Rockland's contract with Shawangunk — the only alleged adverse action that survives summary judgment as to the first two prongs of a retaliation claim — Defendants are correct in noting that there is no direct evidence in the record supporting the conclusion that Creen decided to terminate Rockland's contract in retaliation for Rockland's complaints to law enforcement,[19] but direct evidence of retaliatory intent is not necessary to survive summary judgment. Absent any other context, the fact that Creen terminated Rockland's contract only two days after Rockland made its complaints to law enforcement officials might be sufficient circumstantial evidence of retaliatory motive.

---

[19] The Court concludes, for the same reasons discussed above, *see supra* Section II.D.3.b, that Plaintiffs have adduced sufficient evidence only as to the personal involvement of Creen in the termination of Rockland's contract with Shawangunk. The undisputed evidence is that on May 11, 2007, Creen made the decision, without any direction or encouragement from Kidder, to terminate Rockland's contract (Creen Aff. ¶¶ 5, 7), and on that date Creen and Glassanos jointly drafted a letter to Rockland stating that its contract with Shawangunk was terminated (Defs.' 56.1 ¶ 52). Plaintiffs offer only conjecture that Kidder was involved in this allegedly retaliatory act, asserting that a reasonable jury "could disbelieve [Kidder's] claims of non-involvement," but failing to provide any evidence from which a jury could find that Kidder actually was involved. (Pls.' Mem. 19.)

However, it is undisputed that on May 10, 2007, the day after Rockland made its complaints, Creen called Rockland "to ask whether Rockland would be sending an employee the following day to stock the vending machines," as it was scheduled to do in performance of the contract. (Defs.' 56.1 ¶¶ 48-49.)  It is further undisputed that the next day Rockland did not send an employee to service the vending machines and told Creen that "Rockland would not be sending its employees into the Shawangunk facility again."  (*Id.* ¶¶ 50-51.)  Thus, notwithstanding Rockland's May 9 complaints, Creen called Rockland on May 10 and again on May 11 to ask for reassurance that Rockland would perform under the contract — clearly demonstrating that she intended for the contract to continue — and terminated the contract only after receiving unambiguous confirmation that Rockland refused to perform on May 11 or "again" in the future. In light of this chain of events, it is obvious that Creen reacted to Rockland's unwillingness to perform its basic duties of serving the vending machines, and no reasonable jury could find that Rockland's May 9 complaints were a substantial motivating factor in her decision.

Plaintiffs essentially argue that, in response to Rockland's complaints, Creen intentionally provoked Rockland's repudiation of the contract.  According to Plaintiffs, following Rockland's May 9 complaints, "Creen advised [Rockland] that any driver sent [to Shawangunk] would be detained and made to disgorge [Rockland's] proceeds," knowing that Rockland "had protested the same conduct as against Gallagher" and that it would refuse to service the vending machines at Shawangunk, thereby giving Creen an excuse to terminate the contract.  (Pls.' Mem. 19.)  This explanation cannot be maintained, as it does nothing to cast doubt on the simple conclusion that Creen threatened Rockland that she would repeat her actions of May 9 for the same reasons that she previously took those actions.  Whatever motivated Creen

to retain the proceeds from the vending machines on May 9 — whether she aimed to honestly enforce Shawangunk's putative rights under its contract with Rockland, or to unfairly and improperly gain an advantage over Rockland in negotiating the parties' performance of the contract, or to punish Rockland for some reason — she plainly could not have been motivated by a desire to retaliate against Rockland for complaints to law enforcement that had not yet been made.  Plaintiffs contend that a jury could find that Creen retained proceeds from Shawangunk's vending machines on May 9 for some unknown reason, learned of Rockland's subsequent complaints about her conduct, decided to punish Rockland for making those complaints by threatening to retain proceeds from the vending machines again on May 11 because she knew the threat would cause Rockland to repudiate its contract and give her grounds to terminate it, and would *not* have made the threat had Rockland not complained.  Considering the ample evidence that Creen consistently believed that Shawangunk was entitled to retain proceeds from the vending machines, the complete lack of evidence that Creen had any retaliatory animus toward Rockland, and the implausibility of Plaintiffs' theory of Creen's motivations, a reasonable jury could not infer a causal connection merely from the close temporal proximity between Rockland's complaints and Creen's termination of the contract.

Thus, Defendants are entitled to summary judgment on all of Rockland's First Amendment retaliation claims.

### III.  Conclusion

For the reasons stated herein, Magistrate Judge Davison's R&R is adopted to the extent that it is consistent with this Opinion.  Defendants' motion for summary judgment is granted in full.  The Clerk of Court is respectfully directed to terminate the pending Motion (Dkt. No. 20), to grant judgment for Defendants, and to close this case.

SO ORDERED.

Dated:       August 4, 2009
               White Plains, New York

                                          KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE

41

Service List (By ECF):

Michael H. Sussman, Esq.
Sussman & Watkins
P.O. Box 1005
55 East Main Street
Goshen, NY  10924
sussman1 *a* frontiernet.net

Daniel A. Schulze, Esq.
Office of the Attorney General of the State of New York
120 Broadway
New York, NY  10271
dschulze@oag.state.ny.us

Copy To:

Honorable Paul E. Davison
United States Magistrate Judge